**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| CITY OF FORT LAUDERDALE POLICE AND FIREFIGHTERS' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>v.<br><br>PEGASYSTEMS INC., ALAN TREFLER, and KENNETH STILLWELL,<br><br>    Defendants. | Case No.:   1:22-cv-578<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff the City of Fort Lauderdale Police and Firefighters' Retirement System ("Plaintiff"), by and through its attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based upon, among other things, its counsel's investigation, which includes without limitation: (a) review and analysis of public filings made by the Pegasystems Inc. ("PEGA" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of press releases and other publications disseminated by Defendants and other related non-parties; (c) review of news articles, shareholder communications, conference call transcripts, and postings on PEGA's website concerning the Company's public statements; and (d) review of other publicly available information concerning PEGA and the Individual Defendants.

## NATURE OF THE ACTION

1.      This is a class action on behalf of all persons and entities that purchased PEGA common stock between May 29, 2020 and May 9, 2022, inclusive (the "Class Period"), against PEGA and certain of its officers (collectively, "Defendants") seeking to pursue remedies under the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* (the "Exchange Act").

2.      PEGA develops customer relationship management ("CRM") software.  The Company automates customer interactions across transaction-intensive enterprises and provides its products to customers in the banking, mutual funds and securities, mortgage services, card services, insurance, healthcare management, and telecommunications industries.

3.      The CRM software industry is extremely competitive.  As such, PEGA consistently warned in its SEC filings that the "market for our offerings is intensely competitive, rapidly changing, and highly fragmented" and that PEGA was subject to "significant competition" from other technology vendors.  As a result, investors should have been made aware of any material information that would affect the Company's competitive advantages and ability to grow through legitimate means.

4.      In addition, the Company assured investors that it had internally developed its products.  For example, the Company's 2019 and 2020 Annual Reports on Form 10-K each explained that PEGA's "research and development organization is responsible for product architecture, core technology development, product testing, and quality assurance."  Ironically, PEGA even warned investors that the Company faced a risk that competitors may "appropriate our intellectual property."  At the same time, the Company assured investors that it maintained a written Code of Conduct applicable "to our Board of Directors and all our employees, including our principal executive officer," which provided, among other things, an express commitment: "Never [to] use illegal or questionable means to acquire a competitor's trade secrets or other

2

confidential information, such as . . . stealing, seeking confidential information from a new employee who recently worked for a competitor, or misrepresenting your identity in hopes of obtaining confidential information."

5.      Unbeknownst to investors, however, PEGA's products and thus the revenue generated from those products were, in large part, the result of theft of trade secrets from one of its competitors.   Specifically, on May 29, 2020, PEGA was sued by one of its principal competitors, Appian Corporation ("Appian"), in Virginia circuit court, for stealing its trade secrets and violating the commonwealth's computer crime law (the "Appian Litigation").   The lawsuit alleged that PEGA retained an employee of a government contractor from 2012 to 2014 to secretly access and learn about Appian's software, and pass the information on to rival PEGA in order to improve its products and better train its sales force.   According to the lawsuit, PEGA referred internally to the contractor as a "spy" and to its undisclosed scheme as "Project Crush," with employees using bogus credentials to fool Appian into providing access.   As one PEGA employee who reviewed the materials exclaimed, "we should never lose to Appian again!"

6.      In violation of SEC reporting requirements, for nearly two full years, PEGA never publicly disclosed Appian's lawsuit in its public SEC filings.   Indeed, PEGA did not even disclose the existence of this lawsuit until it filed its 2021 Annual Report on Form 10-K on February 16, 2022—*i.e.*, just one month before a jury trial was scheduled to begin on March 21, 2022.

7.      After the close of the markets on May 9, 2022, PEGA disclosed that the Virginia circuit court jury awarded Appian ***more than $2 billion*** for PEGA's trade secret misappropriation. According to press reports, during the seven-week trial, the jury was presented with substantial evidence supporting Appian's claims, including videos, emails, and text messages, and evidence that Alan Trefler, PEGA's Founder and Chief Executive Officer ("CEO"), personally attended a

meeting with the "spy" and received Appian trade secrets supplied by the "spy."  During the trial, CEO Trefler admitted that it was "inappropriate"' for PEGA to have hired the contractor and that the PEGA employees who gained access to Appian trial software "shouldn't have done it."  The jury found that PEGA engaged in "willful and malicious" misappropriation of Appian's trade secrets.  Notably, the $2.036 billion jury award is estimated to be the largest damages award in Virginia circuit court history.

