**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| CITY OF FORT LAUDERDALE POLICE AND FIREFIGHTERS' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | Case No.:  1:22-cv-11220-WGY |
| Plaintiff, | ) ) | |
| v. | ) ) | **ORAL ARGUMENT REQUESTED** |
| PEGASYSTEMS INC., ALAN TREFLER, and KENNETH STILLWELL, | ) ) ) | Leave to File Excess Pages Granted On December 6, 2022 |
| Defendants, | ) ) | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

     A.    Pega, the Market for "Low-Code," and Competitive Intelligence Efforts ............ 2

     B.    The Virginia Litigation ................................................................................ 4

     C.    Pega's Disclosure of the Virginia Litigation ............................................. 5

ARGUMENT ...................................................................................................................... 6

I.    The Complaint Fails to Allege That Pega's Financial Statements and SEC Reports
Failed to Disclose Material Information About the Virginia Litigation ........................... 6

     A.    Plaintiffs Do Not Allege An Actionable Omission Based on GAAP .................... 6

     B.    Plaintiffs Do Not Allege An Actionable Omission Under Item 103 ..................... 8

II.    The Complaint Fails Otherwise to Allege an Actionable Misstatement .......................... 11

     A.    Pega's Disclosures Concerning Litigation Risk Were Not Materially
Misleading (CAC ¶¶ 136, 139, 142) ................................................................ 11

     B.    Pega's Disclosures Concerning the Virginia Litigation Were Not Materially
Misleading (CAC ¶¶ 145–47) .......................................................................... 12

     C.    Statements Concerning the BPM Industry and Pega's Marketing Efforts
Were Not Materially Misleading or Otherwise Actionable (CAC ¶¶ 121–22,
124–25, 127, 129–30, 132) ............................................................................... 14

     D.    General Statements Concerning Pega's "Competitiveness" and "Credibility"
Are Inactionable Puffery (CAC ¶¶ 122–25, 129) ............................................ 17

     E.    Pega's Code of Conduct Is Immaterial and Not Misleading (CAC ¶¶ 151–57)... 18

III.    The Complaint Fails to Raise the Required "Strong" Inference of Scienter ..................... 19

     A.    Plaintiffs Allege No Facts Showing That Either Individual Defendant Knew,
or Was Reckless In Not Knowing, That A Statement Was False When Made .... 19

         1.    Mr. Stillwell ...................................................................................... 19

         2.    Mr. Trefler .......................................................................................... 21

     B.    Plaintiffs' Motive Allegations Do Not Support a Strong Inference of Scienter ... 26

     C.    The Remaining Allegations of Scienter Are Insufficient .................................... 27

         1.    Plaintiffs Have Not Alleged "Corporate Scienter" ................................. 27

         2.    GAAP Violations, Standing Alone, Are Insufficient to Establish
Scienter ............................................................................................... 28

IV.    The Complaint Fails to Allege Loss Causation ................................................... 28

CONCLUSION.................................................................................................................. 30

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*In re Allaire Corp. Sec. Litig.*,
224 F. Supp. 2d 319 (D. Mass. 2002) ...................................................................................29

*Angelos v. Tokai Pharms., Inc.*,
494 F. Supp. 3d 39 (D. Mass. 2020) ....................................................................................27

*Axar Master Fund, Ltd. v. Bedford*,
308 F. Supp. 3d 743 (S.D.N.Y. 2018)...................................................................................13

*Backman v. Polaroid Corp.*,
910 F.2d 10 (1st Cir. 1990)............................................................................................15, 16

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)...............................................................................................................9

*In re Biogen Inc. Sec. Litig.*,
857 F.3d 34 (1st Cir. 2017)...................................................................................................30

*Brennan v. Zafgen, Inc.*,
853 F.3d 606 (1st Cir. 2017)......................................................................................19, 20, 26

*Cheng v. Activision Blizzard, Inc.*,
2022 WL 2101919 (C.D. Cal. Apr. 18, 2022) ..................................................................11, 18

*City of Mia. Fire Fighters' and Police Officers' Ret. Tr. v. CVS Health Corp.*,
46 F.4th 22 (1st Cir. 2022)....................................................................................................11

*City of Phila. v. Fleming Cos.*,
264 F.3d 1245 (10th Cir. 2001) ...........................................................................10, 20, 22, 26

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*,
129 F. Supp. 3d 48 (S.D.N.Y. 2015)......................................................................................11

*Cody v. Conformis, Inc.*,
199 F. Supp. 3d 409 (D. Mass. 2016) ...............................................................................13, 28

*Corban v. Sarepta Therapeutics, Inc.*,
2015 WL 1505693 (D. Mass. Mar. 31, 2015)........................................................8, 13, 16, 17

*Coyne v. Metabolix, Inc.*,
943 F. Supp. 2d 259 (D. Mass. 2013) ...................................................................................29

*Crowell v. Ionics, Inc.*,
343 F. Supp. 2d 1 (D. Mass. 2004) ...................................................................................28, 29

*In re Cytyc Corp.*,
    2005 WL 3801468 (D. Mass. Mar. 2, 2005)................................................................17

*Day v. Staples, Inc.*,
    555 F.3d 42 (1st Cir. 2009)......................................................................................28

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)................................................................................................29

*ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)....................................................................................17

*Ferris v. Wynn Resorts, Ltd.*,
    462 F. Supp. 3d 1101 (D. Nev. 2020).....................................................................18

*Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*,
    778 F.3d 228 (1st Cir. 2015)....................................................................................21

*Foley v. Transocean Ltd.*,
    861 F. Supp. 2d 197 (S.D.N.Y. 2012)...............................................................20, 26

*Fort Worth Emp'rs Ret. Fund v. Biovail Corp.*,
    615 F. Supp. 2d 218 (S.D.N.Y. 2009)....................................................................30

*In re Fuwei Films Sec. Litig.*,
    634 F. Supp. 2d 419 (S.D.N.Y. 2009)....................................................................10

*Greebel v. FTP Software, Inc.*,
    194 F.3d 185 (1st Cir. 1999)....................................................................................26

*Greenberg v. Sunrun Inc.*,
    233 F. Supp. 3d 764 (N.D. Cal. 2017) ...................................................................10

*Greenstone v. Cambex Corp.*,
    777 F. Supp. 88 (D. Mass. 1991) ...........................................................................15

*Grobler v. Neovasc Inc.*,
    2016 WL 6897760 (D. Mass. Nov. 22, 2016) .......................................................14

*Guerra v. Teradyne Inc.*,
    2004 WL 1467065 (D. Mass. Jan. 16, 2004)..............................................16, 17, 27

*Hall v. Johnson & Johnson*,
    2019 WL 7207491 (D.N.J. Dec. 27, 2019)............................................................13

*Hill v. Gozani*,
    638 F.3d 40 (1st Cir. 2011)......................................................................................15

*Hunt v. Bloom Energy Corp.*,
   2021 WL 4461171 (N.D. Cal. Sept. 29, 2021) ..........................................................7, 8, 9, 11

*Inter-Local Pension Fund GCC/IBT v. Gen. Elec. Co.*,
   445 F. App'x 368 (2d Cir. 2011) ...........................................................................................6

*Isham v. Perini Corp.*,
   665 F. Supp. 2d 28 (D. Mass. 2009) .....................................................................................28

*Kader v. Sarepta Therapeutics, Inc.*,
   887 F.3d 48 (1st Cir. 2018) ............................................................................................19, 21

*Lachman v. Revlon, Inc.*,
   487 F. Supp. 3d 111 (E.D.N.Y. 2020) ..................................................................................11

*Lenartz v. Am. Superconductor Corp.*,
   879 F. Supp. 2d 167 (D. Mass. 2012) ...................................................................................27

*Lentell v. Merrill Lynch & Co., Inc.*,
   396 F.3d 161 (2d Cir. 2005)...................................................................................................30

*In re Lions Gate Ent. Corp. Sec. Litig.*,
   165 F. Supp. 3d 1 (S.D.N.Y. 2016) .................................................................................10, 11

*Lirette v. Shiva Corp.*,
   27 F. Supp. 2d 268 (D. Mass. 1998) ...............................................................................20, 21

*Mass. Ret. Sys. v. CVS Caremark Corp.*,
   716 F.3d 229 (1st Cir. 2013).................................................................................................29

*Mehta v. Ocular Therapeutix, Inc.*,
   955 F.3d 194 (1st Cir. 2020).................................................................................................19

*Metzler Asset Mgmt. GmbH v. Kingsley*,
   305 F. Supp. 3d 181 (D. Mass. 2018) ...................................................................................7

*MHI Shipbuilding, LLC v. Nat'l Fire Ins. Co. of Hartford*,
   286 B.R. 16 (D. Mass. 2002) ................................................................................................24

*N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*,
   537 F.3d 35 (1st Cir. 2008).....................................................................................................28

*In re Omnicare, Inc. Sec. Litig.*,
   769 F.3d 455 (6th Cir. 2014) ................................................................................................26

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015)........................................................................................................ *passim*

iv

*Orton v. Parametric Tech. Corp.*,
   344 F. Supp. 2d 290 (D. Mass. 2004) ...............................................................17, 18

*Pegasystems Inc. v. Appian Corp.*,
   2022 WL 4630231 (D. Mass. Sept. 30, 2022) ............................................................4

*Pegasystems Inc. v. Appian Corp.*,
   463 F. Supp. 3d 152 (D. Mass. 2020) ........................................................................4

*In re Peritus Software Servs., Inc. Sec. Litig.*,
   52 F. Supp. 2d 211 (D. Mass. 1999) ........................................................................21

*Ponsa-Rabell v. Santander Sec. LLC*,
   35 F.4th 26 (1st Cir. 2022)...............................................................................12, 15

*Ratner v. Ovascience, Inc.*,
   134 F. Supp. 3d 621 (D. Mass. 2015) ......................................................................14

*Fresno Cty. Emps.' Ret. Ass'n v. Alphatec Holdings, Inc.*,
   607 F. App'x. 694 (9th Cir. 2015) ...........................................................................17

*Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*,
   845 F.3d 1268 (9th Cir. 2017) .................................................................................18

*Rosenbaum Cap. LLC v. Bos. Commc'ns Grp., Inc.*,
   445 F. Supp. 2d 170 (D. Mass. 2006) .................................................................14, 27

*Salim v. Mobile Telesystems PJSC*,
   2021 WL 796088 (E.D.N.Y. Mar. 1, 2021)............................................7, 8, 11, 18

*In re Sanofi Sec. Litig.*,
   155 F. Supp. 3d 386 (S.D.N.Y. 2016).......................................................................17

*Shaw v. Digit. Equip. Corp.*,
   82 F. 3d 1194 (1st Cir. 1996)...................................................................................17

*Singh v. Cigna Corp.*,
   918 F.3d 57 (2d Cir. 2019)........................................................................................18

*Sousa v. Sonus Networks, Inc.*,
   261 F. Supp. 3d 112 (D. Mass. 2017) ..................................................................26, 27

*In re Stone & Webster, Inc. Sec. Litig.*,
   253 F. Supp. 2d 102 (D. Mass. 2003) .........................................................................2

*In re Stone & Webster, Inc. Sec. Litig.*,
   414 F.3d 187 (1st Cir. 2005)....................................................................................21

v

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)..................................................................................2, 19, 26

*Tharp v. Acacia Commc'ns, Inc.*,
    321 F. Supp. 3d 206 (D. Mass. 2018) ...............................................................19, 20

*Thor Power Tool Co. v. Comm'r of Internal Revenue*,
    439 U.S. 522 (1979)............................................................................................7

*Thrower v. UniversalPegasus, Int'l Inc.*,
    484 F. Supp. 3d 473 (S.D. Tex. 2020) .................................................................4

*Urman v. Novelos Therapeutics, Inc.*,
    796 F. Supp. 2d 277 (D. Mass. 2011) ................................................................29

*Watterson v. Page*,
    987 F.2d 1 (1st Cir. 1993)...................................................................................24

*Winters v. Stemberg*,
    529 F. Supp. 2d 237 (D. Mass. 2008) .................................................................30

*Wright v. Medtronic, Inc.*,
    2010 WL 1027808 (D. Minn. Mar. 17, 2010) .....................................................9

**Other Authorities**

17 C.F.R. § 229.103 .........................................................................................9, 10, 11

Financial Accounting Standards Board Accounting Standards Codification
    Topic 450 ....................................................................................................... *passim*

**INTRODUCTION**

Pegasystems Inc. ("Pega" or the "Company") is a software company that has operated in the highly competitive business process management ("BPM") market since the 1980s. Competition in this market is fierce, and intellectual property disputes unsurprisingly are common. In May 2020, one of Pega's smaller competitors, Appian Corporation ("Appian"), sued Pega for trade secret misappropriation in Virginia state court. As trial neared, Appian amended its complaint on February 11, 2022 to claim damages of $3 billion—a more than 30-fold increase from its original claim. Pega promptly and timely disclosed the pending litigation in its annual report filed on February 16, 2022 per SEC Regulation S-K, Item 103 ("Item 103") and GAAP.

