# Exhibit 6

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

_____

# FORM 10-K
_____

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT of 1934**

**For the fiscal year ended December 31, 2021**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT of 1934**

**Commission File No. 1-11859**
_____

# PEGASYSTEMS INC.

_(Exact name of Registrant as specified in its charter)_
_____

| **Massachusetts** | **04-2787865** |
|---|---|
| _(State or other jurisdiction of incorporation or organization)_ | _(IRS Employer Identification No.)_ |

**One Main Street, Cambridge, MA 02142**
_(Address of principal executive offices, including zip code)_

**(617) 374-9600**
_(Registrant's telephone number, including area code)_
_____

**Securities registered pursuant to Section 12(b) of the Act:**

| <u>Title of each class</u> | <u>Trading symbol(s)</u> | <u>Name of each exchange on which registered</u> |
|---|---|---|
| Common Stock, $.01 par value per share | PEGA | NASDAQ Global Select Market |

**Securities registered pursuant to Section 12(g) of the Act:**
**None**
_____

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Exchange Act. Yes ☐ No ☒

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the Registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the Registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging company," in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | ☒ | Accelerated filer | ☐ | Non-accelerated filer | ☐ | Smaller reporting company ☐ | Emerging growth company ☐ |
|---|---|---|---|---|---|---|---|

If an emerging growth company, indicate by check mark if the Registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

The aggregate market value of the Registrant's common stock held by non-affiliates, based upon the closing price of the Registrant's common stock on the NASDAQ Global Select Market of $139.19, on June 30, 2021 was approximately $5.7 billion.

There were 81,631,845 shares of the Registrant's common stock, $0.01 par value per share, outstanding on February 4, 2022.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the Registrant's definitive proxy statement related to its 2022 annual meeting of stockholders to be filed subsequently are incorporated by reference into Part III of this report.

# PART I

# FORWARD-LOOKING STATEMENTS

This Annual Report on Form 10-K ("Annual Report"), including without limitation, "Item 1. Business," "Item 1A. Risk Factors," "Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities," and "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations," along with other reports that we have filed with the Securities and Exchange Commission ("SEC"), external documents, and oral presentations, contains or incorporates forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995.

Words such as expects, anticipates, intends, plans, believes, will, could, should, estimates, may, targets, strategies, projects, forecasts, guidance, likely, and usually, or variations of such words and other similar expressions identify forward-looking statements, which are based on current expectations and assumptions.

Forward-looking statements deal with future events and are subject to risks and uncertainties that are difficult to predict, including, but not limited to:

•our future financial performance and business plans;

•the adequacy of our liquidity and capital resources;

•the continued payment of our quarterly dividends;

•the timing of revenue recognition;

•management of our transition to a more subscription-based business model;

•variation in demand for our products and services, including among clients in the public sector;

•reliance on key personnel;

•the impact of actual or threatened public health emergencies, such as the Coronavirus ("COVID-19");

•reliance on third-party service providers, including hosting providers;

•compliance with our debt obligations and covenants;

•the potential impact of our convertible senior notes and Capped Call Transactions;

•the relocation of our corporate headquarters;

•the continued uncertainties in the global economy;

•foreign currency exchange rates;

•the potential legal and financial liabilities and damage to our reputation due to cyber-attacks;

•security breaches and security flaws;

•our ability to protect our intellectual property rights, costs associated with defending such rights, as well as intellectual property rights claims and other related claims by third parties;

•our client retention rate; and

•management of our growth.

These risks and others that may cause actual results to differ materially from those expressed in such forward-looking statements are described further in "Item 1A. Risk Factors" of this Annual Report and other filings we make with the SEC.

Except as required by applicable law, we do not undertake and expressly disclaim any obligation to update or revise these forward-looking statements publicly, whether due to new information, future events, or otherwise. The forward-looking statements in this Annual Report represent our views as of February 16, 2022.

