# Exhibit 16

**VIRGINIA:**

**IN THE CIRCUIT COURT OF FAIRFAX COUNTY**

| | |
|---|---|
| **APPIAN CORPORATION** ) | |
| 7950 Jones Branch Drive ) | |
| Tysons, Virginia  22102, ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **Civil Action No. 2020 07216** |
| ) | |
| **PEGASYSTEMS INC.** ) | |
| SERVE AT:  Corporation Service Company ) | |
| 100 Shockoe Slip Fl 2 ) | |
| Richmond, Virginia 23291-4100, ) | |
| ) | |
| **and** ) | |
| ) | |
| **YOUYONG ZOU** ) | |
| 12867 Parapet Way ) | |
| Herndon, Virginia 20171, ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

**SECOND AMENDED COMPLAINT[1]**

Plaintiff Appian Corporation ("Appian"), by the undersigned counsel, files this Second Amended Complaint against defendants Pegasystems Inc. ("Pegasystems") and Youyong Zou ("Zou") seeking damages and other relief.

**NATURE OF THE ACTION**

1.      Over the course of many years, Pegasystems has engaged in an unlawful campaign of corporate espionage against Appian, Pegasystems' smaller yet technologically advanced

---

[1] By Order dated January 13, 2022, the Court dismissed with prejudice Count IV (Statutory Business Conspiracy Against Both Defendants) and Count V (Common Law Conspiracy Against Both Defendants).  Appian reserves all appellate rights with respect to those claims.

1

competitor in the business process management industry.  Involving personnel at Pegasystems up to and including Pegasystems' CEO and Founder, Alan Trefler, and other high-ranking Pegasystems executives, and assisted at least by Zou, Pegasystems' unlawful schemes have involved stealing Appian's trade secrets and confidential information and then using them to damage Appian's business and reputation, and to steal Appian's customers and potential customers.

2.      Among other things, Pegasystems enlisted Zou who illegally provided copies of Appian's software and documentation, which were proprietary confidential information and trade secrets.  Zou worked for an Appian business partner and therefore had access to Appian's software and documentation, subject to duties to maintain their secrecy.  In exchange for payment by Pegasystems, Zou breached those duties by secretly copying Appian's software and documentation.  Pegasystems and Zou then used the illicit copies to conduct detailed technical analyses of Appian's product to determine precisely how it was constructed and how it worked so that they could compare it to Pegasystems' product at a level not possible without the benefit of Appian's stolen trade secrets.  Pegasystems employees then created marketing materials and training materials for Pegasystems' sales force, which were used in repeated attempts to deprive Appian of business, often successfully.  They could not have created these materials without access to the trade secrets and confidential information they took from Appian.

3.      Pegasystems worked willfully and deliberately to ensure that its misappropriation of Appian's trade secrets, as well as the surrounding conspiracy and Pegasystems' and Zou's involvement in it, would evade detection.  Among other things, Pegasystems did not enlist an Appian employee, or seek a license directly from Appian, for its scheme.  Instead, Pegasystems enlisted Zou, who was not an Appian employee but worked for an Appian business partner, and

therefore had access to Appian's trade secrets and confidential information, subject to a duty to maintain their secrecy. Then, rather than hiring Zou directly to misappropriate Appian's trade secrets, Pegasystems funneled payment through a middleman company with whom it contracted to recruit and hire Zou to assist with Pegasystems' misappropriation.

4.    As a result of Pegasystems' concealment efforts, Appian only recently discovered defendants' trade secrets misappropriation, theft of confidential information and the surrounding conspiracy through the exercise of extraordinary diligence, along with happenstance. Pegasystems' efforts to compete with Appian, including in the 2014 timeframe, became an issue in an unrelated litigation. To learn more about Pegasystems's conduct with respect to Appian, Appian interviewed former Pegasystems employees who are now working for Appian to determine whether Pegasystems had engaged in unlawful competitive activities with respect to Appian. These interviews took place over the course of several months in 2020, and Appian took great pains not to learn any of Pegasystems' own trade secrets or confidential information in the process. These employees were reluctant to talk about Pegasystems' wrongdoing, reasonably fearing retaliation by Pegasystems, which has a reputation for dealing harshly with employees and former employees whom it deems disloyal. Eventually, however, the employees began to reveal information about Pegasystems' wrongdoing.

5.    Meanwhile, unrelated to Appian's interviews of the former Pegasystems employees, in early 2020, an individual who does not work for Appian with knowledge of Pegasystems happened to reach out to Appian to advise it of that individual's direct knowledge of some of Pegasystems' unlawful conduct with respect to Appian.

