# Exhibit 20

COMMONWEALTH OF VIRGINIA

IN THE CIRCUIT COURT OF FAIRFAX COUNTY

APPIAN CORPORATION,                    )

                    Plaintiff,   )

v.                                     )   C.A. NO.: 2020-07216

PEGASYSTEMS, INC. and                  )

YOUYONG ZOU,                           )

                    Defendants.  )

_____)

CONFIDENTIAL VIDEOTAPED DEPOSITION OF

ALAN TREFLER

TWO INTERNATIONAL PLACE

BOSTON, MASSACHUSETTS

JANUARY 12, 2022

Reported by:

Sharon Saalfield, CSR, RDR, CRR

JOB 204422

Page 66

ALAN TREFLER - CONFIDENTIAL

if you want me to not talk about what's really going on --

Q.   Tell you what --

A.   -- but you want me to talk about words, just please read his words.

Q.   Sure.  Let's do it this way.  Why don't you read aloud the email from Mr. Sachs to Mr. Leon Trefler, which is on February 13th at 3:43 p.m., can you please read it aloud.

A.   I'd rather you read it but I'll tell you if I believe you're reading it correctly.

Q.   Go ahead and read it, please.

A.   I'd rather not.

Q.   I'm asking you to, so please read it.

MR. FRANK:  You can read it.

THE WITNESS:  All right, I hope my throat holds up.

"Do we have anyone in competitive intelligence on this?  I think I asked this, but I, for one, would really like to see what the Appian experience is.  Do we have the product?"

BY MR. MANGI:

Q.   Now, in the email above that, your brother responds, and in the second paragraph, one thing he

Page 67

ALAN TREFLER - CONFIDENTIAL

says is "I'm sure we can get the product.  I believe they offer free trials."

Do you see that, sir?

A.   I do.

Q.   Now, are you aware that Appian offers free trials?

A.   I am aware that they heavily advertise free trials.

Q.   And are you aware that Appian's license terms for those free trials expressly forbid competitors from seeking or getting access to those free trials?

A.   In the last month or two I have been shown paragraphs in the license "agreement" that say things like you're saying, but that is not the standard in the industry and that is not what I would expect from a free trial.

Q.   Leaving aside the standard in the industry, when's the first time you became aware of Appian not providing competitors with access to free trials?

A.   It would have been, I believe, in the context of this lawsuit.

Q.   So it's your sworn testimony, sir, that prior to this lawsuit, you believe that Appian free trials were open to Pegasystems?

Page 68

ALAN TREFLER - CONFIDENTIAL

A.   I believe that Appian free trials were free.

Q.   But did you believe they were open to Pegasystems?

A.   You know, I don't know that I believe that they were open or not open.

Q.   Well, which is it?  Did you think that Pegasystems people could sign up for an Appian free trial, or did you think Appian would not permit that?

A.   I think that there are certain people at Appian who like to screw around with certain people at Pega, and they might not permit it for certain people, but I did not have any reason to believe that as a policy, their advertising of free trials was false.

Q.   So did you think that Appian was only looking to block some specified individuals at Pega but have no problem with Pega employees generally signing up for free trials?  That's your testimony?

A.   I hadn't thought it through at that level of detail.

Q.   Sir, you have been in this industry for 39 years, correct?

A.   Yeah.

Q.   And your people certainly over the last 10 years have been seeking access to Appian's software

Page 69

ALAN TREFLER - CONFIDENTIAL

platform in a number of different ways, correct?

A.   Yes, I think that's fair.

Q.   Including through free trials.  They have tried to get access to free trials in many different ways, correct?

A.   I have learned through this lawsuit that they have.

Q.   Even before this lawsuit, your people reported to you that it was very hard to get access from Pegasystems to Appian free trials, correct?

A.   They -- they may have.

Q.   And why did you think that was hard?

A.   I really hadn't thought about it.

Q.   You were directing people to get access to Appian, correct?

A.   No.

Q.   You were telling people you wanted to see, for example, demos of Appian, correct?

A.   I -- I did want to see a demo, but that doesn't mean that you need to get access to Appian.

Q.   You did, in fact, see your people using Appian software, correct?

A.   I think I probably did at some point.

Q.   You saw videos of that, too, correct?

Page 70

ALAN TREFLER - CONFIDENTIAL

A. Well, I've seen a lot of videos. There are hundreds of videos of Appian software being used that I have seen, and there are dozens of live demos --

Q. You saw your own --

MR. FRANK: Let him finish, please.

