UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| CITY OF FORT LAUDERDALE POLICE AND FIREFIGHTERS' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>               Plaintiff,<br><br>    vs.<br><br>PEGASYSTEMS INC., et al.,<br><br>            Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 1:22-cv-11220-WGY<br><br>LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT |

4862-9849-0448.v3

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION AND OVERVIEW OF DEFENDANTS' FRAUD ..............................1

II.     LEGAL STANDARDS APPLICABLE TO DEFENDANTS' MOTION .........................5

III.    THE COMPLAINT SETS FORTH IN GREAT DETAIL DEFENDANTS'
        VIOLATIONS OF §10(b)..................................................................................................5

        A.      Defendants' Risk Disclosures Were False and Misleading ..................................6

        B.      Defendants' Statements Regarding the Virginia Action Were False and
                Misleading..............................................................................................................7

        C.      Defendants' Statements Concerning Their Sales and Marketing Practices
                Are Actionable .....................................................................................................10

        D.      Defendants' False and Misleading Statements Went Far Beyond Corporate
                Optimism...............................................................................................................12

        E.      Defendants' False and Misleading Statements About Pega's Code of
                Conduct Are Material ...........................................................................................13

        F.      Plaintiff's Scheme Liability Claims Are Unchallenged.......................................14

IV.     DEFENDANTS VIOLATED GAAP AND SEC DISCLOSURE RULES BY
        FAILING TO DISCLOSE THE VIRGINIA ACTION ......................................................14

        A.      ASC 450 Compelled Disclosure of the Virginia Action......................................15

        B.      Item 103 Required that Defendants Disclose the Virginia Action .......................17

V.      THE COMPLAINT PLEADS A STRONG INFERENCE OF SCIENTER .....................19

        A.      The Complaint Details Defendants' Reckless and/or Conscious
                Misconduct Raising a Strong Inference of Scienter .............................................19

        B.      Plaintiffs' Motive Allegations Support an Inference of Scienter..........................25

        C.      Pega's Corporate Scienter Is Properly Alleged ...................................................26

VI.     THE COMPLAINT SUFFICIENTLY PLEADS LOSS CAUSATION ..........................27

VII.    PLAINTIFFS' CONTROL PERSON CLAIM SHOULD PROCEED ............................30

VIII.   CONCLUSION..................................................................................................................30

4862-9849-0448.v3

## TABLE OF AUTHORITIES

**Page**

### CASES

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
   512 F.3d 46 (1st Cir. 2008)..................................................................................22, 30

*Aldridge v. A.T. Cross Corp.*,
   284 F.3d 72 (5th Cir. 2002) ................................................................... *passim*

*Allison v. Oak St. Health, Inc.*,
   2023 WL 1928119 (N.D. Ill. Feb. 10, 2023) ...................................................10, 25

*Axar Master Fund, Ltd. v. Bedford*,
   308 F. Supp. 3d 743 (S.D.N.Y. 2018),
   *aff'd*, 806 F. Appx. 35 (2d Cir. 2020) ....................................................................21

*Backman v. Polaroid Corp.*,
   910 F.2d 10 (1st Cir. 1990)...................................................................................7

*Blue v. Doral Fin. Corp.*,
   123 F. Supp. 3d 236 (D.P.R. 2015).......................................................................19

*Brumbaugh v. Wave Sys. Corp.*,
   416 F. Supp. 2d 239 (D. Mass. 2006) ................................................................6, 26

*Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc.*,
   496 F. Supp. 3d 952 (E.D. Va. 2020) ....................................................................8

*Chalverus v. Pegasystems, Inc.*,
   59 F. Supp. 2d 226 (D. Mass. 1999).....................................................................23

*City of Phila. v. Fleming Cos.*,
   264 F.3d 1245 (10th Cir. 2001) .......................................................................18, 21

*Collier v. ModusLink Glob. Sols., Inc.*,
   9 F. Supp. 3d 61 (D. Mass. 2014)..............................................................5, 22, 26

*Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*,
   22 F. 4th 1 (1st Cir. 2021)...............................................................................13, 26

*Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*,
   433 F. Supp. 3d 515 (S.D.N.Y. 2020)................................................................13, 14

*Corban v. Sarepta Therapeutics, Inc.*,
   2015 WL 1505693 (D. Mass. Mar. 31, 2015).........................................................16

4862-9849-0448.v3

**Page**

*Coyne v. Metabolix, Inc.*,
    943 F. Supp. 2d 259 (D. Mass. 2013) ........................................................................28

*Crowell v. Ionics, Inc.*,
    343 F. Supp. 2d 1 (D. Mass. 2004),
    *aff'd*, 928 F.3d 151(1st Cir. 2019) ....................................................................23, 26

*Dahhan v. OvaScience, Inc.*,
    321 F. Supp. 3d 247 (D. Mass. 2018) ........................................................................9

*Fantini v. Salem State Coll.*,
    557 F.3d 22 (1st Cir. 2009)..............................................................................5, 16

*Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*,
    778 F.3d 228 (1st Cir. 2015)....................................................................................22

*Foley v. Transocean Ltd.*,
    861 F. Supp. 2d 197 (S.D.N.Y. 2012)......................................................................24

*Frese v. MacDonald*,
    512 F. Supp. 3d 273 (D.N.H. 2021),
    *aff'd sub nom. Frese v. Formella*, 53 F.4th 1 (1st Cir. 2022) ...........................14, 17

*Geffon v. Micrion Corp.*,
    249 F.3d 29 (1st Cir. 2001)......................................................................................19

*Greenberg v. Sunrun Inc.*,
    233 F. Supp. 3d 764 (N.D. Cal. 2017) .....................................................................17

*Guerra v. Teradyne, Inc.*,
    2004 WL 1467065 (D. Mass. Jan. 16, 2004).........................................................26

*Hoff v. Popular, Inc.*,
    727 F. Supp. 2d 77 (D.P.R. 2010)............................................................................10

*Holwill v. AbbVie Inc.*,
    2020 WL 5235005 (N.D. Ill. Sep. 1, 2020) .......................................................10, 25

*Hunt v. Bloom Energy Corp.*,
    2021 WL 4461171 (N.D. Cal. Sept. 29, 2021) ........................................................16

*Ind. Pub. Ret. Sys. v. AAC Holdings, Inc.*,
    2021 WL 1316705 (M.D. Tenn. Apr. 8, 2021)........................................................14

4862-9849-0448.v3

**Page**

*In re Allaire Corp. Sec. Litig.*,
224 F. Supp. 2d 319 (D. Mass. 2002) .................................................................................24, 28

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997) ..................................................................................................15

*In re Cabletron Sys., Inc.*,
311 F.3d 11 (1st Cir. 2002) ...........................................................................................5, 19, 26

*In re Credit Suisse First Bos. Corp.*,
431 F.3d 36 (1st Cir. 2005) ......................................................................................................22

*In re Credit Suisse-AOL Sec. Litig.*,
465 F. Supp. 2d 34 (D. Mass. 2006) ........................................................................................29

*In re Lions Gate Ent. Corp. Sec. Litig.*,
165 F. Supp. 3d 1 (S.D.N.Y. 2016) .................................................................................17, 18

*In re No. Nine Visual Tech. Corp. Sec. Litig.*,
51 F. Supp. 2d 1 (D. Mass. 1999) ..............................................................................................7

*In re Peritus Software Servs., Inc. Sec. Litig.*,
52 F. Supp. 2d 211 (D. Mass. 1999) ........................................................................................22

*In re PerkinElmer, Inc. Sec. Litig.*,
286 F. Supp. 2d 46 (D. Mass. 2003) ..........................................................................................6

*In re Perrigo Co. PLC Sec. Litig.*,
435 F. Supp. 3d 571 (S.D.N.Y. 2020) .......................................................................................9

*In re Raytheon Sec. Litig.*,
157 F. Supp. 2d 131 (D. Mass. 2001) ......................................................................................25

*In re SeaChange Int'l, Inc.*,
2004 WL 240317 (D. Mass. Feb. 6, 2004) ................................................................................7

*In re Sepracor, Inc. Sec. Litig.*,
308 F. Supp. 2d 20 (D. Mass. 2004) ..................................................................................10, 24

*In re Signet Jewelers Ltd. Sec. Litig.*,
2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018) ........................................................................14

*In re Stone & Webster, Inc., Sec. Litig.*,
414 F.3d 187 (1st Cir. 2005) .......................................................................................5, 13, 24, 30

4862-9849-0448.v3

**Page**

*LaRocca v. Borden, Inc.*,
   276 F.3d 22 (1st Cir. 2002)....................................................................................................18

*Lenartz v. Am. Superconductor Corp.*,
   879 F. Supp. 2d 167 (D. Mass. 2012) ....................................................................................23

*Leung v. bluebird bio, Inc.*,
   599 F. Supp. 3d 49, 70 (D. Mass. 2022) ................................................................................30

*Lirette v. Shiva Corp.*,
   27 F. Supp. 2d 268 (D. Mass. 1998) ......................................................................................24

*Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Swanson*,
   2011 WL 2444675 (D. Del. June 14, 2011).............................................................................10

*Lorenzo v. SEC*,
   _U.S._, 139 S. Ct. 1094 (2019).............................................................................................14

*Mass. ex rel. Powell v. Holmes*,
   546 F. Supp. 3d 58 (D. Mass. 2021) ......................................................................................23

*Mass. Ret. Sys. v. CVS Caremark Corp.*,
   716 F.3d 229 (1st Cir. 2013)......................................................................................27, 28, 29

*McMahan & Co. v. Wherehouse Ent., Inc.*,
   900 F.2d 576 (2d Cir. 1990).................................................................................................11

*Metzler Asset Mgmt. GmbH v. Kingsley*,
   305 F. Supp. 3d 181 (D. Mass. 2018) ....................................................................................23

*Miss. Pub. Emps.' Ret. Sys. v. Bos. Sci. Corp.*,
   523 F.3d 75 (1st Cir. 2008)..........................................................................................5, 16, 19

*Nykredit Portefolje Admin. A/S v. ProPetro Holding Corp.*,
   2021 WL 9037758 (W.D. Tex. Sept. 13, 2021).......................................................................13

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015)...........................................................................................................7, 8, 9

*Roeder v. Alpha Indus., Inc.*,
   814 F.2d 22 (1st Cir. 1987).................................................................................................7, 10

*Rosenbaum Cap. LLC v. Bos. Commc'ns Grp., Inc.*,
   445 F. Supp. 2d 170 (D. Mass. 2006) ........................................................................8, 9, 10, 12

4862-9849-0448.v3

**Page**

*Salim v. Mobile Telesystems PJSC*,
    2021 WL 796088 (E.D.N.Y. Mar. 1, 2021),
    *aff'd*, 2022 WL 966903 (2d Cir. Mar. 31, 2022) ..................................................................16

*Schuh v. HCA Holdings, Inc.*,
    947 F. Supp. 2d 882 (M.D. Tenn. 2013).................................................................................15

*SEC v. Johnston*,
    986 F.3d 63 (1st Cir. 2021)....................................................................................................11

*SEC v. Lemelson*,
    532 F. Supp. 3d 30 (D. Mass. 2021) .................................................................................20, 21

*SEC v. RPM Int'l, Inc.*,
    282 F. Supp. 3d 1 (D.D.C. 2017) ............................................................................................9

*SEC v. Sharp*,
    2022 WL 4085676 (D. Mass. Sept. 6, 2022) .........................................................................14

*Silverstrand Invs. v. AMAG Pharms., Inc.*,
    12 F. Supp. 3d 241 (D. Mass. 2014) ......................................................................................12

