# Exhibit 28

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

_____

# FORM 10-K
_____

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT of 1934**

**For the fiscal year ended December 31, 2020**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT of 1934**

**Commission File No. 1-11859**
_____

# PEGASYSTEMS INC.

*(Exact name of Registrant as specified in its charter)*
_____

| | |
|---|---|
| **Massachusetts** | **04-2787865** |
| *(State or other jurisdiction of incorporation or organization)* | *(IRS Employer Identification No.)* |

**One Rogers Street, Cambridge, MA 02142-1209**
*(Address of principal executive offices, including zip code)*

**(617) 374-9600**
*(Registrant's telephone number, including area code)*
_____

**Securities registered pursuant to Section 12(b) of the Act:**

| <u>Title of each class</u> | <u>Trading symbol(s)</u> | <u>Name of each exchange on which registered</u> |
|---|---|---|
| **Common Stock, $.01 par value per share** | **PEGA** | **NASDAQ Global Select Market** |

**Securities registered pursuant to Section 12(g) of the Act:**
**None**
_____

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Exchange Act. Yes ☐ No ☒

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the Registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the Registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging company," in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☒     Accelerated filer ☐     Non-accelerated filer ☐     Smaller reporting company ☐     Emerging growth company ☐

If an emerging growth company, indicate by check mark if the Registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

The aggregate market value of the Registrant's common stock held by non-affiliates, based upon the closing price of the Registrant's common stock on the NASDAQ Global Select Market of $101.17, on June 30, 2020 was approximately $4.0 billion.

There were 80,900,637 shares of the Registrant's common stock, $0.01 par value per share, outstanding on February 5, 2021.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the Registrant's definitive proxy statement related to its 2021 annual meeting of stockholders to be filed subsequently are incorporated by reference into Part III of this report.

In light of continuing fiscal challenges in many jurisdictions, various levels of government are increasingly focused on tax reform and other legislative action to increase tax revenue, including corporate income taxes. Several U.S. states have attempted to increase corporate tax revenues by taking an expansive view of corporate presence to attempt to impose corporate income taxes and other direct business taxes on companies that have no physical presence in their state, and taxing authorities in foreign jurisdictions may take similar actions. Many U.S. states are also altering their apportionment formulas to increase the amount of taxable income or loss attributable to their state from certain out-of-state businesses. Similarly, in Europe and elsewhere globally, there are various tax reform efforts underway designed to ensure that corporate entities are taxed on a larger percentage of their earnings.

*If it becomes necessary or desirable to repatriate any of our foreign cash balances to the United States, we may be subject to increased taxes, other restrictions, and limitations.*

As of December 31, 2020, $66.0 million of our cash and cash equivalents were held in our foreign subsidiaries. If it becomes necessary or desirable to repatriate these funds, we may be required to pay U.S. federal, state, and local income and foreign withholding taxes upon repatriation. We consider the earnings of our foreign subsidiaries to be permanently reinvested. As a result, U.S. federal, state, and local, and foreign withholding taxes on such earnings have not been provided in our financial statements. It is not practical to estimate the amount of tax we would have to pay upon repatriation due to the complexity of the tax laws and other factors.

*We face risks related to intellectual property claims or appropriation of our intellectual property rights.*

We rely primarily on a combination of patent, copyright, trademark, and trade secrets laws, as well as intellectual property and confidentiality agreements to protect our proprietary rights. We also try to control access to and distribution of our technologies and other proprietary information. We have obtained patents in strategically important global markets relating to the architecture of our systems. We cannot assure that such patents will not be challenged, invalidated, or circumvented, or that rights granted thereunder, or the claims contained therein will provide us with competitive advantages. Moreover, despite our efforts to protect our proprietary rights, unauthorized parties may attempt to copy aspects of our software or to obtain the use of information that we regard as proprietary. Although we generally enter into intellectual property and confidentiality agreements with our employees and strategic partners, despite our efforts our former employees may seek employment with our business partners, clients, or competitors, and there can be no assurance that the confidential nature of our proprietary information will be maintained. In addition, the laws of some foreign countries do not protect our proprietary rights as effectively as they do in the U.S. There can be no assurance that our means of protecting our proprietary rights will be adequate or that our competitors will not independently develop similar technology.

