1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS (Boston)

No. 1:22-cv-11220-WGY

CITY OF FORT LAUDERDALE POLICE AND FIREFIGHTERS'
RETIREMENT SYSTEM, et al,
            Plaintiffs

vs.

PEGASYSTEMS, INC, et al,
            Defendants

\*\*\*\*\*\*\*\*\*

For Hearing Before:
Judge William G. Young

Motion to Dismiss

United States District Court
District of Massachusetts (Boston)
One Courthouse Way
Boston, Massachusetts 02210
Wednesday, May 17, 2023

\*\*\*\*\*\*\*

REPORTER: RICHARD H. ROMANOW, RPR
Official Court Reporter
United States District Court
One Courthouse Way, Room 5510, Boston, MA 02210
bulldog@richromanow.com

A P P E A R A N C E S


CHRISTOPHER D. STEWART, ESQ.
CHRISTOPHER CHAD JOHNSON, ESQ.
   Robbins Geller Rudman & Dowd, LLP
   655 West Broadway, Suite 1900
   San Diego, CA 92101
   (619) 231-1058
   Email: Cstewart@rgrdlaw.com
and
THEODORE M. HESS-MAHAN, ESQ.
   Hutchings, Barsamian, Mandelcorn, LLP
   110 Cedar Street, Suite 250
   Wellesley Hills, MA 02481
   (781) 431-2231
   Email: Thessmahan@hutchingsbarsamian.com
   For Plaintiffs


DANIEL W. HALSTON, ESQ.
ROBERT K. SMITH, ESQ.
ERIKA M. SCHUTZMAN, ESQ.
   Wilmer Hale, LLP
   60 State Street
   Boston, MA 02109
   (617) 526-6654
   Email: Daniel.halston@wilmerhale.com
   For Defendants

P R O C E E D I N G S

(Begins, 3:10 p.m.)

THE CLERK:  Now hearing Civil Matter 22-11220, City of Fort Lauderdale versus Pegasystems.

THE COURT:  Would counsel identify themselves.

MR. HESS-MAHAN:  Theodore Hess-Mahan, local counsel for the lead plaintiffs.

MR. JOHNSON:  Good afternoon, your Honor, Chad Johnson, Robbins Geller, for the lead plaintiffs.

MR. STEWART:  Good afternoon, your Honor, Christopher Stewart, with Robbins Geller, for the lead plaintiffs.

MR. HALSTON:  Good afternoon, your Honor, Dan Halston on behalf of the defendants, and with me is Rob Smith and Erika Schutzman, also from my office.

THE COURT:  Good afternoon.  Mr. Halston, this is your motion.  I will tell you it seems in this particular case you've got a rather long road to hoe.

Let me ask you this.  In the Virginia action, which I think causes you some real problems here, what defenses were raised?

MR. HALSTON:  Your Honor, I did not handle the Virginia action.

THE COURT:  I appreciate that.

MR. HALSTON:  But among the defenses were defenses

that there were no actual trade secrets at issue because the matters were available to the members of the public. There were issues on exclusion of evidence, um, Pegasystems was trying to put forward how often people had access to the materials that were under dispute. And then there were issues of causation, your Honor, a significant issue that's being pursued on appeal because the judge changed the burden of proof under Virginia law, and that's why you saw in our papers that there were a couple of amici who had submitted on behalf of Pegasystems in the case, that that shift in the law was impermissible.

THE COURT:  All right, and I thank you for that. But I review this at the present time and against the background of a very large jury verdict, which as it stands now is in fact the judgment of the Courts of Virginia.

Doesn't that get them by a motion to dismiss here?

MR. HALSTON:  No, it doesn't, your Honor.

THE COURT:  Why not?

MR. HALSTON:  And for a couple of reasons.

First, the better rule in the case is that the jury verdict was -- first of all, it was solely against the company.  We have three defendants here, we have the company and we have Mr. Trefler and Mr. Stillwell.  The

verdict was against the company.  And the plaintiffs here, your Honor, have essentially conceded that scienter for the company in this case relies on the scienter of Mr. Trefler and Mr. Stillwell and that's in their opposition at Page 27.

