UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re PEGASYSTEMS INC. SECURITIES LITIGATION | ) ) ) | No. 1:22-cv-11220-WGY **ORAL ARGUMENT REQUESTED** MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO CERTIFY THIS ACTION AS A CLASS ACTION AND RELATED RELIEF |

4858-4495-9638.v1

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ..................................................................................................1

II.  FACTUAL BACKGROUND.................................................................................2

    A.   Summary of Allegations ............................................................................2

    B.   The Proposed Class Representatives ..........................................................4

III. ARGUMENT .........................................................................................................4

    A.   The Proposed Class Satisfies Rule 23(a) ..................................................5

        1.   The Class Is Sufficiently Numerous ..............................................5

        2.   Questions of Law and Fact Are Common to the Class..................6

        3.   The Proposed Class Representatives' Claims Are Typical........................7

        4.   The Proposed Class Representatives Will Fairly and Adequately Protect the Class' Interests............................................................8

    B.   The Proposed Class Satisfies Rule 23(b)(3) .........................................10

        1.   Common Questions Predominate ...............................................10

            a.   Plaintiffs Are Entitled to a Presumption of Reliance Under *Basic*...............................................................11

                (1)   The *Cammer* Factors Establish Pega Common Stock Traded in an Efficient Market.................................12

                (2)   The *Krogman* Factors Establish Pega Common Stock Traded in an Efficient Market.................................16

            b.   Plaintiffs Are Entitled to a Presumption of Reliance Under *Affiliated Ute*...................................................17

            c.   Damages Can Be Calculated in the Same Manner for All Class Members............................................................19

        2.   A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of This Action.................................19

    C.   Robbins Geller Should Be Appointed Class Counsel...........................20

4858-4495-9638.v1

**Page**

IV.    CONCLUSION....................................................................................................................20

# TABLE OF AUTHORITIES

**Page**

## CASES

*Affiliated Ute Citizens of Utah v. United States*,
  406 U.S. 128 (1972) .......................................................................................... 1, 11, 17, 18

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) .......................................................................................... 10

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013) .......................................................................................... *passim*

*Andrews v. Bechtel Power Corp.*,
  780 F.2d 124 (1st Cir. 1985) .............................................................................. 8

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) .......................................................................................... *passim*

*Cammer v. Bloom*,
  711 F. Supp. 1264 (D.N.J. 1989) ...................................................................... *passim*

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
  310 F.R.D. 69 (S.D.N.Y. 2015) ........................................................................ 14

*City of Fort Lauderdale Police & Firefighters' Ret. Sys. v. Pegasystems Inc.*,
  2023 WL 4706741 (D. Mass. July 24, 2023) .................................................... 11, 18

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) ............................................................................................ 19

*Dahhan v. OvaScience, Inc.*,
  2020 WL 2602138 (D. Mass. May 8, 2020) ...................................................... 18

*De Giovanni v. Jani-King Int'l, Inc.*,
  262 F.R.D. 71 (D. Mass. 2009) ......................................................................... 10

*Fogarazzo v. Lehman Bros., Inc.*,
  232 F.R.D. 176 (S.D.N.Y. 2005) ...................................................................... 18

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014) .......................................................................................... 11, 12, 15, 17

*In re AVEO Pharms., Inc. Sec. Litig.*,
  2017 WL 5484672 (D. Mass. Nov. 14, 2017) ................................................... 6, 7

**Page**

*In re Bos. Sci. Corp. Sec. Litig.*,
    604 F. Supp. 2d 275 (D. Mass. 2009) .......................................................................1, 5, 7, 8

*In re Credit Suisse-AOL Sec. Litig.*,
    253 F.R.D. 17 (D. Mass. 2008) ................................................................. *passim*

*In re DVI Inc. Sec. Litig.*,
    249 F.R.D. 196 (E.D. Pa. 2008),
    *aff'd*, 639 F.3d 623 (3d Cir. 2011) ........................................................................13

*In re DVI, Inc. Sec. Litig.*,
    639 F.3d 623 (3d Cir. 2011), *abrogated on other grounds by*
    *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013) ...........................................................................................14

*In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*,
    275 F.R.D. 382 (D. Mass. 2011) ................................................................ *passim*

*In re Nexium Antitrust Litig.*,
    777 F.3d 9 (1st Cir. 2015) ..................................................................................8, 19

*In re Nexium (Esomeprazde) Antitrust Litig.*,
    297 F.R.D. 168 (D. Mass. 2013), *aff'd sub nom.*
    *In re Nexium Antitrust Litig.*,
    777 F.3d 9 (1st Cir. 2015) .........................................................................................8

*In re PolyMedica Corp. Sec. Litig.*,
    453 F. Supp. 2d 260 (D. Mass. 2006) ......................................................................12

*In re Sonus Networks, Inc. Sec. Litig.*,
    247 F.R.D. 244 (D. Mass. 2007) ...............................................................................6

*In re Suffolk Univ. Covid Refund Litig.*,
    2022 WL 6819485 (D. Mass. Oct. 11, 2022) ............................................................7

*In re Xcelera.com Sec. Litig.*,
    430 F.3d 503 (1st Cir. 2005) .............................................................12, 13, 14, 15

*John Hancock Life Ins. Co. v. Goldman, Sachs & Co.*,
    2004 WL 438790 (D. Mass. Mar. 9, 2004)..............................................................4

*Krogman v. Sterritt*,
    202 F.R.D. 467 (N.D. Tex. 2001) .........................................................12, 16, 17

4858-4495-9638.v1

**Page**

*Levy v. Gutierrez*,
    448 F. Supp. 3d 46 (D.N.H. 2019) .................................................................................11, 19

*Lumen v. Anderson*,
    280 F.R.D. 451 (W.D. Mo. 2012) ...........................................................................................15

*Luna v. Carbonite, Inc.*,
    2023 WL 4539855 (D. Mass. July 14, 2023) ...............................................................9, 19, 20