8.     The market reaction to the jury verdict was immediate and significant.  PEGA's stock price dropped from $65.93 per share on May 9, 2022, to close at $52.25 per share on May 10—a one-day decline of 21% that wiped out over $1 billion in market capitalization.  As the market continued to digest the verdict, PEGA's stock price dropped another 8% to close at $48.07 per share the following day, representing a two-day decline of 27%.

9.     Securities analysts were stunned by the disclosure and linked PEGA's sharp stock price decline to the $2 billion damages verdict and Defendants' lack of creditability.  For example, on May 10, 2022, analysts at CFRA lowered its rating on PEGA shares to "Hold" from "Buy," and reported that PEGA shares "are moving sharply lower today on the news that PEGA will pay Appian . . . over $2B in damages due to trade appropriation," which created significant "creditability issues" that "could take time to rebuild investor confidence."  Analysts also expressed concern that the lawsuit, underlying misconduct, and jury verdict would negatively impact PEGA's ability to obtain future business, including contracts with governmental authorities.

10.    As a result of Defendants' false and misleading statements and omissions, and the precipitous decline in the market value of the Company's common stock when the truth emerged,

Plaintiff and other Class members have suffered significant losses and recoverable damages under the federal securities laws.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

13.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa) because a substantial part of the acts giving rise to this complaint occurred in this District and Defendant PEGA maintains an office in this District.

14.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

15.      Plaintiff the City Fort Lauderdale Police and Firefighters' Retirement System is a public pension fund that provides retirement benefits to over 1,930 police officers and firefighters and their families.  As of September 30, 2020, Fort Lauderdale P&F managed approximately $990 million in pension assets.  As set forth in the accompanying certification, incorporated by reference herein, Plaintiff purchased PEGA common stock during the Class Period, and suffered damages as a result of the federal securities law violations and the false and/or misleading statements and/or material omissions alleged herein.

16.     Defendant PEGA is incorporated in Massachusetts, and the Company's principal executive offices are located in Cambridge, Massachusetts.  The Company also maintains an office in Sterling, Virginia, and the Appian Litigation took place in Fairfax County Circuit Court.

17.     Defendant Alan Trefler ("Trefler") has served at all relevant times as the Company's Chairman, and CEO and is also the Company's Founder.

18.     Defendant Kenneth Stillwell ("Stillwell") has served at all relevant times as the Company's Chief Financial Officer and Chief Operating Officer.

19.     Defendants Trefler and Stillwell (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of PEGA's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Further, the Individual Defendants signed reports that PEGA filed with the SEC during the Class Period, including the Company's 2019, 2020 and 2021 Annual Reports on Form 10-K, which were signed by the Individual Defendants. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations that were being made were then materially false and/or misleading.

20.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers, were "controlling persons" within the meaning of § 20(a) of the Exchange Act

and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of PEGA's business.

21.     As senior executive officers and as controlling persons of a publicly traded company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, and were traded on the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to PEGA' financial condition and performance, growth, operations, compliance with applicable laws, financial statements, business, products, markets, management, earnings, and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so the market price of PEGA's common stock would be based on truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

## SUBSTANTIVE ALLEGATIONS

22.     PEGA develops CRM software.  The Company automates customer interactions across transaction-intensive enterprises and provides its products to customers in the banking, mutual funds and securities, mortgage services, card services, insurance, healthcare management, and telecommunications industries.

23.     The CRM software industry is extremely competitive.  As such, during the Class Period, PEGA consistently warned investors in its Annual Report on Form 10-K for 2020, filed on February 17, 2021 (the "2020 Form 10-K"), and its Annual Report on Form 10-K for 2021, filed on February 16, 2022 (the "2021 Form 10-K"), that the "market for our offerings is intensely competitive, rapidly changing, and highly fragmented" and that "we encounter significant

competition" from other technology vendors.  In addition, the 2020 Form 10-K and the 2021 Form

10-K each assured investors that PEGA had internally developed its products, explaining that

PEGA's "research and development organization is responsible for product architecture, core

technology development, product testing, and quality assurance."

24.     The 2020 and 2021 Forms 10-K further stated that PEGA maintained a written

Code of Conduct applicable "to our Board of Directors and all our employees, including our

principal executive officer" which provided, among other things, an express commitment:  "***Never***

***[to] use illegal or questionable means to acquire a competitor's trade secrets or other***

***confidential information, such as . . . stealing, seeking confidential information from a new***

***employee who recently worked for a competitor, or misrepresenting your identity in hopes of***

***obtaining confidential information.***"  The 2020 and 2021 Forms 10-K directed investors to

PEGA's website for the full text of the Code of Conduct, which contained the preceding text.