In May 2022, a Virginia jury found in favor of Appian and awarded $2 billion in damages. This result and the outsized verdict were unforeseen by Pega, and Plaintiffs do not and cannot sufficiently allege otherwise. Indeed, Pega has consistently maintained that Appian's claims have no merit and are subject to meritorious defenses, and that the damages award was the result of various trial court errors that Pega is appealing. Plaintiffs have seized on this unexpected verdict to argue that Pega should have disclosed this litigation earlier than it did, that Pega's disclosures of the litigation were inadequate, and that certain statements in Pega's Code of Conduct and other largely generic statements about competition and Pega's sales efforts were misleading in light of the verdict. This is classic, impermissible fraud-by-hindsight and ignores that there is no identifiable motive for the alleged "fraud," particularly where the Appian litigation was public and tried in open court; no business opportunity is alleged to have been gained by "concealment" of Appian's claims; and Pega's CEO, who owns 49% of Pega, sold no shares during the class period and suffered significant losses. Plaintiffs must plead more to survive a motion to dismiss, and the case should be dismissed.

1

## BACKGROUND[1]

### A.      Pega, the Market for "Low-Code," and Competitive Intelligence Efforts

Pega develops and licenses a "low-code" software application development platform for the BPM market.  CAC ¶¶ 33–34.  Defendant Alan Trefler founded Pega in 1983 and has served as its CEO and Chairman of the Board for most of the time since.  *Id.* ¶ 31.  Mr. Trefler owns 49% of Pega's outstanding common shares (*id.*), sold no shares during the class period, and is aligned in interest with Pega's remaining shareholders.  Defendant Kenneth Stillwell (together with Mr. Trefler, the "Individual Defendants") joined Pega in 2016 and is Pega's CFO and COO.  *Id.* ¶ 32.

Pega's "low-code" platform allows businesses to build custom applications without code. *Id.* ¶ 33.  Pega's clients, which include government agencies and companies in the financial and life sciences industries, use the platform to streamline business processes, such as those related to regulatory compliance or customer service.  Ex. 2 (2019 Form 10-K) at 8 (cited at CAC ¶ 136).

The BPM market also includes Microsoft, IBM, Appian, and others.  CAC ¶¶ 33, 35; Ex. 2 (2019 Form 10-K) at 8, 13.  As in all industries, "[c]ompetitive intelligence is very common across organizations."  Ex. 13 (5/18/22 Needham Tech. & Media Conf.) at 2 (cited at CAC ¶ 118).

### 1.      *Competitive Intelligence Efforts 2012–2014*

Consistent with industry practice, John Petronio, a former Director of Product Marketing at Pega, engaged a staffing firm, Kforce Inc. ("Kforce") in February 2012 to find a developer with experience in Appian's platform.  CAC ¶¶ 41–42, 61–62.  Kforce found and hired Youyong Zou, an individual with access to Appian's platform through his work for a government contractor, and

---

[1] Except as expressly noted, the allegations summarized below are drawn from the Complaint and referenced documents.  Defendants accept these allegations as true only on the motion to dismiss.  The Court may consider documents incorporated by reference in the Complaint and SEC filings on a motion to dismiss.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *In re Stone & Webster, Inc. Sec. Litig.*, 253 F. Supp. 2d 102, 128 n.11 (D. Mass. 2003).  All referenced exhibits ("Ex.") are attached to the Declaration of Daniel W. Halston, filed contemporaneously.  All case citations omit internal quotations, citations, or alterations.

introduced him to Pega.  *Id.*

From February 2012 to September 2014, Mr. Zou, working as a consultant for Pega, provided certain Pega employees with information about Appian's platform, including videos of himself operating Appian's platform.  *Id.* ¶¶ 43, 46.  On January 29, 2013, Mr. Zou met with a group that allegedly included Mr. Trefler and demonstrated Appian's platform.  *Id.* ¶ 62.  Mr. Trefler allegedly was invited in 2014 to recurring project management meetings, during which information obtained from Mr. Zou may have been discussed.  *Id.* ¶ 65.  Plaintiffs do not allege that Mr. Trefler ever attended these meetings.  *Id.*

Information obtained from Mr. Zou allegedly informed Pega's marketing materials, improvements to Pega's platform, and strategy.  *Id.* ¶¶ 45–52.  Plaintiffs allege that Mr. Trefler once requested a "prop" competitive brief for a prospective customer and that he once received a slide deck with "screenshots of Appian's platform," both of which contained information from Mr. Zou.  *Id.* ¶ 57.  Plaintiffs do not seriously allege that Mr. Trefler or Mr. Stillwell knew that Mr. Zou's conduct was unlawful.  *Id.* ¶¶ 52–66.

### 2.    *Competitive Intelligence Efforts 2019*

In 2019, certain Pega employees gathered additional competitive intelligence on Appian. *Id.* ¶ 67; Ex. 19 (PLT 648) (cited at CAC ¶ 67).  This work included drafting a "competitive intelligence" brief with "deeper dive technical details" about Appian's platform, which Mr. Trefler allegedly requested and discussed with Ben Baril, a Director in Pega's Office of the Chief Technology Officer ("CTO").  CAC ¶¶ 64, 69–70, 76, 78.  Beginning around the same time, a handful of Pega's 4,650 employees—but not Mr. Trefler or Mr. Stillwell—allegedly accessed Appian's free trial software using aliases.  *Id.* ¶¶ 82–89, 91–95; Ex. 1 (2018 Form 10-K) at 10. Mr. Trefler was allegedly told that Appian "tightly control[s]" access to its free trial, but Plaintiffs do not allege that he instructed anyone to access Appian's free trial or ever did so himself, let alone

3

that he told employees to use aliases when doing so. *Id.* ¶¶ 9, 39, 75, 217–19. Mr. Trefler also allegedly received an email stating that Peter Bessman, a Pega Solutions Engineer, had posted videos containing information from Appian's free trial on an internal Pega page. *Id.* ¶¶ 85–86. Plaintiffs do not allege that Mr. Trefler viewed the videos or knew their contents. *Id.* They also do not allege that Mr. Stillwell had contemporaneous knowledge of, or participated in, any of the foregoing competitive intelligence efforts. *Id.* ¶¶ 82–85, 88–95.

Plaintiffs also allege that Mr. Trefler used a personal email address to sign up for a public webinar about Appian in 2015.[2] CAC ¶ 203; Ex. 18 (PLT 766) (cited at CAC ¶ 203). Plaintiffs do not allege that Mr. Trefler attended the webinar or that the webinar divulged "trade secrets."

## B.    The Virginia Litigation

On May 29, 2020, while other litigation between the companies was pending in this District, Appian sued Pega in state court in Virginia for misappropriation of trade secrets under the Virginia Uniform Trade Secrets Act ("VUTSA") and violations of the Virginia Computer Crimes Act ("VCCA") ("Virginia Litigation"). *Id.* ¶¶ 11, 18.[3] The VUTSA claim was premised on Mr. Zou's conduct; the VCCA claim was premised on Pega employees accessing Appian's free

---

[2] They also allege that he attempted to register for an Appian forum with a different email address, using a different name. CAC ¶ 203; Ex. 17 (PLT 768) (cited at CAC ¶ 203). As the Court may be aware, having multiple email addresses is a common practice. *See Thrower v. UniversalPegasus, Int'l Inc.*, 484 F. Supp. 3d 473, 490 (S.D. Tex. 2020) (noting that "it is not uncommon for people to create a new email account every couple of years" and that some "folks have multiple e-mail accounts (e.g., work, personal, school) with which they must stay current").

[3] The parties have also been involved in other litigation. In 2015, Pega observed that Appian was hiring current and former Pega employees to obtain Pega's non-public information and sued Appian and an Appian employee who had worked at Pega and who had taken non-public Pega information and accessed it while working for Appian. *See* Ex. 24 (*Maxwell* Stip. of Dismissal) at 1. The court issued a preliminary injunction barring the employee from working for Appian for a time and ordering the return of Pega's confidential information, and the case later settled. *See id.* at 1–3. In 2019, Pega brought unfair competition and false advertising claims against Appian after Appian secretly paid a third-party to publish a "report" containing manipulated data about Pega's product ("D. Mass. Litigation"); the case was dismissed by stipulation after the court granted partial summary judgment to both parties. Ex. 25 (Compl.) ¶¶ 18–31; Ex. 27 (Stip. of Dismissal) at 1; *Pegasystems Inc. v. Appian Corp.*, 2022 WL 4630231, at *13 (D. Mass. Sept. 30, 2022); *Pegasystems Inc. v. Appian Corp.*, 463 F. Supp. 3d 152, 160–61 (D. Mass. 2020). Pega has viewed the Virginia Litigation and the D. Mass. Litigation as related and sought to settle them together. *See* Ex. 26 (Pega Mot. to Cont. Mediation) at 1 (seeking to "explore resolution on a global basis").

4

trial. *Id.*  In its initial and first amended complaints filed on May 29, 2020, and November 4, 2021, Appian demanded $90 million in damages.[4]  On February 11, 2022, Appian amended its complaint a second time and increased its damages claim to $3 billion.  Ex. 16 (Second Am. Compl.) ¶ 89.  As noted below, Pega promptly disclosed the amended complaint and its damages demand.

On May 9, 2022, the jury awarded Appian $2,036,860,045 in damages on the VUTSA claim and nominal damages of $1 on the VCCA claim.  CAC ¶ 117.  Pega moved to set aside the verdict and for a new trial on the grounds that the jury was improperly instructed as to causation and damages under VUTSA, among others.[5]  Ex. 23 (Pega Mot. to Set Aside Verdict) at 2–8.  On September 15, 2022, the court denied this motion and entered judgment for Appian.  Ex. 9 (9/16/22 Form 8-K) at 3 (cited at CAC ¶ 247); *see* CAC ¶ 119.  Pega filed a notice of appeal, and the appeal is pending.  Ex. 9 (9/16/22 Form 8-K) at 3.

Plaintiffs have not pled any facts suggesting that Defendants, or any Pega employee, believed that the Virginia Litigation had merit or that an adverse outcome was probable.

### C.    Pega's Disclosure of the Virginia Litigation

On February 16, 2022, just days after Appian increased its claimed damages more than 30-fold from $90 million to $3 billion, Pega disclosed the Virginia Litigation in its 2021 Form 10-K per Item 103 and provided detail on Appian's claims and the relief sought, including:

> The complaint … alleges that Mr. Zou was an employee of an Appian business partner … ; that, as a result, Mr. Zou had access to Appian trade secrets which [he] was required to keep confidential; and that in approximately 2013 … the Company engaged Mr. Zou through an intermediary to provide [it] with Appian trade secrets and confidential information, which the Company is then claimed to have used to compete against Appian …. Appian filed an amended complaint … alleging that, in the 2019 time frame, employees of the Company accessed free Appian product

---

[4] Ex. 14 (Virginia Compl.) at 1 (cited at CAC ¶ 175–78); Ex. 15 (Virginia First Am. Compl.) ¶ 85.

[5] As Pega has explained, the Virginia court impermissibly shifted the burden to Pega to disprove causation and damages for Appian's VUTSA claim, which was the claim on which the damages award was based, rather than requiring Appian to prove that Pega's alleged misconduct was the proximate cause of its damages. Ex. 8 (Pega 4/28/22 Form 10-Q) at 27 (cited at CAC ¶ 115).  This legal standard had not previously been adopted by the Virginia courts. *See* Ex. 23 at 2–8 (Pega Mot. to Set Aside the Verdict); Ex. 8 (Pega 4/28/22 Form 10-Q) at 27.

trials under false pretenses.

Ex. 6 (2021 Form 10-K) at 23 (cited at CAC ¶ 145); *see* CAC ¶ 114.  The disclosure also expressed Pega's view that the claims were "without merit," that Pega had "strong defenses," and that Pega believed that Appian would be unable to prove damages.  Ex. 6 (2021 Form 10-K) at 23.  Pega similarly disclosed the litigation in the notes to its financial statements, noting "[t]he Company is unable to reasonably estimate possible damages or a range of possible damages … due to the uncertainty as to how a jury may rule" and "it is at least reasonably possible that our estimates will change in the near term and the effect may be material."  *Id.* at 63.  Appian disclosed the Virginia Litigation the next day.  Ex. 10 (Appian 2021 Form 10-K) at 44–45.

Pega then disclosed recent rulings in the Virginia Litigation on April 28 and the jury verdict on May 9, 2022.  CAC ¶¶ 146, 244.  On September 16, 2022, Pega disclosed that the Virginia court had entered judgment for Appian and denied Pega's motion for a new trial.  *Id.* ¶ 119.

## ARGUMENT

### I.  The Complaint Fails to Allege That Pega's Financial Statements and SEC Reports Failed to Disclose Material Information About the Virginia Litigation

The gravamen of Plaintiffs' claims is Pega's alleged failure to disclose the Virginia Litigation before February 16, 2022, either as a loss contingency under ASC 450[6] or as material pending litigation under Item 103, thereby rendering Pega's financial statements materially misleading.  CAC ¶¶ 162–96.  These claims fail because Plaintiffs have not plausibly alleged that Pega's financial statements and SEC reports contained actionable omissions.