In addition, our future income taxes could be materially adversely affected by a shift in our jurisdictional income mix, by changes in the valuation of our deferred tax assets and liabilities, because of changes in tax laws, regulations, or accounting principles, as well as by certain discrete items. In the United States, such tax law changes could include the impact of the currently enacted mandatory capitalization of research and experimentation expenses, effective for tax years beginning after December 31, 2021 (but postponed to 2026 in the proposed Build Back Better ("BBBA") Act, which is currently under consideration in the United States Congress), or new tax revenue-raising provisions also tied to the proposed BBBA. Globally, the Organization for Economic Cooperation and Development Inclusive Framework on Base Erosion and Profit Shifting is advancing fundamental changes to the international corporate tax system creating new rules for allocating rights to tax global income and a global minimum tax.

Considering fiscal challenges in many jurisdictions, various levels of government are increasingly focused on tax reform and other legislative actions to increase tax revenue, including corporate income taxes. Several U.S. states have attempted to increase corporate tax revenues by taking an expansive view of corporate presence to attempt to impose corporate income taxes and other direct business taxes on companies that have no physical presence in their state, and taxing authorities in foreign jurisdictions may take similar actions. Many U.S. states are also altering their apportionment formulas to increase the amount of taxable income or loss attributable to their state from certain out-of-state businesses. Similarly, in Europe and elsewhere globally, there are various tax reform efforts underway designed to increase the taxes paid by corporate entities.

***If it becomes necessary or desirable to repatriate any of our foreign cash balances to the United States, we may be subject to increased taxes, other restrictions, and limitations.***

As of December 31, 2021, $88.0 million of our cash and cash equivalents were held in our foreign subsidiaries. If it becomes necessary or desirable to repatriate these funds, we may be required to pay U.S. federal, state, and local income and foreign withholding taxes upon repatriation. We consider the earnings of our foreign subsidiaries to be permanently reinvested. As a result, U.S. federal, state, and local, and foreign withholding taxes on such earnings have not been provided in our financial statements. It is not practical to estimate the amount of tax we would have to pay upon repatriation due to the complexity of the tax laws and other factors.

***We face risks related to intellectual property claims or appropriation of our intellectual property rights.***

We rely primarily on a combination of patent, copyright, trademark, and trade secrets laws, as well as intellectual property and confidentiality agreements to protect our proprietary rights. We also try to control access to and distribution of our technologies and other proprietary information. We have obtained patents in strategically important global markets relating to the architecture of our systems. We cannot be certain that such patents will not be challenged, invalidated, or circumvented, or that rights granted thereunder, or the claims contained therein will provide us with competitive advantages. Moreover, despite our efforts to protect our proprietary rights, unauthorized parties may attempt to copy aspects of our software or to obtain the use of information that we regard as proprietary. Although we generally enter into intellectual property and confidentiality agreements with our employees and strategic partners, despite our efforts our former employees may seek employment with our business partners, clients, or competitors, and there can be no assurance that the confidential nature of our proprietary information will be maintained. In addition, the laws of some foreign countries do not protect our proprietary rights as effectively as they do in the U.S. There can be no assurance that our means of protecting our proprietary rights will be adequate or that our competitors will not independently develop similar technology.

Other companies or individuals have obtained proprietary rights covering a variety of designs, processes, and systems. Third parties have claimed and may in the future claim that we have infringed or otherwise violated their intellectual property. We are currently party to litigation with Appian Corp. - see Part I, Item 3 "Legal Proceedings" and Note 19 in the "Notes to Consolidated Financial Statements" included in Part II, Item 8 of this Annual Report. Although we attempt to limit the amount and type of our contractual liability for infringement or other violation of the proprietary rights of third parties and assert ownership of work product and intellectual property rights as appropriate, there are often exceptions, and limitations may not be applicable and enforceable in all cases. Even if limitations are found to be applicable and enforceable, our liability to our clients for these types of claims could be material given the size of certain of our transactions. We expect that software product developers will increasingly be subject to infringement claims as the number of products and competitors in our industry segment grows and the functionality of products in different industry segments overlaps. Any such claims, with or without merit, could be time-consuming, result in costly litigation, cause product shipment and delivery delays, require us to enter into royalty or licensing agreements, or be precluded from making and selling the infringing software, if such proprietary rights are found to be valid. Royalty or licensing agreements, if required, may not be available on terms acceptable to us or at all. These claims could also subject us to significant liability for damages, potentially including treble damages if we are found to have willfully infringed patents or copyrights. Even if a license were available, we could be required to pay significant royalties, which would increase our operating expenses. As a result, we may be required to develop alternative non-infringing technology, which could require substantial effort and cost. If we cannot license or develop technology for any infringing aspect of our business, we would be forced to limit or stop sales of our software and may be unable to compete effectively, which could have a material effect upon our business, operating results, and financial condition.