6.    Had these individuals not revealed these facts to Appian, Appian likely would never have learned of Pegasystems' or Zou's wrongdoing. Now aware of it, Appian has filed this suit to

seek legal redress.

7.      As a result of defendants' unlawful scheme, Appian has suffered substantial damages, including lost customers and profits and damage to its reputation in the industry.  In addition, defendants have been unjustly enriched.  Since embarking on its unlawful scheme, Pegasystems' revenues from government and other contracts have steadily increased, much of which would have flowed to Appian absent defendants' unlawful conduct.

## THE PARTIES

8.      Plaintiff Appian Corporation is a corporation organized and existing under the laws of the state of Delaware, with its principal place of business in the Commonwealth of Virginia, at 7950 Jones Branch Drive, Tysons, Virginia.

9.      Defendant Pegasystems Inc. is a corporation organized and existing under the laws of the Commonwealth of Massachusetts, with its principal place of business in Massachusetts, at 1 Rogers Street, Cambridge, Massachusetts.  Pegasystems regularly does and solicits business and derives substantial revenue from services rendered in the Commonwealth of Virginia.

10.      Defendant Youyong Zou is an individual residing and working in the Commonwealth of Virginia.

## JURISDICTION AND VENUE

11.      Pegasystems is subject to personal jurisdiction in this Court.  It regularly does and solicits business and derives substantial revenue from services rendered in Virginia.  The causes of action alleged in this Complaint arise from Pegasystems' transacting business in Virginia, and its causing tortious injury in Virginia, where Appian is.

12.      Zou is subject to personal jurisdiction in this Court because he resides and works in Virginia.  The causes of action alleged in this Complaint arise from Zou's transacting business

in Virginia, and his causing tortious injury in Virginia, where Appian is.

13.    Venue is proper in this Court because Appian is in Fairfax County, Zou resides in Fairfax County, Fairfax County is where the causes of action alleged in the Complaint arose, and a number of fact witnesses (including Zou and Appian employees) and other evidence to the action are in Fairfax County.

## FACTS

14.    Appian is a recognized global leader in the Business Process Management ("BPM") software market, providing a low-code development platform that allows its customers to quickly develop high-impact business applications.  Of Appian's approximately 1,300 employees worldwide, more than 700 are employed in its Tysons, Virginia headquarters.

15.    Appian generates revenue by licensing its software, on a non-exclusive basis, to customers and business partners, such as service providers.  A license to Appian's software permits the licensee to develop custom, low-code applications using Appian's development environment and run them on Appian's platform.  A license also permits the licensee to access Appian's documentation, which describes the technical features of Appian's software platform, as well as techniques that can be used to build applications on Appian's platform.

16.    Appian is the sole owner of its software development platform and documentation, which were trade secrets during the time period relevant to this action.

17.    During the relevant time period, Appian did not permit usage of its software development platform or documentation absent a license from Appian.

18.    Pegasystems competes in the same industry as Appian, providing a BPM software platform to customers that participate in similar industries and are of similar sizes to Appian's customers.

19.     Rather than compete lawfully and fairly with Appian in the marketplace, Pegasystems developed a scheme to unlawfully obtain copies of Appian's software and documentation – which are proprietary trade secrets – and to then use them to design sales and marketing materials to create the illusion for customers and potential customers that Pegasystems' product is better than Appian's product, thereby taking that business and those revenues away from Appian, and unjustly enriching itself.

20.     Pegasystems refrained from contracting directly with individuals who had access to Appian's software and documentation.  Instead, Pegasystems used a middleman company to identify individuals having access to Appian's software.  By using the middleman company, Pegasystems was able to better conceal its wrongdoing.

21.     KForce Inc. ("KForce") is a middleman company Pegasystems used to identify an individual having access to Appian's software.

22.     At Pegasystems' direction, KForce identified Zou as a person having access to Appian's software.

23.     Zou had access to Appian's software and documentation because he worked for Appian business partners, including Serco Inc.  ("Serco").  Serco is a contractor that provides services to the U.S. Government.  Serco is bound by terms of certain agreements that allowed Serco and certain of its licensed user employees (such as Zou) to access Appian's trade secrets and confidential information, but expressly prohibited disclosure of the trade secrets or confidential information to unauthorized third parties, and expressly limited use of the software to authorized business purposes, which did not include misappropriating Appian's trade secrets or sharing its software with Appian's competitors.  Relevant agreements included a February 2012 Subcontract as well as a federal supply contract (bearing the number GS-35F-0511T) and purchase orders

6

issued pursuant thereto.