BY MR. MANGI:

Q. You saw --

A. There are dozens of live demos that I have seen presented by Appian staff at Gartner conferences and other places.

Q. Yes, let's talk about that. Sometimes Appian may choose to make certain aspects of its product available in a marketing material, correct?

A. Yes.

Q. But is it fair to say, sir, that to your knowledge, Appian never consented to having Pegasystems employees do deep dives and analysis and explorations all through its software for you, Alan Trefler?

MR. FRANK: Objection.

BY MR. MANGI:

Q. You're not aware of Appian ever having consented to that, right?

MR. FRANK: Objection.

THE WITNESS: I'm not aware of that ever

Page 71

ALAN TREFLER - CONFIDENTIAL

having happened.

BY MR. MANGI:

Q. Okay. So here's my question, sir. When you are aware that your employees were getting access to Appian free trials and using them, how did you think, as the CEO of the company, they were doing that?

MR. FRANK: Objection.

THE WITNESS: I was thinking that they were doing it the way you do it with Salesforce, or the way you do it with Oracle, or the way you would do it with IBM, or the way you would do it with Camunda, or the way you would do it with Activity, or the other dozens of companies who put forward free trials and don't set this competitive trap that Appian set.

BY MR. MANGI:

Q. And then why is it, sir, that your employees are reporting to you on how hard it was to get access to Appian?

MR. FRANK: Objection.

BY MR. MANGI:

Q. How did you explain that if you thought that access was freely available?

MR. FRANK: Objection. Assumes a matter not in evidence.

Page 72

ALAN TREFLER - CONFIDENTIAL

MR. MANGI: Go ahead.

THE WITNESS: Well, and all of this assumes a level of intensity or attentiveness to this minutia that certainly was not top of mind in terms of this sort of detail.

BY MR. MANGI:

Q. So now can you answer my question? When your people told you that it was hard to get access to Appian trials to do the work you were asking them to do, what did you think that meant if your assumption was free trials were open to everyone?

MR. FRANK: Objection. Assumes a premise not in evidence.

THE WITNESS: I had no requirement, expectation, or even recommendation that the right way to get the information I wanted was through free trials.

BY MR. MANGI:

Q. And how did you want them to get you a demo of Appian? You wanted to see a live demo of Appian. Do you remember that?

A. I don't know that it had to be a live demo. I think that being able to see a demo in Appian is something that could just be pulled off of a variety of

Page 73

ALAN TREFLER - CONFIDENTIAL

websites in the 2019 time frame.

MR. FRANK: Objection.

BY MR. MANGI:

Q. Did you think that Mr. Benjamin Baril could answer the various technical questions you were asking him to answer without access to Appian's trial?

A. Yeah, I do.

Q. You thought he was doing his work without any access to Appian? That's your testimony?

MR. FRANK: Objection.

THE WITNESS: I didn't have an opinion on that.

BY MR. MANGI:

Q. You didn't know one way or the other?

A. Certainly what I was asking for him to look at would not have required access to a Appian, you know, free trial.

Q. Now, in this email, your brother also talks about using BP3. He says, "BP3 would be a great one to do some diligence for us."

Do you see that?

A. Yeah.

Q. And did Pega ever use a company called BP3 to do analysis of Appian?

Page 202

ALAN TREFLER - CONFIDENTIAL

Q. Okay.

A. -- "folder of videos," yes.

Q. And then he goes on and he says, "Appian build one is a 54-minute video of Peter Bessman attempting to recreate a very simple Pega build from scratch in Appian." And then he says, "Warning, the first few minutes include some heavy metal that Peter was listening to that I haven't removed yet." And then he goes on from there.

Do you see that, sir?

A. Yeah. I see a lot of detail there, sure.

Q. It's fair to say, sir, that in 2019, you were sent this email stating clearly that your Pega employees were working within an Appian platform?

A. No, that -- that wouldn't be reasonable if he implies that I saw it.

Q. You don't read your emails?

A. I get hundreds of emails a day.

Q. So do I. I read them.

A. And I have set up -- I actually get thousands of emails a day. I have set up some mechanisms by which certain types of emails are actually shuttled off to places where I'll sometimes look once a month and just look at two percent of them. And things that

Page 203

ALAN TREFLER - CONFIDENTIAL

would come from SA Pulse, for instance, if you were to go look at my PC, you'll see they're all in a separate directory.

So I have no confidence at all that I would have seen something that came from SA Pulse.

Q. But you're not at all uncomfortable with the notion that your people were working inside of an Appian platform? You think that's fine, right?

A. I think that working inside of a -- working inside of a free trial from an organization is profoundly common in the industry and is supported by us.