*Simon v. Abiomed, Inc.*,
    37 F. Supp. 3d 499 (D. Mass. 2014),
    *aff'd sub nom. Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*,
    778 F.3d 228 (1st Cir. 2015)..................................................................................................12

*Singer v. Reali*,
    883 F.3d 425 (4th Cir. 2018) ...................................................................................................8

*Sloman v. Presstek, Inc.*,
    2007 WL 2740047 (D.N.H. 2007)..........................................................................................10

*Sousa v. Sonus Networks, Inc.*,
    261 F. Supp. 3d 112 (D. Mass. 2017) ....................................................................................26

*Special Situations Fund III, L.P. v. Am. Dental Partners, Inc.*,
    775 F. Supp. 2d 227 (D. Mass. 2011) .........................................................................24, 27, 28

*Swack v. Credit Suisse First Bos.*,
    383 F. Supp. 2d 223 (D. Mass. 2004) ..................................................................................5, 22

*Tellabs Inc. v. Makor Issues & Rts, Ltd.*,
    551 U.S. 308 (2007)...................................................................................................5, 19, 22, 25

4862-9849-0448.v3

**Page**

*Tharp v. Acaia Commc'ns, Inc.*,
  321 F. Supp. 3d 206 (D. Mass. 2018) ..............................................................22, 24

*Thor Power Tool Co. v. Comm'r of Internal Revenue*,
  439 U.S. 522 (1979) ....................................................................................................16

*TSC Indus., Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976) ......................................................................................................6

*Washtenaw Cnty. Emps.' Ret. Sys. v. Talbots, Inc.*,
  2013 WL 5348569 (D. Mass. Sept. 23, 2013) ..............................................12, 13

*Wortley v. Camplin*,
  333 F.3d 284 (1st Cir. 2003) ................................................................................28, 30

*Wright v. Medtronic, Inc.*,
  2010 WL 1027808 (D. Minn. Mar. 17, 2010) ......................................................17

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
  §78j(b) .............................................................................................................5, 29, 30
  §78t(a) ...........................................................................................................................30
  §78u-4(b)(1)(B) ...............................................................................................................5
  §78u-5(c)(1)(A)(i) ..........................................................................................................10

Federal Rule of Civil Procedure
  Rule 12(b)(6) .................................................................................................................5
  Rule 15(a) .....................................................................................................................30

17 C.F.R.
  §240.10b-5 .....................................................................................................................14

4862-9849-0448.v3

Lead Plaintiffs Central Pennsylvania Teamsters Pension Fund – Defined Benefit Plan, Central Pennsylvania Teamsters Pension Fund – Retirement Income Plan 1987, and Construction Industry Laborers Pension Fund ("Plaintiffs") hereby oppose Defendants' motion to dismiss the Consolidated Amended Complaint for Violations of Federal Securities Laws (ECF 61) (the "Complaint").[1]

## I.      INTRODUCTION AND OVERVIEW OF DEFENDANTS' FRAUD

Confronted with the Complaint's particularized allegations, Defendants' scattershot Motion – with its improperly proffered appendix – inappropriately asks the Court to assess the credibility of factual sources and weigh countervailing narratives all in Defendants' favor. This effort should fail. Properly considered, the Complaint pleads in great detail Defendants' wrongful course of conduct, their intentional or reckless concealment of it, and the harm their actions inflicted on Pega's shareholders. Defendants' Motion should be denied.

For nearly a decade, Pega, led by Alan Trefler, Pega's CEO, founder, and Chairman, unlawfully misappropriated trade secrets and confidential information of Appian, one of Pega's chief competitors. Trefler in particular was "very focused on destroying Appian. Like making it go away for good." ¶¶36, 75, 240. With the involvement of numerous Pega high ranking executives, including the CPO (Kerim Akgonul), CTO (Don Schuerman), CCM (Leon Trefler, defendant Trefler's brother), and Head of Product Marketing (Douglas Kim), among others, Trefler led a long-running campaign of corporate espionage against Appian. ¶¶8, 55-66.

Beginning as early as 2012, in what was referred to internally as "Project Crush," Pega hired and paid a corporate spy, Youyong Zou, to infiltrate Appian, and then misappropriate and share valuable Appian information with Pega. ¶¶4, 33-54. Working for U.S. government contractors utilizing Appian's platform, Zou had wide access to Appian's proprietary software and documentation. ¶¶4, 42. Over the course of more than two years, from approximately February 2012 to September 2014, Zou worked closely with Pega to access Appian's platform and pilfer valuable documents and

---

[1]  Terms herein have the same meaning as ascribed to them in the Complaint. All "¶" or "¶¶" references are to the Complaint, and internal citations are omitted and emphasis is added throughout, unless otherwise indicated.

other confidential information from and about Appian.  ¶¶42-43.  This included numerous in-person meetings between Zou and upper management at Pega, including a meeting on January 29, 2013 at Pega's headquarters attended by Trefler and others.  ¶¶44, 56.  During these meetings, Zou would access and show Pega how to use and navigate Appian's platform, and answer Pega's detailed technical questions about Appian's software.  ¶¶43-44, 62-64.  In addition, Zou created dozens of hours of extensive video footage of him using Appian's platform and covertly downloaded for Pega large volumes of Appian's confidential documentation.  ¶¶6, 43, 46, 63-64.

Defendants were well aware of the illicit nature of their activities, Zou's infiltration of Appian, and concealed it.  For instance, Pega used a third party service to retain and employ Zou, because Pega did not want its scheme "'getting back to Appian.'"  ¶41.  Similarly, Pega altered internal documents to "remove Youyong's name" and assigned Zou a pseudonym ("Matt" or "the other Matt," a cheeky reference to Appian's CEO) to avoid drawing attention to his work for Pega.  ¶¶5, 54, 199.

Later, with Zou's access cut-off, Defendants engineered another "teardown" of Appian in what was supposed to be an operation even "broader [in] scope" than "Project Crush."  ¶¶67-99.  Trefler led the charge as Pega directly – and illicitly – accessed Appian's platform to continue Pega's campaign of corporate espionage.  ¶¶69, 71, 73, 75-76, 78.  To avoid detection, Pega's employees would pose as customers or potential customers of Appian, using fake names and fake or front companies, in order to gain access to Appian's platform and proprietary business materials.  ¶¶81-99.  For example, Ben Baril (Director, Office of the CTO), one of the principal architects of the teardown, recruited a Solutions Consulting Manager at Pega to use a business space rental company he co-owned with his wife to infiltrate Appian by falsely posing as a potential customer and obtaining a free trial of Appian.  Pega then used the login credentials provided to this company to access Appian's platform and "sho[t] a ton of footage" building an application within the platform – specifically "to steal 4 deals from Appian in Q4 and Q1 2020."  ¶¶84-86.

Defendants knew their actions were improper and likely illegal.  ¶¶9, 79-80, 154, 218.  Indeed, Defendants later admitted that their scheme to misappropriate Appian's trade secrets was inappropriate.  ¶¶216-222.  Even Trefler, when questioned under oath about whether it was appropriate

4862-9849-0448.v3

to hire Zou, admitted: "I don't think it was." ¶217.  This wide range of misconduct by Defendants exposed Pega to significant legal liability, to the detriment of Pega's public shareholders.

Defendants further exposed Pega to liability by leveraging the misappropriated trade secrets to Pega's advantage and to Appian's detriment.  ¶¶45-53.  Competing directly for hundreds of opportunities against Appian up to and through at least 2021, Pega was regularly and unfairly able to win customers and business away from Appian.  ¶¶20, 179, 181-182, 241.  Pega used the misappropriated trade secrets and other confidential material to develop valuable sales and intelligence materials, train Pega's salesforce to effectively compete against Appian, and make improvements to Pega's own software.  ¶¶7, 45-53.  As Trefler himself admitted, he used this information to "blow . . . up" Appian's deals.  ¶52.  Trefler's brother, Leon, similarly declared in a February 2, 2013 email that with the attack materials created with Zou's help, Pega "should never lose against Appian."  ¶60.  Documents and other materials incorporating Appian's stolen trade secrets were distributed widely throughout Pega and to great effect, providing what one Pega employee described as a "war chest of materials" to use against Appian.  ¶¶45, 47, 51, 100-104.

Defendants' scheme began to unravel when two former Pega employees alerted Appian to Pega's long-running campaign of corporate espionage.  ¶¶11, 105-112.  Shortly after these revelations, on May 29, 2020, Appian filed a lawsuit in the Circuit Court of Fairfax County, Virginia, *Appian Corp. v. Pegasystems Inc., et al.*, Civil Action No. 2020-07216 (the "Virginia Action"), against Pega for misappropriation of Appian's trade secrets.  ¶¶11-13, 113.  The relief sought included actual losses, unjust enrichment including a disgorgement of Pega's profits, attorney's fees, costs, punitive damages, treble damages, and sweeping injunctive relief.  ¶¶13, 113, 164, 175-176.  The lawsuit featured alarming allegations and implicated numerous high-ranking Pega executives, including Trefler.  ¶¶12, 163-164.

Given their personal involvement in the scheme and the significant financial liability and reputational harm posed by the Virginia Action, Defendants knew the lawsuit was a bet-the-company proposition; yet they concealed the fact of the Virginia Action, and their illicit activities, from the investing public.  ¶¶105-113, 134-143.  Instead of disclosing the fact of this enterprise-threatening

- 3 -

lawsuit to the market, Defendants misleadingly indicated to investors that litigation theoretically "could" arise at some point in the future. ¶¶134-143. Defendants also misleadingly assured investors that Pega internally prohibited the very tactics it had secretly employed against Appian, including using "illegal or questionable means to acquire a competitor's trade secrets or other confidential information, such as . . . misrepresenting your identity in hopes of obtaining confidential information." ¶¶148-157. Further, Defendants falsely reassured investors of Trefler's responsibilities in providing "guidance as to the propriety" of his employees' actions. ¶¶148-157. Defendants' financial disclosures were also materially misleading for failing to disclose the Virginia Action in violation of GAAP and SEC disclosure rules. ¶¶162-196. These and other statements were false and misleading in light of the misconduct Defendants had engaged in to obtain Appian's trade secrets and the resulting exposure that was likely to be confirmed by the Virginia Action. *See also* ¶¶121-132.

Only after nearly two years of litigation – as Defendants' various efforts to dispatch the case failed and with trial fast approaching – did Defendants finally disclose the Virginia Action. ¶¶114-115. Even then, Defendants continued to mislead the market, concealing material details of their egregious scheme, while misleadingly assuring investors that Appian's claims "are without merit," that there are "strong defenses to these claims," and "any alleged damages claimed by Appian are not supported." ¶¶114, 144-147. Still, Pega's stock plummeted more that 15% on this news. ¶243.

Defendants could no longer minimize their involvement in the scheme when on May 9, 2022, after a seven-week trial, the jury returned a unanimous verdict finding Pega liable for misappropriating Appian's trade secrets and awarding over $2 billion in compensatory damages to Appian. ¶¶116-117. Furthermore, the jury found Pega had acted willfully and maliciously in misappropriating Appian's trade secrets, obligating Pega to compensate Appian for its legal fees and costs – another $23.6 million. ¶¶25, 116-117. Analysts noted the significant business and reputational harm to Pega as a result of the verdict, with one explaining bluntly that the verdict "will be a blot on Pega's record." ¶¶245-246. Pega's stock price plummeted over 27% on these revelations. ¶244.