Other companies or individuals have obtained proprietary rights covering a variety of designs, processes, and systems. There can be no assurance that third parties, including clients, will not claim infringement by us for current or future products. Although we attempt to limit the amount and type of our contractual liability for infringement of the proprietary rights of third parties and assert ownership of work product and intellectual property rights as appropriate, there are often exceptions, and limitations may not be applicable and enforceable in all cases. Even if limitations are found to be applicable and enforceable, our liability to our clients for these types of claims could be material given the size of certain of our transactions. We expect that software product developers will increasingly be subject to infringement claims as the number of products and competitors in our industry segment grows and the functionality of products in different industry segments overlaps. Any such claims, with or without merit, could be time-consuming, result in costly litigation, cause product shipment and delivery delays, require us to enter into royalty or licensing agreements, or be precluded from making and selling the infringing software, if such proprietary rights are found to be valid. Royalty or licensing agreements, if required, may not be available on terms acceptable to us or at all. These claims could also subject us to significant liability for damages, potentially including treble damages if we are found to have willfully infringed patents or copyrights. Even if a license were available, we could be required to pay significant royalties, which would increase our operating expenses. As a result, we may be required to develop alternative non-infringing technology, which could require substantial effort and cost. If we cannot license or develop technology for any infringing aspect of our business, we would be forced to limit or stop sales of our software and may be unable to compete effectively, which could have a material adverse effect upon our business, operating results, and financial condition.

*We may be subject to intellectual property rights claims by third parties, which are extremely costly to defend, could require us to pay significant damages, and could limit our ability to use certain technologies.*

Companies in the software and technology industries, including some of our current and potential competitors, own large numbers of patents, copyrights, trademarks, and trade secrets and frequently enter into litigation based on allegations of infringement or other violations of intellectual property rights. In addition, many of these companies can dedicate substantially greater resources to enforce their intellectual property rights and to defend claims that may be brought against them. The litigation may involve patent holding companies or other adverse patent owners that have no relevant product revenues and against which our patents may, therefore, provide little or no deterrence. We have received, and may in the future receive, notices that claim we have misappropriated, misused, or infringed other parties' intellectual property rights, and, to the extent we gain greater market visibility, we face a higher risk of being the subject of intellectual property infringement claims.

19

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this Annual Report on Form 10-K to be signed on its behalf by the undersigned, thereunto duly authorized.

**Pegasystems Inc.**

Date:   February 17, 2021                                      By:                    /s/ KENNETH STILLWELL

**Kenneth Stillwell**
**Chief Financial Officer and Chief Administrative Officer**
**(Principal Financial Officer)**

Pursuant to the requirements of the Securities Exchange Act of 1934, this Annual Report on Form 10-K has been signed below on February 17, 2021 by the following persons on behalf of the Registrant and in the capacities indicated.

| Signature | Title |
|---|---|
| /s/ ALAN TREFLER<br>**Alan Trefler** | Chairman and Chief Executive Officer<br>(Principal Executive Officer) |
| /s/ KENNETH STILLWELL<br>**Kenneth Stillwell** | Chief Financial Officer and Chief Administrative Officer<br>(Principal Financial Officer) |
| /s/ EFSTATHIOS KOUNINIS<br>**Efstathios Kouninis** | Chief Accounting Officer, Vice President of Finance, and Treasurer<br>(Principal Accounting Officer) |
| /s/ PETER GYENES<br>**Peter Gyenes** | Director |
| /s/ RONALD HOVSEPIAN<br>**Ronald Hovsepian** | Director |
| /s/ RICHARD JONES<br>**Richard Jones** | Director |
| /s/ CHRISTOPHER LAFOND<br>**Christopher Lafond** | Director |
| /s/ DIANNE LEDINGHAM<br>**Dianne Ledingham** | Director |
| /s/ SHARON ROWLANDS<br>**Sharon Rowlands** | Director |
| /s/ LARRY WEBER<br>**Larry Weber** | Director |