Trefler and Stillwell were not defendants in the Virginia case, there were no findings against them in the Virginia case, the only judgment in the Virginia case was against the company.  And so where the scienter here is reliant upon the scienter of Trefler and Stillwell, which we believe they cannot meet, scienter should not then be imputed to the company.

THE COURT:  Why can they not meet it?

MR. HALSTON:  As to the company?

THE COURT:  Oh, no, as to Trefler and Stillwell.

MR. HALSTON:  As to Trefler and Stillwell.

Your Honor -- let me just finish, if I can, and I'm going to get right to Trefler and Stillwell.  But if I can just, um, on the initial question that your Honor raised?

Beyond the issue of what was decided in the Virginia case, your decision in *Rosenbaum vs. Boston Communications*, your Honor, is really not to the contrary and because in that case your Honor did find an inference of scienter based upon an earlier patent

infringement decision, however in that case, your Honor, you then went on to find that to find a strong, a strong showing or inference of scienter, which is required under the PSLRA in Section 10 here, there needed to be some additional affirmative conduct in the nature of almost an admission or hiding of the fact of infringement in that case. And so your Honor went on to say in that case that the defendants, after receiving notice of infringement, added unnecessary components to the infringing product and prepared legal opinions to defend against a finding of willful infringement based on a review of the actual -- based on a review not of the actual patent or prosecution history. It was with that supporting additional information that your Honor then took to find a strong showing for purposes of a showing of scienter. We don't have that additional, um, affirmative misconduct in effect, your Honor, on top of the jury verdict here.

THE COURT: Well let me put it to you. You've got this code of conduct, you've got these statements that affiants', um, claims had no merit against this factual development, and I grant you I'm struck by the jury verdict in Virginia, it would seem that this would survive against the company. I'm not clear that it survives as against Stillwell, but as against the

company and Trefler.

And why shouldn't it?

MR. HALSTON:  Well with respect to the code of conduct, your Honor, which you raised, the cases that we've cited point out that they are largely aspirational, and the code of conduct here, similar to that, it says the company was committed to certain conduct.  It was not a guarantee, it was not a factual representation that there were no violations of the code of conduct.  And in any event, the complaint does not allege widespread and pervasive conduct that would render statements in the code of conduct actionably misleading under the leading cases, your Honor.  Only a handful of Pegasystems' thousands of employees are allegedly involved in the competitive intelligence activities that were raised in the Virginia case.

But coming back to scienter, your Honor.  Even if -- even if the defendants understood, um, the mis -- the so-called "misconduct" that was brewing within the company, that is not sufficient for purposes of scienter purposes, your Honor.  And I pointed the Court to the *City of Philadelphia vs. Fleming* case, the Tenth Circuit, which has been cited several times approvingly by the First Circuit, including the *Aldridge* case and the *City of Dearborn* case, where the Court assumed that

the defendants knew of the underlying fraudulent business practices.  In that case it was a cost-plus contract issue and there were claims of fraud in the underlying litigation.  The Court still concluded that there was no requirement to disclose.  And the issue was -- is because it's not just knowledge of the underlying so-called "misconduct," and I'll quote the Court, but the Court said, "We couldn't conclude that the potential negative impact of the litigation was so obvious that the defendants must have been aware of both the potential impact and the failure to disclose an obvious danger of misleading."

So here, your Honor, what you have is you have allegations in a complaint, allegations in a complaint that alleged $90 million of damages.  The original complaint was filed in May of 2020, it was amended in November of 2021, again alleging $90 million of damages.

What do the plaintiffs say?  The plaintiffs say "We should have been" -- "The defendants should have been aware that they faced billions of dollars of liability."  They say that in the amended complaint in Paragraph 177 and they double-down on it in the opposition, your Honor, at Page 18.

THE COURT:  About 2 more minutes, Mr. Halston.