*McIntire v. China MediaExpress Holdings, Inc.*,
    38 F. Supp. 3d 415 (S.D.N.Y. 2014) .......................................................................................16

*Medoff v. CVS Caremark Corp.*,
    2016 WL 632238 (D.R.I. Feb. 17, 2016) ...................................................................................8

*ODS Cap. LLC v. JA Solar Holdings Co., Ltd.*,
    2020 WL 7028639 (S.D.N.Y. Nov. 30, 2020) .........................................................................14

*Prinzo v. Hannaford Bros. Co., LLC*,
    343 F.R.D. 250 (D. Mass. 2023) ...............................................................................................6

*Swack v. Credit Suisse First Bos.*,
    230 F.R.D. 250 (D. Mass. 2005) ...........................................................................................5, 8

*Vinh Nguyen v. Radient Pharms. Corp.*,
    287 F.R.D. 563 (C.D. Cal. 2012) ............................................................................................17

*Waggoner v. Barclays PLC*,
    875 F.3d 79 (2d Cir. 2017) ......................................................................................................15

*Waste Mgmt. Holdings, Inc. v. Mowbray*,
    208 F.3d 288 (1st Cir. 2000) ...............................................................................................4, 10

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §78j(b) ......................................................................................................................................10
    §78t(a) ......................................................................................................................................10

4858-4495-9638.v1

Page

Federal Rules of Civil Procedure
    Rule 23(a)................................................................................................................1, 5
    Rule 23(a)(1)...............................................................................................................5
    Rule 23(a)(2)...........................................................................................................6, 7
    Rule 23(a)(3)...............................................................................................................7
    Rule 23(a)(4)...........................................................................................................8, 9
    Rule 23(b)...................................................................................................................5
    Rule 23(b)(3)...........................................................................................10, 12, 19
    Rule 23(b)(3)(A).......................................................................................................20
    Rule 23(b)(3)(B).......................................................................................................20
    Rule 23(b)(3)(C).......................................................................................................20
    Rule 23(b)(3)(D).......................................................................................................20
    Rule 23(g)(1)............................................................................................................20
    Rule 23(g)(1)(A).......................................................................................................20

17 C.F.R.
    §240.10b-5.........................................................................................................10, 11

4858-4495-9638.v1

Lead Plaintiffs Central Pennsylvania Teamsters Pension Fund - Defined Benefit Plan, Central Pennsylvania Teamsters Pension Fund - Retirement Income Plan 1987, and Construction Industry Laborers Pension Fund (collectively, "Plaintiffs") respectfully submit this memorandum of law in support of their motion for an order: (1) certifying this action as a class action pursuant to Federal Rule of Civil Procedure 23;[1] (2) appointing Plaintiffs as Class Representatives; and (3) appointing Robbins Geller Rudman & Dowd LLP ("Robbins Geller") as Class Counsel.

## I.      INTRODUCTION

Courts routinely hold that class treatment is "particularly appropriate in the context of securities litigation." *In re Bos. Sci. Corp. Sec. Litig.*, 604 F. Supp. 2d 275, 280 (D. Mass. 2009). This securities action readily satisfies all of Rule 23(a)'s requirements:

- Numerosity: Hundreds if not thousands of investors acquired and sold the millions of publicly held shares of Pega common stock during the Class Period.

- Commonality and Typicality: Defendants issued the same false and misleading statements and omitted the same material facts when speaking to all investors. Plaintiffs, like all Class members, were injured by Defendants' misconduct.

- Adequacy: Plaintiffs and Robbins Geller have vigorously prosecuted this action, and Plaintiffs' interests are directly aligned with the Class' interests.

This action also satisfies Rule 23(b)(3)'s predominance and superiority requirements. Questions common to all Class members predominate over any questions affecting only individual Class members, and Plaintiffs are entitled to a class-wide presumption of reliance under both *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and *Affiliated Ute Citizens of Utah v. United States*, 406 U.S.

---

[1]      The proposed "Class" consists of all persons who purchased or otherwise acquired the common stock of Pegasystems Inc. ("Pega" or the "Company") between June 16, 2020 and May 9, 2022, inclusive (the "Class Period"), and were damaged thereby.  Excluded from the Class are Pega and Alan Trefler (collectively, "Defendants") and their families, the officers and directors of the Company, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

128 (1972).  Class action treatment is also superior to other available methods for fairly and efficiently adjudicating Class members' claims.  Plaintiffs' Motion should be granted.

## II.    FACTUAL BACKGROUND

### A.    Summary of Allegations

As detailed in Lead Plaintiffs' Consolidated Amended Complaint for Violations of the Federal Securities Laws ("Complaint") (ECF 61), beginning as early as 2012, Pega's senior executives orchestrated a scheme to misappropriate Appian's trade secrets and confidential information.  Complaint, §IV.A.  The first part of the scheme, referred to internally as "Project Crush," entailed recruiting an Appian developer, Youyong Zou ("Zou"), who was willing to misappropriate Appian's trade secrets for Pega.  ¶¶4, 40-43.[2]  Pega conspired with Zou – Pega's "spy" – to access Appian's platform and pilfer its trade secrets and other confidential information. ¶¶42-43.

Defendants later engineered another "teardown" of Appian, directed by defendant Trefler, in an operation "broader [in] scope" than "Project Crush."  ¶¶67-99.  As part of the teardown, Pega used fake names and fake or front companies in order to gain access to Appian's platform and information.  ¶¶81-99.  Pega employed the trade secrets and other confidential information it misappropriated to develop valuable sales and intelligence materials, train Pega's salesforce to effectively compete against Appian, and make improvements to Pega's own software.  ¶¶7, 45-53. As Trefler himself admitted, he used this information to "blow . . . up" Appian's deals.  ¶52.

---

[2]    Unless otherwise noted, all paragraph references ("¶__" or "¶¶__") are to the Complaint, citations and footnotes are omitted, and emphasis is added.