25.     On May 29, 2020, Appian filed a civil complaint against PEGA and Youyong Zou

("Zou") in the Circuit Court for Fairfax County, Virginia, alleging claims for trade secret

misappropriation, violation of the Virginia Computer Crimes Act, tortious interference, and

statutory business and common law conspiracy.  The Appian complaint alleged efforts by PEGA

to obtain and use Appian trade secrets through Zou, who worked on a federal program as an

employee of Serco, Inc. and had access to Appian's software and documentation in order to work

on Serco, Inc. projects involving the federal government.  The complaint further alleged that

PEGA's own employees represented themselves as potential customers of Appian partners, rather

than PEGA employees, to improperly gain access to Appian's trial software.

26.     However, despite the obvious materiality of the lawsuit, including its allegation that

PEGA had essentially stolen Appian's trade secrets and caused it massive damages, in violation

of SEC reporting regulations, including 17 C.F.R. § 229.103(a) (Item 103) Legal Proceedings, for nearly two full years Defendants never disclosed or described the Appian Litigation in its Forms 10-Q or Forms 10-K filed during the Class Period.  Instead, the 2020 Form 10-K disclosed under the heading "Legal Proceedings" the generic and boilerplate statement that: "From time to time, we **may** be subject to legal proceedings and civil and regulatory claims that arise *in the ordinary course of our business activities*."  (Emphasis added.)   Similarly, the 2020 Form 10-K contained the generic and boilerplate warning that the Company "*may be subject to intellectual property rights claims by third parties, which are extremely costly to defend, could require us to pay significant damages and could limit our ability to use certain technologies*."  (Italics in original; bold added.)  None of the Company's preceding Quarterly Reports on Form 10-Q filed during the Class Period contained any disclosure whatsoever of the Appian Litigation.

27.     Then, in the 2021 Form 10-K, Defendants publicly disclosed and described for the first time the pendency of the Appian Litigation.  However, even then, the Company falsely reassured investors that the claims asserted in the litigation were "without merit" and it had "strong defenses to the claims," the Company faced no exposure in the litigation as "the sales Appian seeks as damages were not the result of the alleged misappropriation and use of the alleged trade secrets," and that, even if the Company was found liable, it was "unable to reasonably estimate possible damages."

28.     On April 28, 2022, the Company filed its Quarterly Report on Form 10-Q for the first quarter of 2022 (the "2022 Q1 Form 10-Q").  The 2022 Q1 Form 10-Q continued to falsely reassure investors that the claims asserted in the Appian Litigation were "without merit" and PEGA had "strong defenses to the claims," the Company faced no exposure in the litigation as "any alleged damages claimed by Appian are not supported by the necessary legal standard of

proximate cause," and, even if the Company was found liable, it was "unable to reasonably estimate possible damages."

29.     The above statements identified in ¶¶ 23 – 28 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants misrepresented and/or failed to disclose that: (1) PEGA had engaged in corporate espionage and misappropriation of trade secrets to better compete against Appian, a principal competitor; (2) Defendants' product development and associated success was, in significant part, not the result of its own research and product testing but rather the result of such corporate espionage and trade secret theft; (3) Defendants had engaged in a scheme to steal Appian trade secrets, which was not only known to, but carried out through, the personal involvement of the Company's CEO; (4) the Company's CEO and other officers and employees did not comply with the Company's written Code of Conduct, including its express prohibition on "stealing" confidential information from a competitor and "misrepresenting your identity in hopes of obtaining confidential information"; (5) the Company was "unable to reasonably estimate damages" in the Appian Litigation; and (6) as a result of the foregoing, Defendants' statements about PEGA's business, operations, prospects, legal compliance, and potential damages exposure in the Appian Litigation were materially false and/or misleading and/or lacked a reasonable basis when made.

**The Truth Is Revealed**

30.     The truth regarding PEGA's fraudulent conduct was revealed after the close of the markets on May 9, 2022, when PEGA filed a Current Report on Form 8-K revealing that the

Virginia circuit court jury had awarded Appian more than $2 billion for PEGA's trade secret misappropriation.