### A.  Plaintiffs Do Not Allege An Actionable Omission Based on GAAP

Plaintiffs' claim that Pega's financial statements were materially misleading because Pega did not disclose the Virginia Litigation as a loss contingency pursuant to GAAP before February

---

[6] Financial Accounting Standards Board Accounting Standards Codification Topic 450 ("ASC 450").

6

2022 fails. Accounting judgments by management are statements of opinion, and Plaintiffs have not plausibly alleged an actionable opinion. *Id.* ¶ 162(b); *see Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 185–91 (2015).

ASC 450 requires organizations to accrue a loss estimate for any "probable" and reasonably estimable loss contingency. ASC 450-20-25-2. It also requires the disclosure of a loss contingency, even if accrual is not required, if there is "a reasonable possibility" of loss. ASC 450-20-50-3.[7] When considering whether ASC 450 requires disclosure of litigation, organizations must consider: (1) the period in which the events underlying the litigation occurred; (2) the "probability of an unfavorable outcome"; and (3) "[t]he ability to make a reasonable estimate of the amount of loss." ASC 450-20-55-10.

Courts have long recognized that GAAP principles such as in ASC 450 "tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to management." *Thor Power Tool Co. v. Comm'r of Internal Revenue*, 439 U.S. 522, 544 (1979). As a result, courts treat statements about loss contingencies as opinions and apply *Omnicare*. *See*, *e.g.*, *Omnicare*, 575 U.S. at 186; *Hunt v. Bloom Energy Corp.*, 2021 WL 4461171, at *5 (N.D. Cal. Sept. 29, 2021) ("Because [ASC 450] require[s] the exercise of judgment, [the company's] statements about its contingent liabilities are opinion statements, and the *Omnicare* framework applies."); *Salim v. Mobile Telesystems PJSC*, 2021 WL 796088, at *8–9 (E.D.N.Y. Mar. 1, 2021) (statements concerning potential liability are "necessarily" statements of opinion subject to *Omnicare* until company can reasonably estimate potential losses).

For statements of opinion to be actionable, Plaintiffs must allege that (1) defendants' opinions were "objectively and subjectively false," or (2) material facts were omitted concerning

---

[7] A loss is "reasonably possible" if the chance of it happening is "more than remote but less than likely." ASC 450-20-20. The possibility of loss is "remote" if the chance of it happening is "slight." *Id.*

defendants' inquiry into or knowledge of a statement of opinion, *Corban v. Sarepta Therapeutics, Inc.*, 2015 WL 1505693, at *6 (D. Mass. Mar. 31, 2015), which is "no small task," *Omnicare*, 575 U.S. at 194.  Plaintiffs cannot meet either prong.

The Complaint fails to undermine Pega's judgments regarding "the probability of an unfavorable outcome."  ASC 450-20-55-10.  As to objective falsity, conclusory allegations of knowledge (CAC ¶ 196(g)); allegations that Pega committed "egregious discovery abuses" while its "motion practice losses piled up" (CAC ¶ 196(e)); and allegations that Defendants knew they faced "billions of dollars of liability" because of their alleged "involvement" in the conduct underlying the Appian litigation (CAC ¶ 177) cannot replace particularized factual allegations that Pega's judgment was unsupported.[8]  As to subjective falsity, the Complaint does not include any well-pled factual allegations indicating that Defendants actually believed that the chance of a loss from an adverse outcome in the Virginia Litigation was anything other than "remote."  CAC ¶¶ 188–96; *Hunt*, 2021 WL 4461171, at *5–6 (granting motion to dismiss where complaint did not allege defendants' knowledge that contracts "should have been accounted for differently under GAAP").[9]  Plaintiffs' reliance on allegations about Defendants' knowledge of the competitive intelligence practices at issue in the Virginia Litigation (CAC ¶ 196(a)–(d)), in addition to failing to demonstrate any *actual belief*, fails on the grounds detailed *infra*.  *See infra* at 13–14.; *see also Hunt*, 2021 WL 446117, at *5.[10]

### B.      Plaintiffs Do Not Allege An Actionable Omission Under Item 103

Plaintiffs' allegations that Pega's nondisclosure of the Virginia Litigation prior to February

---

[8] *See supra* at 4–5 (discussing legal errors and Pega's appeal).

[9] *Salim*, 2021 WL 796088, at *1–2, *9 (dismissing complaint alleging that defendant's SEC filings were materially misleading where defendant failed to reserve for $850M penalty or disclose that it conspired to pay over $420M in illegal bribes over eight year period because "[P]laintiffs have not adequately alleged that [Defendant] did not actually believe what it was representing in its SEC filings").

[10] As with the other challenges to statements of opinion, Plaintiffs offer no allegations concerning "the inquiry [Pega] did or did not conduct" concerning the chances of an unfavorable verdict.  *Salim*, 2021 WL 796088, at *9.

16, 2022 caused Pega's SEC reports to be materially misleading fail for a similar reason: Plaintiffs do not plead an actionable opinion. *See Omnicare*, 575 U.S. at 185–91.

Item 103 requires the disclosure of "any material pending legal proceedings, other than ordinary routine litigation incidental to the business, to which the registrant or any of its subsidiaries is a party." 17 C.F.R. § 229.103(a). It also expressly provides that no disclosure is required for proceedings that involve "claims or actions if the business ordinarily results in such claims or actions" or "[t]hat involve primarily a claim for damages" that does not exceed 10% of the current assets of the company. § 229.103(b).

As an initial matter, the Court need only focus on Plaintiffs' allegations as to 3Q 2021 because the Virginia Litigation fell under Item 103's express 10% carve-out in all other relevant quarters. *See id.* § 229.103(b)(2) (disclosure not required if claim for damages does not exceed 10% of current assets). It was only as of 3Q 2021 that Appian's damages claim of $90 million exceeded 10% of Pega's current assets—and even then by only 0.86%. *See* CAC ¶ 174.

Similar to ASC 450, determining whether to disclose pending litigation pursuant to Item 103 requires "a considered judgment about what disclosures regarding litigation would be material to investors." *Wright v. Medtronic, Inc.*, 2010 WL 1027808, at \*11 (D. Minn. Mar. 17, 2010); *cf. Hunt*, 2021 WL 4461171, at \*5 (accounting disclosures "requir[ing] the exercise of judgment" are opinions). There is no bright line definition of materiality in this context; it hinges on an assessment of the probability of incurring losses and the anticipated magnitude of those losses. *See Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988). Thus, whether pending litigation is material is an opinion, protected unless Plaintiffs allege that Pega's implicit representation that it was not aware of "any material pending legal proceedings" was objectively and subjectively false or that Pega omitted material facts concerning its inquiry into the materiality of the Virginia Litigation.

9

§ 229.103; *see In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 15–16 (S.D.N.Y. 2016) (applying *Omnicare* to analysis of Item 103 disclosure).  Again, Plaintiffs have done neither.

*First*, Plaintiffs have failed to sufficiently allege that Pega's judgment that the Virginia Litigation was not material before February 2022 was objectively wrong.  Prior to February 2022, this intellectual property dispute with Appian was exactly the type of claim that Pega's business "ordinarily results in" (like its prior disputes with Appian that did not warrant disclosure). § 229.103(b)(1); *see supra* at 4 (describing ongoing litigation with Appian); *see also Greenberg v. Sunrun Inc.*, 233 F. Supp. 3d 764, 775 (N.D. Cal. 2017) (finding no plausibly alleged violation of Item 103 where omitted lawsuits were "ordinary routine litigation" for defendant that "operate[d] in a highly regulated industry").  Indeed, Pega regularly disclosed that the BPM market is rife with intellectual property litigation.  *See* Ex. 2 (2019 Form 10-K) at 17 (noting frequency of "litigation based on … violations of intellectual property rights" in software and technology industries).  It was only when Appian amended its complaint in February 2022 to assert damages *thirty* times greater than it had previously claimed that the Virginia Litigation was no longer ordinary litigation that would not be material to investors—prompting *both* Appian *and* Pega to disclose the Virginia Litigation for the first time.  *See* § 229.103(b)(1) (disclosure not required for claims "the business ordinarily results in … *unless* the claim or action departs from the normal kind of such claims or actions") (emphasis added); *supra* at 5–6; *see also City of Phila. v. Fleming Cos.*, 264 F.3d 1245, 1268 (10th Cir. 2001) (affirming dismissal of § 10(b) claim where company disclosed litigation within one month of significant increase to damages claimed).[11]

---

[11] And the litigation as of February 2022 involved claims that exceeded Item 103's 10% safe-harbor for claims asserting damages of less than 10% of current assets.  Before then, the claims exceeded the 10% safe-harbor for one quarter only, and then by less than 1%.  *See supra* at 9.  In addition, before February 2022, the damages claim of $90 million amounted to just 5% of Pega's total assets, which supports a finding that the proceeding was not material.  *See In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 442–44 (S.D.N.Y. 2009) (finding pending arbitration immaterial where it sought only two percent of defendant's *total* assets, not current assets under § 229.103(b)); Ex. 6 (2021 10-K) at 23; Ex. 5 (3Q 2021 Form 10-Q) at 3.

*Second*, as with ASC 450, Plaintiffs plainly "have not adequately alleged that [Pega] did not actually believe what it was representing." *Salim*, 2021 WL 796088, at *9; *see In re Lions Gate*, 165 F. Supp. 3d. at 16 (rejecting allegation of misleading Item 103 disclosure where plaintiffs "failed to plead how the defendants' opinions were not supported by the facts known to them at the time"). Plaintiffs nowhere "identify particular (and material) facts" concerning Pega's views of the materiality of the Virginia Litigation. *Salim*, 2021 WL 796088, at *9; *see* CAC ¶¶ 167–87; *cf. Hunt*, 2021 WL 4461171, at *5. Instead, they summarily allege that Pega knew it faced "billions of dollars of liability" because Pega knew about the conduct underlying Appian's claims. CAC ¶¶ 175–78. These allegations are insufficient hindsight based on the jury verdict and conclusory allegations that Pega "lacked reasonable grounds" for its belief. *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 129 F. Supp. 3d 48, 71 (S.D.N.Y. 2015); *see Cheng v. Activision Blizzard, Inc.*, 2022 WL 2101919, at *9 (C.D. Cal. Apr. 18, 2022).[12]

## II.    The Complaint Fails Otherwise to Allege an Actionable Misstatement[13]

### A.    Pega's Disclosures Concerning Litigation Risk Were Not Materially Misleading (CAC ¶¶ 136, 139, 142)

Unable to show that Pega had any independent duty under GAAP or Item 103 to disclose the Virginia Litigation before February 2022, *see supra* at 6–11, Plaintiffs seek to manufacture a nondisclosure violation by seizing on a risk factor that disclosed both the receipt of misappropriations claims and the possibility such claims could have a material adverse effect. *See, e.g.*, CAC ¶¶ 139 ("*We have received*, and may in the future receive, notices that claim we have

---

[12] As noted above, the Complaint lacks allegations concerning "the inquiry [Pega] did or did not conduct" into the Virginia Litigation. *Salim*, 2021 WL 796088, at *9.

[13] A complete listing of the statements challenged by Plaintiffs is attached. In addition to the statements discussed in §II, Plaintiffs also challenge Sarbanes-Oxley Act certifications in Pega's Forms 10-K and 10-Q issued during the putative class period. *See* CAC ¶¶ 160–61. These certifications are not independently actionable. *See City of Mia. Fire Fighters' and Police Officers' Ret. Tr. v. CVS Health Corp.*, 46 F.4th 22, 29 n.4 (1st Cir. 2022). In any event, for the reasons described herein, Plaintiffs have failed to allege that Mr. Stillwell or Mr. Trefler "did not genuinely believe [their certifications]" when made. *Lachman v. Revlon, Inc.*, 487 F. Supp. 3d 111, 135–36 (E.D.N.Y. 2020).

misappropriated ... other parties' intellectual property rights, and … we face a higher risk of being the subject of intellectual property infringement claims") (emphasis added); Ex. 4 (2020 Form 10-K) at 22, 59 ("litigation can have a material adverse effect") (cited at CAC ¶¶ 128–30). Thus, Pega plainly disclosed the existence of present claims—which necessarily included the Virginia Litigation—and there was no need to specifically reference that litigation to make the disclosure not misleading.[14] *See* CAC ¶ 143; *infra* at 15 (no duty to accuse oneself of misconduct), *supra* at 6–11 (Virginia Litigation not required to be disclosed under GAAP or Item 103). Moreover, the remaining risk factors concerning legal risk that Plaintiffs challenge[15] were not misleading due to a lack of a specific discussion of the Virginia Litigation in light of the foregoing risk factor disclosing present misappropriation claims and because Plaintiffs have not alleged any affirmative duty to specifically disclose the Virginia Litigation before February 2022. CAC ¶ 143; *Ponsa-Rabell v. Santander Sec. LLC*, 35 F.4th 26, 33 (1st Cir. 2022) (courts consider "the entirety of the relevant facts available at the time of the allegedly misleading statement, not simply the words of the [challenged] statement itself").[16]

### B.    Pega's Disclosures Concerning the Virginia Litigation Were Not Materially Misleading (CAC ¶¶ 145–47)

Plaintiffs further allege that once Pega disclosed the Virginia Litigation in February and

---

[14] The Court's decision in *In re Number Nine Visual Technology Corp. Securities Litigation*, is distinguishable on the facts. 51 F. Supp. 2d 1, 23–24 (D. Mass. 1999). In *Number Nine*, the Court found that "[w]arning of past and future memory shortages is actionably misleading when a present memory shortage remains undisclosed" where Plaintiffs had adequately alleged a present shortage was occurring. *Id.* at 6, 23–24. Pega's risk factor accurately disclosed that Pega was currently in receipt of a notice of misappropriation or similar notices, not that it had "from time to time" received them in the past. *Compare id.* at 6 (noting shortages "have from time to time required")*, with* CAC ¶ 136 ("We have received … notices that claim we have misappropriated.").