## ITEM 3. LEGAL PROCEEDINGS

In addition to the matters below, the Company is, or may become, involved in a variety of claims, demands, suits, investigations, and proceedings that arise from time to time relating to matters incidental to the ordinary course of the Company's business, including actions with respect to contracts, intellectual property, employment, benefits, and securities matters. Regardless of the outcome, legal disputes can have a material effect on the Company because of defense and settlement costs, diversion of management resources, and other factors.

*Pegasystems Inc. v. Appian Corp. & Business Process Management Inc.*

On July 3, 2019, the Company filed suit in Massachusetts federal court against Appian Corp. ("Appian") and Business Process Management, Inc. ("BPM") relating to a BPM "Market Report" that Appian had used to promote itself against the Company. *Pegasystems Inc. v. Appian Corp. & Business Process Management Inc.*, No. 1:19-cv-11461 (D. Mass). The Company's complaint alleges that the report and Appian's marketing of it include false and misleading statements about the Company. The Company asked the court to order Appian to stop using the report, and Appian subsequently agreed to stop using the report. The Company also asked the court to award damages for false advertising, deceptive business practices, and commercial disparagement. On December 17, 2019, Appian asserted counterclaims against the Company seeking unspecified monetary damages and alleging certain of the Company's past marketing materials included false and misleading statements, one of the marketing reports failed to disclose that the report's author was paid by the Company, and that the Company defamed Appian in a LinkedIn post. On May 22, 2020, the court allowed in part the Company's motion to dismiss the counterclaims brought by Appian, but denied the motion as to the third party report and the defamation count. As described below, on May 29, 2020, Appian then sued the Company in Virginia. On June 17, 2021, Appian asserted additional counterclaims against the Company seeking unspecified monetary damages and alleging that certain additional marketing materials used by the Company contained false or misleading statements. The Company believes the counterclaims brought by Appian against the Company are without merit, and the Company intends to vigorously pursue its claims against Appian and defend against the counterclaims brought against the Company in this matter. The Company is unable to reasonably estimate possible damages or a range of possible damages in this matter given the Company's belief that the damages claimed by Appian fail to satisfy the required legal standard, the status of the proceeding, and due to the uncertainty as to how a jury may rule if this ultimately proceeds to trial.