24.     Additionally, Zou was contractually bound by his employment agreement with Serco and under Serco policies to protect the confidentiality of the information made available to him for his work for Serco, including Appian's trade secrets and confidential information.

25.     Pegasystems entered into a contract with KForce under which it paid KForce for the unlawful services that Zou agreed to provide Pegasystems, so that KForce could then pay Zou. These services included Zou using Appian's trade secrets and confidential information to teach Pegasystems precisely how Appian's software worked.  As Zou knew and Pegasystems knew or had reason to know, the services that Zou agreed to provide were in violation of contractual and other duties Zou had to maintain the secrecy of Appian's trade secrets and the confidentiality of Appian's confidential information.

26.     Pegasystems' objectives for its unlawful conduct included identifying secret processes and know how involved in using Appian's software platform that ultimately would allow Pegasystems – through marketing materials and sale techniques – to make its own platform seem better than Appian's.  To do this, beginning in 2012, and possibly earlier, Pegasystems devised a plan to obtain, and – with the assistance of Zou – did obtain, non-public details regarding Appian's architecture, as well as Appian's documentation of its software platform.

27.     In furtherance of defendants' unlawful scheme, Pegasystems paid Zou (through KForce) to travel from Virginia to Pegasystems' Massachusetts headquarters to meet with Pegasystems executives and employees for the purpose of answering detailed technical questions related to Appian's software platform.  These were Appian's trade secrets and confidential information.  Zou had access to them because he worked for Appian's business partner, Serco.  As Pegasystems knew or had reason to know, he was legally and contractually bound to prevent their

disclosure to third parties by virtue of his employment with Serco. In violation of these duties, in return for payment, Zou disclosed Appian's trade secrets and confidential information to Pegasystems.

28. In furtherance of this unlawful scheme, and using access granted to him as an employee of an Appian business partner, in violation of his legal and contractual duties to maintain the secrecy and confidentiality of Appian's trade secrets and confidential information, Zou downloaded confidential Appian documentation from Appian's password-protected site, for turnover to Pegasystems. Much of Zou's downloading of documentation occurred outside of work hours. He also checked Appian's documentation site repeatedly, downloading updated versions when available.

29. Zou had access to other trade secrets and confidential information of Appian besides its software and documentation. As an employee of Serco, he developed Appian applications for Appian customers. He therefore received customer feedback – including specific areas where Appian customers sought improved functionality from Appian's platform, such as administrative capabilities and scalability of the platform. This information was Appian's confidential information, and, as Pegasystems knew or had reason to know, Zou had contractual and legal duties to maintain its confidentiality. In violation of these duties, in return for payment, Zou disclosed the information to Appian's major competitor Pegasystems.

30. Also at the direction of Pegasystems and for its use, in return for payment, Zou created videos demonstrating the operation of Appian's software platform, including detailed demonstrations of building applications on it. As Zou knew and Pegasystems knew or had reason to know, this was in violation of Zou's contractual and legal duties to maintain the secrecy and confidentiality of Appian's trade secrets and confidential information.

31.     Also in furtherance of defendants' unlawful scheme, Pegasystems had Zou compare Appian's and Pegasystems' platforms to determine the platform on which certain application development operations were faster.  This allowed Pegasystems to identify features it could emphasize in sales processes as it competed against Appian for the same customers.

32.     Pegasystems featured still shots and excerpts from the videos that Zou created of Appian's trade secrets and confidential information in training materials for use by Pegasystems' sales force.  These training materials effectively slowed down the videos that Zou created to show in painstaking, screen-by-screen, detail precisely how applications were built on Appian's software platform.  Pegasystems could never have made these training materials without misappropriating Appian's trade secrets or stealing its confidential information.

33.     Many of Pegasystems' senior-most executives were aware of and condoned the illicit training materials, which were reviewed during meetings including Alan Trefler (Pegasystems' CEO), Kerim Akgonul (Pegasystems' Senior Vice President of Products), Stephen Bixby (Pegasystems' Vice President of Product Development), and Don Schuerman (Pegasystems' current Chief Technology Officer).

34.     Pegasystems also created technical briefs favorably comparing Pegasystems to Appian that were based on Appian's trade secrets and confidential information provided by Zou.