Q. And so you have no qualms, you have no discomfort with the notion that you knew your people were working within Appian's platform in 2019, correct?

A. So, first, I don't think there's anything here that shows I knew they were working -- I don't know that we were ever working in their platform in the way that some people might understand their term. I think that what's been shown is we had some people working in their free trial.

Q. Did you know?

MR. FRANK: Did you know what? Objection?

BY MR. MANGI:

Page 204

ALAN TREFLER - CONFIDENTIAL

Q. That people were working inside Appian's free trials?

A. I don't, as I sit here, have any recollection that I knew that then.

Q. Did you know it at the time?

A. No.

Q. Based upon all the documents that we've looked at, including an email to you telling them that's what they're doing?

A. I'm telling you that this email from this point of view is worthless.

Q. You're not willing to accept that you knew about it at the time, correct?

A. Well, as I've pointed out, the fact that it went to SA Pulse notification is an example that it most certainly did not go into my main email box.

Q. I'm not asking about the email. I'm just asking more generally now. Are you comfortable accepting the notion that you knew part of the work you were having your people do in 2019 involved having them access Appian's platform?

MR. FRANK: Objection.

THE WITNESS: So there was nothing I can recall about what I was asking them to do that would

Page 205

ALAN TREFLER - CONFIDENTIAL

have required access to their platform. I was looking for different things.

BY MR. MANGI:

Q. And if you had known that they were accessing Appian's platform, what would you have done differently?

A. You know, that's a pretty complex hypothetical question, because it also requires what we would have known years ago about who was doing what, what was happening, what was legal, what was not legal, what was a trap, what wasn't a trap. So there's a lot of stuff there for the sort of yes or no answer that you want. If you want to be more specific, I'll be happy to --

Q. The question is very straightforward, sir. If, in fact, you had read this email at the time and you had seen that they're actually using an Appian platform, would you have done anything differently than what you did?

MR. FRANK: An Appian platform? Objection. You mean an Appian free trial?

MR. MANGI: Please don't make speaking objections.

Go ahead.

THE WITNESS: So a couple things. If I had

Page 246

ALAN TREFLER - CONFIDENTIAL

A.   You know, I sign on to thousands of things in the course of a year.  I can't remember every single variation I might have done.

Q.   How many aliases do you have?

A.   Well, those are the three I use.

Q.   Which ones?

A.   I consider the alias to be the email address, which is the key identifier, and there is ASCII, you know, the ASCIIzero@gmail and Yahoo, and then there's the, you know, Alan -- well, in fact, I probably have about six aliases at Pega.

Q.   Well, let's go through these one by one.  So ASCIIzero@gmail.com, that's one of your email addresses, right?

A.   Yeah.

Q.   Okay.  And associated with that email address, you've used A. Skii as an identity?  You saw that on your emails?

A.   We did see that.

Q.   You have used -- you have used A. Ewe as an identity, A., E-w-e?

A.   We've seen that, yes.

Q.   You've used Albert Skii as an identity?

A.   It would not surprise me, though I can't

Page 247

ALAN TREFLER - CONFIDENTIAL

remember when I would have.

Q.   And you're not sure if you ever used Paul Foon?

A.   I --

MR. FRANK:  Objection.  That's not his testimony.  I believe he testified he had no memory of doing that.

BY MR. MANGI:

Q.   But you can't rule it out, fair?

A.   I can't rule it out in that things that you cannot remember, you cannot rule out.  Yes, that's correct.

Q.   Okay.  So let's have a look at Exhibit 37 to your deposition.

(Exhibit 37 marked for identification.)

BY MR. MANGI:

Q.   All right, sir.  Exhibit 37 is an Appian forum registration in the name of Albert Skii.  And the email address is ASCIIzero@telstra.com.

Do you see that?

A.   I do.

Q.   Is that you?

A.   I don't think so.

Q.   Have you ever used a Telstra email address?

Page 248

ALAN TREFLER - CONFIDENTIAL

A.   Not to my recollection.

Q.   Have you ever entered that as a email address on a registration?

A.   Not that I recall.

Q.   So it'd be quite a coincidence, wouldn't it, sir, if someone else is using the name Albert Skii, and they're using the email prefix ASCIIzero, but it's not you?

A.   Well, it might be less of a coincidence than you realize, because the reason I had to do ASCIIzero@gmail.com was because ASCII with an actual zero was already taken.  So there are lots of people around who, I guess, like the prefix ASCII.  I didn't tell you that I knew I had used Albert Skii.  I just told you I thought it could be possible because sometimes you'll be in places that require more than one letter.