After the verdict, Defendants doubled down on their lies, calling the verdict "ridiculous" and without any factual support. ¶¶118. The Virginia court rejected Defendants' contentions, denied

- 4 -

Pega's motion to set aside the verdict, and entered final judgment against Pega on September 16, 2022. ¶¶25, 119.  When the market learned judgement had been entered, Pega's stock price fell another nearly 12% dismissing Defendants' pleas that the Virginia Action was of no concern.  ¶248.

## II.    LEGAL STANDARDS APPLICABLE TO DEFENDANTS' MOTION

On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court must "accept[] all well-pleaded facts as . . . true and draw[] all reasonable inferences in favor of" the plaintiff.  *Fantini v. Salem State Coll.*, 557 F.3d 22, 26 (1st Cir. 2009).  When evaluating Defendants' Motion, the Court also must assess the complaint "holistically" and "in its entirety."  *Tellabs Inc. v. Makor Issues & Rts, Ltd.*, 551 U.S. 308, 322, 326 (2007).  And importantly, "a question of fact [is] not resolvable on a motion to dismiss."  *Swack v. Credit Suisse First Bos.*, 383 F. Supp. 2d 223, 234 (D. Mass. 2004).

Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), the "pleading standard is not an insurmountable bar."  *Collier v. ModusLink Glob. Sols., Inc.*, 9 F. Supp. 3d 61, 70 (D. Mass. 2014).  When "'determining the adequacy of a complaint[, a court] cannot hold plaintiffs to a standard that would effectively require them, pre-discovery, to plead evidence.'"  *Miss. Pub. Emps.' Ret. Sys. v. Bos. Sci. Corp.*, 523 F.3d 75, 90 (1st Cir. 2008).  To the contrary, "courts will allow private securities fraud complaints to advance past the pleadings stage when some questions remained unanswered, provided the complaint as a whole is sufficiently particular to pass muster under the PSLRA."  *In re Cabletron Sys., Inc.*, 311 F.3d 11, 32 (1st Cir. 2002).

## III.    THE COMPLAINT SETS FORTH IN GREAT DETAIL DEFENDANTS' VIOLATIONS OF §10(b)

At the pleading stage, a plaintiff need not prove falsity, but instead only "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading."  15 U.S.C. §78u-4(b)(1)(B).  "The falsity of a statement and the materiality of a false statement are questions for the jury."  *In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 209 (1st Cir. 2005).  Thus, a court's responsibility at the pleading stage "is to 'review the complaint only to determine that it pleads the existence of [misleading] statements and presents a plausible jury question

4862-9849-0448.v3

of materiality.'" *In re PerkinElmer, Inc. Sec. Litig.*, 286 F. Supp. 2d 46, 52 (D. Mass. 2003) (quoting *Cabletron*, 311 F.3d at 34).

A statement may also be misleading by a material omission. *See Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 248 (D. Mass. 2006) ("[i]n order to state a 10b-5 claim, a plaintiff must allege . . . false statement or omission of material fact"). "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act]." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 439 (1976). Materiality is defined as "'a reasonable likelihood that a reasonable investor would consider [the information omitted] important.'" *Brumbaugh*, 416 F. Supp. 2d at 249-50. The Complaint more than satisfies these requirements. In arguing otherwise, Defendants try to ignore Plaintiffs' allegations and ask the Court to resolve questions of fact in Defendants' favor. Defendants' arguments fail.

### A.    Defendants' Risk Disclosures Were False and Misleading

Defendants' assertion that their "risk factors" "disclosed both the receipt of misappropriations claims and the possibility such claims could have a material adverse effect" is off point and misrepresents the actual disclosures made to investors. ECF 65 ("Mtn.") at 11, 12 n.14. Defendants contend that generically disclosing that at some point in Pega's 40-year history it had received a "notice" of misappropriation while at the same time stating it "may" be subject to intellectual property infringement claims adequately disclosed that Pega was *in fact then being sued for trade secret misappropriation by one of its chief competitors based on actions undertaken at the highest level of Pega, including the CEO*. *Id*. at 12. This is nonsense.

Rather than disclose the fact of Appian's lawsuit against Pega, Defendants misleadingly assured investors that, among other things, Pega "*may* be subject to intellectual property rights claims by third parties, which . . . *could* require us to pay significant damages, and *could* limit our ability to use certain technologies" and that Pega "[had] received, and *may* in the future receive, *notices* that claim we have misappropriated . . . other parties' intellectual property rights." ¶¶136, 139. In reality, Pega had *already been sued* – not merely having had received a "notice" – by one of its chief competitors, stemming from Pega's long-running scheme to misappropriate Appian's trade secrets.

- 6 -

¶¶11-15, 113, 139, 141.  Defendants' failure to disclose these material facts was misleading.  *In re No. Nine Visual Tech. Corp. Sec. Litig.*, 51 F. Supp. 2d 1, 24 (D. Mass. 1999) ("Warning of past and future memory shortages is actionably misleading when a present memory shortage remains undisclosed.").

Having chosen to make these and other statements, Defendants were required to disclose facts necessary to make their statements not misleading.[2]  Instead of tailoring their disclosures to the predicament they *currently* faced – *i.e.*, Pega's long-standing espionage scheme had led to a lawsuit by a primary competitor – Defendants undisputedly repeated the same risk disclosures *during* the Class Period that they had issued *before* the Virginia Action was filed.  These disclosures remained unchanged well into the Class Period.  ¶¶134-142.  As such, Defendants did not provide complete disclosures to the market, rendering those they did make materially misleading.

### B. Defendants' Statements Regarding the Virginia Action Were False and Misleading

When Defendants finally disclosed the existence of the Virginia Action, they falsely stated the claims "are without merit."  ¶145.  By doing so, Defendants conveyed false "embedded" facts, including that: (i) no evidence of the scheme existed; (ii) that Defendants were not aware of any such evidence; and (iii) the claimed damages had no support.  ¶¶18-20, 52, 114-115, 144-147; *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 185 (2015).  The Complaint further alleges in detail that Defendants knew, or recklessly disregarded, that their statements about the Virginia Action were inaccurate and incomplete.  *See* Complaint, §VII.  Faced with these allegations, Defendants argue their statements concerning the Virginia Action and trial outcome are inactionable "opinions."  Mtn. at 12-14.  Defendants are flat wrong.

Having *chosen* to speak about the "merits" of the Virginia Action, Defendants owed investors a duty to "keep the information from being materially misleading."  *SeaChange*, 2004 WL 240317, at

---

[2]   *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 26 (1st Cir. 1987) ("When a corporation does make a disclosure – whether it be voluntary or required – there is a duty to make it complete and accurate."); *Backman v. Polaroid Corp.*, 910 F.2d 10, 16 (1st Cir. 1990) (a company's statements, once made, must not be "'so incomplete as to mislead'"); *In re SeaChange Int'l, Inc.*, 2004 WL 240317, at *8 (D. Mass. Feb. 6, 2004) (same).  Defendants' cases are distinguishable.  Mtn. at 13 (citing *Cody v. Conformis, Inc.*, 199 F. Supp. 3d 409, 417, 419 (D. Mass. 2016) ("'*quality control*'" risk warning inactionable absent "allegation" of "*ongoing* manufacturing problems") (emphasis in original)).

4862-9849-0448.v3

*8. Presented with analogous facts, the court in *Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc.*, 496 F. Supp. 3d 952, 963 (E.D. Va. 2020), rejected the defendant's argument that "it need not 'confess to the wrongdoing . . . while that litigation was ongoing.'"  Discussing *Singer v. Reali*, 883 F.3d 425, 440-412 (4th Cir. 2018) (once a company speaks on an issue, it must disclose the "'whole, [material] truth"), *Cambridge* explained that "ongoing litigation about the illegal behavior [does not] relieve" a defendant's duty to disclose the whole truth.  496 F. Supp. 3d at 963.[3]  "Moreover, disclosing a lawsuit's existence and allegations while also vigorously denying their validity does not satisfy a company's duty to make full, honest disclosures."  *Cambridge*, 496 F. Supp. 3d at 963.

Further, even if Defendants' statements can be characterized as "opinions" – which they are not – they are actionable under *Omnicare*.[4]  Opinions are actionable if they (1) convey false "embedded" facts, (2) omit "material" facts, or (3) are not believed by the speaker.  *Omnicare*, 575 U.S. at 185, 194. Defendants' statements run afoul of all three.  Not only did Defendants' statements convey false "embedded" facts, they also omitted "particular (and material) facts going to the basis for the . . . opinion[s]."  *Id.*  As the Complaint details, Trefler and other high level Pega executives participated in and directed the efforts to misappropriate Appian's information, and then used that information to Pega's competitive advantage, winning lucrative business from Appian.  ¶¶4-10, 20, 33-90, 179, 181-182, 241.  Defendants' omission of these (and other) facts was directly at odds with Defendants' statements concerning the merits of the Virginia Action and Pega's exposure to liability, thereby

---

[3]   Likewise, in *Rosenbaum Cap. LLC v. Bos. Commc'ns Grp., Inc.*, 445 F. Supp. 2d 170, 175 (D. Mass. 2006), this Court found that a defendant corporation made misleading statements regarding the infringement of a patent because the defendant made a disclosure that did not reflect the complete truth.  Specifically, the defendant affirmatively claimed that it had not infringed on the patents of a competing company and that those patents were invalid.  *Id.*  "Assuming, as alleged," that the defendant's statements were knowingly false, the statements are "inaccurate by definition." *Id.* at 176.  Moreover, the defendant company's failure to disclose its steps to "hide its willful infringement render[ed] the statements misleadingly incomplete."  *Id.*

[4]   *See Omnicare*, 575 U.S. at 187 ("[A] reasonable investor may . . . understand an opinion statement to convey facts about how the speaker has formed the opinion – or, otherwise put, about the speaker's basis for holding that view.  And if the real facts are otherwise, but not provided, the opinion statement will mislead its audience."); Mtn. at 8 (citing *Corban v. Sarepta Therapeutics, Inc.*, 2015 WL 1505693, at *6-*9 (D. Mass. Mar. 31, 2015) (listing *Omnicare* prongs, finding optimistic statements regarding FDA Approval of new drug inactionable where company disclosed FDA had issues with drug trial data)).

4862-9849-0448.v3

rendering those statements misleading to a reasonable investor "reading the statement[s] fairly and in context."[5]  Finally, Plaintiffs' allegations that Defendants knew that support for Appian's claims and damages existed suffice under *Omnicare* as well.[6]

Similarly, Defendants' assertion that their assessment of GAAP's requirements, and their decision not to disclose the Virginia Action, were inactionable "opinions," is baseless.  Mtn. at 6-10.  Plaintiffs' allegations that Defendants knew about the scheme render meritless any argument that Defendants' "opinion" that GAAP and Item 103 did not require disclosure of the Virginia Action or the underlying conduct.  *See* §§III-V.  And even crediting Defendants' absurd assertion that they did not know about the scheme at the time they spoke, the inquiry required by GAAP, and the critical nature of Pega's competitive market and direct competition with Appian, also render baseless any argument that their "opinion" that GAAP did not require disclosure had a reasonable basis.  Indeed, Defendants' arguments have been rejected in other cases with similar facts.[7]

Finally, defendants' "[o]missions of ***existing facts***" regarding the Virginia Action, including facts about Pega's espionage against Appian, "are not forward-looking statements."  *Dahhan v.*

---

[5]  *Omnicare*, 575 U.S. at 194; *Rosenbaum*, 445 F. Supp. 2d at 175-76 (holding "substantive declarations regarding [defendants'] beliefs about the merits of the . . . litigation" were "knowingly false when made" and thus "inaccurate by definition").