MR. HALSTON:  But they say that, your Honor, when,

under Virginia law, the ad damnum limited the exposure of the company to -- the cap was $90 million, that was the exposure, they couldn't have faced billions of dollars of liability, that that only arose when they amended the complaint a second time in February of 2022, and within 5 days the company disclosed that litigation when they amended and claimed there was a $3 billion claim.  So before that is the $90 million claim, your Honor, a $90 million claim that the Court, under *Omnicare*, should put in context, and the context was that these parties were involved in ongoing IT litigation going back to 2015, there were cases in the Superior Court and a case here before Judge Saris in the District Court.  Neither party disclosed that prior litigation.

But once the ad damnum was raised to $3 billion, the company still believed it didn't have merit, as it did say it didn't have merit.  Now there again distinguishing from *Rosenbaum vs. Boston Communications*, your Honor, your Honor pointed out in that case the company repeatedly said that the patent was invalid, the patent was not infringed, and the claims were without merit.  We have one statement about lack of merit in that February disclosure with respect to the $3 billion claim, there's not repeated statements about it, your

Honor.

THE COURT:  Thank you.

All right?

MR. STEWART:  Good afternoon, your Honor.  Chris Stewart.

Your Honor, the reason that the --

THE COURT:  What about Stillwell, shouldn't I let Stillwell out?

MR. STEWART:  You should not let Stillwell out, your Honor, for a few reasons.

THE COURT:  Why not?

MR. STEWART:  Now, first of all, Mr. Stillwell, he joined Pegasystems in 2016 as CFO.  He -- so he wasn't -- he wasn't joining the company as the company was being sued, he was there for a few years before the company was actually sued by Appian in May of 2020.

Now Mr. Stillwell has also said on record that he was very close to deals, more than most CFOs.  So we already have a CFO who is saying, "I'm closer to deals more than any other CFOs that I know."  Now Mr. Stillwell, he's signed every "Q" and he's signed every "K," and in connection with some or each of those SEC filings he's making stock certifications that he's done his due diligence on the filings, he's responsible for the company's compliance with GAAP as a CFO, he has

to make assurances that, Number 1, the company's statements regarding whether there's material pending legal proceedings under Item 103 is accurate, he has to make assurances as to whether the company's disclosures about, um, loss contingencies under ASC 450 are accurate. So he's having to make these investigations.

Now on May 29th, 2020, the company received this complaint from Appian. The complaint specifically identifies four individuals at Pegasystems that were involved in the underlying conduct, including Mr. Trefler, the Chief Products Officer, Mr. Ackomo, Steve Defiza, who was the Vice-President, and one other individual, and the first thing Mr. Stillwell is going to do is go to those individuals, hold up the complaint and say, "Is any of this true?" He needs to be investigating -- the plausible interest -- the plausible inference at this stage, as the well-pled allegations provide, is that Mr. Stillwell either did the investigation that he was expected to do and that he was responsible for doing, and he learned about the facts underlying the espionage in the action, or he was reckless in not finding the true facts out.

Either way we plausibly allege that Mr. Stillwell has sufficient scienter for the statements that he made during the class period which, um, we would add he's not

only discussing the company's credibility with customers, including the government customers, he's talking about specific deals that were negotiated prior to his time at the company, including with the U.S. Census Bureau, which we allege in our complaint was one of the deals on which the company, Pegasystems, is using the ill-gotten fruits of Mr. Zou's labor as part of that -- as part of the U.S. Census Bureau deal.

So we think we've alleged sufficient facts as to Mr. Stillwell's scienter, and in addition to the corroborations. I mean Appian, this is not some low-level competitor, this is a primary competitor of Pegasystems. They go up against each other constantly. Pegasystems won over 200 deals against Appian during an approximate 8-year period. So Mr. Stillwell, when he's talking about their business with government customers, he's talking about competition with Appian, um, he's making those statements because presumably he's very informed about what he's talking about.