Appian sued Pega and Zou on May 29, 2020, alleging Pega's top executives had directed corporate espionage against Appian. *Appian Corporation v. Pegasystems Inc., et al.*, Civil Action No. 2020-07216 (Circuit Court of Fairfax County, Virginia) (the "Virginia Action").  ¶12.

Despite Appian's damning allegations, Defendants concealed the Virginia Action and their illicit behavior from investors for nearly two years.  ¶¶14-17; Complaint, §IV.B.  The Complaint details numerous material misstatements and omissions related to the Virginia Action and Defendants' underlying scheme, including: (1) statements regarding Pega's competition and sales and marketing practices (Complaint, §V.A.); (2) statements concerning Pega's and its competitors' intellectual property, and that infringement claims merely ***could*** arise at some indeterminate point (*id.*, §V.B.); (3) statements that the Virginia Action was "without merit," that Pega had "strong defenses," and that any damages were not supported (*id.*, §V.C.); (4) statements regarding Pega's Code of Conduct and compliance with legal and ethical guidelines (*id.*, §V.D.); and (5) statements in Defendants' SOX certifications (*id.*, §V.E.).  ¶¶118, 120-161.  The Complaint also alleges that Defendants' failure to disclose the Virginia Action to the investing public violated U.S. Securities and Exchange Commission ("SEC") Regulation S-K, Item 103 and Generally Accepted Accounting Principles ("GAAP") Rule ASC 450.  ¶¶162-196.

Ultimately, Defendants' fraud unwound through a series of partial disclosures.  First, Defendants publicly disclosed the existence of the Virginia Action on February 16, 2022, but falsely assured investors that Appian's claims were "without merit," that Pega had "strong defenses to these claims," and that Appian's claimed damages were "not supported."  ¶¶114, 145, 243.  Then, on May 9, 2022, Pega announced a Virginia jury had found Pega liable to Appian for over $2 billion for willfully and maliciously violating the Virginia Uniform Trade Secrets Act, and that Pega had violated the Virginia Computer Crimes Act.  ¶¶21-22.  Pega publicly derided the verdict, assuring

the market that there were no "facts of any wrongdoing," and "certainly no damages that would ever suggest a dollar amount." ¶118. On September 16, 2022, the Virginia court entered final judgment against Pega affirming the $2 billion verdict and awarding Appian $23.6 million in attorneys' fees and costs, as well as post-judgment interest of approximately $122 million annually. ¶¶25, 119. Pega's stock price declined precipitously following each disclosure, causing investors to suffer massive losses. ¶249. This action seeks to recover those losses.

### B.    The Proposed Class Representatives

On August 9, 2022, the Court appointed Plaintiffs as Lead Plaintiffs in this action. ECF 40. Lead Plaintiffs Central Pennsylvania Teamsters Pension Fund - Defined Benefit Plan and Central Pennsylvania Teamsters Pension Fund - Retirement Income Plan 1987 are multiemployer plans with over $2 billion in collective assets under management for the benefit of over 35,000 Teamsters members and their beneficiaries. ECF 17-4. Lead Plaintiff Construction Industry Laborers Pension Fund is a multiemployer defined benefit pension plan with over $900 million in assets under management for the benefit of approximately 12,000 participants and their beneficiaries. *Id.* Plaintiffs collectively purchased 55,551 shares of Pega common stock and suffered approximately $3.4 million in losses during the Class Period. ECF 16 at 4; ECF 17-2, 17-3.

## III.    ARGUMENT

"'There is little question that suits on behalf of shareholders alleging violations of federal securities laws are prime candidates for class action treatment and that Rule 23 of the Federal Rules of Civil Procedure has been liberally construed to effectuate that end.'" *John Hancock Life Ins. Co. v. Goldman, Sachs & Co.*, 2004 WL 438790, at *2 (D. Mass. Mar. 9, 2004); *see also Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000) (noting that securities cases are "particularly well-suited for class treatment"); *In re Credit Suisse-AOL Sec. Litig.*, 253 F.R.D. 17,

22 (D. Mass. 2008) ("investors seeking damages for violations of federal securities [laws] are often considered the prototypical class action plaintiffs").

To certify a class, the Court must determine whether the requirements of Rule 23(a) and at least one subsection of Rule 23(b) are satisfied.  *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013).  The inquiry at the class certification stage is not concerned with whether the plaintiff will ultimately prevail on the merits, but rather whether the requirements of Rule 23 are met.  *See id.* at 466 ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage"); *Bos. Sci.*, 604 F. Supp. 2d at 280 ("The First Circuit has cautioned . . . that a court must not turn the class-certification proceeding into an unwieldy trial on the merits.").

## A.      The Proposed Class Satisfies Rule 23(a)

Rule 23(a) establishes four requirements for class certification: (1) the class must be "so numerous that joinder of all members is impracticable"; (2) "questions of law or fact common to the class" must exist; (3) "the claims or defenses of the representative parties [must be] typical of the claims or defenses of the class"; and (4) "the representative parties [must] fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).  As described below, the proposed Class satisfies each prerequisite.

### 1.      The Class Is Sufficiently Numerous

Rule 23(a)(1) requires that a proposed class be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  While a plaintiff need not identify the exact number or identity of class members (*see Swack v. Credit Suisse First Bos.*, 230 F.R.D. 250, 258 (D. Mass. 2005)), "forty class members generally establishes numerosity" (*In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*, 275 F.R.D. 382, 388 (D. Mass. 2011)).  In a securities fraud action, "the class size may be reasonably inferred to be in the hundreds or thousands when there are

- 5 -

'millions of shares outstanding and . . . millions of transactions during the class period.'" *In re AVEO Pharms., Inc. Sec. Litig.*, 2017 WL 5484672, at *3 (D. Mass. Nov. 14, 2017).[3]

During the Class Period, Pega averaged over 81 million shares outstanding, with an average weekly trading volume of 1.63 million shares. Ex. 1, Report on Market Efficiency and Damages Methodology by Professor Steven P. Feinstein, Ph.D., CFA ("Feinstein Rpt."), ¶¶57, 93.[4] On average, 325,021 Pega shares changed hands daily, and over 155 million shares traded during the Class Period. Feinstein Rpt., ¶56. These facts easily establish numerosity. *See Evergreen*, 275 F.R.D. at 388 (finding numerosity established with 64-68.9 million shares outstanding and noting "courts in this district have found that numerosity was established in cases with many fewer class members"); *AVEO*, 2017 WL 5484672, at *3 (numerosity established where "more than 43 million shares were outstanding").