31.     As discussed above, Appian filed its underlying lawsuit, captioned *Appian Corp. v. Pegasystems Inc. & Youyong Zou*, in May 2020 in Virginia state court.  The case was litigated through a jury verdict.  The record and evidence presented show PEGA engaged in corporate espionage and trade secrets theft to better compete with Appian over an extensive period beginning as early as 2012 and continuing at least until Appian discovered the misappropriation and filed its lawsuit against PEGA in May 2020.

32.     Documents from the case show that PEGA hired Youyong Zou, an employee of a government contractor and former developer for Appian.  In exchange for payment, Zou provided PEGA with copies of Appian's confidential software and documentation in violation of confidentiality restrictions that barred him from sharing Appian's trade secrets.  Appian asserted a damage claim of approximately $3 billion, seeking all of PEGA's revenues less estimated direct costs from the sale of all of PEGA's products and services from the period from the fourth quarter of 2013 through the third quarter of 2021.  In support of its claim, Appian presented evidence showing that the PEGA misappropriation of Appian trade secrets resulted in Appian losing 201 customers and PEGA being unjustly enriched by $479 million between 2012 and 2020.

33.     During the seven-week jury trial, Appian presented substantial evidence that PEGA utilized Appian's trade secrets to improve the ease of use, social capabilities, and mobile capabilities of the PEGA platform.  Appian also supplied evidence showing PEGA referred to the misappropriation internally as "Project Crush," which involved PEGA paying Zou from 2012 to 2014, and that Zou was referred to as a "spy" internally at PEGA.  Appian further provided

evidence demonstrating Zou made video recordings of the Appian development environment so the PEGA could compile the competitive intelligence.

34.     Notably, when testifying under oath, Trefler, PEGA's Founder and CEO, conceded that he knew all about the blatantly improper and illegal tactics, knew that it was inappropriate for PEGA to have hired Zou, and knew that Zou had engaged in unauthorized activities.  In closing arguments, Appian's counsel referenced evidence that PEGA had engaged in "shady and arrogant" conduct by using fake identities to gain access to Appian's company information and trial versions of Appian's software.  In its press release announcing the jury verdict, Appian's general counsel stated "we are very grateful that the jury held Pegasystems accountable for its wrongful conduct . . . .  We put forward strong evidence that Appian trade secrets were misappropriated by Pegasystems.  The award of substantial damages to Appian is entirely appropriate given the nature and extent of what Pegasystems did."  Appian CEO Matt Calkins called the verdict "the right news" that was "justified and shows the length and gravity of [PEGA's] misdeeds."

35.     Tellingly, the Fairfax County Circuit Court jury found both defendants (PEGA and Zou) had misappropriated Appian's trade secrets; however, the jury awarded Appian over $2 billion in damages against PEGA and only $5,000 in damages against Zou after finding that only PEGA had engaged in willful and malicious misappropriation.

36.     The market reaction to the jury verdict was swift and significant.   PEGA's stock price dropped from $65.93 per share on May 9, 2022, to a close of $52.25 per share on May 10, 2022—a one-day decline of 21% that wiped out over $1 billion in market capitalization.  As the market continued to digest the verdict, PEGA's stock price dropped another 8% to close at $48.07 per share the following day, representing a two-day decline of 27%.

37.     Securities analysts were stunned by the disclosure and linked PEGA's sharp stock price decline to the Appian Litigation, $2 billion damages award, and Defendants' lack of creditability.  For example, on May 10, 2022, analysts at CFRA lowered their rating on PEGA shares from "Buy" to "Hold," noting that PEGA shares "are moving sharply lower today on the news that PEGA will pay Appian . . .  over $2B in damages due to trade appropriation," which created significant "creditability issues" that "could take time to rebuild investor confidence." Similarly, on May 10, 2022, Wedbush analyst Dan Ives reported that "[Wall] Street is reading this ruling as cemented rather than a very long process that could have a much different outcome possibly through appeal."

38.     Other analysts piled on with near unanimity in downgrading PEGA on the heels of the verdict.  For example, on May 11, 2022, Truist analysts downgraded the stock to hold and slashed their price target to $60 from $110 while estimating that PEGA's stock price decline wiped out about $1.15 billion in market cap or just over half of the judgment amount.  The same Truist analysts reported surprise at the size of the award and warned the verdict could have repercussions on PEGA's going-forward business by impacting the Company's average contract value growth.

## CLASS ACTION ALLEGATIONS

39.     Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class, consisting of all persons and entities that purchased PEGA common stock between May 29, 2020 and May 9, 2022, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

40.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Throughout the Class Period, PEGA's common stock actively traded on the NASDAQ (an open and efficient market) under the ticker symbol "PEGA."  Millions of PEGA shares were traded publicly during the Class Period on the NASDAQ.  As of April 19, 2022, PEGA had more than 81.8 million shares of common stock outstanding.  Record owners and other members of the Class may be identified from records maintained by PEGA or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

41.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

42.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests that conflict with those of the Class.