[15] *See* CAC ¶ 139 (Pega "may be subject to intellectual property rights claims;" there are no assurances that "third parties … will not claim infringement;" "software product developers will increasingly be subject to infringement claims," which could result in costly litigation; and Pega "may in the future receive, notices that claim [Pega has] misappropriated, misused, or infringed" third parties' intellectual property rights).

[16] Plaintiffs also allege that the challenged risk factors were materially misleading because Pega failed to disclose that it had "engaged in similar conduct against other software companies." CAC ¶ 143(c). But Pega had no duty to accuse itself of uncharged misconduct. *See infra* at 15.

later in April 2022, it inaccurately characterized Appian's claims as lacking merit and Appian's damages claim as unsupported.  CAC ¶¶ 145–47.  These statements are inactionable opinions.[17] *See Cody v. Conformis, Inc.*, 199 F. Supp. 3d 409, 419 (D. Mass. 2016).

*First*, Plaintiffs fail to plead that Pega's opinions that Appian's claims were "without merit" or that it had "strong defenses" were wrong or otherwise not believed when made.  CAC ¶ 145; *see supra* at 5 (explaining Virginia Litigation outcome was unforeseen due to numerous errors by the trial court); *infra* at 19–29 (stating why Plaintiffs fail to allege scienter with regard to these disclosures); *see also Omnicare*, 575 U.S. at 194; *Axar Master Fund, Ltd. v. Bedford*, 308 F. Supp. 3d 743, 756–57 (S.D.N.Y. 2018) (finding similar litigation disclosures non-actionable opinions).[18] Plaintiffs' hindsight reliance on the later jury verdict is insufficient; they must allege particularized facts from which the Court can conclude that Defendants did not believe the opinions when given. *See Corban*, 2015 WL 1505693, at *6; *Hall v. Johnson & Johnson*, 2019 WL 7207491, at *19 (D.N.J. Dec. 27, 2019) ("Plaintiff has not identified any specific facts indicating [Defendants] possessed information regarding the viability of the lawsuits … or suggesting [Defendants] knew they had no viable defenses against the lawsuit.").  They do not do so.

*Second*, Plaintiffs also fail to allege contemporaneous facts challenging Defendants' belief that Pega's sales were not the result of misappropriation and thus Appian's damages claims were unsupported.  *See* CAC ¶¶ 145–46; *infra* at 19–29; *see also Omnicare*, 575 U.S. at 194.[19] Plaintiffs' sole purported basis for demonstrating either objective or subjective falsity is a May 2022 statement by Pega's damages expert that Plaintiffs characterize as supposedly accepting that

---

[17] *See* CAC ¶¶ 145 ("[T]he Company *believes*" Appian's damages claim is flawed and Appian's claims are "without merit") (emphasis added), 146 ("The Company continues to *believe*" its sales did not result from alleged misappropriation) (emphasis added).

[18] Plaintiffs also have not pleaded facts suggesting that Pega did not undertake a reasonable investigation into the merits of the Virginia Litigation or that Pega's statements concerning the litigation failed to take into account any information learned from any such investigation. *See Omnicare*, 575 U.S. at 194.

[19] *See supra* n.18 (noting lack of allegations concerning an investigation by Pega).

all of Pega's sales from the challenged time frame were the result of product improvement from Appian's trade secrets. CAC ¶ 147(d). But this statement (which is taken out of context) *post-dates* the challenged statements and is therefore insufficient to demonstrate falsity. *See Ratner v. Ovascience, Inc.*, 134 F. Supp. 3d 621, 628 (D. Mass. 2015). Moreover, Plaintiffs mischaracterize the statement: the expert *assumed* that Pega's sales were the result of product improvement in an effort to demonstrate that Appian had no unjust enrichment damages. *See* Ex. 22 (5/3/22 Trial Tr. (cited at CAC ¶ 180)) at 7459:16–25 (expert was "required to assume that … there is liability" for unjust enrichment analysis), 7511:6–12 (calculating $0 in damages).

Moreover, to the extent these disclosures are forward-looking, they were identified as such and accompanied by meaningful cautionary language "anchored" to the Virginia Litigation and thus are protected by the safe harbor. *Grobler v. Neovasc Inc.*, 2016 WL 6897760 at *3–6 (D. Mass. Nov. 22, 2016) (finding statements that legal claims were "without merit" or "baseless" were protected by safe harbor); *see* Ex. 6 (2021 Form 10-K) at 3. Here, as in *Grobler*, Pega's disclosures specifically discussed risks attendant to the Virginia Litigation and are distinguishable from "boilerplate" statements that this Court has rejected as sufficiently cautionary.[20]

C.     **Statements Concerning the BPM Industry and Pega's Marketing Efforts Were Not Materially Misleading or Otherwise Actionable (CAC ¶¶ 121–22, 124–25, 127, 129–30, 132)**

Plaintiffs also challenge certain statements concerning the competitive BPM industry and Pega's marketing and sales efforts, including statements in Pega's 2020 Form 10-K and statements

---

[20] In *Grobler,* Judge Stearns found that statements that a lawsuit was "without merit" and "baseless" were "forward-looking" and protected by the safe harbor where they contained "specific and repeated warnings … about a potentially significant loss in the very litigation at issue," including that defendant could not assure success and that a loss could materially impact the business. 2016 WL 6897760, *2–4. Judge Stearns distinguished this Court's decision in *Rosenbaum Capital LLC v. Boston Communications Group*, which addressed a challenge to a company's assurances that it had "meritorious defenses" to patent litigation, on the grounds that the *Rosenbaum* defendants lacked sufficient cautionary language for the safe harbor. *Id.* at *4. Here, Pega's disclosures are akin to those deemed inactionable in *Grobler* because they specifically discuss the risks of the Virginia Litigation. *See* Ex. 6 (2021 10-K) at 19 (risk factors), 23 (company could not estimate possible damages "due to the uncertainty as to how a jury may rule").

14

by Mr. Stillwell during the July 2020 earnings call and at industry conferences.  But Pega had no duty to disclose its competitive intelligence efforts or otherwise accuse itself of unadjudicated misconduct, and thus the statements are inactionable opinions and/or not materially false.

*2020 Form 10-K.  First*, Plaintiffs' assertion that Pega's statement that "[t]he markets for our offerings are intensely competitive" and its reference to "other direct and indirect marketing efforts" were materially misleading fails because those statements did not impose any obligation on Pega to disclose its competitive intelligence practices.  CAC ¶¶ 129–30, 133(a), (c), (h)–(i).  These statements accurately describe the competitive BPM market and Pega's marketing efforts.  *See Ponsa-Rabell*, 35 F.4th at 34 ("Plaintiffs carry the burden of showing that defendants … omitted to state a material fact necessary to make a statement not misleading").  They do not address, and therefore do not require disclosure regarding, Pega's competitive intelligence efforts.  *See Backman v. Polaroid Corp.*, 910 F.2d 10, 16 (1st Cir. 1990) (a company must reveal only those facts "that are needed so that *what was revealed* would not be so incomplete as to mislead" (emphasis added)); *see also Hill v. Gozani*, 638 F.3d 40, 59 (1st Cir. 2011) (defendants "had no obligation to make … public" expert opinion that company was engaging in fraudulent billing practices through use of improper coding where profit statement "simply … mentioned the risk associated with non-reimbursement by third-party payers").  Similarly, Pega had no obligation to accuse itself of misconduct, much less as yet unadjudicated misconduct, when speaking about competition generally.  *See Greenstone v. Cambex Corp.*, 777 F. Supp. 88, 91 (D. Mass. 1991) ("[D]efendants had no duty to disclose information about their illegal business practices").

*Second*, the statements "[w]e *believe* we are competitively differentiated" and "[w]e *believe* we compete favorably" are inactionable statements of opinion.  CAC ¶ 129 (emphasis added).  Plaintiffs have not alleged facts suggesting that Pega did not sincerely believe that it was

"competitively differentiated" or that its client relationships or industry experience were the reason for its successful sales. Nor do Plaintiffs identify any material facts about Pega's inquiry into these opinions that were omitted. *See Omnicare*, 575 U.S. at 194.

*July 2020 Earnings Call*. Plaintiffs allege that Mr. Stillwell's opinion about Pega's credibility in the public sector was materially misleading because Mr. Stillwell did not disclose Pega's competitive intelligence efforts or that Pega had allegedly concealed its work with Mr. Zou from the government while bidding on government contracts. CAC ¶¶ 124 ("I think there's just a tremendous amount of opportunity. Our wins at defenses, our wins at IRS, really just demonstrating how credible we are in that space…"), 133(d)–(f). This is without merit.[21] Discussing public sector opportunities did not impose on Mr. Stillwell a duty to disclose Pega's competitive intelligence efforts, particularly where he was asked instead to specifically comment on opportunities for business growth. *See* CAC ¶ 124 (discussing IRS win, not purporting to explain how Pega won government contracts); Ex. 3 (7/28/20 Earnings Call Tr.) at 10–11 (asking about growth "vectors"); *Backman*, 910 F.2d at 16. Nor do Plaintiffs identify any basis for their contention that Mr. Stillwell had a duty to disclose to investors Pega's discussions with the government.[22] CAC ¶ 124, 133(f). Finally, Plaintiffs do not allege that Mr. Stillwell did not believe his opinions. *See Corban*, 2015 WL 1505693, at *6.[23]

*Industry Conferences*. Plaintiffs' challenge to Mr. Stillwell's statements at industry conferences fares no better. CAC ¶¶ 121, 126–27, 132. The June 16, 2020 statement that Pega's key was to "sell our differentiator" and the December 10, 2020 statement that "Appian is a

---

[21] Mr. Stillwell's statement that the "federal vertical" is "one country" and "one buyer" is accurate. CAC ¶ 124; *see Guerra v. Teradyne Inc.*, 2004 WL 1467065, at *9 (D. Mass. Jan. 16, 2004).

[22] Plaintiffs also do not identify any reason Pega should have discussed Mr. Zou with the government, much less facts suggesting it would not have won the contracts had it done so.

[23] These arguments likewise apply to Mr. Stillwell's June 16 and August 13, 2020 statements concerning Pega's "credibility," both of which were preceded with "I think" and reflected an opinion. *See* CAC ¶¶ 122, 125.

16

company that we've competed with in some verticals" were accurate. *Id.* ¶¶ 121, 127; *see Guerra*, 2004 WL 1467065, at *9. So too was the September 15, 2021 statement that Pega had "refin[ed]" its "playbooks"—a term introduced by the analyst asking the question—to ensure it was "targeting the right organizations with the right message." CAC ¶ 132. None of these statements suggest anything about Pega's competitive intelligence efforts so as to render them misleadingly incomplete. *See In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 403–04 (S.D.N.Y. 2016) (disclosure required only if information is "sufficiently connected to … existing disclosures"); *Fresno Cty. Emps.' Ret. Ass'n v. Alphatec Holdings, Inc.*, 607 F. App'x. 694, 695 (9th Cir. 2015) (no duty to disclose inventory issues "unrelated to" and "conceptually distinct from" statements about acquisition and consolidation of two departments).

> ### D. General Statements Concerning Pega's "Competitiveness" and "Credibility" Are Inactionable Puffery (CAC ¶¶ 122–25, 129)

Certain challenged statements concerning the BPM industry and Pega's "credibility" in the public sector are inactionable puffery.[24] *See Shaw v. Digit. Equip. Corp.*, 82 F. 3d 1194, 1217–19 (1st Cir. 1996) (superseded by statute on other grounds); *In re Cytyc Corp.*, 2005 WL 3801468, at *22 (D. Mass. Mar. 2, 2005) (reference to "best-in-class sales team" was puffery). Other statements about Pega and the BPM market are too general to be actionable.[25] *See ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 205–06 (2d Cir. 2009) ("statements [that] are too general to cause a reasonable investor to rely upon them" such as "generalizations regarding business practices" are puffery); *Orton v. Parametric Tech. Corp.*, 344

---

[24] *See*, *e.g.*, CAC ¶¶ 122 (describing Pega as "best-in class), 123 (Pega "show[s] very well competitively"), 124 (Pega is "credible … in [the federal] space"), 125 (describing "momentum" and "great opportunit[ies]"). Alternatively, these statements are expressions of opinions that Pega did "show well competitively" or was "best-in-class," for example. *See id.* ¶¶ 122–23. As such, they are inactionable; Plaintiffs have failed to plead that the speakers did not subjectively believe these opinions. *See Omnicare*, 575 U.S. at 185–86; *Corban*, 2015 WL 1505693, at *6.