*Appian Corp. v. Pegasystems Inc. & Youyong Zou*

On May 29, 2020, Appian sued the Company and an individual, Youyong Zou, in the Circuit Court of Fairfax County, Virginia in a matter titled *Appian Corp. v. Pegasystems Inc. & Youyong Zou*, No. 2020-07216 (Fairfax Cty. Ct.). The complaint filed by Appian on May 29, 2020 (the "2020 Complaint") alleges that Mr. Zou was an employee of an Appian business partner, Serco Inc. ("Serco"); that, as a result, Mr. Zou had access to Appian trade secrets which Mr. Zou was required to keep confidential; and that in approximately 2013, while Mr. Zou was employed by Serco, the Company engaged Mr. Zou through an intermediary to provide the Company with Appian trade secrets and confidential information, which the Company is then claimed to have used to compete against Appian. The 2020 Complaint sets forth claims for misappropriation of trade secrets under the Virginia Uniform Trade Secrets Act, violation of the Virginia Computer Crimes Act, tortious interference with contract and business expectancy, and statutory and common law conspiracy. On July 24, 2020, the Company filed a plea in bar, seeking to have the claims asserted against the Company in the 2020 Complaint barred, in whole or in part, by the applicable statutes of limitations. Before the original plea in bar could be heard, Appian filed an amended complaint which the court allowed on November 4, 2021 (the "2021 Amended Complaint"), alleging that, in the 2019 time frame, employees of the Company accessed free Appian product trials under false pretenses. The 2021 Amended Complaint withdrew the claim for tortious interference with contract. After Appian filed the 2021 Amended Complaint, the Company successfully moved to dismiss Appian's conspiracy claims, which are no longer a part of the case. The Company also re-filed a plea in bar on November 29, 2021 seeking to have the claims asserted against the Company in the 2021 Amended Complaint barred, in whole or in part, by the applicable statutes of limitations. A jury hearing on the plea in bar commenced on January 31, 2022. On February 9, 2022, the judge determined that he could decide the plea in bar without the jury and, on February 10, 2022, the judge entered a verdict granting the relief sought by the Company's plea in bar motion with respect to the Virginia Computer Crimes Act, meaning the allegations asserted against the Company in the 2021 Amended Complaint with respect to the Virginia Computer Crimes Act are barred by the applicable statutes of limitations for conduct on or prior to May 29, 2015, while the claims made with respect to misappropriation of trade secrets under the Virginia Uniform Trade Secrets Act are not similarly barred. Appian's claim for tortious interference with business expectancy was not a subject of the plea in bar. On February 11, 2022, the court allowed Appian's motion to further amend the 2021 Amended Complaint to assert a damages claim of approximately $3 billion, seeking all of the Company's revenues less estimated direct costs from the sale of all of the Company's products and services in the period from the fourth quarter of 2013 through the third quarter of 2021. Virginia law requires that the plaintiff establish proximate cause between any alleged use of the alleged trade secrets and damages incurred by the plaintiff, and also requires plaintiffs seeking damages to allege a specific damages amount, prohibiting recovery beyond that amount.

In addition to disputing the validity of Appian's claims against the Company, the Company believes that any alleged damages claimed by Appian are not supported by the necessary legal standard of proximate cause. In addition, following the February 10, 2022 ruling on the Company's plea in bar, the ongoing claim under the Virginia Computer Crimes Act is time limited to acts occurring after May 29, 2015. A jury trial with respect to the merits of the dispute is scheduled to begin on March 21, 2022. The Company believes the claims brought by Appian against the Company are without merit, that the Company has strong defenses to these claims and that, among other things, even were the jury to find that the Company misappropriated Appian's alleged trade secrets, any alleged damages claimed by Appian are not supported by the necessary legal standard of proximate cause. The Company is unable to reasonably estimate possible damages or a range of possible damages given the Company's belief that the damages claimed by Appian fail to satisfy the required legal standard and due to the uncertainty as to how a jury may rule.

23

Carryforward losses and credits expire between 2022 and 2039, except for the 2020 and 2021 federal net operating loss of $139.0 million and $1.0 million of state credits, which both have unlimited carryforward periods.

The Company's India subsidiary is primarily located in Special Economic Zones ("SEZs") and is entitled to a tax holiday in India. The tax holiday reduces or eliminates income tax in India. The tax holiday in the Hyderabad SEZ is scheduled to expire in 2024. The tax holiday in the Bengaluru SEZ is scheduled to expire in 2022.

### *Uncertain tax benefits*

A rollforward of the Company's gross unrecognized tax benefits is:

| (in thousands) | 2021 | | 2020 | | 2019 |
|---|---|---|---|---|---|
| Balance as of January 1, | $ | 23,801 | $ | 23,271 | $ | 18,157 |
| Additions for tax positions related to the current year | | 653 | | 653 | | 510 |
| Additions for tax positions of prior years | | - | | 962 | | 4,917 |
| Reductions for tax positions of prior years | | (6,870) | | (1,085) | | (313) |
| Balance as of December 31, | $ | 17,584 | $ | 23,801 | $ | 23,271 |

As of December 31, 2021, the Company had $17.6 million of total unrecognized tax benefits, which would decrease the Company's effective tax rate if recognized.

### *Tax examinations*

The Company files federal and state income tax returns in the U.S. and in various foreign jurisdictions. In the ordinary course of business, the Company and its subsidiaries are examined by various tax authorities, including the Internal Revenue Service in the U.S. As of December 31, 2021, the Company's U.S. federal tax returns for the years 2014 through 2017 were under examination by the Internal Revenue Service. In addition, certain foreign jurisdictions are auditing the Company's income tax returns for periods ranging from 2013 through 2019. The Company does not expect the results of these audits to have a material effect on the Company's financial condition, results of operations, or cash flows. With few exceptions, the statute of limitations remains open in all jurisdictions for the tax years 2016 to the present.