35.     Pegasystems also used the trade secrets and confidential information defendants unlawfully obtained from Appian to develop a presentation for its sales force to use highlighting differences between Pegasystems' and Appian's products to make Pegasystems' product seem better than Appian's.

36.     Pegasystems also used Appian's trade secrets and confidential information provided by Zou to create a set of "kill points" to emphasize points on which it thought it competed

9

very favorably against Appian.

37.    When Pegasystems and Appian were in head-to-head competition for the same contracts with prospective customers, Pegasystems provided documents or utilized information that Pegasystems developed using Appian's misappropriated trade secrets and confidential information.  As a result of this unlawful conduct, Pegasystems won the contracts over Appian, damaged Appian's reputation and business and unjustly enriched itself.

38.    In at least one instance, Zou logged into Appian's password-protected documentation website from an IP address associated with Pegasystems.  While at that IP address, Zou downloaded Appian's Reference Application, a "best practices" guide for development of software applications on Appian's platform.  At that time, this was confidential and trade secret information belonging to Appian.  On information and belief, Zou conducted this illegal access and downloading while physically on site at Pegasystems' headquarters.

39.    Pegasystems sought to obtain and did obtain and use at least the following information from Zou in violation of contractual and other legal duties to maintain the secrecy and confidentiality of Appian's trade secrets and confidential information, which Pegasystems then used to its own benefit at Appian's expense:

    a.    How to develop and change applications on Appian's software platform;

    b.    The types of application development operations that could be completed more quickly on either platform;

    c.    The types of application challenges Appian's software platform would have trouble with;

    d.    The architecture of Appian's software platform;

    e.    Details regarding the ability of Appian's platform to scale to accommodate

10

different types of use;

f.    The number of developers who could simultaneously work on processes in Appian's software platform;

g.    The capabilities of Appian's platform for conducting parallel work-related Appian applications;

h.    How Appian was using its proprietary database to store data for applications developed on Appian's software platform;

i.    Any risks of data loss using Appian's product;

j.    Any scalability issues with Appian's software platform;

k.    The content of Appian's documentation;

l.    How Pegasystems' platform could be better positioned and improved relative to Appian's.

40.    Pegasystems' unlawful use of the Appian trade secrets acquired for it by Zou continued for years after 2014, including through at least 2018 and potentially beyond. Pegasystems has also conspired with others besides Zou to misappropriate and unlawfully access Appian's trade secrets, or misappropriated and unlawfully accessed Appian trade secrets through its own employees accessing Appian's software and its network under false identities and by hiding their affiliation with Pegasystems, including in 2019.

### COUNT I:  MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF VIRGINIA'S UNIFORM TRADE SECRETS ACT (AGAINST BOTH DEFENDANTS)

41.    Appian incorporates by reference the allegations contained in paragraphs 1-40 of the Complaint as if fully set forth herein.

42.    Appian's software platform, including the technical details of how its various components can be combined and used to develop applications and the functionality of the

11

platform, the steps by which Appian's applications are developed, and Appian's documentation, are trade secrets under the Virginia Uniform Trade Secrets Act ("VUTSA"). They are information that derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and they are information that is the subject of efforts that are reasonable under the circumstances to maintain their secrecy.

43. Reasonable efforts that Appian undertakes to maintain the secrecy of its trade secrets include requiring its business partners (including Serco) and the employees of its business partners (including Zou) to comply with non-disclosure and confidentiality obligations protecting Appian's trade secrets, and to agree in writing to comply with those obligations.

44. As an employee of Appian's business partner Serco, Zou had a duty to maintain the secrecy of Appian's trade secrets, which he breached. Pegasystems knew or had reason to know that Zou had that duty, and conspired with him, induced him and paid him to breach it.

45. Defendants misappropriated Appian's trade secrets by acquiring them, while knowing or having reason to know that the trade secrets were acquired by improper means.

46. Defendants also misappropriated Appian's trade secrets by disclosing or using them without Appian's express or implied consent, having used improper means to acquire knowledge of the trade secret.

47. Defendants also misappropriated Appian's trade secrets by disclosing them or using them without Appian's express or implied consent, where, at the time of their disclosure or use, defendants knew or had reason to know that their knowledge of the trade secrets was (a) derived from or through a person who had used improper means to acquire them, (b) acquired under circumstances giving rise to a duty to maintain their secrecy or limit their use, (c) derived from or

12

through a person who owed a duty Appian to maintain their secrecy or limit their use, and/or (d) acquired by accident or mistake.