Q.   Have you ever used the company SA Zero Mines?

A.   Not to my knowledge.  And I've never had this phone number.  That I can actually tell you.

Q.   Now, the other email address you said was a Yahoo one, what is that email address?

A.   It's ASCIIzero@yahoo.com.

Q.   And what names are associated with that email

Page 249

ALAN TREFLER - CONFIDENTIAL

account?

A.   I don't recall to tell you.  I don't use it very much.

Q.   Well, what's the name on it?

A.   I don't know.

Q.   You don't know what name is on your own email account?

A.   No, not -- not that one.

Q.   It's not Alan?

A.   Maybe.

Q.   Well, is it your own name or is it a fake name?

A.   So you keep wanting to call it fake.  The name on it it is the name that's on it.  I'm happy to look it up and tell you.

Q.   You don't know what name is on it?

A.   No, I don't.

Q.   How is it that you have an email address and you don't know what name is on it?  If you ask me what name is on my email address I'll say it's my name, Adeel Mangi.

MR. FRANK:  Objection.

MR. MANGI:  That's true on my private email.  That's true on my work email.

Page 282

ALAN TREFLER - CONFIDENTIAL

Q. So you're saying it was inappropriate, what he did to bring in Zou?

A. I think it was incomplete.

Q. What do you mean by that?

A. He didn't do the right vetting. He didn't check that this resource would be able to properly deliver what he did.

Q. And what should he have checked?

A. Well, a number of things. One, he should have made sure that he or Kforce understood whether Zou was under any limitations and what those limitations were, so he could decide if Zou was appropriate or whether he should do that. And then I think he should have, you know, been tighter in the supervision to make sure that all the work that was being done was work that was appropriate.

Q. And was it appropriate?

A. I don't think it was appropriate for him to hire Zou.

Q. And what do you think was inappropriate about that?

A. Well, he didn't check that Zou was fully cleared to do the work.

Q. Was he fully cleared?

Page 283

ALAN TREFLER - CONFIDENTIAL

A. Well, from what I've seen, there's a contention about what he's allowed to do, and neither he nor Kforce had brought that to light at the time.

Q. You're aware that Zou was working for Serco at the time?

MR. FRANK: Objection. At what time?

MR. MANGI: This time period, 2012 through 2014.

MR. FRANK: Objection.

THE WITNESS: I've seen -- so I can answer that, I've seen Zou's name in conjunction with the company Serco, but I don't know anything about that business relationship or how it worked out.

BY MR. MANGI:

Q. Would you agree with me, sir, that if a developer has access to Appian in order to do work for the government as working for a third party like a developing -- a development company, that they should not be then sharing their access to the Appian platform, that they have to do their day job with a competitor?

MR. FRANK: Objection.

THE WITNESS: I think there's so much in that sentence I don't even know where to begin.

Page 284

ALAN TREFLER - CONFIDENTIAL

MR. MANGI: Well, let's begin here.

THE WITNESS: I think that people should do things for which they are entitled, and Zou apparently did things for which he was not entitled.

BY MR. MANGI:

Q. And as the CEO of Pegasystems, do you accept responsibility for the fact that your company hired Zou to do things for which he was not entitled to do?

A. Well, I don't expect -- accept direct and individual responsibility for the specific act, but ultimately, I'm not trying to shift responsibility away from myself or the company.

Q. And so what are you going to do to make it right with Appian that, in fact, your company did this?

A. Well, I've had a chance to see what the fruits of Zou's labors were. I have a tremendous amount of knowledge, contemporaneous and precedent to this time, and I think that Appian suffered no damage and we achieved no benefit from the work that Zou did.

Q. So your position, sir, is you concede that Pegasystems should not have done this work with Zou, but, nonetheless, you don't think Appian was damaged by it; is that a fair summary?

A. I -- I don't think that Appian was damaged by

Page 285

ALAN TREFLER - CONFIDENTIAL

the work that Zou did.

Q. But you also do concede, don't you, that Pegasystems should not have hired Mr. Zou to do this work in the way that it did?

A. I think that the hiring and the progression should have been different.

Q. It shouldn't have happened, correct?

MR. FRANK: Objection. That's not what he said.

THE WITNESS: No, it shouldn't have been different. I'm not sure what it was that shouldn't have happened.

BY MR. MANGI:

Q. Would you agree that given that Mr. Zou had access to Appian in order to do his day job for a third-party company working on Appian installations for the government, would you agree that Pegasystems should not then have hired him to provide it with information about Appian?

A. I don't think that those things connect very directly at all.

Q. Well, you're aware that Mr. Zou was giving demonstrations of the Appian platform to Pegasystems' employees using login credentials that he had in order