[6]  Defendants' arguments that their statements about damages are inactionable opinions similarly fail.  Mtn. at 13-14 (citing *Ratner v. Ovascience, Inc.*, 134 F. Supp. 3d 621, 628 (D. Mass. 2015) (FDA meeting request did not render earlier statement false)).  Defendants incorrectly assert that Plaintiffs allege merely that Defendants' expert's damage estimate supports the falsity of their statements that Appian's claimed damages were unsupported.  *Id.*  But the Complaint alleges far more, including how Defendants unjustly enriched themselves by using the pilfered information to win lucrative business – all of which supported Appian's damages claims.  *See* ¶¶12, 36, 52, 57, 61, 66, 75, 85, 240-241; *e.g.*, *In re Amylin Pharms., Inc. Sec. Litig.*, 2003 WL 21500525, at *9 (S.D. Cal. May 1, 2003) (opinion statements actionable, where defendants were "privy to information . . . which they did not disclose and which seriously undermines any belief Defendants may have had" in their statements); *see also* Complaint, §VII.

[7]  *See, e.g.*, *In re Perrigo Co. PLC Sec. Litig.*, 435 F. Supp. 3d 571, 586 (S.D.N.Y. 2020) (holding that misrepresentation of "loss contingency" under ASC 450 was not a protected opinion under *Omnicare*); *SEC v. RPM Int'l, Inc.*, 282 F. Supp. 3d 1, 27-28 (D.D.C. 2017) (holding "statements regarding loss contingencies" at time company was aware of lawsuit and DOJ investigation actionable under *Omnicare*, explaining the "facts alleged in the complaint about what was known [internally about the qui tam action and DOJ investigation] but omitted from the filings would render the statements misleading to a reasonable reader").

4862-9849-0448.v3

*OvaScience, Inc.*, 321 F. Supp. 3d 247, 254 (D. Mass. 2018); *Sloman v. Presstek, Inc.*, 2007 WL 2740047, at *5 (D.N.H. 2007) (safe harbor does not apply where the "alleged fraud springs primarily from the omission of material information."); *see* Mtn. at 14.  Even if pieces of Defendants' statements could be considered forward-looking, they were not accompanied by "meaningful cautionary statements."[8]  Plaintiffs' allegations that Defendants had actual knowledge their statements were misleading also defeat any safe harbor argument.  *See* §§III-V.[9]

### C. Defendants' Statements Concerning Their Sales and Marketing Practices Are Actionable

Defendants' statements concerning competition in the BPM industry and Pega's sales and marketing practices were also misleading.  ¶¶121-122, 124-125, 127, 129-130, 132.  Defendants principally argue they had no duty to disclose Pega's "competitive intelligence practices" and "efforts," or "accuse itself of misconduct."  Mtn. at 15.  Yet they ignore the fact they ***chose*** to tout to investors Pega's marketing techniques and efforts as the supposed basis for beating out Pega's competition for lucrative business.  ¶¶121-133.  Having elected to speak about ***how*** Pega "differentiated" itself competitively, and tout Pega's "sales and marketing" techniques, Defendants were obligated to disclose that their success relied on corporate espionage for which Pega was being sued.  *Roeder*, 814 F.2d at 26 ("When a corporation does make a disclosure – whether it be voluntary or required – there is a duty to make it complete and accurate.").[10]

---

[8]  *See* 15 U.S.C. §78u-5(c)(1)(A)(i); *In re Sepracor, Inc. Sec. Litig.*, 308 F. Supp. 2d 20, 34 (D. Mass. 2004) ("'Vague or boilerplate disclaimers are insufficient . . . .'"); *Rosenbaum*, 445 F. Supp. 2d at 176 (misstatements regarding merits of patent litigation "were not tempered by warnings sufficient as matter of law to dissuade investors from giving credence to" the misstatements); Mtn. at 14 (citing *Grobler v. Neovasc Inc.*, 2016 WL 6897760, at *3-*6 (D. Mass. Nov. 22, 2016) (plaintiff did not dispute statements were technically "forward-looking," and company issued "specific and repeated warnings" for over 16 months "about a potentially significant loss" from the lawsuit)).

[9]  *See, e.g.*, *Hoff v. Popular, Inc.*, 727 F. Supp. 2d 77, 95 (D.P.R. 2010) (safe harbor foreclosed where warnings were boilerplate and speakers had actual knowledge their statements were misleading); *Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Swanson*, 2011 WL 2444675, at *13 (D. Del. June 14, 2011) (no safe harbor where Defendants had "actual knowledge of the inaccuracies of their projections").

[10]  *Allison v. Oak St. Health, Inc.*, 2023 WL 1928119, at *6 (N.D. Ill. Feb. 10, 2023) (finding "statements about [defendant's] marketing practices" misleading where defendants failed to disclose that certain of those practices were potentially illegal); *Holwill v. AbbVie Inc.*, 2020 WL 5235005, at

4862-9849-0448.v3

Defendants' argument they had no "duty to disclose to investors Pega's discussions with the government" mischaracterizes Plaintiffs' allegations. Mtn. at 16. Plaintiffs allege it was misleading to tout Pega's credibility with the government while concealing the fact that the government did not then know that Pega had engaged in a long-running corporate espionage scheme that gave Pega an improper competitive advantage in winning lucrative government contracts. ¶¶124-255, 133(f), 222.[11] Again, having chosen to tout Pega's "credibility" with the government as a key factor in its ability to win lucrative contracts, Defendants had a duty to inform investors that they had won that business, and undeservedly obtained that credibility, through corporate espionage. ¶¶124-125.

Finally, Defendants contend that their statements during industry conferences were "accurate" and thus not misleading. Mtn. at 16-17. But statements that are technically accurate can still mislead.[12] For instance, even crediting Defendants' contention that it's true, Stillwell's statement that Pega had "done a lot of work on the playbooks" to "refin[e] the plays that we run" to make sure that Pega "target[ed] the right organizations with the right message" was misleading given that it omitted that the "work" to "refin[e]" the "playbook[]" was based in large part on Defendants' corporate

---

*3 (N.D. Ill. Sep. 1, 2020) ("statements attributing . . . success to [company's] sales and marketing practices and programs implicated [company's] allegedly unlawful kickback scheme").

[11]   For these same reasons, Defendants' argument that Kenneth Stillwell's statements alleged in ¶¶124, 133(d)-(f) are protected opinions, is off base. Mtn. at 16. Plaintiffs do not challenge **whether** Pega was "credible" with the government, but rather note that Defendants' claimed credibility with the government depended in part on the concealment of their corporate espionage from government authorities. ¶133(e). Defendants' cases are factually inapposite. Mtn. at 15-17 (citing *Greenstone v. Cambex Corp.*, 777 F. Supp. 88, 89 (D. Mass. 1991) (reporting **accurate** revenue numbers did not create a duty to disclose practices challenged in a civil lawsuit which settled two months later); *Hill v. Gozani*, 638 F.3d 40, 59 (1st Cir. 2011) (company publicly identified as a "risk," as opposed to touted, challenged sales area); *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 404 (S.D.N.Y. 2016) (reporting "'accurate historical data'" not misleading); *In re Cytyc Corp.*, 2005 WL 3801468, at *22-*23 (D. Mass. Mar. 2, 2005) ("'best-in-class'" statements inactionable despite allegations of "channel stuffing")).

[12]   *SEC v. Johnston*, 986 F.3d 63, 72 (1st Cir. 2021) ("Statements can be misleading . . . if they are half-truths, painting a materially false picture in what they say because of what they omit."); *McMahan & Co. v. Wherehouse Ent., Inc.*, 900 F.2d 576, 579 (2d Cir. 1990) ("[T]he disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers.").

4862-9849-0448.v3

espionage. ¶¶131-132. Because Stillwell offered this and other statements, he was obligated to make them complete and accurate so as not to mislead investors.[13]

> **D.     Defendants' False and Misleading Statements Went Far Beyond Corporate Optimism**

As recognized in *Washtenaw Cnty. Emps.' Ret. Sys. v. Talbots, Inc.*, 2013 WL 5348569, at \*29 (D. Mass. Sept. 23, 2013), because "'the recent trend is to consider expressions of corporate optimism carefully,'" a court evaluating claims of puffery must consider "(1) 'whether the statement is so vague, so general, or so loosely optimistic that a reasonable investor would find it unimportant to the total mix of information' and (2) 'whether the statement was also considered unimportant to the total mix of information by the market as a whole.'"   In fact, statements should not be considered puffery unless they are "'immaterial as a matter of law.'" *Rosenbaum*, 445 F. Supp. 2d at 176. Defendants' contention that their statements touting their ability to out compete and win lucrative business are too generalized and immaterial to be actionable is wrong. Mtn. at 17-18.

As Defendants readily admit, the BPM market was "highly" and "intensely" competitive. Mtn. at 1, 15; *see also* ¶129 (quoting 2020 Form 10-K). As such, securities analysts repeatedly sought to understand how Pega was able to compete the way it did and differentiate itself from others. For instance, during an investor conference on June 16, 2020, an analyst questioned Pega about how it secured a contract with the U.S. Census Bureau – "how you were able to win that versus some of your competitors in the RFP?" ¶122. Demonstrating his knowledge of Pega's sales practices, Stillwell responded that Pega was able to beat out the other 29 companies competing for the business because of Pega's reputation with its public sector clients as offering the "best-in-class" product "that can actually drive very significant transformations." ¶122. Indeed, Defendants were repeatedly asked how Pega competed against others, and why it was successful where its competitors were not. ¶¶121, 123-127, 131-132. Thus, Defendants' ability to compete favorably, and the reasons why Pega was successful,

---

[13]     *Simon v. Abiomed, Inc.*, 37 F. Supp. 3d 499, 518 (D. Mass. 2014) ("[I]f a company chooses to speak, [securities] laws require that it do so in a manner that does not leave a false or misleading impression."), *aff'd sub nom. Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*, 778 F.3d 228 (1st Cir. 2015); *see also Silverstrand Invs. v. AMAG Pharms., Inc.*, 12 F. Supp. 3d 241, 248 (D. Mass. 2014) (holding when a disclosure is made, "a duty arises to make it complete and accurate").

- 12 -

were important to investors. As such, Defendants' statements are actionable misstatements, not immaterial corporate fluff. *Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*, 22 F. 4th 1, 4, 7 (1st Cir. 2021) (statements that product "'improves our performance'" and "'makes us extremely competitive'" are actionable fact statements); *Talbots*, 2013 WL 5348569, at *1.

### E.    Defendants' False and Misleading Statements About Pega's Code of Conduct Are Material

Defendants' contention that Plaintiffs' allegations concerning Pega's code of conduct "merely identify" a "handful" of Pega employees "who worked with Mr. Zou or accessed an Appian free trial," and are thus immaterial and not misleading, ignores the actual allegations in the Complaint. Mtn. at 18-19.[14]  As detailed above (*see supra* §I), Pega engaged in corporate espionage to access a chief competitors' trade secrets, then used the misappropriated information to enhance Pega's product, gain advantage in marketing its products and services, and compete for business. This conduct was directed and engaged in by Pega's highest level executives. These executives then recruited other Pega employees to participate in the misappropriation by, among other things, creating accounts using fake names or businesses in order to gain access to Appian's platform. Defendants engaged in this course of conduct all while telling the market that Pega would "[n]ever use illegal or questionable means to acquire a competitor's trade secrets or other confidential information" including by "misrepresenting your identity in hopes of obtaining confidential information." ¶154.[15]

Such statements are actionable if the statements are directly at odds with violations of the code of ethics – allegations like those contained in the Complaint (¶¶148-157). *See, e.g.*, *Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*, 433 F. Supp. 3d 515, 532-34 (S.D.N.Y. 2020) (statements may be actionable when they are "so anathema to the alleged internal wrongdoing that, even if general or

---

[14]    Whether the statements are "immaterial" is a factual matter not appropriately decided at this stage. *Stone & Webster*, 414 F.3d at 209 (materiality is a question of fact for jury).