As for, um -- as for Mr. Trefler, our complaint, we have zero discovery, we've alleged these facts because we want to establish that this is not a fraud-by-hindsight case. We went back all the way till 2012 to establish what is the factual history leading up to the lawsuit. We've alleged facts regarding the

developments in the lawsuit.  We've alleged not -- most complaints have zero whistle blowers, we've alleged two whistle blowers.  We have internal documents.  We have internal communications with internal reporting.  We've alleged who spoke to who and when.  We've alleged when Mr. Trefler is being provided documents that were informed by the trade secrets misappropriation.  We've alleged communications with Mr. Trefler in 2019 --

THE COURT:  What do you say to Mr. Halston's point that the, um, code of conduct is aspirational?

MR. STEWART:  Well we think that -- first of all we've cited case law that, um, in which courts have held that code-of-conduct statements can be actionable, particularly when the conduct is so persuasive as it was at this company.

Now the conduct at issue in this case, it involved the CEO Chairman, the Chief Technical Officer, the Chief Product Officer, multiple Vice-Presidents or Senior Vice-Presidents, these are not low-level people that are participating in this illicit activity, these are the top levels of the company.

Now as the code of conduct specifically states, Mr. Trefler is the moral compass, him and the Chief Compliance Officer.  If there's any questions about compliance ethics, you go to Mr. Trefler.  And one other

point.  The code of conduct specifically addressed precisely what folks at the company were doing, using fake names, using fake or front businesses, creating their own consulting firms, just in order to get confidential information or trade secrets from a competitor.  What they were doing is black and white exactly what the code of conduct says you should not be doing.

So we think that those code-of-conduct statements are actionable, and the fact that they have this code of conduct or are pointing investors to it is showing that it's important to investors.

THE COURT:  And, um, the fact they said the lawsuit had no merit, that's not surprising, I've seen many cases where defendants say that.

MR. STEWART:  That's right.

So when the company came out and finally disclosed the litigation, 18 months after it was disclosed -- it should have been disclosed in the middle of 2020, but setting that aside, the company was under no obligation to actually make comments on the merits, they voluntarily took that step, and when a company makes comments to the investors, they have a duty to make those comments complete and accurate.  So when they're actually speaking about the merits saying "This case has

no merits, any damages that the plaintiffs are seeking they're completely unsupported," well those facts, those comments, they matter to investors and they're completely and utterly contradicted by many many facts that the company is aware of and are inconsistent with what they're telling investors.

THE COURT:  All right.

In most of these cases the Court takes the motion to dismiss under advisement, reviews everything, writes an opinion, and then the case is either over and on appeal or then we begin to go forward.  Now this case, in this Court's judgment and having reflected carefully on it, is of a different ilk.  This Court from the bench is going to deny the motion to dismiss.  I'll write an opinion, but the motion to dismiss is denied.

In one respect I'm not sure that the allegations against Mr. Stillwell raise a strong inference of scienter, and I can deal with that in the opinion and give you a chance to amend if you wish to amend.  But the motion is denied.  So recognizing that this is a class action, we're going to have to give more than the usual year.

Now when do the plaintiffs want to go to trial here?

MR. STEWART:  Summer of 2024, your Honor.

16

THE COURT:  December of 2024?

MR. STEWART:  The summer of 2024.

THE COURT:  The summer.  You can get out class-action notices and everything?

MR. HESS-MAHAN:  Yes, your Honor, we can.

THE COURT:  The summer of 2024, Mr. Halston?  "Summer" to me means July, as you well know.

MR. HALSTON:  I think that's a rather accelerated pace for a case of this sort, um, and I would suggest that the parties meet and confer and present your Honor a proposed schedule which would be consistent with what your Honor would typically do.

THE COURT:  I will allow that, 2 weeks to propose a joint case-management schedule.

All right.  Now you don't have to agree, but set out your different positions, and like a baseball arbitrator I will choose the one I think is most reasonable.  Thank you very much.  That's the order of the Court.

(Ends, 3:30 p.m.)

C E R T I F I C A T E

        I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

do hereby certify that the foregoing record is a true

and accurate transcription of my stenographic notes,

before Judge William G. Young, on Wednesday, May 17,

2023, to the best of my skill and ability.


/s/ Richard H. Romanow 06-14-23
_____
RICHARD H. ROMANOW   Date