## 2. Questions of Law and Fact Are Common to the Class

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The "'requirement of commonality is a low bar, and courts have generally given it a "permissive application."'" *Prinzo v. Hannaford Bros. Co., LLC*, 343 F.R.D. 250, 252 (D. Mass. 2023) (Young, J.). "Rule 23(a)(2) 'does not require that every question be common' and even a 'single common legal or factual issue can suffice.'" *AVEO*, 2017 WL 5484672, at *4.

In this case, common questions include whether: (1) Defendants publicly misrepresented or omitted material facts they were required to disclose; (2) Defendants acted with scienter; (3) the

---

[3]   *See also In re Sonus Networks, Inc. Sec. Litig.*, 247 F.R.D. 244, 248 (D. Mass. 2007) ("a plaintiff can generally demonstrate numerosity on the basis of a large number of shares outstanding and traded").

[4]   All exhibits referenced herein are attached to the Declaration of Debra J. Wyman in Support of Plaintiffs' Motion to Certify This Action as a Class Action and Related Relief ("Wyman Decl."), filed concurrently herewith.

4858-4495-9638.v1

alleged misconduct artificially inflated the price of Pega common stock; and (4) Defendants' conduct

caused Class members to sustain damages.  These common questions easily satisfy Rule 23(a)(2).

*See Credit Suisse-AOL*, 253 F.R.D. at 22 (commonality is "clearly satisfied" in securities actions);

*Bos. Sci.*, 604 F. Supp. 2d at 281 (common questions in securities class actions include "whether

defendants made material misleading statements or omissions, whether defendants acted with the

requisite scienter, and whether the proposed class is entitled to a presumption of reliance under the

fraud-on-the-market theory").

### 3.      The Proposed Class Representatives' Claims Are Typical

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of

the claims and defenses of the class."  Fed. R. Civ. P. 23(a)(3).  Typicality "is 'not a highly

demanding' requirement and 'the claims only need to share the same essential characteristics and

need not be identical.'"  *In re Suffolk Univ. Covid Refund Litig.*, 2022 WL 6819485, at *1 (D. Mass.

Oct. 11, 2022) (Young, J.).  A plaintiff establishes typicality "by showing that its injuries arise from

the same events or course of conduct as do the injuries of the class, and that its claims are based on

the same legal theory as those of the class."  *Bos. Sci.*, 604 F. Supp. 2d at 282 (citing *Credit Suisse-

AOL*, 253 F.R.D. at 23).

Here Plaintiffs' claims arise out of the same course of conduct as the proposed Class':

Defendants' public, material misstatements and omissions that artificially inflated Pega's stock price.

*See supra*, §II.A.  Moreover, Plaintiffs and the putative Class suffered losses from the same course

of conduct, and Plaintiffs and the proposed Class' claims will be proven by the same common

evidence on a class-wide basis.  Thus, typicality is established.  *See AVEO*, 2017 WL 5484672, at *4

("all members of the class are purchasers of [company] stock which they allege was inflated in price

due to Defendants' material omissions and were harmed by the later revelations that cured the

omission"); *Bos. Sci.*, 604 F. Supp. 2d at 282 (typicality met where plaintiff "purchased [company] stock at a time when the price was alleged to have been artificially inflated due to defendants' misleading statements, and was subsequently harmed by the drop in stock price").

### 4. The Proposed Class Representatives Will Fairly and Adequately Protect the Class' Interests

Rule 23(a)(4) requires that the "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). According to *Swack*:

> The First Circuit has interpreted the Rule 23(a)(4) adequacy prerequisite to entail a two part test: "[t]he moving party must show first that the interests of the representative party will not conflict with the interests of the class members, and second, that counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation."

230 F.R.D. at 265 (quoting *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir. 1985)). As "the Court of Appeals has observed, speculative or hypothetical conflicts do not defeat Rule 23's adequacy requirement." *Medoff v. CVS Caremark Corp.*, 2016 WL 632238, at *3 (D.R.I. Feb. 17, 2016) (citing *In re Nexium Antitrust Litig.*, 777 F.3d 9, 21 (1st Cir. 2015)). Instead, to impact adequacy, the conflict must be "'fundamental to the suit and . . . go to the heart of the litigation.'" *In re Nexium (Esomeprazde) Antitrust Litig.*, 297 F.R.D. 168, 172 (D. Mass. 2013), *aff'd sub nom. In re Nexium Antitrust Litig.*, 777 F.3d 9 (1st Cir. 2015).