43.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a)   whether Defendants violated the Exchange Act by the acts and omissions alleged herein;

b)   whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period

misrepresented material facts about the business, operations, and prospects of PEGA;

c)   whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, operations, and prospects of PEGA;

d)   whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

e)   whether the market price of PEGA common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations and omissions complained of herein; and

f)   the extent to which the members of the Class have sustained damages and the proper measure of damages.

44.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

45.     The market for PEGA common stock was open, well-developed, and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or omissions particularized in this Complaint, PEGA common stock traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased PEGA common stock relying

upon the integrity of the market price of the Company's common stock and market information relating to PEGA and have been damaged thereby.

46.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of PEGA common stock, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about PEGA's business, operations, and prospects as alleged herein.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its business, thus causing the Company's common stock to be overvalued and artificially inflated or maintained at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class who purchased the Company's common stock at artificially inflated prices and were harmed when the truth was revealed.

## **LOSS CAUSATION**

47.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss, *i.e.*, damages, suffered by Plaintiff and the Class.

48.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market.  This artificially inflated the price of PEGA's common stock and operated as a fraud or deceit on the Class.  When Defendants' prior misrepresentations, information alleged to have been concealed,

16

fraudulent conduct, and/or the effect thereof were disclosed to the market, the price of PEGA's stock fell precipitously, as the prior artificial inflation came out of the price.

## SCIENTER ALLEGATIONS

49.     As alleged herein, Defendants acted with scienter in that Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws

50.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding PEGA, their control over, receipt, and/or modification of PEGA's allegedly materially misleading statements and omissions, and/or their positions with the Company, which made them privy to confidential information concerning PEGA, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

51.     The market for PEGA common stock was open, well-developed, and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose particularized in this Complaint, PEGA common stock traded at artificially inflated and/or maintained prices during the Class Period.  Plaintiff and other members of the Class purchased the Company's common stock relying upon the integrity of the market price of PEGA common stock and market information relating to PEGA and have been damaged thereby.

52.     At all relevant times, the market for PEGA common stock was an efficient market for the following reasons, among others:

17

a)  PEGA was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b)  As a regulated issuer, PEGA filed periodic public reports with the SEC and/or the NASDAQ;

c)  PEGA regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

d)  PEGA was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

53.     As a result of the foregoing, the market for PEGA common stock promptly digested current information regarding PEGA from all publicly available sources and reflected such information in the price of PEGA's common stock.  Under these circumstances, all purchasers of PEGA common stock during the Class Period suffered similar injury through their purchase of PEGA common stock at artificially inflated prices and a presumption of reliance applies.

54.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business, operations, and prospects—information that

Defendants were obligated to disclose during the Class Period but did not—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

<b><u>INAPPLICABILITY OF STATUTORY SAFE HARBOR</u></b>

55.     The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

56.     In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of PEGA who knew that the statement was false when made.

<b><u>FIRST CLAIM</u></b><br>
<b>Violation of Section 10(b) of the Exchange Act and<br>
Rule 10b-5 Promulgated Thereunder<br>
<u>Against All Defendants</u></b>

57.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

19

58.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of PEGA common stock; and (iii) cause Plaintiff and other members of the Class to purchase PEGA common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each defendant, took the actions set forth herein.

59.     Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for PEGA common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below

60.     Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about PEGA's business, operations, and prospects, as specified herein.  Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of PEGA's business, operations, and prospects, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary

in order to make the statements made about PEGA and its business, operations, and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

61.     Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period and a member of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's business, operations, and prospects; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public, which they knew and/or recklessly disregarded was materially false and misleading.

62.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing PEGA's operating condition, business practices, and prospects from the investing public and supporting the artificially inflated and/or maintained price

of its common stock.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

63.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of PEGA common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class purchased PEGA common stock during the Class Period at artificially high prices and were damaged thereby.

64.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that PEGA was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased their PEGA common stock, or if they had purchased such common stock during the Class Period, they would not have done so at the artificially inflated prices that they paid.

65.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

66.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

67.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

68.     The Individual Defendants acted as controlling persons of PEGA within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions in the Company, participation in, and/or awareness of the Company's operations and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.  Each of the Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.  Further, the Individual Defendants signed the Company's 2020 and 2021 Annual Reports on Form 10-K.