[25] *See*, *e.g.*, CAC ¶ 121 (Pega "compete[s] fiercely"), 123 (Pega "work[s] in a highly competitive world"), 129 (Pega "competes favorably").

F. Supp. 2d 290, 300 (D. Mass. 2004) (statement regarding "the confirmation we are receiving from the market and our customers on the importance of product development as the core of competitive advantage" was inactionable).

### E.    Pega's Code of Conduct Is Immaterial and Not Misleading (CAC ¶¶ 151–57)

Finally, Plaintiffs' challenge to statements in Pega's Code of Conduct fails because courts routinely deem similar aspirational statements immaterial.  *See* CAC ¶¶ 151–57 (challenging expressions of Pega's commitment to compete fairly and maintain culture committed to high standards of ethical conduct, statement concerning Pega's policy on use of third-parties' confidential information, and explanation of Code's enforcement); *see also Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1276 (9th Cir. 2017) (codes of conduct are "inherently aspirational" and not objectively verifiable).  That is because committing to act ethically or to take disciplinary measures is not a factual representation that no violations have occurred.  *See Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019) (codes of conduct contain "general statements about … integrity, and compliance with ethical norms" that are "inactionable puffery"); *Salim*, 2021 WL 796088, at *11 (code of conduct statements were puffery); *Ferris v. Wynn Resorts, Ltd.*, 462 F. Supp. 3d 1101, 1121 (D. Nev. 2020) (statements that violations "will be … investigated" and harassment "will not be tolerated" were inactionable).

Plaintiffs' allegations of two episodes during which certain Pega employees allegedly engaged in behavior inconsistent with the Code are insufficient to show falsity.  Plaintiffs must, but do not, allege that violations of Pega's Code were so "blatant and pervasive" that Pega did not genuinely hold the stated goals.  *See Cheng*, 2022 WL 2101919, at *10 (departing from "*Retail Wholesale*'s clear conclusions" requires at least allegations that defendant "took no action at all in the face of blatant and pervasive violations of its Code").  Plaintiffs' allegations merely identify a handful of Pega's thousands of employees who worked with Mr. Zou or accessed an Appian free

trial.  CAC ¶¶ 82–85, 88–89, 91–95; Ex. 2 (2019 Form 10-K) at 10.

## III.   The Complaint Fails to Raise the Required "Strong" Inference of Scienter

Plaintiffs' failure to allege particularized facts giving rise to a "strong inference" that Defendants "consciously intended to defraud" or "acted with a high degree of recklessness" also supports dismissal.  *Mehta v. Ocular Therapeutix, Inc.*, 955 F.3d 194, 206 (1st Cir. 2020).  To be "strong," an inference "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at 314.  Recklessness requires "a highly unreasonable omission" that involves "an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers and sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."  *Brennan v. Zafgen, Inc.*, 853 F.3d 606, 613 (1st Cir. 2017).

### A.   Plaintiffs Allege No Facts Showing That Either Individual Defendant Knew, or Was Reckless In Not Knowing, That A Statement Was False When Made

#### 1.   *Mr. Stillwell*

There are virtually no scienter allegations against Mr. Stillwell, even though the vast majority of challenged statements are attributed to him.[26]

The Complaint lacks any allegations about or references to contemporaneous "internal records or witnessed discussions" to which Mr. Stillwell was privy that contradicted his or Pega's public statements about competition or the Virginia Litigation.  *See Tharp v. Acacia Commc'ns,*

---

[26] Statements attributed to Mr. Stillwell concern: (1) competition and Pega's credibility in the public sector from analyst conferences between June 2020 and September 2021 (CAC ¶¶ 121–25, 131–32); (2) the BPM market and Pega's marketing efforts from Pega's July 2020 analyst call, Pega's 2020 Form 10-K, which Mr. Stillwell signed, and analyst conferences (*id.* ¶¶ 122–25, 127, 129–30, 138); (3) risk disclosures about litigation from Pega's Forms 10-Q and 10-K (between July 2020 and October 2021), which he signed (*id.*¶¶ 136, 138–39, 142); (4) disclosures about the Virginia Litigation from Pega's 2021 Form 10-K and Form 10-Q for the first quarter of 2022, which he signed (*id.*¶¶ 145–47); and (5) SOX certifications from Pega's Forms 10-K and 10-Q (between July 2020 and April 2022), which Mr. Stillwell signed (*id.*¶ 160).  None of these statements is a "clear falsehood" or otherwise actionable.  *See Kader v. Sarepta Therapeutics, Inc.*, 887 F.3d 48, 59 (1st Cir. 2018) ("[A]n arguable misrepresentation provides by itself less support for an inference of scienter than does a clear falsehood"); *supra* at 11–19.

19

*Inc.*, 321 F. Supp. 3d 206, 227 (D. Mass. 2018) ("strong" inference arises when a "complaint contains clear allegations of admissions, internal records or witnessed discussions suggesting that at the time they made the statements claimed to be misleading, the defendant officers were aware that they were withholding vital information or at least were warned by others that this was so"). Plaintiffs do not allege that Mr. Stillwell was aware of, involved in, or otherwise had access to information concerning Pega's competitive intelligence efforts, let alone the specific conduct at issue in the Virginia Litigation, at the time of the challenged statements that would have contradicted any statement when made.[27]

The very few allegations Plaintiffs do make fail as a matter of law.  Generic allegations that Mr. Stillwell served as CFO and COO and had an "expansive role" (CAC ¶¶ 32, 270, 274) are "scienter by status" pleading that the Court must disregard.  *See Lirette v. Shiva Corp.*, 27 F. Supp. 2d 268, 283 (D. Mass. 1998) (inferences that defendants by virtue of their position within company "must have known" about problems are "inadequate").  Similarly, allegations suggesting that a verdict for Appian was preordained and that any statements to the contrary were reckless, *see, e.g.*, CAC ¶¶ 14, 19, are impermissible fraud-by-hindsight.  *See Brennan*, 199 F. Supp. 3d at 466. Plaintiffs offer no allegations that Mr. Stillwell did not believe at the time of his statements that Pega was likely to prevail.  *Cf. City of Phila.*, 264 F.3d at 1265 (no scienter where pending litigation was promptly disclosed after complaint was amended to increase damages significantly and plaintiffs failed to allege that defendants knew or were reckless in not knowing that failure to disclose litigation earlier posed substantial risk of misleading investors).

---

[27] Plaintiffs reference Mr. Stillwell in passing in a footnote listing the Pega employees who met with the Company's damages expert.  CAC ¶ 180 n.37.  If this is a scienter allegation, it falls far short of the PSLRA's pleading standards.  *See Brennan*, 199 F. Supp. 3d at 451 (dismissing complaint that failed to clear PSLRA's "high hurdle" and lacked "particularized facts" demonstrating scienter).  Moreover, the damages expert testified on May 3 and 4, 2022—after all of the challenged statements—and Plaintiffs do not allege when the expert met with Mr. Stillwell or what might have been discussed.  Without these particulars, allegations concerning the damages expert are irrelevant to the scienter analysis.  *See Foley v. Transocean Ltd.*, 861 F. Supp. 2d 197, 213–14 (S.D.N.Y. 2012).

At bottom, the Complaint's scienter allegations against Mr. Stillwell reduce to the bare assertion that he made or approved false or misleading statements with scienter. *See* CAC ¶ 260. But conclusory allegations like this that assert only an element of a claim are insufficient to plead scienter. *See In re Stone & Webster*, 414 F.3d 187, 214 (1st Cir. 2005) (rejecting "conclusory assertion that the defendant knew the true facts … What is needed is the allegation of particularized facts which give strong support to that conclusion").

### 2.    *Mr. Trefler*

The scienter allegations concerning Mr. Trefler are equally flawed.[28]   *First*, Plaintiffs cannot dredge up the past in support of scienter; they must connect a challenged statement to the defendant's *contemporaneous* state of mind. *See In re Peritus Software Servs., Inc. Sec. Litig.*, 52 F. Supp. 2d 211, 228 (D. Mass. 1999) (dismissing complaint that failed to allege "relevant speakers knew, at the time of speaking, that their statements were false or misleading"); *Lirette*, 27 F. Supp. 2d at 283 (similar).  Here, even assuming Mr. Trefler knew of Mr. Zou's conduct for Pega in 2012–2014, these allegations are too remote to bear on his statements about the Company's business practices and the competitive environment in 2020 and later. *Cf. Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*, 778 F.3d 228, 245 (1st Cir. 2015) (discounting probative value of confidential witnesses who did not work at company during class period).

*Second*, for the reasons that follow, Plaintiffs' allegations concerning Mr. Trefler's limited knowledge of and involvement in competitive intelligence in 2012–2014, 2019, and 2022 do not

---

[28] Plaintiffs attribute very few statements to Mr. Trefler, none of which is a "clear falsehood." *Kader*, 887 F.3d at 59; *supra* at 11–19.  Plaintiffs challenge a statement during the July 2020 earnings call that is immaterial puffery and a statement from Pega's 2020 Form 10-K concerning the market for Pega's offering that is factually accurate. *See* CAC ¶ 123 ("[W]e're working in a highly competitive world.  So every piece of business we're winning, somebody else is losing…. And we show very well competitively.")), 129 ("[T]he markets for our offerings are intensely competitive").  They also challenge statements in Pega's Forms 10-K for 2020 and 2021, which Mr. Trefler signed, including risk disclosures concerning litigation and the disclosure of the Virginia Litigation, a statement describing Pega's marketing efforts, and Mr. Trefler's SOX certification. *See* CAC ¶¶ 130, 139, 145, 160.

show that he was aware of information that contradicted his or Pega's public statements and do not support an inference that he knew nondisclosure of the Virginia Litigation risked misleading investors.[29] *See City of Phila.*, 264 F.3d at 1264 ("[E]ven if we were to accept as true Plaintiffs' unsupported statements that … Defendants … 'must have known' both about the [lawsuit] and about the 'fraudulent' business practices forming the basis of that lawsuit, the important issue in this case is *not* whether Defendants knew the underlying facts, but whether Defendants knew that not disclosing the [lawsuit] posed substantial likelihood of misleading a reasonable investor.").

2012–2014. Plaintiffs allege that in 2012–14 certain mostly low-level Pega employees worked with Mr. Zou to misappropriate Appian's trade secrets, and that this conduct supported Appian's $2 billion verdict. *See supra* at 2–3. However, Mr. Trefler is not alleged to have been involved in engaging Mr. Zou or to have known that Mr. Zou or others were misappropriating trade secrets, such that the statements challenged by Plaintiffs were knowingly misleading:

- Mr. Trefler allegedly knew Mr. Zou's name and attended one meeting in 2013 at which Mr. Zou presented about the Appian platform. CAC ¶¶ 44, 54, 56, 62. But nothing concerning Mr. Trefler's state of mind in July 2020 or later can be gleaned from these allegations. Moreover, Plaintiffs' allegation that "Pega and Zou 'collaborated around a whiteboard' regarding ways to employ Appian's trade secrets against Appian" is not tied to Mr. Trefler (CAC ¶ 56) and the cited sources do not indicate that attendees would have known that the information Mr. Zou was discussing contained Appian trade secrets.

- Mr. Trefler's team allegedly apprised him in January 2013 that they were updating and then sent him competitive intelligence materials in 2013 and 2014. CAC ¶¶ 56–57. Although Plaintiffs allege that this material was "created using Zou's information" (CAC ¶ 57), they do not

---

[29] As with Mr. Stillwell, Plaintiffs do not allege that anyone at Pega believed Mr. Trefler's statements were misleading or warned him of such. *See supra* at 20 (citing *Tharp*).

allege that these materials referenced Mr. Zou or that it would have been apparent that they were prepared through any misappropriation of trade secrets.

- Mr. Trefler allegedly received an invitation to recurring meetings during which feedback for sales personnel based on Mr. Zou's work may have been discussed. CAC ¶ 65. But Plaintiffs do not allege that Mr. Trefler attended these meetings, much less whether he would have learned from them that Mr. Zou inappropriately obtained Appian trade secrets.

2019. Plaintiffs allege that certain low-level Pega employees used false names in 2019 to access Appian's free trial, which allegedly contained trade secrets. *See supra* at 3–4.[30] Yet, Mr. Trefler is not alleged to have engaged in this conduct or known that any employees were doing so, such that the statements challenged by Plaintiffs were knowingly misleading:

- Mr. Trefler allegedly received two emails in March 2019 regarding competitive intelligence efforts: one regarding a "teardown project for ServiceNow" (*id.* ¶ 232) with no further information about its status; and another proposing a "consulting engagement to deep dive Appian's product" that never took place (*id.* ¶ 68). Nothing in these emails suggests that anyone at Pega was engaging in unlawful behavior. *See id.* ¶ 234.