## 18. (LOSS) PER SHARE

Basic (loss) per share is calculated using the weighted-average number of common shares outstanding during the period. Diluted (loss) per share is calculated using the weighted-average number of common shares outstanding during the period, plus the dilutive effect of outstanding stock options, RSUs, and convertible senior notes.

Calculation of (loss) per share:

| (in thousands, except per share amounts) | 2021 | | 2020 | | 2019 |
|---|---|---|---|---|---|
| Net (loss) | $ | (63,040) | $ | (61,373) | $ | (90,433) |
| Weighted-average common shares outstanding | | 81,387 | | 80,336 | | 79,055 |
| **(Loss) per share, basic** | **$** | **(0.77)** | **$** | **(0.76)** | **$** | **(1.14)** |
| | | | | | | |
| Net (loss) | $ | (63,040) | $ | (61,373) | $ | (90,433) |
| Stock options | | - | | - | | - |
| RSUs | | - | | - | | - |
| Effect of dilutive securities | | - | | - | | - |
| Weighted-average common shares outstanding, assuming dilution [1][2][3] | | 81,387 | | 80,336 | | 79,055 |
| **(Loss) per share, diluted** | **$** | **(0.77)** | **$** | **(0.76)** | **$** | **(1.14)** |
| | | | | | | |
| Outstanding anti-dilutive stock options and RSUs [4] | | 5,862 | | 6,278 | | 5,911 |

(1) The shares underlying the conversion options in the Company's Notes are included using the if-converted method, if dilutive in the period. If the outstanding conversion options were fully exercised, the Company would issue an additional 4.4 million shares.

(2) In periods of loss, all dilutive securities are excluded as their inclusion would be anti-dilutive.

(3) The Company's Capped Call Transactions convert to 4.4 million shares of the Company's common stock (representing the number of shares for which the Notes are initially convertible). The Capped Call Transactions are expected to reduce common stock dilution and/or offset any potential cash payments the Company must make, other than for principal and interest, upon conversion of the Notes, with such reduction and/or offset subject to a cap of $196.44. The Capped Call Transactions are excluded from weighted-average common shares outstanding, assuming dilution, in all periods as their effect would be anti-dilutive.

(4) Outstanding stock options and RSUs that were anti-dilutive under the treasury stock method in the period were excluded from the computation of diluted (loss) per share. These awards may be dilutive in the future.

## 19. COMMITMENTS AND CONTINGENCIES

### *Commitments*

See "Note 10. Leases" for additional information.

***Legal Proceedings***

In addition to the matters below, the Company is, or may become, involved in a variety of claims, demands, suits, investigations, and proceedings that arise from time to time relating to matters incidental to the ordinary course of the Company's business, including actions with respect to contracts, intellectual property, employment, benefits, and securities matters. Regardless of the outcome, legal disputes can have a material effect on the Company because of defense and settlement costs, diversion of management resources, and other factors. In addition, as the Company is a party to ongoing litigation it is at least reasonably possible that our estimates will change in the near term and the effect may be material. As of December 31, 2021, the Company has not accrued a loss with respect to any litigation matter.