48.     The improper means by which Appian's trade secrets were acquired included theft, use of a computer or computer network without authority, breach of a duty or inducement of breach of a duty to maintain secrecy, and espionage through electronic or other means.

49.     Zou's breach of his duty to maintain the secrecy of Appian's trade secrets was improper means.

50.     Pegasystems' inducement of the breach by Zou of his duty to maintain the secrecy of Appian's trade secrets was improper means.

51.     Among other things, Zou misappropriated Appian's trade secrets by acquiring, disclosing and using Appian's software development platform, including the technical details of how its various components can be combined and used to develop applications and the functionality of the platform, the steps by which Appian's applications are developed, and Appian's documentation.

52.     Among other things, Pegasystems misappropriated Appian's trade secrets by acquiring, disclosing and using Appian's software development platform, including the technical details of how its various components can be combined and used to develop applications and the functionality of the platform, the steps by which Appian's applications are developed, and Appian's documentation.

53.     Appian has suffered damages as a result of Zou's and Pegasystems' misappropriation of its trade secrets. As a result of the violations, among other things, Pegasystems used the trade secrets as part of its sales process and marketing materials to take business away

from Appian.  Lost sales to Appian from existing and potential customers, and damage to Appian's goodwill in the industry, followed as a result.

54.    As a direct and proximate result of defendants' misappropriation of Appian's trade secrets, Appian has suffered and will suffer substantial monetary damages.

55.    In addition to the actual losses caused Appian by Zou's and Pegasystems' misappropriation, defendants have been unjustly enriched by the misappropriation.  Appian is entitled to an award of damages for the misappropriation, including for both the actual loss caused by the misappropriation and the unjust enrichment caused by the misappropriation.

56.    The commercial advantage derived by Pegasystems through the misappropriation continues, and some of the harm caused by it to Appian is ongoing.

57.    Pegasystems' misappropriation of Appian's trade secrets was willful and malicious, entitling Appian to an award of reasonable attorneys' fees and punitive damages against Pegasystems.

**COUNT II:  COMPUTER FRAUD IN VIOLATION
OF THE VIRGINIA COMPUTER CRIMES ACT
<u>(AGAINST PEGASYSTEMS ONLY)</u>**

58.    Appian incorporates by reference the allegations contained in paragraphs 1-40 of the Complaint as if fully set forth herein.

59.    Appian's software platform is "property" protected by the Virginia Computer Crimes Act ("VCCA").

60.    Appian's documentation is also property protected by the VCCA.

61.    Appian is the sole owner of its software platform and documentation.

62.    Appian does not permit usage of its software platform or documentation absent a license from Appian.

14

63.    Pegasystems, Appian's competitor, does not have a license from Appian to use Appian's software platform or documentation.  Appian has never authorized Pegasystems to use Appian's software platform or documentation.

64.    In violation of the VCCA, Pegasystems used a computer or computer network without authority with the intent to convert Appian's property, and converted Appian's property, causing Appian damages, including lost profits.

65.    Pegasystems converted Appian's property by exercising control over Appian's software platform, and by using it, examining it and analyzing it.

66.    Pegasystems converted Appian's documentation by viewing it and making copies of it.

67.    Appian is entitled to an award for the damages it has sustained from Pegasystems' VCCA violations.  Appian is also entitled to the costs of suit.

**COUNT III:  TORTIOUS INTERFERENCE**
**WITH APPIAN'S BUSINESS EXPECTANCY**
**(AGAINST DEFENDANT PEGASYSTEMS)**

68.    Appian incorporates by reference the allegations contained in paragraphs 1-40 of the Complaint as if fully set forth herein.

69.    Appian routinely enters into license and related agreements with prospective customers who desire to license to Appian's platform, resulting in revenue to Appian.

70.    Appian had a business expectancy with prospective customers.

71.    Upon information and belief, Pegasystems knew of those business expectancies.

72.    Pegasystems intentionally interfered with those business expectancies, causing a termination of the expectancies, and resultant damage to Appian.  Upon information and belief, during competitive bidding processes with the prospective customers, Pegasystems provided

15

documents or utilized information that Pegasystems developed using Appian's misappropriated trade secrets. The prospective customers subsequently entered into agreements with Pegasystems, not Appian.

73. Upon information and belief, but for Pegasystems' intentional interference with business expectancies, Appian would have entered into new agreements with the prospective customers. Appian has lost profits as a result.

74. As a direct and proximate result of Pegasystems' tortious interference with business expectancy, Appian has suffered and will suffer substantial monetary damages.