[15]    *Nykredit Portefolje Admin. A/S v. ProPetro Holding Corp.*, 2021 WL 9037758, at *17 (W.D. Tex. Sept. 13, 2021) ("Because ProPetro's Code of Ethics specifies practices the company purports to adopt . . . these statements are actionable.").

- 13 -

aspirational, they [are] materially false").[16]  The well-pled allegations that Pega failed to put a stop to this conduct, allowing it to fester for years, are equally sufficient.[17]

### F.    Plaintiff's Scheme Liability Claims Are Unchallenged

Plaintiffs allege Defendants engaged in a course of conduct during the Class Period which operated as a fraud on investors, known as "scheme liability."[18]  Defendants' course of conduct concealed from investors the Virginia Action, as well as shocking details of egregious misconduct involving Pega's CEO and other senior executives.  Defendants do not seek dismissal of the scheme claims, and therefore have "waived" any challenge to them.[19]

## IV.    DEFENDANTS VIOLATED GAAP AND SEC DISCLOSURE RULES BY FAILING TO DISCLOSE THE VIRGINIA ACTION

Plaintiffs adequately allege that Pega violated GAAP and SEC disclosure rules by failing to disclose the Virginia Action prior to February 16, 2022.  ¶¶162-196.  Instead of actually addressing the allegations against them, Defendants urge the Court to conclude as a matter of law that Defendants complied with GAAP.  Mtn. at 6-11.  However, "it is a factual question whether [the company's]

---

[16]    Like in *CBS*, in *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *17 (S.D.N.Y. Nov. 26, 2018), the complaint adequately pled a "culture of 'pervasive' sexual harassment" that "directly contravened" the company's statements in the code of conduct.

[17]    *See CBS*, 433 F. Supp. 3d at 535 (allegations the company "took no action at all in the face of blatant and pervasive violations of its [Code]" may suffice); Mtn. at 18 (citing *Cheng v. Activision Blizzard, Inc.*, 2022 WL 2101919, at *9 (C.D. Cal. Apr. 18, 2022) (same)); ¶¶79-80, 218 (alleging Pega's CTO failed to take action despite concerns over "legality"); ¶158 (alleging Pega "continu[ed] to employ, or promote" those who spied on Appian); ¶¶97-99 (alleging Pega failed to discipline employees that participated in the misappropriation).  Defendants acknowledge such statements can be actionable.  Mtn. at 18 (falsity may be shown where statements "***could*** [be] understood as at least promising specifically not to do what had been done") (citing *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1277 (9th Cir. 2017)).

[18]    *See, e.g.*, *Lorenzo v. SEC*, _U.S._, 139 S. Ct. 1094, 1101 (2019); Complaint, §§IV, VII; *SEC v. Sharp*, 2022 WL 4085676, at *24 (D. Mass. Sept. 6, 2022) ("'Conduct itself can be deceptive' under Rule 10b-5; statements are not required for liability.").

[19]    *See Frese v. MacDonald*, 512 F. Supp. 3d 273, 290 (D.N.H. 2021) (Arguments not made in motion to dismiss "may not be raised for the first time in a reply brief."), *aff'd sub nom. Frese v. Formella*, 53 F.4th 1 (1st Cir. 2022); *see also Ind. Pub. Ret. Sys. v. AAC Holdings, Inc.*, 2021 WL 1316705, at *4 (M.D. Tenn. Apr. 8, 2021) ("Defendants did not move to dismiss Plaintiffs' scheme liability claims and, therefore, it will not address Defendants' belated argument related thereto, which are deemed waived for purposes of the Motion.").

- 14 -

accounting practices were consistent with GAAP" which is not suited for resolution at this point. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1421 (3d Cir. 1997).[20]

### A.    ASC 450 Compelled Disclosure of the Virginia Action

ASC 450, the relevant GAAP in this matter, states that when a loss contingency exists, the likelihood a future event or events will confirm the loss or the incurrence of a liability can range from "probable" to "remote." ¶190. The threshold for disclosure required by ASC 450 is very low, requiring disclosure if the chance of loss is merely reasonably possible – *i.e.*, "[t]he chance of the future event or events occurring is more than remote but less than likely." ¶194. Only when the potential loss or incurrence of a liability is "slight" is disclosure of the loss contingency not required. ¶¶191, 193. The only reasonable inference – which Defendants ignore and dismissively label as "conclusory" – is that Defendants knew under ASC 450 a material loss was likely or "probable" from the Virginia Action.[21] Also, the damning allegations cover an extremely long time as Defendants secretly employed a scheme to misappropriate Appian's trade secrets for over seven years – between 2012 and at least 2019. ¶¶3-5, 9, 12, 37, 43, 67-80, 172, 177. ASC 450's highlights factors for assessing whether accrual or disclosure is required with respect to litigation, which includes, among others, assessing the degree of probability of an unfavorable outcome. ¶195. Plaintiffs allege that this factor supported disclosing the Virginia Action as a loss contingency because an unfavorable outcome and material loss was probable as demonstrated by the length of Defendants' misconduct, Appian's material damage claims against Pega, and Defendants' knowledge, due to their direct participation in the wrongful conduct, that Appian's allegations were true. ¶¶175-183, 195-196.

Defendants, however, give short shrift to the continuing motion losses and discovery abuses that piled up in the Virginia Action during the Class Period. Mtn. at 8. But each quarter ASC 450

---

[20]   *See also Schuh v. HCA Holdings, Inc.*, 947 F. Supp. 2d 882, 894 (M.D. Tenn. 2013) ("In any event, [a GAAP violation] is not a claim susceptible to resolution by way of the present motion to dismiss."); *In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 273 (S.D.N.Y. 2010) ("The parties' disagreements over GAAP compliance also raise issues of fact that cannot be resolved on a motion to dismiss.").

[21]   As the Complaint illustrates, the Virginia Action was not the run-of-the-mill intellectual property dispute that Defendants attempt to characterize it as. Mtn. at 10.

- 15 -

required Defendants to objectively assess the likelihood a loss in the litigation was more than remote based on any new case developments. ¶194. Plaintiffs' well-pled allegations detail how "the degree of probability of an unfavorable outcome" in the litigation was only increasing throughout the Class Period and that discovery in the Virginia Action confirmed the truth of Appian's incriminating allegations. ¶¶195, 196 (e), (g). Defendants either did not engage in the required quarterly assessment, or knowingly or recklessly omitted disclosure so as to continue to hide from investors Pega's exposure and the facts describing Defendants' misconduct. Plaintiffs are entitled to this reasonable inference. *See Fantini*, 557 F.3d at 26; *Bos. Sci. Corp.*, 523 F.3d at 85.[22] Finally, even if Defendants' failure to disclose the lawsuit could somehow be characterized as an "opinion," that omission remains actionable. *See supra* §III.B.[23]

---

[22] Unlike here, the defendants in *Salim v. Mobile Telesystems PJSC*, 2021 WL 796088 at *2, *9 (E.D.N.Y. Mar. 1, 2021), *aff'd*, 2022 WL 966903 (2d Cir. Mar. 31, 2022), ***disclosed at the start of the class period*** they were under investigation by the DOJ and SEC, over ***five years*** before the company was fined in 2019. And unlike here, the claim in *Salim* was that defendants should have ***recorded a reserve*** in late 2018, not that they should have ***disclosed*** an investigation. This distinction is important, as "the threshold for disclosure of a loss contingency . . . is very low," while the "threshold for . . . accrual[s]" is much higher. ¶¶192, 194 (GAAP requires disclosure if a loss is only "reasonably possible," whereas an accrual is required when a loss is "probable" and reasonably estimable). Meanwhile, *Hunt v. Bloom Energy Corp.*, 2021 WL 4461171, at *5 (N.D. Cal. Sept. 29, 2021), concerned complex accounting estimates under ASC 605 and 450 of servicing liabilities and costs for solid-oxide fuel cells. The issue here is whether the chance of a loss from meritorious claims involving corporate espionage was more than "remote." *Id.*; ¶¶191-194. Moreover, plaintiffs in *Hunt* relied entirely on a short-seller's report to demonstrate the company's knowledge of GAAP violations (2021 WL 4461171, at *6), as opposed to the sworn testimony detailing Pega's espionage. *See generally* ¶¶43-104. *Thor Power Tool Co. v. Comm'r of Internal Revenue*, 439 U.S. 522, 544 (1979*)*, and *Corban v. Sarepta Therapeutics, Inc.*, 2015 WL 1505693, at *6 (D. Mass. Mar. 31, 2015), *aff'd*, 868 F.3d 31 (2017) – also cited by Defendants – do not even address ASC 450.

[23] Defendants' contention that the Complaint offers no allegations regarding Pega's "inquiry" into the alleged espionage is flatly wrong. Mtn. at 8 n.11 n.12. *See* ¶79 (Pega executive inquiring about the "legality of using [Appian's] system"); ¶¶108-112 (alleging Pega questioned one whistleblower about stolen trade secrets in early 2020); ¶155 (Pega claimed that conduct such as Appian had alleged would be brought to the attention of Pega's CEO or Chief Compliance Officer); ¶¶178, 183 (alleging voluminous discovery and internal Pega data regarding Appian's claims and damages); ¶169 (2021 Form 10-K disclosure admitting the legal expenses from the Virginia Action were not "routine litigation," but instead "***outside the ordinary course of business***").

- 16 -

4862-9849-0448.v3

**B.**      **Item 103 Required that Defendants Disclose the Virginia Action**

Defendants also wrongly argue that Plaintiffs' Item 103 allegations are "summarily allege[d]," are based on the "hindsight" of the jury verdict, and are "conclusory." Mtn. at 11. The Complaint details the rules requiring disclosure under Item 103, which were met with the Virginia Action.

First, the Virginia Action was not an "ordinary routine litigation incidental to the business" that Item 103 does not require be disclosed. ¶167. Defendants' Motion ignores that Pega admitted in its 2021 Form 10-K that the increased legal expense Pega incurred "in 2021" from the Virginia Action was not routine litigation incidental to the business, but rather "***outside the ordinary course of business***." ¶169.[24] Defendants' failure to even address this allegation in their motion is telling, and consequently Defendants have waived any right to raise it. *Frese*, 512 F. Supp. 3d at 290.

Second, the Virginia Action was a "material pending legal proceeding" that Defendants were required to disclose under Item 103's quantitative measure. ¶¶173-187.[25] Item 103 provides a quantitative threshold that indicates that legal proceedings involving a claim for damages of 10% or greater of the ***current assets*** of the registrant are considered material and should be disclosed. ¶174.[26] Defendants ***ignore 15 paragraphs of well-pled allegations*** that set forth how and why the Virginia Action exceeded Item 103's quantitative threshold, including the following:

---

[24]   In contrast, the defendants in *Greenberg v. Sunrun Inc.*, 233 F. Supp. 3d 764, 775 & n.14 (N.D. Cal. 2017), did not concede their "proceedings . . . originated outside the ordinary course of business." ¶170.