Plaintiffs are institutional investors and have no conflicts with the Class; indeed, Plaintiffs' and the Class' interests are directly aligned. Like all Class members, Plaintiffs purchased Pega common stock at inflated market prices during the Class Period and were injured by Defendants' misconduct. Plaintiffs are thus incentivized to establish Defendants' liability and maximize their and the Class' recovery. Plaintiffs have also demonstrated their willingness and ability to serve as representatives of the Class, and to monitor and participate in the prosecution of this action. ECF 17-4. For example, Plaintiffs have: (1) successfully moved for appointment as lead plaintiffs;

- 8 -

(2) supervised the filing of the Complaint; (3) supervised Lead Counsel's defeat of Defendants' motion to dismiss; (4) consulted with Robbins Geller regarding key events in the litigation; (5) reviewed court filings and other key documents; and (6) diligently complied with their discovery obligations, including by filing initial disclosures and producing to Defendants tens of thousands of pages of documents.  Wyman Decl., ¶¶7-8.  Further, each plaintiff understands its responsibilities as lead plaintiff to act on the behalf and for the benefit of all proposed Class members.  ECF 17-4.  In this regard, Plaintiffs have undertaken their responsibilities to interact with and direct counsel concerning litigation strategy and other matters, and review and authorize important documents, and have done so jointly and in concert with one another.  *Id*.  Plaintiffs have executed their responsibilities in furtherance of their shared goal to maximize the outcome for all proposed Class members.  *Id*.  Plaintiffs have also demonstrated their adequacy by retaining capable attorneys with considerable experience litigating securities class actions.  *See* Ex. 2.  "Robbins Geller is highly experienced in litigating securities fraud class actions, and courts 'have repeatedly found Robbins Geller to be adequate and well-qualified for the purpose of litigating class action lawsuits.'"  *Luna v. Carbonite, Inc.*, 2023 WL 4539855, at *11 (D. Mass. July 14, 2023); *see also Evergreen*, 275 F.R.D. at 392 (finding that Robbins Geller had "substantial experience with securities class action litigation" and was "adequate to serve as class counsel").  To date, Robbins Geller has, *inter alia*, conducted an extensive investigation of Plaintiffs' claims; defeated Defendants' motion to dismiss; and vigorously pursued both party and non-party discovery.  Plaintiffs and Robbins Geller easily satisfy Rule 23(a)(4)'s adequacy requirement.

**B.      The Proposed Class Satisfies Rule 23(b)(3)**

This action also satisfies Rule 23(b)(3)'s requirements that: (1) common questions of law or fact predominate over individual questions; and (2) a class action is superior to alternative methods of resolving the dispute.  *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997).

**1.      Common Questions Predominate**

"Predominance is a test readily met in certain cases alleging consumer or securities fraud . . . ."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).  This inquiry is satisfied where "***questions*** of law or fact common to the class will 'predominate over any questions affecting only individual members' as the litigation progresses."  *Amgen*, 568 U.S. at 467 (emphasis in original).  The inquiry does not ask whether those common questions "will be answered, on the merits, in favor of the class." *Id.* at 459.  "Importantly, Rule 23(b)(3) 'requires merely that common issues ***predominate***, not that all issues be common to the class.'"  *De Giovanni v. Jani-King Int'l, Inc.*, 262 F.R.D. 71, 76 (D. Mass. 2009) (Young, J.) (emphasis in original).  "The First Circuit Court of Appeals has defined the predominance test as requiring the Court to find that 'a sufficient constellation of common issues binds class members together.'"  *Evergreen*, 275 F.R.D. at 392 (quoting *Waste Mgmt.*, 208 F.3d at 296).

Plaintiffs allege Defendants violated §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder.  The elements of a §10(b) claim are: "'(1) a material misrepresentation or omission by the defendant[s]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'"  *Amgen*, 568 U.S. at 460-61.  Falsity, scienter, materiality, and loss causation are all issues common to the Class.  *See id.* at 475 ("loss causation and the falsity or misleading nature of the defendant's alleged statements or

- 10 -

omissions are common questions that need not be adjudicated before a class is certified"); *Levy v. Gutierrez*, 448 F. Supp. 3d 46, 59 (D.N.H. 2019) ("most of these elements [of the Exchange Act] are generally amenable to common proof").

Moreover, as explained below, because a presumption of class-wide reliance is appropriate under both *Basic* and *Affiliated Ute*, common issues will predominate.

### a. Plaintiffs Are Entitled to a Presumption of Reliance Under *Basic*

Predominance is met because Plaintiffs are entitled to rely on the fraud-on-the-market ("FOTM") presumption of reliance. *Basic*, 485 U.S. at 241; *Amgen*, 568 U.S. at 460-62.[5] Under the FOTM theory, "'in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.'" *Basic*, 485 U.S. at 241-42; *see also Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 270 (2014) ("*Halliburton II*") ("'the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations'"). Accordingly, "'reliance on any public material misrepresentations . . . may be presumed for purposes of a Rule 10b-5 action.'" *Halliburton II*, 573 U.S. at 268.

To invoke the presumption, Plaintiffs must demonstrate: "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Id.* Here, the Court has already found that Defendants made public, materially misleading misstatements and omissions. *See City of Fort Lauderdale*

---

[5]   *See Credit Suisse-AOL*, 253 F.R.D. at 25 (identifying the FOTM theory as one of "two circumstances in which a class-wide presumption of reliance is appropriate").

*Police & Firefighters' Ret. Sys. v. Pegasystems Inc.*, 2023 WL 4706741, at \*8-\*10 (D. Mass. July 24, 2023).[6]  Plaintiffs also purchased Pega common stock between the time the misrepresentations were made and the end of the Class Period.  *See* ECF 17-2, 17-3.

The remaining element is fulfilled here, as the market for Pega common stock was traded efficiently during the Class Period.  In evaluating market efficiency, courts consider the factors outlined in both *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989), and *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001).  *See In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 511 (1st Cir. 2005) ("By drawing on the standard of efficiency in *Cammer* . . . the district court adopted the correct standard of efficiency."); *In re PolyMedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260, 266 n.2 (D. Mass. 2006) (noting the *Krogman* factors).  As discussed below, the *Cammer* and *Krogman* factors establish that Pega common stock traded in an efficient market during the Class Period.