69.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

70.     As set forth above, PEGA and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a.     Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b.      Awarding Plaintiff and the other members of the Class damages in an amount that may be proven at trial, together with interest thereon;

c.     Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

d.     Awarding such other relief as this Court deems appropriate.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: May 19, 2022                     Respectfully submitted,

By: */s/ Walter D. Kelley, Jr.*

Walter D. Kelley, Jr. (VA Bar No. 21622)
Tara Zurawski (VA Bar No. 73602)
**HAUSFELD LLP**
888 16th Street N.W., Suite 300
Washington, DC 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201

wkelley@hausfeld.com
tzurawski@hausfeld.com

Robert D. Klausner
**KLAUSNER KAUFMAN JENSEN &
LEVINSON**
7080 NW 4th Street
Plantation, FL  33317
Telephone: (954) 916-1202
Facsimile: (954) 916-1232
bob@robertdklausner.com

Maya Saxena
Joseph E. White, III
Lester R. Hooker
**SAXENA WHITE P.A.**
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Telephone: (561) 394-3399
Facsimile: (561) 394-3382
msaxena@saxenawhite.com
jwhite@saxenawhite.com
lhooker@saxenawhite.com

Steven B. Singer
Rachel A. Avan
**SAXENA WHITE P.A.**
10 Bank Street, 8th Floor
White Plains, NY 10606
Telephone: (914) 437-8551
Facsimile: (888) 631-3611
ssinger@saxenawhite.com
ravan@saxenawhite.com

*Counsel for Plaintiff City of Fort Lauderdale Police
and Firefighters' Retirement System*

## CERTIFICATION AND AUTHORIZATION

I, Lynn Wenguer, on behalf of the City of Fort Lauderdale Police & Firefighters' Retirement System ("Ft. Lauderdale P&F"), hereby certify, as to the claims asserted under the federal securities laws, that:

1.  I have reviewed a complaint ("Complaint") prepared against Pegasystems Inc. ("Pegasystems") alleging violations of the federal securities laws, and authorized its filing. I am authorized in my capacity as Plan Administrator of Ft. Lauderdale P&F to initiate litigation and to execute this Certification on behalf of Ft. Lauderdale P&F.

2.  Ft. Lauderdale P&F did not purchase the securities that are the subject of this action at the direction of counsel, or in order to participate in any action arising under the federal securities laws.

3.  Ft. Lauderdale P&F is willing to serve as a lead plaintiff and representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4.  Ft. Lauderdale P&F's transactions in Pegasystems securities during the Class Period are set forth in the attached Schedule A.

5.  Ft. Lauderdale P&F has sought to serve and was appointed as lead plaintiff and/or representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

    *In re Emergent BioSolutions Inc. Sec. Litig.*, No. 8:21-cv-00955 (D. Md.)

6.  Ft. Lauderdale P&F has sought to serve as a lead plaintiff or representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for lead plaintiff, was not appointed lead plaintiff, or the lead plaintiff decision is still pending:

    *Roberts v. Zuora, Inc.*, No. 3:19-cv-03422 (N.D. Cal.)

    *Chauhan v. Intercept Pharm. Inc.*, No. 1:21-cv-00036 (S.D.N.Y.)

    *Hartel v. SelectQuote, Inc.*, No. 1:21-cv-06903 (S.D.N.Y.)

7.  Ft. Lauderdale P&F will not accept any payment for serving as a representative party on behalf of the Class beyond Ft. Lauderdale P&F's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 19 day of May, 2022.

*City of Fort Lauderdale Police &
Firefighters' Retirement System*

Lynn Wenguer, Plan Administrator

**SCHEDULE A**
**Fort Lauderdale Police and Firefighters' Retirement System**
**Transactions in Pegasystems Inc.**

| Common Stock Purchases | | | Common Stock Sales | | |
|---|---|---|---|---|---|
| **Date** | **Shares** | **Price** | **Date** | **Shares** | **Price** |
| 06/26/20 | 441 | $95.96 | 01/15/21 | 705 | $133.89 |
| 06/26/20 | 616 | $96.22 | 03/23/22 | 150 | $80.35 |
| 06/26/20 | 886 | $97.67 | 04/25/22 | 311 | $71.68 |
| 06/26/20 | 364 | $97.94 | | | |
| 06/26/20 | 456 | $97.97 | | | |
| 09/28/21 | 26 | $130.38 | | | |
| 12/21/21 | 256 | $105.34 | | | |