- Mr. Trefler allegedly requested between August and October 2019 a competitive intelligence brief on Appian, a write-up of its weaknesses, a "demo," and other technical details. *Id.* ¶¶ 69–71, 75–76. He allegedly was told that "Appian is very tightly controlled about who has access to their trial environments" and that his team was working to "get a new instance" to "record some videos of their environment for you." *Id.* ¶ 75. Plaintiffs editorialize to say that Mr. Trefler "personally directed" the "teardown" of Appian (*id.* ¶ 9), but the allegations show only that Mr. Trefler asked his team for information (*id.* ¶¶ 69, 71). Plaintiffs offer no factual allegations

---

[30] Plaintiffs further allege that a handful of Pega employees accessed Appian's free trial in 2020 and 2021. *See* CAC ¶¶ 91, 93–94. Plaintiffs do not connect these later events in any way to Mr. Trefler.

supporting their leap from notice of Appian's alleged "tight control" to knowledge by Mr. Trefler that "his 'teardown' depended on *improperly* obtaining access to Appian's platform" (*id.* ¶ 75 (emphasis added)). Indeed, their conclusion departs from Mr. Trefler's testimony that he did not know at the time that Appian's free trial was restricted and that, in any event, his requests for information could have been satisfied without access to a free trial.[31]

• Mr. Trefler allegedly met with Mr. Baril twice (in October and December 2019) to give Mr. Baril "direction and feedback" on his competitive intelligence efforts and "list[] questions and topics about Appian's platform" for him to research. *Id.* ¶ 78. Notably, Plaintiffs do not allege that Mr. Baril told Mr. Trefler that he was inappropriately accessing Appian's free trial, or that it was obvious that the information Mr. Baril supplied was wrongfully obtained.[32]

• Mr. Trefler was one of many Pega employees who allegedly received an email with a video recorded by Mr. Bessman documenting Mr. Bessman using Appian's platform with an alias. *Id.* ¶ 86. Plaintiffs do not allege that Mr. Trefler viewed the video or acknowledged the email. Moreover Mr. Trefler did not know at the time that employees had accessed Appian's free trial.[33]

• Unrelatedly, Mr. Trefler allegedly used a personal email address to sign up for a *public* webinar concerning Appian in 2015 that was hosted by BPM.com—not Appian. *Id.* ¶ 203; Ex. 18 (PLT 766). The Complaint does not allege that Mr. Trefler joined the webinar or ever accessed confidential Appian information. CAC ¶ 10. The allegation that "Trefler also admitted he may

---

[31] Ex. 20 (Trefler Depo. Tr.) at 67:10–17, 73:5–8 (cited at CAC ¶ 217). On a motion to dismiss, the Court may consider "documents sufficiently referred to in the complaint," such as Mr. Trefler's deposition transcript, which Plaintiffs quote from directly to support their scienter allegations. *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993); *see MHI Shipbuilding, LLC v. Nat'l Fire Ins. Co. of Hartford*, 286 B.R. 16, 21 (D. Mass. 2002) (document quoted in exhibit to complaint but not appended to complaint or incorporated within it may be considered by court on motion to dismiss).

[32] As noted above, Mr. Trefler believed that Mr. Baril could have completed the requested research without accessing Appian's free trial. Ex. 20 (Trefler Depo. Tr.) at 73:5–8.

[33] Ex. 20 (Trefler Depo. Tr.) at 203:23–204:4 ("Q. Did you know [that people were working inside Appian's free trial] at the time? A. No").

have attempted to register for an Appian forum" using a similar email address (CAC ¶ 203) is not supported by the cited source, which is merely a print-out of a forum registration with no connection to Mr. Trefler.[34]  *See* Ex. 17 (PLT 768).

2022.  Plaintiffs allege that Mr. Trefler admitted during his January 2022 deposition that certain actions by Pega's employees were "not appropriate."  CAC ¶ 217.  These allegations take Mr. Trefler's testimony out of context and, regardless, do not support an inference of scienter:

• Mr. Trefler testified "I don't think it was appropriate for [Mr. Petronio] to hire Zou."  *Id.* (citing Trefler Depo. Tr. at 282).[35]  In the portion of the deposition transcript excluded by Plaintiffs, Mr. Trefler explains that working with Mr. Zou was "inappropriate" only because Mr. Petronio, and by implication Kforce, failed to properly vet Mr. Zou for the assignment—hardly an admission that Mr. Zou engaged in unlawful conduct.[36]

• Mr. Trefler testified that "it was not appropriate" for Mr. Baril to access Appian's free trial under false pretenses.  *Id.* ¶ 217 (citing 2/1/22 Trial Tr. at 1047:9-14, 1095:2-9).[37]  In the portion of the trial transcript omitted by Plaintiffs, Mr. Trefler explains that while use of aliases is benign, it is inappropriate to use a false name to gain access to otherwise restricted material.[38]  Notably, Plaintiffs do not allege that Mr. Trefler had any knowledge of Mr. Baril's use of an alias to access Appian's free trial contemporaneous with Mr. Trefler's challenged statements.

---

[34] The allegation that Mr. Trefler "admitted" he registered for an Appian forum is not supported; indeed, it is directly contradicted by Mr. Trefler's deposition testimony in which he denied any connection with the contact information listed on PLT 768.  *See* Ex. 20 (Trefler Depo. Tr.) at 247:25–248:1, 248:21.

[35] Mr. Trefler misspoke when he referenced Mr. Petronio "hir[ing]" Mr. Zou.  *See* CAC ¶¶ 41–42 & n.6 (alleging that Pega hired Kforce, which introduced Mr. Zou to Pega as a potential consultant).

[36] *See* Ex. 20 (Trefler Depo. Tr.)*.* at 282:21-283:4 ("Q. And what do you think was inappropriate about [hiring Mr. Zou]?  A. Well, [Mr. Petronio] didn't check that Zou was fully cleared to do the work.  Q. Was he fully cleared?  A. Well, from what I've seen, there's a contention about what he's allowed to do, and neither he nor Kforce had brought that to light at the time.").

[37] Plaintiffs cite the February 1, 2022 trial transcript, but the quoted material appears in the March 28 transcript.

[38] Ex. 21 (3/28/22 Trial Tr.) at 1047:15-21 (testifying that it was not appropriate "to get access to something [Mr. Baril] couldn't otherwise have gotten") (cited at CAC ¶ 217).

25

In any event, testimony concerning Mr. Trefler's views after he learned certain information in the lawsuit obviously has no bearing on Mr. Trefler's state of mind with regard to the 2020 or 2021 challenged statements.  *See id.* ¶¶ 123, 139; *Foley*, 861 F. Supp. 2d at 213–14.  And with regard to the opinions expressed in February 2022 concerning the Virginia Litigation, this deposition testimony does not "strongly suggest[] that [Mr. Trefler] did not believe [those] particular opinion[s] to be true when uttered."  *Credit Suisse First Bos. Corp.*, 431 F.3d 36, 49 (1st Cir. 2005), *overruled on other grounds by Tellabs*, 551 U.S. 308; *see In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 470 (6th Cir. 2014) ("When an alleged misrepresentation concerns soft information, which includes predictions and matters of opinion, a plaintiff must additionally plead facts showing that the statement was made with knowledge of its falsity.").

*Finally*, Plaintiffs' hindsight allegations concerning the outcome of the Virginia Litigation do not support recklessness.  *See supra* at 20–21; *Brennan*, 199 F. Supp. 3d at 466.

**B.    Plaintiffs' Motive Allegations Do Not Support a Strong Inference of Scienter**

Plaintiffs also rely on motive allegations, contending that Defendants were motivated to "publicly conceal[]" the Virginia Litigation to minimize lost business opportunities.  CAC ¶ 229.  This merely identifies a motive "not to jeopardize a company's business plan" common to executives and is the type of "catch all" allegation courts routinely find insufficient.  *City of Phila.*, 264 F.3d at 1268; *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 197 (1st Cir. 1999).

Moreover, it is implausible that Pega took steps to temporarily "conceal" a publicly filed lawsuit that was to be tried in open court.  *See Sousa v. Sonus Networks, Inc.*, 261 F. Supp. 3d 112, 120–21 (D. Mass. 2017) ("implausible" for defendants to intentionally make wrong projection "with the almost certain prospect of having to publicly correct" it); *Inter-Local Pension Fund GCC/IBT v. Gen. Elec. Co.*, 445 F. App'x 368, 370 (2d Cir. 2011) ("It is hard to see what benefits accrue from a short respite from an inevitable day of reckoning.").  That is especially so where the

26

Individual Defendants (or Pega for that matter) are not alleged to have received "concrete benefits" from nondisclosure.[39]  *Angelos v. Tokai Pharms., Inc.*, 494 F. Supp. 3d 39, 59 (D. Mass. 2020) (scienter based on "motive and opportunity" requires "plausible allegations of concrete benefits that could be realized by the misstatement, and the likely prospect of achieving such benefits").

In fact, Mr. Trefler, who owns approximately 49% of Pega's outstanding common shares (CAC ¶ 31) sold *no* shares during the putative class period.  *See Sousa*, 261 F. Supp. 3d at 120 (dismissing complaint lacking "any of the telltale motives that have been found to strengthen an inference of scienter" such as "stock sales").  Instead, he experienced the most significant loss of any Pega investor.  *See Guerra*, 2004 WL 1467065, at *28 (defendant's substantial losses "undermine[] any inference of scienter").

## C.     The Remaining Allegations of Scienter Are Insufficient[40]

### 1.     Plaintiffs Have Not Alleged "Corporate Scienter"

Plaintiffs also fail to allege a strong inference of scienter as to Pega.[41]  Plaintiffs' corporate scienter allegations fall short because the Complaint does not identify any Pega employee responsible for making or overseeing the challenged statements other than the Individual

---

[39] For example, Plaintiffs do not allege that Pega was bidding for a particular contract or seeking a significant investment that it might have lost were the injunctive relief sought in the Virginia Litigation public at the time.

[40] Alternatively, it is far more cogent and compelling to infer that at worst Defendants were simply mistaken about the Virginia Litigation and genuinely believed it had no merit given the defenses available to Pega, its relationship to the earlier-filed D. Mass. Litigation, and Appian's own disclosure of the Virginia Litigation on the same day as Pega.

[41] Neither a "willfulness" verdict of misappropriation nor Plaintiffs' characterization of Appian as Pega's "primary competitor" alter this analysis.  *See* CAC ¶¶ 222, 235–41.  As this Court has found, "[a] finding of willful infringement, by itself, is not sufficient to be *res judicata* on the issue of fraudulent intent."  *Rosenbaum Cap. LLC v. Bos. Commc'ns Grp., Inc.*, 445 F. Supp. 2d 170, 175 (D. Mass. 2006).  The jury's finding that Pega misappropriated trade secrets "knowing injury will probably follow" (CAC ¶ 222) does not shed light on any defendant's state of mind regarding the alleged misstatements.  Moreover, Plaintiffs may not avail themselves of the core operations doctrine to support an inference of scienter where they fail to allege a "plus factor."  *See Metzler Asset Mgmt. GmbH v. Kingsley*, 305 F. Supp. 3d 181, 219 (D. Mass. 2018) (courts are "hesitant to apply significant weight" to "core operations" allegations without a "plus factor"); *Lenartz v. Am. Superconductor Corp.*, 879 F. Supp. 2d 167, 183 n.9 (D. Mass. 2012) (core operations doctrine inapplicable where no "plus factor" alleged); *supra* at 19–26 (scienter allegations do not otherwise support a finding of intent or recklessness).  Reliance on the core operations doctrine also fails because Plaintiffs do not allege a "core operation" where Appian was one of many competitors in the BPM market.  *See Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 19 (D. Mass. 2004) (core operations doctrine is premised on "[f]acts critical to a business's core operations or an important transaction"); Ex. 4 (2020 Form 10-K) at 14 (listing competitors).

Defendants. *See N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35, 56 (1st Cir. 2008) (scienter of general counsel insufficient for corporate scienter where he "made none of the statements alleged to be misleading"); *Isham v. Perini Corp.*, 665 F. Supp. 2d 28, 36 (D. Mass. 2009) (scienter of senior executive insufficient where "complaint [did] not claim that [he] participated in making … the statements" at issue). For example, while the Complaint contains allegations focusing on employees of varying seniority,[42] these employees are not alleged to have had *any* role in preparing financial disclosures, participating in analyst calls, or otherwise making the challenged statements. CAC ¶¶ 55–57, 85–89, 93, 101, 121–64; *see Cody*, 199 F. Supp. 3d at 421 (scienter of senior executive insufficient where "[h]e did not participate" in making statements and there were "no allegations suggesting he had anything to do with" them).[43]

        2.     *GAAP Violations, Standing Alone, Are Insufficient to Establish Scienter*

Even assuming that Plaintiffs have adequately alleged a GAAP violation, such allegations alone are insufficient to support an inference of scienter. *See Day v. Staples, Inc.*, 555 F.3d 42, 56 (1st Cir. 2009). For the reasons described *supra*, Plaintiffs make no such allegations here. *Compare supra at* 21–26 (scienter allegations concerning Pega's CEO at most suggest awareness of benign information), *with Crowell*, 343 F. Supp. 2d at 17 (scienter adequately pled where CEO allegedly "ordered … accounting manipulations," and where alleged misconduct was too egregious to give rise to "a good-faith dispute" about accounting practices).