*Pegasystems Inc. v. Appian Corp. & Business Process Management Inc.*

On July 3, 2019, the Company filed suit in Massachusetts federal court against Appian Corp. ("Appian") and Business Process Management, Inc. ("BPM") relating to a BPM "Market Report" that Appian had used to promote itself against the Company. *Pegasystems Inc. v. Appian Corp. & Business Process Management Inc.*, No. 1:19-cv-11461 (D. Mass). The Company's complaint alleges that the report and Appian's marketing of it include false and misleading statements about the Company. The Company asked the court to order Appian to stop using the report, and Appian subsequently agreed to stop using the report. The Company also asked the court to award damages for false advertising, deceptive business practices, and commercial disparagement. On December 17, 2019, Appian asserted counterclaims against the Company seeking unspecified monetary damages and alleging certain of the Company's past marketing materials included false and misleading statements, one of the marketing reports failed to disclose that the report's author was paid by the Company, and that the Company defamed Appian in a LinkedIn post. On May 22, 2020, the court allowed in part the Company's motion to dismiss the counterclaims brought by Appian, but denied the motion as to the third party report and the defamation count. As described below, on May 29, 2020, Appian then sued the Company in Virginia. On June 17, 2021, Appian asserted additional counterclaims against the Company seeking unspecified monetary damages and alleging that certain additional marketing materials used by the Company contained false or misleading statements. The Company believes the counterclaims brought by Appian against the Company are without merit, and the Company intends to vigorously pursue its claims against Appian and defend against the counterclaims brought against the Company in this matter. The Company is unable to reasonably estimate possible damages or a range of possible damages in this matter given the Company's belief that the damages claimed by Appian fail to satisfy the required legal standard, the status of the proceeding, and due to the uncertainty as to how a jury may rule if this ultimately proceeds to trial.

*Appian Corp. v. Pegasystems Inc. & Youyong Zou*

On May 29, 2020, Appian sued the Company and an individual, Youyong Zou, in the Circuit Court of Fairfax County, Virginia in a matter titled *Appian Corp. v. Pegasystems Inc. & Youyong Zou*, No. 2020-07216 (Fairfax Cty. Ct.). Appian's complaint alleges a relationship between the Company and a consultant in approximately 2013 and sets forth claims for misappropriation of trade secrets under the Virginia Uniform Trade Secrets Act, violation of the Virginia Computer Crimes Act, tortious interference with contract and business expectancy, and statutory and common law conspiracy. The court allowed Appian to file an amended complaint on November 4, 2021, alleging that, in the 2019 time frame, employees of the Company accessed free Appian product trials under false pretenses. The amended complaint withdrew the claim for tortious interference with contract. After Appian filed the amended complaint, the Company successfully moved to dismiss Appian's conspiracy claims, which are no longer a part of the case. A jury trial with respect to the merits of the dispute is scheduled to begin on March 21, 2022. The Company believes the claims brought by Appian against the Company are without merit, that the Company has strong defenses to these claims and that, among other things, even were the jury to find that the Company misappropriated Appian's alleged trade secrets, any alleged damages claimed by Appian are not supported by the necessary legal standard of proximate cause. The Company is unable to reasonably estimate possible damages or a range of possible damages given the Company's belief that the damages claimed by Appian fail to satisfy the required legal standard and due to the uncertainty as to how a jury may rule.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this Annual Report on Form 10-K to be signed on its behalf by the undersigned, thereunto duly authorized.

**Pegasystems Inc.**

Date:  February 16, 2022      By:      /s/ KENNETH STILLWELL

**Kenneth Stillwell**
**Chief Operating Officer and Chief Financial Officer**
**(Principal Financial Officer)**

Pursuant to the requirements of the Securities Exchange Act of 1934, this Annual Report on Form 10-K has been signed below on February 16, 2022 by the following persons on behalf of the Registrant and in the capacities indicated.

| Signature | Title |
|---|---|
| /s/ ALAN TREFLER<br>**Alan Trefler** | Chairman and Chief Executive Officer<br>(Principal Executive Officer) |
| /s/ KENNETH STILLWELL<br>**Kenneth Stillwell** | Chief Operating Officer and Chief Financial Officer<br>(Principal Financial Officer) |
| /s/ EFSTATHIOS KOUNINIS<br>**Efstathios Kouninis** | Chief Accounting Officer, Vice President of Finance, and Treasurer<br>(Principal Accounting Officer) |
| /s/ PETER GYENES<br>**Peter Gyenes** | Director |
| /s/ RICHARD JONES<br>**Richard Jones** | Director |
| /s/ CHRISTOPHER LAFOND<br>**Christopher Lafond** | Director |
| /s/ DIANNE LEDINGHAM<br>**Dianne Ledingham** | Director |
| /s/ SHARON ROWLANDS<br>**Sharon Rowlands** | Director |
| /s/ LARRY WEBER<br>**Larry Weber** | Director |

69