75. Appian is entitled to an award for the damages it has sustained from Pegasystems' tortious interference with business expectancy. Appian pursues relief pursuant to this Count only with regard to agreements that the prospective customers entered into with Pegasystems on or after May 29, 2015.

### COUNT IV:  STATUTORY BUSINESS CONSPIRACY
### (AGAINST BOTH DEFENDANTS)

76. Appian incorporates by reference the allegations contained in paragraphs 1-40 of the Complaint as if fully set forth herein.

77. In violation of Va. Code § 18.2-499, *et seq.*, Pegasystems with other parties, or Pegasystems and Zou, combined, associated, agreed, mutually undertook or concerted together for the purposes of willfully and maliciously injuring Appian in its trade, business or profession. Among other things, they agreed and combined to injure Appian's business by:  (1) misappropriating Appian's trade secrets and confidential information; (2) breaching Zou's contractual and legal duties to maintain the secrecy of Appian's trade secrets and the confidentiality of Appian's confidential information; (3) tortiously interfering with Appian's

16

business expectancies.  In doing so, Pegasystems, or Pegasystems and Zou, acted intentionally, purposefully and without lawful justification.

78.    As a result of Pegasystems' and Zou's violations, Appian has suffered damages, including lost profits.

79.    As a direct and proximate result of defendants' unlawful conspiracy, Appian has suffered and will suffer substantial monetary damages in an amount that will exceed $90 million.

80.    Appian is entitled to an award of treble damages for Pegasystems' and Zou's violations.

81.    Appian is also entitled to an award of the costs of suit, including reasonable attorneys' fees.

### COUNT V:  COMMON LAW CONSPIRACY
### (AGAINST BOTH DEFENDANTS)

82.    Appian incorporates by reference the allegations contained in paragraphs 1-40 of the Complaint as if fully set forth herein.

83.    Pegasystems and Zou combined to accomplish, by some concerted action, some criminal or unlawful purpose by a criminal or unlawful means.  Among other things, they combined to:  (1) misappropriate Appian's trade secrets and confidential information; (2) breach Zou's contractual and legal duties to maintain the secrecy of Appian's trade secrets and the confidentiality of Appian's confidential information; (3) tortiously interfere with Appian's business expectancies.

84.    As a result of Pegasystems' and Zou's unlawful conspiracy, Appian has suffered damages, including lost profits.

85.    As a direct and proximate result of defendants' unlawful conspiracy, Appian has suffered and will suffer substantial monetary damages in an amount that will exceed $90 million.

17

86. Appian is entitled to an award of damages for Pegasystems' and Zou's violations.

87. Appian is also entitled to an award of punitive damages.

### REQUEST FOR RELIEF

WHEREFORE, Appian requests relief as follows:

88. Enter judgment in favor of Appian on all counts;

89. Award damages including both the actual loss and the unjust enrichment, a reasonable royalty as provided by Va. Code § 59.1-338, and/or all other remedies available under the causes of action pled herein, in an amount not to exceed $3,032,847,000 (exclusive of attorneys' fees, pre- and post-judgment interest, and any other amounts awarded by the Court);

90. Award punitive damages against Pegasystems to the maximum amount allowed by law;

91. Award Appian treble its compensatory damages against Pegasystems; and

92. Award Appian its costs, including reasonable attorney's fees pursuant to Va. Code § 59.1-338.1 (VUTSA) and Va. Code §18.2-500 (business conspiracy) incurred in connection with this action; and

93. Grant such other and further relief as is just and proper.

### JURY DEMAND

Appian demands a trial by jury.

Dated:  January __, 2022                    Respectfully submitted,

_____

Ellen D. Marcus (Virginia Bar No. 44314)
Sheila M. Costin (Virginia Bar No. 31452)

18

HOLMES COSTIN & MARCUS PLLC
301 N. Fairfax Street, Suite 202
Alexandria, Virginia 22314
(703) 260-6401
emarcus@hcmlawva.com
scostin@hcmlawva.com

Adeel A. Mangi (*pro hac vice*)
Jeffrey Ginsberg (*pro hac vice*)
Muhammad U. Faridi (*pro hac vice*)
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000
aamangi@pbwt.com
jginsberg@pbwt.com
mfaridi@pbwt.com

John M. McNichols (Virginia Bar No. 66663)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street N.W.
Washington, D.C. 20005
(202) 434-5000
jmcnichols@wc.com

*Counsel to Appian Corporation*

19