[25]   Meanwhile, *In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 12 (S.D.N.Y. 2016), involved an SEC investigation (not a civil lawsuit involving a CEO's espionage against a chief competitor), and the court held "defendants did not have a duty to disclose the SEC investigation and Wells Notices because the securities laws do not impose an obligation on a company to predict the outcome of investigations." *Id.* at 12, 16 ("There is no duty to disclose litigation that is not 'substantially certain to occur.'"). Moreover, the defendants ***publicly acknowledged*** "an investigation was ongoing," but "cho[se] not to speak about [it]." *Id.* at 15-16. *Wright v. Medtronic, Inc.*, 2010 WL 1027808, at *9, *11 (D. Minn. Mar. 17, 2010), is similarly distinguishable; the company disclosed one lawsuit "before the beginning of the class . . . period" and the other "settled for . . . a drop in the bucket."

[26]   Defendants effectively concede their 3Q21 Form 10-Q was false and misleading for failing to disclose the Virginia Action under Item 103 as they admit the 10% quantitative threshold was met for that quarter. Mtn. at 9.

- 17 -

- Appian's May 2020 Complaint alleged potential damages materially greater than $90 million, including actual damages, unjust enrichment, punitive damages, treble damages, attorney's fees, and other and further relief. ¶176. Indeed, Appian's May 2020 Complaint alleges that Appian suffered and will suffer damages that *will exceed $90 million*. ¶175.[27]

- Appian's May 2020 Complaint alleged that Pega's misappropriation scheme persisted for at least *seven years* and Appian successfully propounded comprehensive fact discovery implicating *eight years of Pega's profits as impacted by the scheme – putting billions in damages* at issue. ¶¶177-178.

- Pega's own expert conceded Appian's damages could reach $187 million if Pega was found to have misappropriated Appian's trade secrets. $187 million was between 19.1% and 23.3% of Pega's current assets during the Class Period. ¶¶179-181.[28]

- Defendants knew or recklessly disregarded Pega acted willfully and maliciously in misappropriating Appian's trade secrets, exposing Pega to hundreds of millions of dollars in post-judgment interest and attorney's fees and costs. ¶¶25, 119, 186.

Defendants sidestep the fact that Appian sought *both* its *actual losses as well as* Pega's "unjust enrichment" – *i.e.*, Pega's "*profits*." ¶¶175-177. Unjust enrichment damages address Pega's gains, not Appian's losses, and Pega's gains were enormous. ¶¶177-178.[29] Thus, the Complaint clearly alleges the Virginia Action exceeded Item 103's threshold for disclosure.[30]

---

[27] Defendants argue that because "$90 million" amounted to 5% of Pega's "total assets," the proceeding was not material. Mtn. at 10 n.11 (citing *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 442-44 (S.D.N.Y. 2009) (acknowledging "Item 103" addresses "'current assets'")). This is a red herring that uses the wrong comparison metric – Item 103 uses *current assets* not *total assets* to determine materiality. ¶174; Mtn. at 9. This argument is also contrary to the accounting rules addressing materiality generally. Staff Accounting Bulletin No. 99 establishes a "rule of thumb" that a 5% (or greater) misstatement or omission of an item is deemed material.

[28] The Complaint's allegations surpass those in *City of Phila. v. Fleming Cos.*, 264 F.3d 1245, 1266 (10th Cir. 2001) (ruling it "could not determine the potential materiality under §229.103" of litigation because the plaintiffs "provided no information whatsoever regarding Fleming's current assets," and no "financial data [to] calculate the percentage of Fleming's current assets that the increased claims represented"), and *Lions Gate*, 165 F. Supp. 3d at 19 ("plaintiffs have not alleged that the civil penalty . . . exceeded ten percent" of "current assets").

[29] *LaRocca v. Borden, Inc.*, 276 F.3d 22, 28 (1st Cir. 2002) ("'damages is measured by the plaintiff's loss; restitution is measured by the defendant's unjust gain'").

[30] Defendants' argument that their failure to disclose the Virginia Action was a protected "statement of opinion" under Item 103 fails for the same reasons set forth above. *See supra* §III.B.

- 18 -

4862-9849-0448.v3

## V.    THE COMPLAINT PLEADS A STRONG INFERENCE OF SCIENTER

The First Circuit has long "rejected any rigid formula for pleading scienter, preferring to rely on a 'fact-specific approach' that proceeds case by case." *Cabletron*, 311 F.3d at 38.  The issue at the pleadings stage is whether "***all*** of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether an individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 323 (emphasis in original).  A "strong inference" is raised when a reasonable person would deem the inference cogent and "***at least as likely as*** any plausible opposing inference." *Id.* at 328. (emphasis in original).  Thus, "'Courts should look at the complaint as a whole and weigh competing inferences in a comparative evaluation of plaintiff's allegations and alternative inferences from those allegations. . . .  If there are equally strong inferences for and against scienter, then the tie goes to the plaintiff.'" *Blue v. Doral Fin. Corp.*, 123 F. Supp. 3d 236, 250 (D.P.R. 2015).

Scienter may be sufficiently pled by allegations of conscious intention to defraud or "'recklessness.'" *Bos. Sci. Corp.*, 523 F.3d at 85.  Recklessness is defined as conduct that constitutes "'an extreme departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it.'" *Geffon v. Micrion Corp.*, 249 F.3d 29, 37 (1st Cir. 2001).

### A.    The Complaint Details Defendants' Reckless and/or Conscious Misconduct Raising a Strong Inference of Scienter

The Complaint explains in great detail, including quoting internal Pega documents and sworn testimony in the Virginia Action, that Defendants either knew their statements during the Class Period were false or misleading, or that they made those statements recklessly disregarding the truth. Defendants ignore the allegations against them, argue that the allegations they do address are not detailed enough, that Plaintiffs plead "fraud-by-hindsight," or ask the Court to adjudicate facts. Mtn. at 19-26.  These arguments are meritless.

To begin, Defendants' arguments that the Complaint is not sufficiently pled because certain allegations supposedly are not true – according to Defendants – are misplaced at this stage. *Id*. at 2, 4, 22-25; *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 82 (5th Cir. 2002) ("'Plaintiffs need not foreclose all

- 19 -

other characterizations of fact, as the task of weighing contrary accounts is reserved for the fact finder.'"); *see also SEC v. Lemelson*, 532 F. Supp. 3d 30, 42 (D. Mass. 2021) (denying **summary judgment** holding that "scienter is usually a question reserved for the jury").

Nor are Plaintiffs' allegations "fraud-by-hindsight" or lacking in detail. Mtn. at 20-25. Plaintiffs allege in exacting detail Defendants' contemporaneous knowledge or recklessness that the statements they made were false. Indeed, Plaintiffs provide painstaking details concerning what Defendants knew and when about the efforts to misappropriate Appian's information, including that Appian closely guarded its trade secrets and took preventative measures to ensure access to its platform was controlled. ¶¶38-39. Plaintiffs show that beginning in 2012 and again in 2019, Defendants engaged in subterfuge to gain access to the information they coveted.

Knowing that it was "impossible to get an Appian trial," Defendants hired a developer who had access to Appian's platform to gather intelligence on Appian's product for Pega. ¶¶39-40. Specifically, Pega utilized a third party to hire "an Appian developer" who had "access to the Appian BPM tool" and who was not "loyal" to Appian and would keep Defendants' scheme confidential. ¶41. Defendants found this person in Zou. ¶43. Zou worked exclusively with Pega between February 2012 and September 2014: (1) creating video footage inside Appian's platform; (2) covertly downloading volumes of Appian documentation; (3) showcasing for Pega the functionality of Appian's platform; (4) supplying Pega with confidential information outlining the strengths and limitations of Appian's platform; (5) demonstrating how to use and navigate Appian's platform; and (6) answering technical questions about Appian's platform. Defendants then used that information to enhance Pega's product and compete against Appian, amassing an arsenal that included hours of video footage, hundreds of presentation slides, and sales "briefing on where you should attack Appian" so that Pega could "win EVERYTIME." ¶¶57, 60, 66; *see generally* ¶¶43-104.

Zou also met personally with Pega executives, including Trefler. ¶44. On January 29, 2013 – nearly a year after Zou had begun working to access Appian's trade secrets for Pega, Trefler met with him at Pega's headquarters. During that meeting Zou logged into Appian's platform and demonstrated it for Trefler. Trefler, Zou, and the other meeting attendees, including John Petronio – Pega's Director

- 20 -

4862-9849-0448.v3

of Product Marketing – "collaborat[ed] around [a] whiteboard" regarding ways to employ Appian's trade secrets against Appian. ¶56. The next day Petronio emailed Trefler to confirm that they were "updating the competitive brief, attack plan, and Appian scalability whitepaper" following Zou's demonstration. *Id.*[31]

Trefler also received, reviewed, and provided to customers he met with the materials Pega created using the information Zou provided – including specifically asking that he be provided with a "prop" he could leave with a customer against whom Pega was going "head-to-head" with Appian for business. ¶57. Trefler was provided with the "prop," *i.e.* a revised "competitive brief on Appian" that "included the new information we've learned." *Id.* Trefler left this information with the customer, Rabobank, and won the business over Appian. *Id.* In February 2013, Trefler also received over 200 presentation slides featuring information on Appian, including screenshots of its platform, Pega had obtained from Zou. *Id.*

In 2019 Trefler and other high ranking Pega executives launched another "teardown" of Appian's platform. ¶67. By August 2019 Trefler was demanding a "critical CI [competitive intelligence] Brief" that contained "deeper dive technical details" about Appian's platform, and asked for "an hour long demo of Appian." ¶¶69-70, 72. This time, however, Pega's executives could not find a "spy" to infiltrate Appian's platform, so instead they took matters into their own hands. ¶68. Several Pega executives and employees used fake names and front businesses to create Appian accounts and obtain access to Appian's platform. ¶¶72-96. This information was then provided to Trefler and other Pega executives in September and October 2019. ¶¶72-73, 75-76, 78. In fact, in October 2019, Trefler specifically asked his executives to "dig deep into Appian's technology in order to find more compelling weaknesses to form a more targeted and damning attack." ¶76. Trefler then

---

[31] Unlike here, where Pega's CEO orchestrated the scheme, and its CEO and CFO were deposed, the complaint in *Fleming* (Mtn. at 22) lacked "particular facts" showing defendants knew of the litigation or its "underlying business practices." 264 F.3d at 1263, 1265; *see also* Mtn. at 13 (citing *Hall v. Johnson & Johnson*, 2019 WL 7207491, at *19 (D.N.J. Dec. 27, 2019) (no "specific facts indicating that any . . . Defendants possessed information regarding the viability of the lawsuits")); *Axar Master Fund, Ltd. v. Bedford*, 308 F. Supp. 3d 743, 758-59 (S.D.N.Y. 2018) (fact that carriers tried to settle legal dispute insufficient to show statements challenging dispute were false), *aff'd*, 806 F. Appx. 35 (2d Cir. 2020)).

4862-9849-0448.v3

met with one of his executives in October and December 2019, to discuss the specific information obtained about Appian. Trefler provided direction and feedback on the ongoing efforts to obtain Appian's information, identified specific technical details about Appian's platform that he wanted investigated, and provided a list of questions and topics on Appian he wanted addressed. ¶78.[32]

These allegations show that Defendants, and Trefler in particular, not only knew about the efforts to misappropriate Appian's trade secrets, but that Trefler participated in and directed those efforts. This is not fraud-by-hindsight pleading as Defendants contend. But instead, considered collectively, these allegations paint a compelling picture of Trefler's scienter. *Aldridge*, 284 F.3d at 83 ("[T]he fact that the defendants published statements when they knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter."); *Tharp v. Acaia Commc'ns, Inc.*, 321 F. Supp. 3d 206, 227 (D. Mass. 2018) (same).[33] While Defendants argue that more detail is required (Mtn. at 21-25), "no 'smoking gun' is required to allege a strong inference of scienter, especially at this stage." *Collier*, 9 F. Supp. 3d at 76; *see also Tellabs*, 551 U.S. at 324.