### (1) The *Cammer* Factors Establish Pega Common Stock Traded in an Efficient Market

The five *Cammer* factors "are: (1) the stock's average trading volume; (2) the number of securities analysts that followed and reported on the stock; (3) the presence of market makers and arbitrageurs; (4) the company's eligibility to file a Form S-3 Registration Statement; and (5) a cause-and-effect relationship, over time, between unexpected corporate events or financial releases and an immediate response in stock price."  *Xcelera.com*, 430 F.3d at 511 (citing *Cammer*, 711 F. Supp. at 1286-87).  "[T]here is no 'magic number' of factors for determining efficiency," and the First Circuit "leave[s] it to the district court in the first instance to decide which factors and how many factors it will consider."  *Id.* at 518.  Each *Cammer* factor supports a finding of market efficiency here.

---

[6]  *See also Halliburton II*, 573 U.S. at 282 ("Even though materiality is a prerequisite for invoking the *Basic* presumption, [the Supreme Court has] held that it should be left to the merits stage, because it does not bear on the predominance requirement of Rule 23(b)(3).") (citing *Amgen*, 568 U.S. at 467-68).

***Pega Had a High Average Trading Volume***.  An average weekly trading volume of 1% or 2% of outstanding shares indicates an efficient market.  *See Cammer*, 711 F. Supp. at 1293; *Xcelera.com*, 430 F.3d at 514 (noting average weekly trading volume of 1% or 2% of outstanding shares serves "as the benchmark for supporting a presumption of efficiency").  Here, Pega common stock actively traded on the NASDAQ with an average weekly trading volume of 1.63 million shares, or an average of 2.00% of Pega's outstanding shares.  Feinstein Rpt., ¶57.  The average weekly turnover of Pega stock as a percentage of outstanding float was 4.01%.  *Id.*, ¶58.  This factor supports market efficiency.  *See, e.g.*, *Credit Suisse-AOL*, 253 F.R.D. at 22 ("weekly turnover rate of 2.36%" supported efficiency).

***A Substantial Number of Securities Analysts Closely Followed Pega***.  Analyst coverage indicates market efficiency because securities analysts facilitate the flow and digestion of information within the marketplace.  *See* Feinstein Rpt., ¶60; *Xcelera.com*, 430 F.3d at 514 ("[T]he existence of a significant number of analysts implies that company reports are 'closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors.'") (quoting *Cammer*, 711 F. Supp. at 1286).  Here, at least 18 securities analysts covered Pega throughout the Class Period, which indicates market efficiency.  Feinstein Rpt., ¶¶64, 65; *see Cammer*, 711 F. Supp. at 1283 n.30 (finding market efficiency where 15 analyst reports were issued); *Credit Suisse-AOL*, 253 F.R.D. at 27 (finding market efficiency where 20 analysts covered the company); *In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 209-10 (E.D. Pa. 2008) (three analysts sufficient), *aff'd*, 639 F.3d 623 (3d Cir. 2011).

Similarly, the media published at least 916 articles about the Company during the Class Period.  Feinstein Rpt., ¶70.  The extensive media coverage further facilitated the flow of information about Pega and supports a finding of market efficiency.  *See Xcelera.com*, 430 F.3d at

- 13 -

515 (market efficiency established where information about the company "was widely distributed through 'news articles, press releases, television interviews and the Company's SEC filings'"); *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 92 (S.D.N.Y. 2015) (fact that "'information concerning Barclays was widely disseminated throughout the Class Period through Bloomberg and other news services'" supported a finding of market efficiency).[7]

***Pega Was Listed on the NASDAQ and Had Numerous Market Makers***.  "A market-maker is '[o]ne who helps establish a market for securities by reporting bid-and-asked quotations . . . .'" *Xcelera.com*, 430 F.3d at 515.  Market makers indicate an efficient market because they "react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." *Cammer*, 711 F. Supp. at 1286-87.  Here, there were at least 89 market makers for Pega common stock during the Class Period, including well-known firms such as Barclays, Credit Suisse, Goldman Sachs, and Morgan Stanley, which supports market efficiency.  Feinstein Rpt., ¶75; *Xcelera.com*, 430 F.3d at 516 (market efficiency supported by over 20 market makers); *Credit Suisse-AOL*, 253 F.R.D. at 27 (finding market was efficient where stock "had numerous market makers").

Further, Pega's listing on the NASDAQ during the Class Period strongly indicates that its common stock traded in an efficient market.  Feinstein Rpt., ¶76; *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 634 (3d Cir. 2011) ("[T]he listing of a security on a major exchange such as . . . the NASDAQ weighs in favor of a finding of market efficiency."), *abrogated on other grounds by Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455 (2013); *ODS Cap. LLC v. JA Solar Holdings Co., Ltd.*, 2020 WL 7028639, at *14 (S.D.N.Y. Nov. 30, 2020) ("'[T]he federal courts are unanimous in their

---

[7]    Additionally, at least 586 major institutions owned Pega stock during the Class Period, which further indicates that Pega traded in an efficient market.  Feinstein Rpt., ¶68.

agreement that a listing on the NASDAQ . . . is a good indicator of efficiency.'"); *Lumen v. Anderson*, 280 F.R.D. 451, 459 (W.D. Mo. 2012) (citing cases and finding it would be "remarkable for a court to conclude NASDAQ is not an efficient market – which is why '[s]ecurities traded on NASDAQ are often presumed to be traded on an efficient market'").[8]

   ***Pega Was Eligible to File Form S-3 Registration Statements***.  A company's ability to file a Form S-3 with the SEC indicates market efficiency because it is associated with other characteristics that correlate with efficiency, including size, transparency, and the availability of relevant financial information.  Feinstein Rpt., ¶¶82-87; *Cammer*, 711 F. Supp. at 1285 ("[T]he existence of Form S-3 status is an important factor weighing in favor of a finding that a market is efficient."); *Credit Suisse-AOL*, 253 F.R.D. at 27.  Here, Pega was eligible to file Forms S-3 throughout the Class Period, further confirming its common stock traded in an efficient market.  Feinstein Rpt., ¶¶86-87.