**IV.    The Complaint Fails to Allege Loss Causation**

---

[42] Those employees include, among others, Mr. Schuerman (CTO); Mr. Baril (Director in the Office of the CTO); Maynar Snir Barak (Director of Data & Integration); Vijay Krishna Potluri (Director of Case Management); Steve Bixby (Vice President of Product Development); John Petronio (Director of Product Marketing); Leon Trefler (Chief of Clients and Markets); and Peter Bessman (Solutions Engineer). CAC ¶¶ 45, 51, 57, 61, 64, 68, 85–88, 197–221.

[43] Plaintiffs also allege that Pega compensated employees who completed Management-Based Objectives ("MBOs"), which included creating internal presentations about Pega's competitors. CAC ¶ 104. Plaintiffs fail to connect their MBO allegation to the state of mind of anyone who made or oversaw the challenged statements. And, in any event, there is nothing nefarious about incentivizing employees to better understand Pega's competitors.

Plaintiffs fail to plead a causal connection between the alleged fraud and losses.  *See* CAC ¶¶ 243–49; *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005) ("causal connection" between misstatement and loss required).  Typically, a plaintiff pleads loss causation by identifying a stock price drop caused by a corrective disclosure or the materialization of a concealed risk.  *See Leung*, 2022 WL 1192801, at *13.  The stock price drops at issue do not qualify.

*First*, Plaintiffs fail to connect Pega's disclosure of the Virginia Litigation on February 16, 2022—as opposed to other contemporaneous disclosures—causally to the drop in Pega's stock price on February 17, 2022.[44]  *See* CAC ¶ 243; *Coyne v. Metabolix, Inc.*, 943 F. Supp. 2d 259, 273 (D. Mass. 2013) (securities fraud claim not pled where "Plaintiff's loss resulted from the disclosure of negative information other than a prior false or misleading statement").  Analysts following Pega attributed the February 17 price impact to low earnings and revenue reports, but ***not*** the disclosure of the Virginia Litigation.[45]  *Cf. In re Allaire Corp. Sec. Litig.*, 224 F. Supp. 2d 319, 338 (D. Mass. 2002) (considering analyst reports in assessing loss causation).  *See generally Mass. Ret. Sys. v. CVS Caremark Corp.*, 716 F.3d 229, 237–38 (1st Cir. 2013) (loss causation generally established by "eliminating other possible explanations for [the] price drop, so that the factfinder can infer that it is more probable than not that it was the corrective disclosure—as opposed to other possible depressive factors—that caused at least a 'substantial' amount of the price drop").

*Second*, Plaintiffs fail to allege plausibly that Pega's May 9, 2022 Form 8-K (disclosing verdict) or its September 16, 2022 Form 8-K (disclosing entry of judgment) were "corrective" disclosures as opposed to bad news about a matter already disclosed.  *See* CAC ¶¶ 244, 247; *Leung*,

---

[44] The fact that Pega also gave its views of the Virginia Litigation is irrelevant; the market was clearly informed in detail about the nature of the claims and the damages sought and thus was fully apprised of the risk.

[45] *See, e.g.*, Ex. 11 (Barclays 2/17/22 note) at 1 (noting "total revenue growth came in well below consensus" with no analysis of litigation); Ex. 12 (JMP 2/17/22 note) at 1 (providing similar analysis); Ex. 7 (2/16/22 Earnings Call Tr.) at 1 –14 (no questions on Virginia Litigation). The Court may consider these materials on a motion to dismiss. *See Urman v. Novelos Therapeutics, Inc.*, 796 F. Supp. 2d 277, 282 (D. Mass. 2011) ("In addition to the documents attached to the [pleading], the Court properly considers … news and analyst reports separately submitted.").

29

2022 WL 1192801, at *13 (corrective disclosure occurs when company releases information that reveals to market pertinent truth that was previously concealed or obscured by company's fraud); *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 175 n.4 (2d Cir. 2005) (disclosure of negative information not corrective because it did not "reveal" falsity of prior disclosures"). Months before, Pega had provided significant detail about Appian's claims and the relief sought,[46] noted the "uncertainty as to how a jury may rule," and stated that the Virginia Litigation could generate a material loss. *See* Ex. 6 (2021 Form 10-K) at 23, 63. Thus, the later disclosures did not "correct" prior misstatements or omissions; they reflected adverse developments in a lawsuit Pega had discussed at length and cautioned about.[47] *See Fort Worth Emp'rs Ret. Fund v. Biovail Corp.*, 615 F. Supp. 2d 218, 229 (S.D.N.Y. 2009) (where underlying trial data had been disclosed, "decline in the price of [company's] stock following the … announcement that the FDA had not approved [drug] application … was caused by the agency's failure to approve the drug—not by any 'corrective' disclosure of some prior untruth"). Indeed, this case fits squarely within the paradigm of a loss resulting from the materialization of a previously disclosed risk (here, the risk of a material adverse jury verdict), which does not plead loss causation. *Lentell v. Merrill Lynch &. Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005) ("[T]he pleading principles [for loss causation] require … that the loss be caused by the materialization of the concealed risk").

## CONCLUSION[48]

For the foregoing reasons, the Complaint should be dismissed with prejudice.

---

[46] Thus, the nature of the underlying alleged misconduct, as well as the fact of the lawsuit itself, was known to the markets months before the jury verdict.

[47] For example, discussion of the Virginia Litigation at a conference days after the verdict focused on the size of the verdict. *See* Ex. 13 (5/18/22 Needham Tech. & Media Conf.) at 2 ("[I]n the interest of clearing the air in recent news, but earlier this month, obviously, the $2 billion verdict. Can you walk us through, I guess, what happened?").

[48] Plaintiffs' Section 20(a) "control person" claim fails because they have not pled a primary violation of § 10(b). CAC ¶¶ 268–78; *see Winters v. Stemberg*, 529 F. Supp. 2d 237, 253 (D. Mass. 2008); *see also In re Biogen Inc. Sec. Litig.*, 857 F.3d 34, 44 (1st Cir. 2017) (affirming dismissal; "[g]iven that the Section 10(b) claim fails, [the plaintiff's] Section 20(a) claim necessarily fails as well").

Dated: December 19, 2022

Respectfully submitted,

/s/ Daniel W. Halston

Daniel W. Halston (BBO # 548692)
Michael G. Bongiorno (BBO # 558748)
Robert Kingsley Smith (BBO # 681914)
Erika M. Schutzman (BBO # 696241)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
Daniel.Halston@wilmerhale.com
Michael.Bongiorno@wilmerhale.com
Robert.Smith@wilmerhale.com
Erika.Schutzman@wilmerhale.com

*Counsel for Defendants*

**Appendix: Challenged Statements in the Consolidated Amended Complaint (ECF No. 61)**

*City of Fort Lauderdale Police and Firefighters' Retirement Sys v. Pegasystems Inc. et al.* (No. 1:22-cv-11220-WGY)

| CAC ¶ | Disclosure | Date | Speaker | Page in Brief Addressing Statement | Challenged Statement |
|---|---|---|---|---|---|
| 121 | Conference Call at NASDAQ 42nd London Investor Conference | 06/16/2020 | K. Stillwell | Page 17 | "***Our key is to sell our differentiator to help our clients augment their environments and to make sure we operate well with all of the different application providers that are out there.*** We don't – we believe in open environments so that all of us can kind of work together is actually much better for our clients, because at the end of the day, nobody's going to buy just one application across their entire infrastructure. And I think that, that's important for all of us to continue to work together. ***Even though we do compete fiercely, we also need to stop and help our clients when they need to integrate us with each other.***" |
| 122 | Conference Call at NASDAQ 42nd London Investor Conference | 06/16/2020 | K. Stillwell | Page 17 | "Sure. So as you can imagine, most of these larger campaigns really try to do a proof of concept or a benchmark on the technology against the problem. And so I think that ***the fact that we won that against 29 vendors and we actually got down selected down to us and another vendor*** and we actually had to compete against the internal development inside of the agency, as you can imagine, that's a fairly competitive environment. ***So I think the fact that we won that and also our recent win with the IRS really kind of highlights the fact that we're really viewed as a solution that has – that is best-in-class that can actually drive very significant transformations.***" |
| 123 | Pegasystems' 2Q 2020 Earnings Call | 07/28/2020 | A. Trefler | Page 18 | "***Sure. So look, we're working in a highly competitive world. So every piece of business we're winning, somebody else is losing. So that's just the way it goes. And we show very well competitively***, particularly in the sweet spots, which I think our view on low-code goes all the way back to our original vision of being a model-driven platform." |
| 124 | Pegasystems' 2Q 2020 Earnings Call | 07/28/2020 | K. Stillwell | Pages 16–17 | "So I think that, that's what's exciting is we have so much opportunity with our existing installed base, or our existing client base. ***And then we have these verticals, like a federal vertical, that's just one country. It's just one buyer really, within that country.*** And I think there's just a tremendous amount of opportunity. |

1

| CAC ¶ | Disclosure | Date | Speaker | Page in Brief Addressing Statement | Challenged Statement |
|---|---|---|---|---|---|
| | | | | | Our wins at defenses, our wins at IRS, *really just demonstrating how credible we are in that space, even with being relatively – that being a relatively less mature vertical in terms of the growth rate*." |
| 125 | 40th Annual Canaccord Genuity Growth Conference | 08/13/2020 | K. Stillwell | Page 18 | "*I think that the thing with public sector really becomes as soon as you get credibility of winning a handful of larger agencies, really there's a lot of kind of momentum that comes from that. And I think that our census win really just opened our eyes and quite frankly, the market size [sic- market's eyes] on, wow, like this is a great opportunity for Pega*, and governments are going through digital transformation at a much faster clip actually than even commercial is." |
| 127 | Barclays Global Technology, Media, and Telecommunications Conference | 12/10/2020 | K. Stillwell | Page 17 | "*Appian is a company that we've competed with in some verticals that has low-code*. Pega has low-code. There are other low-code providers that are – I would call it more the technology of low-code. So there are some other companies that have built very, very simple tools to be able to build simple workflows, like something like I want to check the badge of an employee when they check-in. That application isn't going to expand into something more than that, but you can build it really fast and you can do it with nondevelopers. That's what I would call the low-code, the product." |
| 129 | 2020 Form 10-K | 02/17/2021 | Pega, K. Stillwell (signed filing), A. Trefler (signed filing) | Pages 15–16 | "*Competition: The markets for our offerings are intensely competitive*, rapidly changing, and highly fragmented, as current competitors expand their product offerings and new companies enter the market. * * * We have been most successful in competing for clients whose businesses are characterized by a high degree of change, complexity, or regulation. *We believe we are competitively differentiated from our competitors* because our unified Pega Platform is designed to allow client business and IT staff, using a single, intuitive user interface, to build and evolve enterprise applications in a fraction of the time it would take with disjointed architectures and tools offered by many of our competitors. . . . *We believe we compete favorably due to our expertise in our target industries and our long-standing client relationships*." |

2

| CAC ¶ | Disclosure | Date | Speaker | Page in Brief Addressing Statement | Challenged Statement |
|---|---|---|---|---|---|
| 130 | 2020 Form 10-K | 02/17/2021 | Pega, K. Stillwell (signed filing), A. Trefler (signed filing) | Pages 15–16 | "To support our sales efforts, we conduct a broad range of marketing programs, including awareness advertising, client and industry-targeted solution campaigns, trade shows, including our PegaWorld iNspire user conference, solution seminars and webinars, industry analyst and press relations, web and digital marketing, community development, social media presence, ***and other direct and indirect marketing efforts***." |
| 132 | Investor Call at Jefferies Software Conference | 09/15/2021 | K. Stillwell | Page 17 | "***So we've done a lot of work on the playbooks over the last 3 or 4 years. I would say – I would characterize it as more refining the plays that we run and making sure that we have the right profile of the salesperson, the right level of enablement, and that we're targeting the right organizations with the right message, right?***<br><br>Those – if you have really good salespeople that don't get enabled, that's a failure. If you have really good salespeople that are enabled, but they're on the wrong organizations that they want to buy your product, that's a failure. So it's a connection between those 3 pieces." |
| 136 | 2Q 2020 Form 10-Q;<br><br>3Q 2020 Form 10-Q | 07/28/2020;<br><br>10/28/2020 | Pega, K. Stillwell (signed filing) | Pages 11–13 | "We ***may*** be subject to intellectual property rights claims by third parties, which are extremely costly to defend, could require us to pay significant damages, and could limit our ability to use certain technologies." |
| 136 | 2Q 2020 Form 10-Q;<br><br>3Q 2020 Form 10-Q | 07/28/2020;<br><br>10/28/2020 | Pega, K. Stillwell (signed filings) | Pages 11–13 | "There can be ***no assurance that third parties***, including clients, ***will not claim infringement*** by us with respect to current or future products." |
| 136 | 2Q 2020 Form 10-Q;<br><br>3Q 2020 Form 10-Q | 07/28/2020;<br><br>10/28/2020 | Pega, K. Stillwell (signed filings) | Pages 11–13 | "***We expect*** that software product developers ***will increasingly be subject to infringement claims*** as the number of products and competitors in our industry segment grows and the functionality of products in different industry segments overlaps. ***Any such claims***, with or without merit, ***could*** be time-consuming, result in costly litigation, cause product shipment and delivery delays, require us to enter into royalty or licensing agreements, or be precluded from making and selling the" |