Furthermore, it is beyond dispute that Appian posed a significant competitive threat to Pega. Plaintiffs allege that Pega considered Appian one of its main competitors stating at investor conferences that Appian was a "big major player." ¶237. Industry analysts agreed, describing "Appian [a]s probably the closest pure-play competitor to Pegasystems." ¶239. Further, on October 4, 2019, Pega's Director of the CTO stated that "Alan [Trefler] and [his brother] Leon [Trefler] are very

---

[32]   Defendants feebly counter such allegations with *Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*, 778 F.3d 228, 245 (1st Cir. 2015) (holding allegations based on low-level "confidential witnesses" who had "'little ongoing contact with senior management'" insufficient). Mtn. at 21.

[33]   *In re Peritus Software Servs., Inc. Sec. Litig.*, 52 F. Supp. 2d 211, 228 (D. Mass. 1999) ("general statements" and "'allusions to unspecified internal corporate information'" insufficient to allege scienter), does not support the suggestion that Trefler simply forgot about his role in Pega's scheme. Mtn. at 21. *In re Credit Suisse First Bos. Corp.*, 431 F.3d 36, 49 (1st Cir. 2005) (*see* Mtn. at 26), which applied an outdated legal standard for scienter, merely held that analysts' rosy stock ratings about another company lacked scienter because "[analysts'] ratings . . . rest upon outsiders' views about a corporation rather than upon a corporate insider's factual assertions regarding his or her own company." *Credit Suisse*, 431 F.3d at 47; *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 52 (1st Cir. 2008) (noting *Tellabs* altered the "standard [applied in *Credit Suisse*] . . . for . . . scienter").

4862-9849-0448.v3

focused on destroying Appian.  Like making it go away for good," indicating that Trefler well understood the competitive threat Appian posed.  ¶¶36, 240.

Defendants' motion does not mention these allegations.  Clearly Pega and the market recognized not only the competitive nature of the industry Pega and Appian were in, but the direct competition for business in that industry between them – including lucrative government contracts market participants were focused on.  *Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 19 (D. Mass. 2004) ("'[F]acts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its officers.'"); *Aldridge*, 284 F.3d at 84 (scienter inferred where new product line "was very important" to the company).[34]  Because of the critical importance to Pega of out competing Appian, it is implausible to infer that Trefler and Stillwell were unaware of Pega's efforts to gain access to Appian's materials, or that upon Pega being sued by Appian for said misappropriation, that a reasonable and diligent review of the situation would not have uncovered the scheme.[35]

Defendants provide no argument against such an inference, waiving any right to do so. *Mass. ex rel. Powell v. Holmes*, 546 F. Supp. 3d 58, 80 n.9 (D. Mass. 2021) ("Where . . . a moving party raises an argument for the first time in a reply, that argument is waived.").  Even if Defendants buried their heads in the sand and somehow were unaware of the scheme to misappropriate Appian's information, scienter is still adequately alleged because if they "did not know that their statements

---

[34]  *See also Chalverus v. Pegasystems, Inc.*, 59 F. Supp. 2d 226, 235 (D. Mass. 1999). Although pleading a "plus factor" is not necessary for the Court to give "significant weight" to Plaintiffs' "core operations" allegations, the Complaint alleges "plus factors" in spades.  Mtn. at 27 n.41; *Metzler Asset Mgmt. GmbH v. Kingsley*, 305 F. Supp. 3d 181, 219 (D. Mass. 2018) (explaining "significant evidence of a defendant's intent or recklessness, *or* a 'plus factor'" such as "'an e-mail pointing to the company's vice president as the author of the scheme,'" is enough) (quoting *Crowell*, 343 F. Supp. 2d at 19), *aff'd*, 928 F.3d 151(1st Cir. 2019); *see* Complaint, §§IV.A, VII.A. (describing emails involving Trefler or Pega's executives regarding Pega's espionage).  *Lenartz v. Am. Superconductor Corp.*, 879 F. Supp. 2d 167, 183 n.9 (D. Mass. 2012) (simple "failure to provide a letter of credit" insufficient) (Mtn. at 27 n.41), is in accord.

[35]  Indeed, Trefler and Stillwell each declared under penalty of perjury they had undertaken a diligent investigation and that Pega's Forms 10-Q and 10-K "do[] not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made. . . not misleading." ¶¶159-160.  These certifications were false and made with scienter.

posed a danger of misleading investors in this way, then they were highly reckless not to know it – reckless enough to incur liability under the securities laws."[36]

And these allegations are far more than pleading Stillwell's "scienter by status." Mtn. at 20.[37] Stillwell was Pega's CFO – responsible for Pega's financial reporting, including compliance with GAAP. He had an obligation under GAAP to conduct a reasonable investigation – particularly where Pega had been sued by a chief competitor for misappropriating business information for over seven years, potentially impacting billions in Pega revenues and its ability to sell its products or use sales materials that were otherwise tainted by the corporate espionage Appian alleged against various Pega executives, including Trefler, its CEO. ¶¶163-166; *see also supra* §V. Stillwell either performed the investigation properly, and discovered Appian's allegations had merit, or did not complete the investigation and recklessly misapplied GAAP, and then misled the market about Pega's business successes (¶¶121-122, 124-125, 127). These are strong and plausible inferences that rely on far more than his mere "status" as CFO.[38]

---

[36]   *Special Situations Fund III, L.P. v. Am. Dental Partners, Inc.*, 775 F. Supp. 2d 227, 243 (D. Mass. 2011) (in a similar situation, holding given "Defendants' personal participation" in acts causing the company's largest customer to sue it for breach of contract, "Defendants must have known that statements to the effect that [defendant company] had not changed its behavior toward [its largest client] *at all* posed the danger of misleading investors").

[37]   Defendants rely on cases that are off point. Mtn. at 19-20; *see Lirette v. Shiva Corp.*, 27 F. Supp. 2d 268, 282-83 & n.9 (D. Mass. 1998) (plaintiffs' scienter allegations were predicated on "information and belief" – not "***particularized*** facts" – and a single, unsuspicious stock sale); *Acacia Commc'ns*, 321 F. Supp. 3d at 229 (lacking "any allegations or references to 'internal records or witnessed discussions'" to support scienter); *Foley v. Transocean Ltd.*, 861 F. Supp. 2d 197, 210, 213 (S.D.N.Y. 2012) (finding no scienter where plaintiff did not "identify any pre-August 2009 report" that predated and contradicted the defendant's alleged misstatements).

[38]   *See Sepracor*, 308 F. Supp. 2d at 31 ("Far from merely alleging 'scienter by status,' the Complaints set forth 'specific facts that make it reasonable to believe that defendant[s] knew that [the] statement[s] [were] false or misleading.'"); *In re Allaire Corp. Sec. Litig.*, 224 F. Supp. 2d 319, 329 (D. Mass. 2002) (holding it was "simply inconceivable" that the defendants were uninformed of key product's failure to operate). The holding in *Stone & Webster* (*see* Mtn. at 21), that plaintiffs failed to plead scienter against the corporate defendant's ***outside auditor***, is inapposite; regardless, the Complaint's allegations easily surpass the allegations there. 224 F. Supp. 2d at 199 (no detailed allegations the CEO and CFO were "directly involved in the detailed accounting for" the "ten particular contracts" that formed the suit's gravamen).

Moreover, Stillwell also served as Pega's COO, and therefore was "very close to the deals at Pega, probably even more so than most CFOs because of the – some of the functions that report in to me, but I'm very close to deals." ¶¶32, 274. The fact Stillwell spoke so authoritatively about Pega's sales practices and deals Pega had won by weaponizing Appian's trade secrets, strongly infers his scienter. ¶¶51, 122, 125, 127, 132.[39]

Finally, Defendants' contention that GAAP violations, standing alone, cannot plead scienter misses the mark: Plaintiffs allege *far more* than GAAP violations. Mtn. at 28. Even so, the First Circuit has recognized that allegations that Defendants violated GAAP are probative of scienter.[40]

### B.    Plaintiffs' Motive Allegations Support an Inference of Scienter

Plaintiffs need not plead a motive to properly allege scienter, especially when, as here, the Complaint pleads in great detail Defendants' knowledge and reckless conduct. *See Tellabs*, 551 U.S. at 325 ("absence of a motive allegation is not fatal" to alleging a strong inference of scienter). But Plaintiffs do plead a powerful motive that extends beyond merely "minimiz[ing] lost business opportunities." Mtn. at 26. Defendants had a strong motive to conceal the Virginia Action, including the injunctive relief sought by Appian which would have prevented Pega from selling tainted software or relying on tainted sales processes. ¶¶224-227. Plaintiffs allege, and the jury in the Virginia Action found, that Pega's products and sales processes were "tainted" by the use of Appian's misappropriated information. ¶¶33-104. And Plaintiffs allege that Defendants were motivated to conceal the potential injunctive relief so as to avoid a potential backlash from its customers concerned that the products they were using or buying would be restricted or impacted by the Virginia Action. ¶227. This meant lost or impacted business in the billions of dollars. ¶¶223-229. Allegations that "[d]efendants had 'more than

---

[39]    *E.g.*, *Allison*, 2023 WL 1928119, at *10 ("defendants' specific statements about [company's] marketing practices indicate[d] knowledge"); *Holwill*, 2020 WL 5235005, at *5 (fact that defendants made "statements regarding . . . marketing practices" indicated they "had detailed information regarding" those practices).

[40]    *See Aldridge*, 284 F.3d at 83 (allegations that defendants knowingly committed accounting violations, even absent a restatement, supports strong inference of scienter); *In re Raytheon Sec. Litig.*, 157 F. Supp. 2d 131, 148 (D. Mass. 2001) ("GAAP are intended to provide a reliable degree of predictability, and an application of GAAP that strays beyond the boundaries of reasonableness will provide evidence from which scienter can be inferred.").

the usual concern by executives' to increase the value of [company's] stock; 'the executives' careers and the very survival of the company were on the line," support an inference of scienter. *Brumbaugh*, 416 F. Supp. 2d at 253. Defendants' Motion addresses none of these allegations.

Further, sales of stock by an insider are not required to establish motive. *See, e.g.*, *Aldridge*, 284 F.3d at 84.[41] Indeed, as one court noted in an analogous situation, where plaintiffs "paint[ed] a picture that strongly suggests Defendant's fraudulent intent," even where individual defendants **purchased** stock during the class period, "this behavior does not necessarily bear upon Plaintiffs' scienter allegations." *Collier*, 9 F. Supp. 3d at 74-76; *see also Crowell*, 343 F. Supp. 2d at 15 ("Even if none of the . . . Defendants profited from stock trades . . . that does not establish that they lacked any motive to mislead the investing public, and a recklessness argument by definition would not require a motive in any event.").[42]

### C.   Pega's Corporate Scienter Is Properly Alleged

Defendants' assertion that Plaintiffs have failed to plead Pega's scienter equally ignores the Complaint's allegations and the law. Mtn. at 27-28. "The scienter alleged against the company's agents is enough to plead scienter for the company." *Cabletron*, 311 F.3d at 40. This is precisely the conclusion recently reached by Judge Woodlock who found corporate scienter was supported through plaintiff's allegations that Boston Scientific's CEO had made false and misleading statements with

---

[41]   The fact Trefler was Pega's largest shareholder **supports** an inference of scienter. Trefler stood to lose the most if Pega's business faltered, and squashing one of Pega's chief competitors ensured that Pega's financial results remained positive and, in turn, its stock price remained strong. *See Carbonite*, 22 F.4th at 9 (reasoning "'the importance of a particular item to a defendant can support an inference that the defendant is "paying close attention" to that item'" necessitating further inquiry and supporting a finding of scienter, even absent suspicious stock sales); *Aldridge*, 284 F.3d at 83 (finding scienter absent insider trading due to "inferences that corporate officers understood . . . that the success of the new products, and of taking the old line company into a new world, was important to their own survival and that of the company").