   ***Pega Stock Reacted to New, Company-Specific Information***.  The final *Cammer* factor focuses on whether Pega common stock prices quickly responded to the release of new, company-specific news events.  *Cammer*, 711 F. Supp. at 1287.  While the *Cammer* court found that a cause-and-effect relationship is "helpful" for showing market efficiency (*id.*), it "is not always necessary [in order] to establish market efficiency and invoke the *Basic* presumption" (*Waggoner v. Barclays PLC*, 875 F.3d 79, 96-97 (2d Cir. 2017)).  To test whether Pega common stock responded to new information, Plaintiffs' expert performed a collective event study for Pega common stock, focusing on Pega's earnings announcements and comparing those events to all other days during the Class Period.  Feinstein Rpt., ¶¶99-147.  Event studies are widely used to demonstrate market efficiency. *See, e.g.*, *Halliburton II*, 573 U.S. at 280-81; *Xcelera.com*, 430 F.3d at 512-13 ("To demonstrate the

---

[8]   Finally, market efficiency is supported by the likely existence of arbitrageurs, which are traders who attempt to profit from any immediate mispricing of a security and thus quickly drive out any mispricing.  Feinstein Rpt., ¶¶77-81; *Cammer*, 711 F. Supp. at 1286-87.

existence of a cause-and-effect relationship . . . Plaintiffs' expert presented the results of a sophisticated event study . . . .").  As detailed in his report, Dr. Feinstein's event study identified a cause-and-effect relationship between the release of new, Pega-specific information and the movement in Pega's stock price.  Feinstein Rpt., ¶¶139-144, 146.[9]

### (2)   The *Krogman* Factors Establish Pega Common Stock Traded in an Efficient Market

In assessing market efficiency, courts also consider the *Krogman* factors:  (1) a company's market capitalization; (2) bid-ask spread; and (3) the stock's float.  *See Krogman*, 202 F.R.D. at 474, 478.

*Pega Had a Large Market Capitalization*.  A higher market capitalization indicates market efficiency "because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."  *Id*.  Here, over the course of the Class Period, the market capitalization of Pega stock ranged from $5.39 billion to $11.87 billion, averaging $9.49 billion.  Feinstein Rpt., ¶90.  This average market capitalization was larger than the market capitalizations of 89.90% of all publicly traded companies in the United States.  *Id*.  Pega's market capitalization accordingly indicates market efficiency.  *See McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 433 (S.D.N.Y. 2014) (finding market capitalization ranging from "$292 million to $585 million" weighed in favor of a finding of market efficiency).

*Pega Common Stock Had a Narrow Bid-Ask Spread*.  The bid-ask spread is the difference between the prices at which investors are willing to buy and current stockholders are willing to sell shares; a low bid-ask spread indicates a more efficient market.  *See Krogman*, 202 F.R.D. at 478.

---

[9]   Each of the *Cammer* factors is also satisfied for the period from June 16, 2020 to September 15, 2022, the date immediately preceding the last alleged corrective disclosure (the "Examination Period").  Feinstein Rpt., ¶¶1 n.1, 57 n.26, 63 n. 31, 68 n.35, 70 n.38, 76 n.39, 79 n.43, 86 n.47.

During the Class Period, Pega common stock had a narrow bid-ask spread of 0.13%, which indicates market efficiency. Feinstein Rpt., ¶96; *Krogman*, 202 F.R.D. at 478 (bid-ask spread of 5.6% supported market efficiency); *Vinh Nguyen v. Radient Pharms. Corp.*, 287 F.R.D. 563, 574-75 (C.D. Cal. 2012) (bid-ask spread of 0.58% supported efficiency).

**Pega Had a Large Public Float**. A company's public float is "the percentage of shares held by the public, rather than insiders." *Krogman*, 202 F.R.D. at 478. Pega's public float was large, averaging about 49.88% of all shares outstanding during the Class Period, which in dollar terms was larger than the market capitalization of 84.00% of all other publicly traded companies in the United States. Feinstein Rpt., ¶93. Pega's large float further indicates that it traded in an efficient market.[10]

### b. Plaintiffs Are Entitled to a Presumption of Reliance Under *Affiliated Ute*

Plaintiffs are also entitled to a presumption of reliance under *Affiliated Ute*, which applies to claims that involve a failure to disclose material information. *See Affiliated Ute*, 406 U.S. at 153. To establish the presumption under *Affiliated Ute*, "[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of [their] decision." *Id.* at 153-54. Because materiality itself is a common question, Plaintiffs need not prove materiality at the class certification stage. *Amgen*, 568 U.S. at 467 ("[B]ecause '[t]he question of materiality . . . is an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor,' materiality can be proved through evidence common to the class."); *Halliburton II*, 573 U.S. at 281-83.

---

[10] Each of the *Krogman* factors is also satisfied for the Examination Period. Feinstein Rpt., ¶¶90 nn.49-50, 96 n.53, 97 n.54.

Plaintiffs' §10(b) claims are based on a combination of affirmative misrepresentations and omissions.  *See* ¶¶120-161.  First, Plaintiffs allege that Defendants' failure to disclose the Virginia Action and the underlying misconduct rendered various Class Period statements materially false and misleading.  ¶¶120-162.  Specifically, for the first **18 months** of the Class Period, Defendants omitted ***any*** mention of the Virginia Action or the misconduct related to the Virginia Action.  ¶14. Second, Plaintiffs allege that Defendants' failure to disclose the existence of and potential loss exposure related to the Virginia Action violated both GAAP Rule ASC 450 and SEC Regulation S-K, Item 103.  *See* ¶¶162-196.  After extensive briefing on defendants' motion to dismiss, the Court upheld Plaintiffs' allegations that Defendants' alleged omissions of fact were materially misleading. *See, e.g.*, *Pegasystems*, 2023 WL 4706741, at *10 (finding Defendants' statements that Appian's claims were "'without merit,'" while failing to disclose "substantial information about the viability of those claims," were actionable); ¶147.  The Court also recognized that the "***core*** of [Plaintiffs'] case is that the Defendants – despite knowingly having engaged in the conduct underlying the Virginia Action – ***failed to disclose that litigation***."  *Pegasystems*, 2023 WL 4706741, at *1.