| CAC ¶ | Disclosure | Date | Speaker | Page in Brief Addressing Statement | Challenged Statement |
|---|---|---|---|---|---|
| | | | | | infringing software, if such proprietary rights are found to be valid. . . . These claims *could* also subject us to significant liability for damages, *potentially* including treble damages if we are found to have willfully infringed patents or copyrights." |
| 136 | 2Q 2020 Form 10-Q; 3Q 2020 Form 10-Q | 07/28/2020; 10/28/2020 | Pega, K. Stillwell (signed filings) | Pages 11–13 | "We have received, and *may* in the future receive, *notices* that claim we have misappropriated, misused, or infringed other parties' intellectual property rights, and, to the extent we gain greater market visibility, *we face a higher risk of being the subject of intellectual property infringement claims*." |
| 139 | 2020 Form 10-K | 02/17/2021 | Pega, K. Stillwell (signed filing), A. Trefler (signed filing) | Pages 11–13 | "We *may* be subject to intellectual property rights claims by third parties, which are extremely costly to defend, could require us to pay significant damages, and could limit our ability to use certain technologies." "There can be *no assurance that third parties*, including clients, *will not claim infringement* by us with respect to current or future products." "*We expect* that software product developers *will increasingly be subject to infringement claims* as the number of products and competitors in our industry segment grows and the functionality of products in different industry segments overlaps. *Any such claims*, with or without merit, *could* be time-consuming, result in costly litigation, cause product shipment and delivery delays, require us to enter into royalty or licensing agreements, or be precluded from making and selling the infringing software, if such proprietary rights are found to be valid. . . . These claims *could* also subject us to significant liability for damages, *potentially* including treble damages if we are found to have willfully infringed patents or copyrights." "We have received, and *may* in the future receive, *notices* that claim we have misappropriated, misused, or infringed other parties' intellectual property rights, and, to the extent we gain greater market visibility, *we face a higher risk of being the subject of intellectual property infringement claims*." |

| CAC ¶ | Disclosure | Date | Speaker | Page in Brief Addressing Statement | Challenged Statement |
|---|---|---|---|---|---|
| 142 | 1Q 2021 Form 10-Q; 2Q 2021 Form 10-Q; 3Q 2021 Form 10-Q | 04/28/2021; 07/28/2021; 10/27/2021 | Pega, K. Stillwell (signed filings) | Pages 11–13 | "We *may* be subject to intellectual property rights claims by third parties, which are extremely costly to defend, could require us to pay significant damages, and could limit our ability to use certain technologies." "There can be *no assurance that third parties*, including clients, *will not claim infringement* by us with respect to current or future products." "*We expect* that software product developers *will increasingly be subject to infringement claims* as the number of products and competitors in our industry segment grows and the functionality of products in different industry segments overlaps. *Any such claims*, with or without merit, *could* be time-consuming, result in costly litigation, cause product shipment and delivery delays, require us to enter into royalty or licensing agreements, or be precluded from making and selling the infringing software, if such proprietary rights are found to be valid. . . . These claims *could* also subject us to significant liability for damages, *potentially* including treble damages if we are found to have willfully infringed patents or copyrights." "We have received, and *may* in the future receive, *notices* that claim we have misappropriated, misused, or infringed other parties' intellectual property rights, and, to the extent we gain greater market visibility, *we face a higher risk of being the subject of intellectual property infringement claims*." |
| 145 | 2021 Form 10-K | 02/16/2022 | Pega, K. Stillwell (signed filing), A. Trefler (signed filing) | Pages 13–15 | "**ITEM 3. LEGAL PROCEEDINGS** In addition to the matters below, the Company is, or may become, involved in a variety of claims, demands, suits, investigations, and proceedings that arise from time to time relating to matters incidental to the ordinary course of the Company's business, including actions with respect to contracts, intellectual property, employment, benefits, and securities matters. Regardless of the outcome, legal disputes can have a material effect on the Company because of defense and settlement costs, diversion of management resources, and other factors. |

| CAC ¶ | Disclosure | Date | Speaker | Page in Brief Addressing Statement | Challenged Statement |
|---|---|---|---|---|---|
| | | | | | * * * <br><br> ***Appian Corp. v. Pegasystems Inc. & Youyong Zou*** <br><br> On May 29, 2020, Appian sued the Company and an individual, Youyong Zou, in the Circuit Court of Fairfax County, Virginia in a matter titled *Appian Corp. v. Pegasystems Inc. & Youyong Zou*, No. 2020-07216 (Fairfax Cty. Ct.). The complaint filed by Appian on May 29, 2020 (the "2020 Complaint") alleges that Mr. Zou was an employee of an Appian business partner, Serco Inc. ("Serco"); that, as a result, Mr. Zou had access to Appian trade secrets which Mr. Zou was required to keep confidential; and that in approximately 2013, while Mr. Zou was employed by Serco, the Company engaged Mr. Zou through an intermediary to provide the Company with Appian trade secrets and confidential information, which the Company is then claimed to have used to compete against Appian. The 2020 Complaint sets forth claims for misappropriation of trade secrets under the Virginia Uniform Trade Secrets Act, violation of the Virginia Computer Crimes Act, tortious interference with contract and business expectancy, and statutory and common law conspiracy. On July 24, 2020, the Company filed a plea in bar, seeking to have the claims asserted against the Company in the 2020 Complaint barred, in whole or in part, by the applicable statutes of limitations. Before the original plea in bar could be heard, Appian filed an amended complaint which the court allowed on November 4, 2021 (the "2021 Amended Complaint"), alleging that, in the 2019 time frame, employees of the Company accessed free Appian product trials under false pretenses. The 2021 Amended Complaint withdrew the claim for tortious interference with contract. After Appian filed the 2021 Amended Complaint, the Company successfully moved to dismiss Appian's conspiracy claims, which are no longer a part of the case. The Company also re-filed a plea in bar on November 29, 2021 seeking to have the claims asserted against the Company in the 2021 Amended Complaint barred, in whole or in part, by the applicable statutes of limitations. A jury hearing on the plea in bar commenced on January 31, 2022. On February 9, 2022, the judge determined that he could decide the plea in bar without the jury and, on February 10, 2022, the judge entered a verdict granting the relief sought by the Company's plea in bar motion with respect to the Virginia Computer |

6

| CAC ¶ | Disclosure | Date | Speaker | Page in Brief Addressing Statement | Challenged Statement |
|---|---|---|---|---|---|
| | | | | | Crimes Act, meaning the allegations asserted against the Company in the 2021 Amended Complaint with respect to the Virginia Computer Crimes Act are barred by the applicable statutes of limitations for conduct on or prior to May 29, 2015, while the claims made with respect to misappropriation of trade secrets under the Virginia Uniform Trade Secrets Act are not similarly barred. Appian's claim for tortious interference with business expectancy was not a subject of the plea in bar. On February 11, 2022, the court allowed Appian's motion to further amend the 2021 Amended Complaint to assert a damages claim of approximately $3 billion, seeking all of the Company's revenues less estimated direct costs from the sale of all of the Company's products and services in the period from the fourth quarter of 2013 through the third quarter of 2021. Virginia law requires that the plaintiff establish proximate cause between any alleged use of the alleged trade secrets and damages incurred by the plaintiff, and also requires plaintiffs seeking damages to allege a specific damages amount, prohibiting recovery beyond that amount. ***In addition to disputing the validity of Appian's claims against the Company, the Company believes that any alleged damages claimed by Appian are not supported by the necessary legal standard of proximate cause***. In addition, following the February 10, 2022 ruling on the Company's plea in bar, the ongoing claim under the Virginia Computer Crimes Act is time limited to acts occurring after May 29, 2015. A jury trial with respect to the merits of the dispute is scheduled to begin on March 21, 2022. ***The Company believes the claims brought by Appian against the Company are without merit, that the Company has strong defenses to these claims and that, among other things, even were the jury to find that the Company misappropriated Appian's alleged trade secrets, any alleged damages claimed by Appian are not supported by the necessary legal standard of proximate cause***. The Company is unable to reasonably estimate possible damages or a range of possible damages given the Company's belief that the damages claimed by Appian fail to satisfy the required legal standard and due to the uncertainty as to how a jury may rule." |
| 146 | 1Q 2022 Form 10-Q | 04/28/2022 | Pega, K. Stillwell | Pages 13–15 | "As previously reported, the Company is a defendant in litigation brought by Appian that is currently being tried in Virginia (the "Court") titled *Appian Corp. v. Pegasystems Inc. & Youyong Zou*, No. 2020-07216 (Fairfax Cty. Ct.). The jury trial |

| CAC ¶ | Disclosure | Date | Speaker | Page in Brief Addressing Statement | Challenged Statement |
|---|---|---|---|---|---|
| | | (signed filing) | | | began on March 21, 2022. On April 13, 2022, Appian withdrew its claim against the Company for tortious interference with business expectancy. On that same day, in the course of making determinations on various motions, the Court stated that if the jury finds that the Company misappropriated information that constituted Appian trade secrets and finds that the Company incorporated those trade secrets into the Company's products or the Company's marketing materials, the burden will then shift to the Company to prove that the sales Appian seeks as damages were not the result of the alleged misappropriation and use of the alleged trade secrets. This legal standard has not previously been adopted by the Virginia courts. ***The Company continues to believe that its sales of the products at issue were not caused by, or the result of, the alleged misappropriation of trade secrets, and is submitting evidence to the jury to that effect***. The Company is unable to reasonably estimate possible damages because, among other things, of the uncertainty as to how a jury may decide and the parties' existing grounds for appeal based on rulings to date in the proceeding." |
| 151 | Pega Code of Conduct | Class Period (available online) | Pega | Pages 18–19 | "This code applies to ***all our interactions*** in various areas of our shared professional lives ***including those of our officers, full and part-time employees, interns, all people retained as independent consultants, and members of the Board of Directors of Pega and its subsidiaries worldwide***." |
| 152 | Pega Code of Conduct | Class Period (available online) | Pega | Pages 18–19 | Statement that Pega is "commit[ted]" to "***[c]ompete fairly, honestly***, and vigorously," and "[m]aintain a culture that values and nurtures ***ethical conduct*** and fosters ***transparency and honesty*** by being fair and trustworthy in all our interactions with each other, our clients, and our partners." |
| 153 | Pega Code of Conduct | Class Period (available online) | Pega | Pages 18–19 | Statements regarding Pega's treatment of competitors' confidential information. For example, that Pega's "policy is to ***protect the confidential information of third parties with the same care that we use to protect our own*** confidential information." |
| 154 | Pega Code of Conduct | Class Period | Pega | Pages 18–19 | Assurances that Pega would "***[n]ever use illegal or questionable means to acquire a competitor's trade secrets or other confidential information***, such as trespassing, |

8

| CAC ¶ | Disclosure | Date | Speaker | Page in Brief Addressing Statement | Challenged Statement |
|---|---|---|---|---|---|
|  |  | (available online) |  |  | burglary, wiretapping, bribery, stealing, seeking confidential information from a new employee who recently worked for a competitor, *or misrepresenting your identity in hopes of obtaining confidential information*." |
| 155 | Pega Code of Conduct | Class Period (available online) | Pega | Pages 18–19 | Assurances that A. Trefler (CEO) was one of Pega's moral compasses.  For instance, in section "Compliance with the Code: If Issues or Questions Arise," the Code states, "*[i]f any of [Pegasystems' employees] are asked to depart from this Code*, whether by our supervisor, another employee or anyone else, *we agree to seek clarification and/or guidance as to the propriety of the actions in question from our Chief Executive Officer* or our Chief Compliance Officer." |
| 156 | Pega Code of Conduct | Class Period (available online) | Pega | Pages 18–19 | Assurances that Pega "will not tolerate any deviation from our Code," and that it would "take prompt action to enforce this Code and all of Pega's other policies.  Depending on the seriousness of the violation and the other relevant circumstances, violations of this Code may result in a formal or informal warning or reprimand, demotion, suspension, dismissal, or other disciplinary action." |
| 157 | Pega Code of Conduct | Class Period (available online) | Pega | Pages 18–19 | "*[A]ny supervisor who directs or approves* of any conduct in violation of this Code, *or who has knowledge* of such conduct and does not immediately report it, *also will be subject to disciplinary action*, which may include suspension or termination of employment." |
| 160 | Q2 2020 Form 10-Q;  Q3 2020 Form 10-Q;  2020 Form 10-K;  Q1 2021 Form 10-Q; | 07/28/2020;  10/28/2020;  02/17/2021;  04/28/2021;  07/28/2021;  10/27/2021; | A. Trefler, K. Stillwell | Pages 20, 22 | "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report".  "Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report." |

9

| CAC ¶ | Disclosure | Date | Speaker | Page in Brief Addressing Statement | Challenged Statement |
|---|---|---|---|---|---|
| | Q2 2021 Form 10-Q;<br><br>Q3 2021 Form 10-Q;<br><br>2021 Form 10-K;<br><br>Q1 2022 Form 10-Q | 02/16/2022;<br><br>04/28/2022 | | | |

10