[42]   Defendants' cited cases are otherwise inapposite as indicia of scienter were completely lacking. Here, by contrast, far from being "vague as to when the defendants became aware of facts that should have made them aware of the falseness of their optimistic statements," the Complaint alleges particular facts showing Defendants' direct participation in the underlying misconduct. *Sousa v. Sonus Networks, Inc.*, 261 F. Supp. 3d 112, 120 (D. Mass. 2017). Nor is the situation here one where "there are no direct conflicts between the reality of the situation and the representations made." *Guerra v. Teradyne, Inc.*, 2004 WL 1467065, at *27-*28 (D. Mass. Jan. 16, 2004) ("'lack of sales'" is "'not determinative'").

4862-9849-0448.v3

scienter. *In re Bos. Sci. Corp. Sec. Litig.*, 2022 WL 17823837, at *30 (D. Mass. Dec. 20, 2022) (The Court found that the CEO "'was hardly a random corporate bureaucrat or mid-level manager. He was [Boston Scientific's] . . . CEO' and he made material misrepresentations with the requisite scienter."). As outlined above, Plaintiffs sufficiently plead that both Trefler and Stillwell, Pega's two most senior officers and spokespeople, made false and misleading statements with scienter. *Supra* §§III-V. As Pega's CEO and CFO, respectively, their scienter is imputed to Pega.

## VI.    THE COMPLAINT SUFFICIENTLY PLEADS LOSS CAUSATION

Continuing their theme of arguing the merits and urging the Court to engage in impermissible fact-finding, Defendants contend that Plaintiffs fail to satisfactorily plead loss causation. Mtn. at 28-30. However, Defendants **do not dispute** that once they finally disclosed the Virginia Action, the claimed damages Pega was facing from it, the jury's verdict and findings of willful and malicious conduct on Pega's part, and the entry of a final judgment, Pega's stock price fell significantly. This concession dooms their arguments which, once again, are off base, premature, and wrong.

Loss causation is the "causal connection" between a defendant's misrepresentations and a drop in the company's stock price. *Mass. Ret. Sys. v. CVS Caremark Corp.*, 716 F.3d 229, 238 (1st Cir. 2013) ("Loss causation is easiest to show when a corrective disclosure is associated with a drop in share price."). To plead loss causation, a plaintiff must "plausibly" allege that the loss-causing disclosures "relate to the same subject matter as the alleged misrepresentation." *Id.* at 240. And, contrary to Defendants' position, Plaintiffs may do so using "'ordinary'" and "not heightened" pleading requirements. *Am. Dental Partners, Inc.*, 775 F. Supp. 2d at 244.

The Complaint's allegations clearly identify the required "causal connection." Plaintiffs allege that Defendants improperly concealed from the market the existence of the Virginia Action, the risk it posed to Pega, Defendants' involvement in the actions alleged in the Virginia Action, and the benefits to Pega from the alleged wrongful appropriation of Appian's information. *See generally* ¶¶120-196; *see also supra* §§III-V. Plaintiffs further allege that this concealed information was revealed to the market in a series of partial disclosures beginning on February 16, 2022 that resulted in precipitous drops in Pega's stock price. ¶¶242-249. These are precisely the sort of allegations routinely deemed

- 27 -

4862-9849-0448.v3

sufficient to plead loss causation. *See, e.g.*, *Bos. Sci.*, 2022 WL 17823837, at \*29; *Am. Dental Partners*, 775 F. Supp. 2d at 244-245.[43]

On February 16, 2022, more than two years after it was filed and on the eve of the trial, Defendants finally disclosed the Virginia Action and Pega's exposure to $3 billion in damages in Pega's 2021 Form 10-K filed with the SEC.  ¶¶114, 145, 243.  Accompanying this disclosure were false assurances from Defendants that Appian's claims were "without merit," that Pega had "strong defenses to these claims," and that Appian's claimed damages were "not supported by the necessary legal standard of proximate cause." ¶145.  Plaintiffs allege that these disclosures resulted in an over 15% drop in Pega's stock price. ¶243.  These allegations are sufficient.

Further, Defendants' protests that it was other news disclosed that day that actually caused Pega's stock price to decline, and their citation to analyst reports to "prove" they are correct miss the mark.  Mtn. at 29.  What caused the stock price to decline is a complex *factual* determination that depends on expert analysis. *Wortley v. Camplin*, 333 F.3d 284, 295 (1st Cir. 2003) (holding that loss causation is generally a question of fact).  Just because the two analyst reports Defendants cite to did not mention the disclosure of the Virginia Action does not conclusively *prove* that disclosure of a $3 billion lawsuit by one of Pega's chief competitors did not impact the stock price movement as Plaintiffs have alleged.  And as this Court has recognized, all inferences are to be drawn in Plaintiffs' favor in undertaking this analysis. *Allaire*, 224 F. Supp. 2d at 338.[44]

---

[43]  Defendants' citation to *Coyne v. Metabolix, Inc.*, 943 F. Supp. 2d 259 (D. Mass. 2013), is misplaced.  Mtn. at 29.  In *Metabolix* the allegedly false statements concerned the quality and demand for defendant's product, "[y]et the stock price did not fall in response to any public disclosure of quality problems or lack of demand for the product." 943 F. Supp. 2d at 274-75.  Here, by contrast, the connection between the negative information and the earlier false or misleading statements or omissions is clear and well pled. *See supra* §§III-V.  Defendants concealed the Virginia Action and their misappropriation activities from the market for over two years, and when they finally disclosed the fact of the litigation, Pega's share price plummeted.

[44]  Further, consistent with the First Circuit's guidance on how to establish loss causation in *CVS Caremark*, 716 F.3d at 237-38, Plaintiffs here have "eliminat[ed] other possible explanations for [the] price drop[s]" by showing that the drops following each of the alleged corrective disclosures were not attributable to changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. ¶¶243 n.49, 244 n.51, 248 n.53, 249.

4862-9849-0448.v3

Equally unavailing are Defendants' arguments concerning the May 9 and September 16, 2022 disclosures. Mtn. at 29-30. On May 9, 2022, Defendants announced that the jury in the Virginia Action had returned a $2 billion verdict against Pega, including findings that Pega had willfully and maliciously misappropriated Appian's trade secrets, further entitling Appian to recover its attorney's fees and costs. ¶¶117, 244. Defendants derided the verdict as "ridiculous," claiming that there were no "facts of any wrongdoing," specifically stating that any "implication" that "Pega's CEO accessed any Appian free trials is categorically false." ¶118. Still, Pega's stock price fell nearly 30% in response to this news. ¶244. Pega's stock fell another nearly 12% after Defendants disclosed on September 16, 2022 that judgment had been entered in favor of Appian in the Virginia Action. ¶¶119, 247-248. These allegations also clearly plead the required causal connection.

Defendants, however, claim that neither of these disclosures were "corrective" because they "had discussed at length and cautioned about" the Virginia Action prior to the jury's verdict. Mtn. at 30.[45] Defendants' argument amounts to a "truth-on-the-market" defense. This highly fact-specific inquiry requires that ***Defendants prove*** that the truth about the information Plaintiffs allege was concealed entered the market with a """"degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements."""" *In re Credit Suisse-AOL Sec. Litig.*, 465 F. Supp. 2d 34, 51 (D. Mass. 2006) (""""[t]he truth on the market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a §10(b) complaint""""). Moreover, Defendants' argument conveniently ignores that they engaged in a media blast to undermine the jury's findings, convince the market that the verdict was "ridiculous" and unsupported by any evidence, that the damage award was unsupportable, and that it would be overturned on appeal.

---

[45] *CVS Caremark* also undercuts Defendants' arguments related to the other two corrective disclosures on May 9 and September 16, 2022. Here, like there, just as defendants' prior disclosure of the fact of lost contracts in *CVS Caremark* did not disclose how or why defendants lost those contracts and thus serve to preempt the corrective nature of subsequent disclosures revealing this information, Defendants' February 2022 disclosure of the fact of the Virginia Action does not foreclose liability for the subsequent corrective disclosures in May and September 2022, particularly in light of Defendants' numerous statements that the Virginia Action was meritless. *See* 716 F.3d at 242.

4862-9849-0448.v3

¶¶245-246, 248.  The time for sorting out these facts is at trial, not at the pleading stage.  *Wortley*, 333 F.3d at 295 (loss causation is a factual question resolved by the jury).[46]

## VII.   PLAINTIFFS' CONTROL PERSON CLAIM SHOULD PROCEED

Defendants undisputedly controlled Pegasystems.  ¶¶269-278; Mtn. at 30 n.48.  Having sufficiently stated a §10(b) claim against Defendants, Plaintiffs have stated a §20(a) claim against Trefler and Stillwell.  *Stone*, 424 F.3d at 27.

## VIII.   CONCLUSION

For the reasons stated above, Defendants' motion should be denied.[47]

DATED:  February 17, 2023

Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
DEBRA J. WYMAN
CHRISTOPHER D. STEWART
LONNIE A. BROWNE
RAPHAELLA FRIEDMAN


s/ Debra J. Wyman
DEBRA J. WYMAN

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
debraw@rgrdlaw.com
cstewart@rgrdlaw.com
lbrowne@rgrdlaw.com
rfriedman@rgrdlaw.com

---

[46]   *Leung v. bluebird bio, Inc.*, 599 F. Supp. 3d 49, 70 (D. Mass. 2022), is inapposite as Defendants here continued to conceal the true risk posed by the Virginia Action even after they disclosed the existence of the litigation in February 2022.  It was the materialization of this concealed risk – the true extent and likelihood of Pega's liability – which only occurred in May and September 2022, that caused Plaintiffs' losses.  Defendants' other cited cases are out-of-Circuit and likewise distinguishable.

[47]   If the Court grants any part of Defendants' motion, Plaintiffs respectfully request leave to amend under Federal Rule of Civil Procedure 15(a) to cure any defects.  *See Advest*, 512 F.3d at 56.

- 30 -

4862-9849-0448.v3

ROBBINS GELLER RUDMAN
  & DOWD LLP
CHAD JOHNSON
420 Lexington Avenue, Suite 1832
New York, NY  10170
Telephone:  212/432-5100
chadj@rgrdlaw.com

Lead Counsel for Lead Plaintiffs

HUTCHINGS BARSAMIAN MANDELCORN, LLP
THEODORE M. HESS-MAHAN, BBO #557109
110 Cedar Street, Suite 250
Wellesley Hills, MA  02481
Telephone:  781/431-2231
781/431-8726 (fax)
thess-mahan@hutchingsbarsamian.com

Liaison Counsel for Lead Plaintiffs

- 31 -

4862-9849-0448.v3

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on February 17, 2023.

s/ DEBRA J. WYMAN
DEBRA J. WYMAN

ROBBINS GELLER RUDMAN
    & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

Email:  debraw@rgrdlaw.com

4862-9849-0448.v3