Courts in this District and elsewhere have repeatedly held that *Affiliated Ute* applies to claims involving both misstatements and omissions.  *See, e.g.*, *Dahhan v. OvaScience, Inc.*, 2020 WL 2602138, at *5 (D. Mass. May 8, 2020) (finding both *Basic* and *Affiliated Ute* applied to case alleging misstatements and omissions); *Fogarazzo v. Lehman Bros., Inc.*, 232 F.R.D. 176, 186 (S.D.N.Y. 2005) ("[T]he theory behind the *Affiliated Ute* presumption . . . is not undermined simply because a defendant makes misstatements at the same time it omits material information.").  The presumption squarely applies to Plaintiffs' claims.

- 18 -

### c.      Damages Can Be Calculated in the Same Manner for All Class Members

At the class certification stage, Plaintiffs' burden "'is simply to propose a methodology for calculating damages that corresponds to its theory of liability.'"  *Carbonite*, 2023 WL 4539855, at *10; *see also Nexium*, 777 F.3d at 23 ("simply . . . at class certification, the damages calculation must reflect the liability theory").  Accordingly, Plaintiffs must show only "'that damages are capable of measurement on a classwide basis.'"  *Levy*, 448 F. Supp. 3d at 64 (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 34-36 (2013)).  The First Circuit and Supreme Court have made clear that "'class certification ought not . . . turn into a "free-ranging merits inquir[y]" through unnecessary demands for exact calculations of damages.'"  *Nexium*, 777 F.3d at 17.  Further, "'[w]here . . . common questions predominate regarding liability . . . courts generally find the predominance requirement to be satisfied even if individual damages issues remain.'"  *Id.* at 21.

Here, Class members' damages are capable of being measured on a class-wide basis, consistent with Plaintiffs' theory of the case, using the widely accepted out-of-pocket measure of damages.  Feinstein Rpt., ¶¶148-159; *see Levy*, 448 F. Supp. 3d at 64-65 ("[T]he 'out-of-pocket' methodology proposed by [plaintiffs' expert] satisfies the criteria set by *Comcast* as applied to the plaintiffs' Section 10(b) claims.").  Accordingly, common issues of damages will predominate.

### 2.      A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of This Action

Rule 23(b)(3) also requires that class treatment be "superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  In making this assessment, courts consider: (1) the interests of members of the class in individually controlling the prosecution of separate actions; (2) whether other litigation has already commenced; (3) the desirability of concentrating claims in one forum; and (4) the likely difficulties in managing a class

action.  Fed. R. Civ. P. 23(b)(3)(A)-(D).  Courts in this Circuit recognize that securities cases easily satisfy the superiority requirement.  *See Credit Suisse-AOL*, 253 F.R.D. at 31 ("Investors seeking damages for violations of federal securities are often considered the prototypical class action plaintiffs."); *Evergreen*, 275 F.R.D. at 393 ("judges of this Court have stressed that class actions are particularly appropriate for securities litigation because it may be the 'only practicable means of enforcing investors' rights'").  This case is no different.

Most Class members' interests in individually prosecuting separate actions is minimal, as the trouble and expense of doing so would be prohibitive when weighed against the potential recoveries. Additionally, the maintenance of a class action in this District ensures an efficient expenditure of resources and consistent rulings on the Class' claims.  This District is a desirable forum for this class action: individual Class members are located in geographically dispersed areas, Pega is headquartered in this District, and many of the acts and practices complained of occurred in substantial part in this District.  Plaintiffs do not foresee any management difficulties that preclude this action from proceeding as a class action.

### C.     Robbins Geller Should Be Appointed Class Counsel

Rule 23(g)(1) provides that "a court that certifies a class must appoint class counsel."  Fed. R. Civ. P. 23(g)(1).  In appointing class counsel, the Court considers counsel's work "in identifying or investigating potential claims in the action," "counsel's experience in handling class actions," "counsel's knowledge of the applicable law," and "the resources that counsel will commit to representing the class."  Fed. R. Civ. P. 23(g)(1)(A).  Plaintiffs' chosen counsel, Robbins Geller, readily satisfies these requirements.  *See supra*, §III.A.4.; *Carbonite*, 2023 WL 4539855, at *8.

## IV.    CONCLUSION

Plaintiffs respectfully request that the Court grant the Motion in its entirety.

- 20 -

DATED:  December 12, 2023

Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
DEBRA J. WYMAN (admitted *pro hac vice*)
CHRISTOPHER D. STEWART (admitted *pro hac vice*)
LONNIE A. BROWNE (admitted *pro hac vice*)
MEGAN A. ROSSI (admitted *pro hac vice*)
NICOLE Q. GILLILAND (admitted *pro hac vice*)

s/ Debra J. Wyman
DEBRA J. WYMAN

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
debraw@rgrdlaw.com
cstewart@rgrdlaw.com
lbrowne@rgrdlaw.com
mrossi@rgrdlaw.com
ngilliland@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
CHAD JOHNSON (admitted *pro hac vice*)
420 Lexington Avenue, Suite 1832
New York, NY  10170
Telephone:  212/432-5100
chadj@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SNEHEE KHANDESHI (admitted *pro hac vice*)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
skhandeshi@rgrdlaw.com

Lead Counsel for Lead Plaintiffs

- 21 -

HUTCHINGS BARSAMIAN MANDELCORN, LLP
THEODORE M. HESS-MAHAN, BBO #557109
110 Cedar Street, Suite 250
Wellesley Hills, MA  02481
Telephone:  781/431-2231
781/431-8726 (fax)
thess-mahan@hutchingsbarsamian.com

Liaison Counsel for Lead Plaintiffs

- 22 -

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on December 12, 2023.

s/ Debra J. Wyman

DEBRA J. WYMAN

4858-4495-9638.v1