UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re PEGASYSTEMS INC. SECURITIES LITIGATION | ) ) ) | No. 1:22-cv-11220-WGY |

**ORAL ARGUMENT REQUESTED**

MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFFS' MOTION TO COMPEL DEFENDANTS TO PRODUCE DOCUMENTS AND RELATED RELIEF

4856-8496-4506.v1

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ..............................................................................................................1

       A.     Background........................................................................................................1

       B.     Overview of the Disputes..................................................................................2

II.    ARGUMENT....................................................................................................................6

       A.     Defendants Should Apply the Agreed Terms Against the Agreed
              Custodians' Files...............................................................................................6

              1.     The Agreed Custodians Possess Relevant Information ...........................6

              2.     The Agreed Terms Target Relevant Information......................................9

       B.     Defendants Should Search the Files of Roche and O'Keefe .............................12

       C.     Defendants Should Immediately Produce, Without a Manual Relevance
              Review, All Un-Reviewed, Non-Privileged Documents Yielded by the
              Searches in Appendix A....................................................................................14

       D.     Defendants Should Collect Hyperlinked Attachments from Microsoft
              Sources as Agreed.............................................................................................17

III.   CONCLUSION..............................................................................................................20

4856-8496-4506.v1

## TABLE OF AUTHORITIES

**Page**

**CASES**

*ADT LLC v. Vivint, Inc.*,
2017 WL 11632812 (S.D. Fla. Dec. 1, 2017)..........................................................................12

*Carrillo v. Schneider Logistics, Inc.*,
2012 WL 4791614 (C.D. Cal. Oct. 5, 2012)............................................................................14

*City of Fort Lauderdale Police & Firefighters' Ret. Sys. v. Pegasystems Inc.*,
2023 WL 4706741 (D. Mass. July 24, 2023)..................................................................2, 9, 10

*Consumer Fin. Prot. Bureau v. Navient Corp.*,
2018 WL 6729794 (M.D. Pa. Dec. 21, 2018).....................................................................14, 15

*Fams. for Freedom v. U.S. Customs & Border Prot.*,
2011 WL 4599592 (S.D.N.Y. Sept. 30, 2011)........................................................................20

*Hall v. Life Care Ctrs. of Am., Inc.*,
2018 WL 5295892 (D. Kan. Oct. 25, 2018) ...........................................................................12

*In re Actavis Holdco U.S., Inc.*,
2019 WL 8437021 (3d Cir. Dec. 6, 2019) ..............................................................................14

*In re Allergan PLC Sec. Litig.*,
2020 WL 4034751 (S.D.N.Y. Mar. 30, 2020) ..........................................................................4

*In re Generic Pharms. Pricing Antitrust Litig.*,
2019 WL 8106511 (E.D. Pa. Oct. 24, 2019)...........................................................................14

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
2009 WL 3443563 (D.D.C. Oct. 23, 2009) ............................................................................12

*In re Stubhub Refund Litig.*,
2023 WL 3092972 (N.D. Cal. Apr. 25, 2023) ........................................................................19

*IQVIA, Inc. v. Veeva Sys., Inc.*,
2019 WL 3069203 (D.N.J. July 11, 2019)..............................................................................19

*Isaac v. Harvard Univ.*,
769 F.2d 817 (1st Cir. 1985).................................................................................................12

*Judge Rotenberng Educ. Ctr., Inc. v. U.S. Food & Drug Admin.*,
376 F. Supp. 3d 47 (D.D.C. 2019).......................................................................................19

4856-8496-4506.v1

**Page**

*Kozlowski v. Sears, Roebuck & Co.*,
    73 F.R.D. 73 (D. Mass. 1976)................................................................19

*Littlefield v. NutriBullet, L.L.C.*,
    2017 WL 10439692 (C.D. Cal. Dec. 20, 2017) ......................................14

*Nevarez v. Forty Niners Football Co., LLC*,
    No. 4:16-cv-07013-HSG, ECF 254
    (N.D. Cal. Oct. 16, 2018)........................................................................14

*Progressive Cas. Ins. Co. v. Delaney*,
    2014 WL 3563467 (D. Nev. July 18, 2014) ...........................................15

*Williams v. Taser Int'l, Inc.*,
    2007 WL 1630875 (N.D. Ga. June 4, 2007).............................................15

**STATUTES, RULES AND REGULATIONS**

Federal Rules of Civil Procedure
    Rule 26(b) ...............................................................................................12

Federal Rules of Evidence
    Rule 502(d) ......................................................................................5, 13, 15

4856-8496-4506.v1

## I.      INTRODUCTION

### A.      Background

As early as 2012, Pegasystems Inc.'s ("Pega") senior executives orchestrated a scheme to misappropriate Appian Corporation's ("Appian") trade secrets and confidential information, which Pega used to compete against Appian and improve Pega's products. *See* Lead Plaintiffs' Consolidated Amended Complaint for Violations of the Federal Securities Laws (ECF 61) ("Complaint"), §IV.A. On May 29, 2020, shortly after discovering Defendants'[1] scheme, Appian sued Pega in Virginia state court (the "Virginia Action"). ¶¶3, 11-13, 53, 113.[2]

For nearly two years thereafter, Defendants concealed the Virginia Action, and their illicit behavior, from investors. ¶¶14-17; Complaint, §IV.B. When Defendants finally disclosed the existence of the Virginia Action on February 16, 2022, they falsely assured investors that Appian's claims were "'without merit,'" and that Appian's claimed damages were "'not supported,'" despite their extensive involvement in the misconduct at issue. ¶¶114, 145, 243. On May 9, 2022, a Virginia jury found Pega liable to Appian for over $2 billion for willfully and maliciously violating the Virginia Uniform Trade Secrets Act, and that Pega had violated the Virginia Computer Crimes Act. ¶¶21-22. The Virginia court entered final judgment against Pega on September 16, 2022, affirming the $2 billion verdict and awarding Appian $23.6 million in attorneys' fees and costs, as well as post-judgment interest of approximately $122 million annually. ¶¶25, 119.

---

[1]  "Defendants" are Pega and Alan Trefler ("Trefler"), "Plaintiffs" are Lead Plaintiffs Central Pennsylvania Teamsters Pension Fund - Defined Benefit Plan, Central Pennsylvania Teamsters Pension Fund - Retirement Income Plan 1987, and Construction Industry Laborers Pension Fund, and together, Plaintiffs and Defendants are the "Parties."

[2]  Unless otherwise noted, all "¶__" or "¶¶__" references are to the Complaint, all exhibits referenced herein are attached to the Declaration of Christopher D. Stewart in Support of Lead Plaintiffs' Motion to Compel Defendants to Produce Documents and Related Relief, filed concurrently herewith, and all emphasis is added and citations are omitted.

- 1 -

Plaintiffs filed the Complaint on October 18, 2022, detailing Defendants' scheme and material misstatements and omissions. As Plaintiffs allege, each of Pega's Forms 10-K and 10-Q, dated between July 28, 2020 and October 27, 2021, misleadingly failed to disclose the Virginia Action or Pega's egregious conduct, while instead stating that Pega "*may* be subject to intellectual property rights claims," that "[t]here can be *no assurance* that third parties . . . will not claim infringement," and that Pega "face[d] a higher risk of being the subject of intellectual property infringement claims." ¶¶134-142. Pega also touted its competitive advantages and sales and marketing tactics in U.S. Securities and Exchange Commission ("SEC") filings, while misleadingly failing to disclose the Virginia Action or Pega's scheme against Appian. ¶¶128-130. Moreover, Pega's SEC filings assured investors that Pega had adopted a written Code of Conduct, and directed investors to that Code of Conduct, which assured investors that Pega would "[n]ever use illegal or questionable means to acquire a competitor's trade secrets or other confidential information, such as . . . misrepresenting your identity in hopes of obtaining confidential information." ¶¶148-149, 154.

On May 17, 2023, this Court denied Defendants' motion to dismiss as to Pega and its Chief Executive Officer ("CEO") Trefler. ECF 76. The Court explained and expanded on its May 17 ruling in a July 24, 2023 written memorandum, sustaining Plaintiffs' allegations that Defendants had made material misstatements and omissions with scienter, including regarding the Virginia Action, Pega's competitiveness in the highly-competitive business process management market, and compliance with Pega's Code of Conduct. *City of Fort Lauderdale Police & Firefighters' Ret. Sys. v. Pegasystems Inc.*, 2023 WL 4706741, at *8-*11 (D. Mass. July 24, 2023).

### B.  Overview of the Disputes

On June 29, 2023, Plaintiffs proposed a framework for exchanging search terms, sharing search term hit reports, and resolving disputes over search terms. Defendants rejected Plaintiffs'

4856-8496-4506.v1

framework on July 31, 2023, stating that Defendants would instead propose a comprehensive "discovery plan" containing search terms and custodians.

Defendants provided their proposed terms and custodians seven weeks later, on September 19, 2023.  Plaintiffs responded with additional terms and custodians on September 22, 2023.  Ex. 6. Months of conferral followed,[3] during which Plaintiffs: (a) withdrew several proposed custodians; (b) withdrew or narrowed proposed search terms; (c) relented to Defendants' objections by limiting searches to documents dated prior to October 26, 2022[4]; and (d) significantly limited the search time period for eight of Plaintiffs' proposed custodians (all members of Pega's Disclosure Committee).[5] By November 2023, the Parties had reached agreement on 24 custodians (the "Agreed Custodians"), and approximately 150 search terms (the "Agreed Terms").  The Agreed Custodians (including their titles and committee memberships at Pega) and Agreed Terms are listed in §§I.A. and II (respectively) of Appendix A, attached hereto.

---

[3]    The Parties' meet and confer calls regarding the disputed issues have included telephonic meet and confers on: July 21 and 28, 2023; August 1, 2023; September 21 and 27, 2023; October 2, 4, and 23, 2023; December 8, 15, and 20, 2023; and January 8, 2024.  The Parties have also exchanged written correspondence concerning the disputed issues, including correspondence dated: July 27 and 31, 2023; August 4, 16, and 21, 2023; September 5, 18, 19, and 22, 2023; October 4, 5, 9, 13, 16, and 26, 2023; November 3, 7, 11, 17, 22, and 27, 2023; December 11, 15, 19, and 22, 2023; and January 3, 4, 5, 6, and 7, 2024.  Exs. 3-4, 6-14, 16.  The Parties' calls typically last one hour. Participating counsel generally included Debra Wyman and Christopher Stewart for Plaintiffs, and Robert Smith and Erika Schutzman for Defendants.

[4]    *See* Ex. 11 at 3; Ex. 6 at 8 n.2 (agreeing to a search date range ending on October 26, 2022 "without prejudice to the right to seek documents . . . dated outside of this date range"); Ex. 11 at 15 (explaining the date range ending October 26, 2022 "should not be misconstrued as agreement that" documents dated after October 26, 2022 are not discoverable).

[5]    Ex. 11 at 1-2 (limiting searches to the period during which each custodian sat on the Disclosure Committee).  On January 5, 2024, Defendants narrowed the time period for six of these custodians even further.  Plaintiffs have agreed to these narrower time periods in order to reduce the disputed areas in this Motion.

4856-8496-4506.v1

Notwithstanding months of negotiations, Defendants subsequently refused to run all of the Agreed Terms across all of the Agreed Custodians' files, due to some unspecified "burden." Instead, Defendants seek to narrowly restrict the Agreed Terms applied to specific custodians' documents, eliminating highly relevant documents.[6] At the same time, Defendants refused to substantiate their alleged "burden," rebuffing Plaintiffs' repeated requests for "hit reports," which show the number of documents that proposed searches would capture.[7] Defendants possessed and ***initially*** agreed to share hit reports, and even cited "hit" statistics when it favored Defendants. Ex. 12 at 1. After seeking hit reports from Defendants for four months, Defendants disclosed on December 15, 2023 that they ***would not*** provide hit reports because, according to Defendants, the reports were supposedly "inaccurate" and of "no value" to Plaintiffs. Ex. 16 at 11-13; Ex. 13 at 4-5.

On January 5, 2024, two days after Plaintiffs notified Defendants of this Motion, Defendants provided hit reports for the first time in this case. Nearly all of the reports were missing some or most of the Agreed Terms. Ex. 16 at 2-4; Ex. 15. The reports also excluded, *inter alia*, hit counts:

---

[6]  Plaintiffs have highlighted several deficiencies with Defendants' piecemeal approach. For instance, Defendants initially refused to run accounting and financial reporting terms across the files of custodians responsible for Pega's accounting and financial reporting, terms targeting Pega's communications with Deloitte & Touche LLP ("Deloitte") across the files of employees that communicated with Deloitte, and compliance-related terms across the files of employees involved with compliance. Ex. 11 at 11-15. Defendants' piecemeal approach also does not accurately reflect the agreements reached through months of conferral regarding the scope of Defendants' production.

[7]  Ex. 3 at 2 ("[P]laintiffs intend to seek search term hit reports that include all search terms and not only a subset of disputed terms."); Ex. 6 at 2 (same); Ex. 7 at 4 (same); Ex. 11 at 10 ("Defendants have not shared any hit reports"); Ex. 12 at 1 (same, requesting hit reports); Ex. 16 at 16 ("Plaintiffs have been seeking hit reports from Defendants for months"); *see also In re Allergan PLC Sec. Litig.*, 2020 WL 4034751, at *1 (S.D.N.Y. Mar. 30, 2020) ("[T]he defendants must provide the plaintiff with the hit counts for searches run with proposed terms – regardless of whether the defendants believe the terms are proper. . . . The effort to arrive at appropriate search terms must be part of a collaborative process in which the defendants must provide to plaintiff the maximum information possible."). The Stipulated Electronic Discovery Protocol and Order (ECF 97) ("ESI Order") also contemplated "the sharing of search term hit reports for proposed terms." ESI Order at 2-3.

4856-8496-4506.v1

(a) for seven of the 24 Agreed Custodians; (b) for the two custodians remaining in dispute (Christopher Roche ("Roche") and Kevin O'Keefe ("O'Keefe")); and (c) reflecting the differences in search volumes between running Plaintiffs' proposal and Defendants' proposal. Ex. 16 at 2-4.

As explained in §II.A., *infra*, all of the Agreed Custodians are specifically involved in the facts of this case and no doubt possess highly relevant documents. Moreover, the Agreed Terms were highly negotiated, are specifically tailored to the claims and defenses in this case, and will undoubtedly capture relevant documents within each of the Agreed Custodians' files. Given Defendants' consistent refusal to substantiate their "burden" through hit reports, which unnecessarily prolonged the conferral process, any effort to oppose this Motion with "hit" figures first disclosed in 2024, should be disregarded as waived. Accordingly, Defendants should be compelled to apply each of the Agreed Terms listed in Appendix A (§II) against: (a) the custodial files of the Agreed Custodians; and (b) the custodial files of the two custodians remaining in dispute, Roche and O'Keefe (discussed *infra*, §II.B.).

Additionally, Defendants should also be ordered to promptly produce, without a manual relevance review, the un-reviewed documents that "hit" on the searches requested above, subject to the Federal Rule of Evidence 502(d) claw back protections in the Stipulated Protective Order (ECF 95) ("Protective Order"). *Infra*, §II.C. This remedy is the ***only*** feasible option to avoid further prejudicial delays in Defendants' production. After over seven months of discovery, ***Defendants have produced only a few thousand documents specific to the non-disclosure issues in this case*** – approximately 96% of Defendants' production to date consists of documents from Pega's prior litigation with Appian. Defendants' production of documents that are actually dated from June 16, 2020 to May 9, 2022 (the "Class Period"), or that come from the Agreed Custodians' files, remains paltry. And just weeks ago, Defendants revealed that – due to the faulty manner in which Pega's in-

4856-8496-4506.v1

house IT personnel collected electronically stored information ("ESI") for this case – Defendants are *recollecting* millions of documents for review. Compelling Defendants to promptly produce the search term "hits" (with families, as required by the ESI Order), without a manual relevance review, would accomplish substantial completion in an expeditious manner.

Finally, as explained in §II.D., *infra*, given Pega's use of "hyperlinks" to "attach" documents to communications, Defendants agreed in 2023 to collect "hyperlinked attachments" from Microsoft sources. Defendants reneged on this agreement on December 15, 2023, claiming Pega's faulty ESI collection methods rendered Defendants' earlier agreement "unduly burdensome." Defendants should be compelled to honor their earlier agreement, which can be accomplished through automated means and at a minimal burden.

## II.    ARGUMENT

### A.    Defendants Should Apply the Agreed Terms Against the Agreed Custodians' Files

#### 1.    The Agreed Custodians Possess Relevant Information

Given that this case centers on material misstatements and omissions in Pega's SEC filings, the Agreed Custodians include, without limitation: (a) all 13 of Pega's Disclosure Committee members during the Class Period; (b) Pega's Chief Financial Officer ("CFO"); (c) Pega's Chief Accounting Officer ("CAO"); (d) other senior financial reporting and accounting executives at Pega; (e) Pega's Chief Compliance Officer ("CCO") and General Counsel; and (f) Pega's head of internal audit. *See* Appendix A, §I.A. The Agreed Custodians also include officers and executives that – along with Trefler – directly participated in Pega's corporate espionage against Appian, as well as Pega's director of competitive intelligence, and Pega's senior investor relations executives. *Id.* Each of the Agreed Custodians (some of whom are discussed in depth below) were highly negotiated, are involved in the facts of this case, and possess relevant information.

- 6 -

***Disclosure Committee Members***: According to Pega, its Disclosure Committee was responsible for "ensure[ing] compliance with [Pega's] disclosure controls and procedures and . . . evaluat[ing] the effectiveness of [Pega's] controls and procedures on a regular basis."[8]  Among other things, Disclosure Committee members reviewed Pega's disclosures in Forms 10-K and 10-Q prior to filing with the SEC.[9]  All eight of the Disclosure Committee members that Plaintiffs proposed (listed *infra* at page 10) reviewed, and approved, at least one of the SEC filings that Plaintiffs allege concealed the Virginia Action and Pega's underlying corporate espionage.

***Efstanthios Kouninis ("Kouninis")***: In addition to serving as Pega's CAO, Kouninis also signed Pega's misleading 2020 and 2021 Forms 10-K, sat on Pega's Disclosure Committee throughout the Class Period, and is one of the only ***two*** non-party Pega employees identified in Defendants' initial disclosures as having relevant information.  Ex. 2 at 2.  Kouninis regularly communicated with Pega's officers, executives, Board of Directors (the "Board"), and outside auditor (Deloitte) regarding the Virginia Action and Pega's accounting.  Kouninis also attended Pega's Audit Committee meetings, and signed Pega's management representation letters to Deloitte.[10]

***Matthew Cushing ("Cushing")***: Cushing – Pega's General Counsel, CCO, and Chief Commercial Officer – was closely involved in Pega's assessment and reporting of the Virginia Action.[11]  Cushing regularly corresponded with Deloitte and others regarding the Virginia Action,

---

[8]   Ex. 17 at 715; *see also id.* (Pega employees to "[i]mmediately report to a member of the Disclosure Committee if . . . Pega's public disclosures are not accurate [or] complete").

[9]   *E.g.*, Ex. 30 at 129 ("Disclosure Committee Summary" regarding disclosures in Form 10-Q).

[10]   Ex. 38 at 151; Ex. 40 at 328; Ex. 30 at 121-22; Ex. 31 at 426-27; Ex. 32 at 662, 664.

[11]   Appian personally sent Cushing a copy of Appian's complaint.  Ex. 26 at 593.

4856-8496-4506.v1

and prepared letters to Deloitte describing the Virginia Action.[12]  Cushing also corresponded with

Pega's outside counsel regarding the Virginia Action, regularly met with Pega's CEO, CFO, and in-

house counsel regarding the Virginia Action, and updated Pega's Board on the Virginia Action.[13]

Cushing also served as a primary contact for addressing compliance concerns, and was responsible

for providing Pega guidance as to "what constitutes a trade secret, proprietary information, or

permissible use thereof."  Ex. 17 at 708; Ex. 18.  Pega also assured investors that "[i]f any of [Pega's

employees] are asked to depart from [Pega's] Code [of Conduct] . . . we agree to seek clarification

and/or guidance as to the propriety of the actions in question from **[*Cushing*]**."  Ex. 17 at 717.

PegaCompliance@pega.com (one of the Agreed Custodians) was one of Cushing's email addresses.

*Id.*

*John Kenneally ("Kenneally"), Tom Sorrentino ("Sorrentino"), and Phil Benvenuti*

*("Benvenuti")*: Kenneally communicated with Pega's officers, in-house counsel, external auditor,

and credit facility lender regarding the Virginia Action and Pega's public reporting, and prepared

memoranda regarding the Virginia Action.[14]  Kenneally also managed the Disclosure Committee,

organized its meetings, and compiled Pega's draft disclosures.  Ex. 11 at 3.  Sorrentino also

---

[12]  Ex. 37 at 133 ("discussed all potential litigation matters with Matt Cushing"); Ex. 41 (Cushing providing in-house legal letter to Deloitte); Ex. 36 (June 8, 2020 email from Cushing regarding call with Pega's outside counsel regarding the Virginia Action); Ex. 28 at 621 (February 5, 2021 email attaching Pega outside counsel's letter to Cushing and Deloitte).

[13]  *E.g.*, Ex. 34 at 779 (October 2020 meeting between Cushing, Trefler, Kenneth Stillwell ("Stillwell"), and Roche concerning "Appian Update"); Ex. 35 at 458 (March 2021 meeting concerning "Appian Mediation"); Ex. 33 at 694 (July 2021 "Appian Briefing" meeting to "[b]rief Alan on all Appian matters").

[14]  *E.g.*, Ex. 29 at 780 (June 29, 2020 email with Kenneally, Roche, and Kouninis: "PNC would be expected to be informed on all material developments [regarding the Virginia Action] in a timely manner."); Ex. 44 ("Appian Litigation Update" memorandum prepared by Kenneally and reviewed by Kouninis); Ex. 45 (same).

4856-8496-4506.v1

communicated about the Virginia Action and Pega's public reporting and accounting (*e.g.*, Ex. 47), and prepared periodic memoranda regarding Pega's "[a]ccounting considerations over Appian Litigation," which were provided to Deloitte.[15]   Among other things, Sorrentino's memoranda documented events in the Virginia Action and analyses ostensibly performed under Accounting Standards Codification Topic 450, *Contingencies*, including the likelihood of a loss from the Virginia Action.   Ex. 42.   Sorrentino also helped facilitate Pega's payments to Youyong Zou ("Zou").   Ex. 11 at 13.   Finally, Benvenuti's responsibilities at Pega include "internal audit (financial, operational, regulatory, IT), SOX, . . . fraud investigation, and risk assessment activities." Ex. 21.   Benvenuti also reported on Pega's internal audit activities to Pega's Board, Audit Committee, external auditor, and outside counsel.   Ex. 48 at 310; Ex. 39 at 308.

### 2.      The Agreed Terms Target Relevant Information

Each of the Agreed Terms the Parties spent months negotiating will undoubtedly capture relevant documents within each of the Agreed Custodians' files.   For instance, the Agreed Terms include: (a) terms that reference or quote Pega's "Code of Conduct," which falsely assured investors that Pega would "[n]ever use illegal or questionable means to acquire a competitor's trade secrets or confidential information" (Terms 36, 133-138, and 143-144) (*see* ¶154; *Pegasystems*, 2023 WL 4706741, at *9); (b) Zou's first and last name and email address (Terms 3-5 and 146); and (c) fake names and front businesses Pega used to access Appian's platform (Terms 15-18, 37-38, and 48-49), and aliases Trefler allegedly used to access Appian's information (Terms 29-31 and 39-41) (*see*

---

[15]   Ex. 42 at 243; Ex. 46 at 271; Ex. 43 at 452.

4856-8496-4506.v1

¶¶10, 203).  Given Appian's focus in this case, over 100 of the Agreed Terms combine "Appian" (or its ticker symbol, "APPN") with additional, limiting terms (together, the "Appian Terms").[16]

Defendants concede that each of the Agreed Terms target discoverable information, and are running 100% of the Agreed Terms across Trefler's and Stillwell's files.  Appendix A, §I.A. Defendants are also running approximately 90% of the Agreed Terms across the files of the following *eight* Agreed Custodians primarily responsible for: (a) product development (Kerim Akgonul and Steve Bixby); (b) clients and sales (Leon Trefler); (c) competitive intelligence (Benjamin Baril and Norma Suarez); (d) product strategy and marketing (Don Schuerman ("Schuerman")); and (e) investor relations (Lisa Pitchman Rogers and Peter Welburn).  *Id.*

However, on account of unsubstantiated "burden," ***Defendants will only run 2%-21% of the Agreed Terms*** across the following 14 Agreed Custodians, which include senior officers, accounting executives, and Disclosure Committee members: (a) eight of the thirteen Disclosure Committee members (*i.e.*, Danielle Albon, Marissa Arsenault Foti, Cris Morera Balaguer, Nick Collier, Carlos Fuentes, Jack Geraghty, Donald Lancaster ("Lancaster"), and Daniel Nash) (***21 terms or 14%***); (b) Benvenuti (***10 terms or 7%***); (c) CCO Cushing (***28 terms or 19%***); (d) Kenneally (***24 terms or 16%***); (e) CAO Kouninis (***32 terms or 21%***); (f) Sorrentino (***24 terms or 16%***); and (g) the PegaCompliance@pega.com email account (***3 terms or 2%***).  *See id.*

Defendants' refusal to run all of the Agreed Terms across the files of Pega's officers and executives ***responsible*** for drafting, reviewing, approving, and/or signing Pega's false and misleading SEC filings is illogical and would shield relevant documents.  Critically, Defendants fail

---

[16]  *See* Appendix A, §II.  Given Pega used the standalone term "Appian" to gather relevant documents for this case, the Appian Terms are undoubtedly narrow.  Ex. 13 at 1.

to articulate how running the Agreed Terms across each of these 14 Agreed Custodians' files would yield an "unduly burdensome" volume of irrelevant documents.

In reality, documents located within the files of Pega's Disclosure Committee members, CAO, CCO, head of internal audit, or other accounting executives, are *just as likely* (if not *more likely*) to be relevant to the claims and defenses in this case than documents within the files of Agreed Custodians responsible for Pega's marketing, sales, product development, and competitive intelligence.[17]  For instance, documents reflecting what Disclosure Committee members, or Pega's senior officers, knew (or, did *not* know) about the Virginia Action, Pega's underlying espionage, or events in the Virginia Action – at the time Pega published the alleged misstatements and omissions – are highly relevant.  Documents evidencing the information Pega's officers and executives possessed when they communicated with Pega's Board, in-house counsel, external auditor, or the market regarding the issues in this case, are highly relevant as well.  These are *precisely* the types of documents the Agreed Terms target.[18]

Defendants fail to show why the Agreed Terms should not be applied uniformly to each of the Agreed Custodians.  Defendants' attempt to shield from discovery certain Agreed Custodians' highly relevant documents, by narrowly restricting the Agreed Terms to be applied to their files, is

---

[17]  As an illustrative example, Defendants refuse to run Term 35 ((Appian OR APPN) AND *deloitte*) across Cushing's files despite his routine contacts with Deloitte. *See* Appendix A, §I.A.; *see also supra*, §II.A.1.  But, Defendants agree to run Term 35 across Pega's marketing, sales, product development, and competitive intelligence custodians.  Appendix A, §I.A.

[18]  Indeed, the Agreed Terms target documents that ***Defendants*** contend are relevant to this case. Ex. 2 at 4-5 (asserting the documents "Defendants may use to support their claims or defenses" include documents: (i) "***concerning the Appian Virginia Litigation***"; (ii) "concerning Pegasystems' public representations and disclosures"; (iii) "concerning Pegasystems' accounting treatment of the Appian Virginia Litigation"; and (iv) "otherwise relating to th[is] Action").

4856-8496-4506.v1

inappropriate. [19]  Given the above, each of the Agreed Terms should be run across each of the Agreed Custodians' files.

Finally, Defendants should apply the search time period May 29, 2020 through October 26, 2022 for Term 146 ("Zou" and not "Zhou") – the same date range used for Zou's first name (Terms 3-4) and email address (Term 5).  Ex 11 at 5; Ex. 12 at 3-4.  "Zou" features prominently in the Complaint, pinpoints relevant documents, and is necessary given the reality that individuals are routinely identified using their last name.[20]  "Zou" is so effective as a search term that Pega was ordered to run it over a ***nine-year*** period, including across "***all Pegasystems emails, regardless of custodian***, ***for [a three-year period]***."  Ex. 19 at 046, 055 n.1; Ex. 20.  Defendants' proposal from November 17, to limit Term 146 to ***just 11 weeks***, is entirely arbitrary and will exclude approximately 26 months of relevant documents.

## B.      Defendants Should Search the Files of Roche and O'Keefe

The parties dispute whether Roche and O'Keefe – Pega's in-house lawyers that worked directly on the Virginia Action – should have their documents reviewed.  In-house lawyers are proper custodians,[21] and neither custodian's relevance is disputed.  Roche provided Deloitte with

---

[19]   *Isaac v. Harvard Univ.*, 769 F.2d 817, 828 (1st Cir. 1985) (courts "'must be careful not to deprive a party of discovery that is reasonably necessary to afford a fair opportunity to develop and prepare the case'") (quoting Fed. R. Civ. P. 26(b) advisory committee's note to 1983 amendment).

[20]   For example, Defendants' Answer mentions "Zou" 18 times and "Youyong" zero times.  ECF 87.

[21]   *See, e.g.*, *ADT LLC v. Vivint, Inc.*, 2017 WL 11632812, at *2 (S.D. Fla. Dec. 1, 2017) (ordering company "to produce all documents located in [two in-house attorneys'] email files responsive to the search it ran for the other custodians"); *Hall v. Life Care Ctrs. of Am., Inc.*, 2018 WL 5295892, at *4 (D. Kan. Oct. 25, 2018) (ordering ESI searches of in-house attorneys' and legal staff's files); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 2009 WL 3443563, at *10 (D.D.C. Oct. 23, 2009) (granting motion to add in-house attorneys as custodians).

Pega's assessment of Appian's claims shortly after Appian sued Pega,[22] and communicated regularly with Trefler, Pega's officers, or Deloitte about the Virginia Action.  O'Keefe (along with Agreed Custodian Schuerman) verified Pega's interrogatory responses in the Virginia Action.  Ex. 11 at 3-4.[23]

Defendants principally object that because Roche and O'Keefe were in "'constant communication' about the Virginia Action," they will possess *too many* responsive documents, which will force Defendants to log "'close to [their] full mailboxes.'"  Ex. 12 at 2-3.

*First*, this is rank speculation:  Defendants have not even collected their documents, and refuse to even provide hit reports for Roche and O'Keefe.  Ex. 13 at 2; Ex. 16 at 1.  And the fact that *two other lawyers are Agreed Custodians* undermines Defendants' objection that including lawyers as custodians is necessarily "unduly burdensome."

*Second*, Defendants possess various means to address the purported "burden" of logging privileged documents.  For instance, the ESI Order permits Defendants to utilize metadata in logging documents, or avoid logging certain documents altogether.  *See* ESI Order, §IV.  Plaintiffs suggested in November 2023 that Defendants could produce Roche's and O'Keefe's documents under a Rule 502(d) agreement – Defendants declined.  Ex. 12 at 3; Ex. 14 at 4.

*Finally*, Defendants' purported "privilege" concerns carry little weight given Pega's prior voluntary disclosures of "privileged" information.  For instance, during the Virginia Action trial, Trefler touted Pega's "investigation" into Appian's allegations, *after* Pega's counsel asserted that

---

[22]    Ex. 37 at 133.  Defendants have stated they intend to rely on Deloitte in support of their defenses in this matter.  ECF 87 at 105; ECF 103 at 5 n.7.

[23]    A search of O'Keefe's material would be limited to the 14-month period of his employment at Pega (*i.e.*, June 2021 to July 2022).

- 13 -

information regarding Pega's "investigation" was privileged.[24]   Defendants also **published** their outside counsel's "legal advice" following the May 9, 2022 verdict.[25]   Defendants' failure to log **a single document of theirs in this case** – and inability to provide a timeline for their logs – further illustrates their lackadaisical approach to preserving "privilege."   Roche's and O'Keefe's highly relevant documents should be searched.

### C.      Defendants Should Immediately Produce, Without a Manual Relevance Review, All Un-Reviewed, Non-Privileged Documents Yielded by the Searches in Appendix A

District courts "have, in some circumstances, ordered the production of documents without a manual relevance review." *In re Actavis Holdco U.S., Inc.*, 2019 WL 8437021, at *1 (3d Cir. Dec. 6, 2019); *see also, e.g.*, *Consumer Fin. Prot. Bureau v. Navient Corp.*, 2018 WL 6729794, at *2 (M.D. Pa. Dec. 21, 2018) (ordering party to produce all non-privileged documents containing specific search terms); *In re Generic Pharms. Pricing Antitrust Litig.*, 2019 WL 8106511, at *1 (E.D. Pa. Oct. 24, 2019) ("Defendants shall apply the agreed search terms to the agreed custodial files and may review the identified documents for privilege, but may not withhold prior to production any documents based on relevance or responsiveness.").[26]

---

[24]   Ex. 4 at 4; Ex. 12 at 3; Ex. 24 at 383:11-14 ("Q. Did Pegasystems' counsel conduct an investigation into this issue? MR. FRANK: **Objection.  I instruct you not to answer**."); Ex. 25 at 150:7-20 (drawing same privilege objection during October 22, 2021 deposition of Stillwell).

[25]   *See* ¶228; Ex. 1 (Pega's outside counsel's letter to, *inter alia*, Roche and O'Keefe); Ex. 27 at 882 (informing Trefler "the legal advice from Choate has been shared").

[26]   *See also Nevarez v. Forty Niners Football Co., LLC*, No. 4:16-cv-07013-HSG, ECF 254 at 2 (N.D. Cal. Oct. 16, 2018) (Ex. 22) ("Defendants' entire ESI production, whether or not Defendants have been able to review all of the documents in advance of production, must be turned over to Plaintiffs"); *Littlefield v. NutriBullet, L.L.C.*, 2017 WL 10439692, at *4 (C.D. Cal. Dec. 20, 2017) ("Defendant shall run the search [terms] and produce all resulting hits except those protected from disclosure by a privilege.  Defendant may not withhold documents . . . based on relevance."); *Carrillo v. Schneider Logistics, Inc.*, 2012 WL 4791614, at *11 (C.D. Cal. Oct. 5, 2012) ("no

- 14 -

4856-8496-4506.v1

Given the circumstances, Defendants should immediately produce, without a manual relevance review, all un-reviewed, non-privileged documents that "hit" on the searches in Appendix A, subject to the Rule 502(d) claw back protections in the Protective Order. Protective Order, §16.[27] This would expeditiously accomplish substantial completion, eliminate the supposed burden on Defendants in manually reviewing the search terms "hits" for relevance and "allow discovery. . . to move forward, and reduce future disputes about [defendants'] ESI production." *See Progressive Cas. Ins. Co. v. Delaney*, 2014 WL 3563467, at *11 (D. Nev. July 18, 2014).

This remedy is entirely appropriate for many reasons. First and foremost, the documents will be produced from the Agreed Custodians, each of whom were specifically identified as possessing relevant information. In addition, the Agreed Terms will significantly narrow the information to be produced. *See supra*, §II.A.

This remedy is also necessary given the snail's pace of Defendants' production. Despite needing to merely replicate documents gathered, reviewed, and produced in the Virginia Action, Defendants had produced fewer than 600 documents by mid-August 2023, and fewer than 51,000 documents by early November 2023. Although Defendants have produced approximately 142,000 documents, ***approximately only 4% of those documents (approximately 6,000) are specific to the disclosure issues in this case***. Ex. 13 at 8-9. That is, ***approximately 96% of Defendants' production consists of documents that were previously produced in Pega's litigation against Appian,*** including approximately 82,000 documents Appian produced, and 47,000 documents Pega

---

documents . . . may be withheld on relevance grounds"); *Williams v. Taser Int'l, Inc.*, 2007 WL 1630875, at *6 (N.D. Ga. June 4, 2007) (same); *Navient*, 2018 WL 6729794, at *2 (same).

[27]    Plaintiffs proposed this remedy to Defendants in late 2023. Ex. 16 at 16; Ex. 13 at 7.

4856-8496-4506.v1

produced, in the Virginia Action. *Id.* at 8-9. Although these documents needed no relevance review, Defendants took many months to produce them, including some as recently as December 2023.[28]

Meanwhile, Defendants revealed on December 15, 2023, that Pega's in-house IT personnel had collected ***millions of documents*** so far for this case. Ex. 13 at 1. But Pega ***also revealed*** on December 15, that – due to its IT's faulty collection methods – Defendants were ***recollecting*** millions of documents for their review. *Id.* at 6. In essence, Defendants are starting from scratch seven months into discovery, with nine weeks remaining before the current discovery cut-off deadline. *Id.* at 7.[29]

An expedited production is also necessary given the paltry volume of documents Defendants have produced that are dated during the Class Period, and that come from the Agreed Custodians' files. For instance, as of January 11, ***fewer than 2,000 of Defendants' documents are from the Agreed Custodians' files and appear dated during the Class Period***.[30] And of these documents only approximately ***142 documents*** have been produced from Trefler's files, ***143 documents*** from CFO Stillwell's files, ***114 documents*** from CAO Kouninis' files, ***55 documents*** from CCO Cushing's files, and fewer than ***200 documents*** from the files of Kenneally or Sorrentino. As of January 11, Defendants have produced more custodial documents from Zou's files than from the

---

[28] Ex. 5 at 1. Moreover, as of October 2023, Defendants had yet to produce such readily identifiable documents as, *inter alia*: (i) trial exhibits and deposition exhibits from the Virginia Action; and (ii) Board, Audit Committee, and Disclosure Committee materials. Ex. 8 at 1-2.

[29] On November 9, 2023, the Parties submitted a Stipulation and Proposed Order modestly modifying the deadlines in this case, and the good cause for their request. ECF 101. On December 20, 2023, the Parties jointly filed a motion asking the Court to reschedule the hearing on Plaintiffs' Motion to Certify This Action as a Class Action and Related Relief and enter the modified schedule from November 9. ECF 112.

[30] According to the "Date" and "Custodian-All" metadata that Defendants produced.

4856-8496-4506.v1

files of Pega's CEO, CFO, CAO, and CCO **combined**, and with respect to many Agreed Custodians, Defendants have produced **zero** custodial files.

In summary, Defendants are nowhere near substantial completion, have had to recollect their files and start from scratch, and cannot provide a timeline for completing their production.  Ex. 13 at 7.  The remedy Plaintiffs seek is the **only** feasible option to avoid further prejudicial delays in Defendants' production, and allow Plaintiffs time to review the highly relevant documents Defendants have yet to produce.

### D. Defendants Should Collect Hyperlinked Attachments from Microsoft Sources as Agreed

Pega uses a system which routinely uses "hyperlinks" to "attach" documents to emails and communications, by inserting a hyperlink that allows others to click on the hyperlink and access the "attached" document.[31]  In late 2023, Defendants agreed to collect hyperlinked attachments (also known as "point-in-time" documents or "modern attachments") from **Microsoft** sources,[32] but noted that "**non-Microsoft sources** of point-in-time documents" would **not** be "systematically collect[ed]."[33]  The ESI Order reflects this understanding.  ESI Order at 7.

On December 8, 2023, Defendants mentioned an issue with hyperlinked attachments, but did not provide details.  On December 15, 2023, Defendants blind-sided Plaintiffs with the revelation

---

[31]   The system, Microsoft 365, includes email and other Microsoft products such as Teams, Word, Excel, Powerpoint, OneDrive, and Sharepoint.

[32]   *See* Ex. 7 at 2 ("***You further indicated that the company uses Microsoft 365, which allows for the collection of hyperlinked documents from SharePoint, and you are using the available functionalities to capture and associate linked documents from emails and Teams chats***.  However, you indicated that you would only be collecting and associating the versions of the documents as they exist at the time of collection.").

[33]   Ex. 7 at 3; Ex. 9 at 1-2 ("If Defendants learn of an automated means of collecting and linking to the parent documents of **non-Microsoft sources** of point-in-time documents that is not unduly burdensome, Defendants will conduct such automated collection and linking for future productions.").

- 17 -

that – due to Pega's faulty ESI collections in 2023 – Defendants were ***recollecting*** documents and reneging on their 2023 agreement – meaning countless relevant documents would be eliminated from production.  Ex. 13 at 6; Ex. 16 at 11-13.

After originally collecting emails with their hyperlinked attachments in 2023, Defendants claimed on December 15 that they were unable to successfully deduplicate the collection.  Ex. 13 at 2, 7.  Defendants provided no reasonable explanation as to why they are unable to deduplicate the collections, as this should have been easily accomplished if exported correctly,[34] but claimed that this purported "burden" of deduplicating required them to recollect the documents.

Defendants indicated on December 15 and 18, 2023 they were continuing their recollection of documents without hyperlinked attachments over Plaintiffs' objections.  Ex. 16 at 6, 10.  On December 20, 2023, Defendants stated their recollection did not utilize Microsoft's automated collection of hyperlinked attachments because Defendants were unaware of a method, using their new preferred format, to show a family relationship between an email and its hyperlinked attachment, as required by the ESI Order.[35]  ***At Defendants' request***, on December 22, 2023, Plaintiffs shared their outside ESI vendor's process for linking hyperlinked attachments using Defendants' new preferred format.[36]  Ex. 16 at 6-7.  To date, Defendants have not confirmed they will abide by their earlier agreement.  *Id.* at 6.

---

[34]  *See* Declaration of Jerry Bui (Ex. 23), ¶3 ("When exporting using the Condensed Directory Structure, the export includes a metadata report that reflects the hash value of all of the exported files that can be reliably and consistently used to identify duplicate documents within the collection and future collections."); Ex. 13 at 1 (Pega's original "collections were performed using a condensed directory structure ('CDS') delivery format").

[35]  Ex. 13 at 3-4; ESI Order at 6 ("Documents extracted from links shall . . . ***show the family relationship***.")

[36]  Defendants refused to include their ESI vendor on the Parties' calls.  Ex. 16 at 10-11, 14; Ex. 13 at 7-8.  Defendants have responded that the process outlined by Plaintiffs' vendor may require their

- 18 -

Defendants' unilateral refusal to honor their prior agreement is wrong.[37]    Although Defendants contend that collecting hyperlinked attachments from Microsoft is "unduly burdensome," there is nothing unduly burdensome about the process.  *See* Bui Decl., ¶2 ("[t]his process is automated").  Defendants' purported "burden" stems not from ***collecting*** hyperlinked attachments, but from ***deduplicating***, which is ***optional***.  ESI Order at 4 (parties "***may*** remove duplicative ESI").  Moreover, Defendants' "burden" is self-inflicted, due to Pega's faulty and unilaterally designed ESI collection.[38]  Defendants then waited until ***December 15*** to reveal that Pega's ESI collections were largely unusable, that Defendants had ***already*** begun a recollection, and that Defendants were eliminating hyperlinked attachments from their production.

Defendants' offer to instead produce "a reasonable number of" hyperlinked attachments from Microsoft sources "on a case-by-case basis" is wholly insufficient and unilaterally modifies the ESI Order.  ***First***, the ESI Order neither capped the number of hyperlinked attachments from Microsoft

---

vendor to develop a script.  Ex. 14 at 1 n.1; *see* Bui Decl., ¶¶4-5 ("Creating a script is routine for eDiscovery vendors and the one used to associate the parent communications with the hyperlinked cloud attachment is not particularly complex or time consuming to execute.")

[37]    The ESI Order does not support Defendants.  To the contrary, it states that "[t]he parties shall use their best efforts to collect and produce documents that are links in communications such as emails and chats, including, but limited to, cloud attachments in Microsoft 365," and that "[i]f ***any*** part of an email or Teams chat and its attachments is responsive, ***the entire email or Teams chat and its attachments should be produced***."  ESI Order at 5-6; *see*, *e.g.*, *In re Stubhub Refund Litig.*, 2023 WL 3092972, at *1-*2 (N.D. Cal. Apr. 25, 2023) (ordering defendant to comply with the ESI order); *Judge Rotenberng Educ. Ctr., Inc. v. U.S. Food & Drug Admin.*, 376 F. Supp. 3d 47, 61-62 (D.D.C. 2019); *IQVIA, Inc. v. Veeva Sys., Inc.*, 2019 WL 3069203, at *5 (D.N.J. July 11, 2019) (ordering defendant to link emails with hyperlinked documents).

[38]    *Kozlowski v. Sears, Roebuck & Co.*, 73 F.R.D. 73, 77 (D. Mass. 1976) ( "the costliness of the discovery procedure involved is entirely a product of the defendant's" actions).  Although Defendants have been unable to clearly articulate the causes of Pega's "deduplication" issues, Defendants indicated the "MD5 hash values" Pega's IT collected were "not reliable," and that Defendants employed a "manual process" for duplicates.  Ex. 13 at 2-4; *see also* Bui Decl., ¶3 (explaining the standard deduplication process using "MD5 hashes").

sources for production, nor required Plaintiffs to request specific ones.[39]  ***Second***, without the context of the hyperlinked attachments, the relevance of cover emails with relevant hyperlinked attachments may not be apparent and therefore not produced at all.[40]  ***Third***, without ***possessing*** the unproduced attachments, Plaintiffs cannot meaningfully discern which are more germane than others.  ***Finally***, producing just a handful of hand-picked attachments will unduly prejudice Plaintiffs.  Defendants should collect and produce hyperlinked attachments as agreed, using the process shared on December 22 (*see supra*, §IV.A.), or a similarly effective process that accomplishes the same result.

## III.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court grant this Motion.

DATED:  January 12, 2024                    Respectfully submitted,

                                            ROBBINS GELLER RUDMAN
                                              & DOWD LLP
                                            DEBRA J. WYMAN (admitted *pro hac vice*)
                                            CHRISTOPHER D. STEWART (admitted *pro hac vice*)
                                            LONNIE A. BROWNE (admitted *pro hac vice*)
                                            MEGAN A. ROSSI (admitted *pro hac vice*)
                                            NICOLE Q. GILLILAND (admitted *pro hac vice*)


                                                     s/ Christopher D. Stewart
                                            CHRISTOPHER D. STEWART

---

[39]   Rather, given that the linked documents Pega produced would "consist of the document ***as it existed at the time of collection*** and not necessarily the document as it existed at the time the communication containing the link was sent," the Parties had agreed to "***reasonable requests for earlier versions of the linked document***."  ESI Order at 6; *see also supra*, n.33.

[40]   *See Fams. for Freedom v. U.S. Customs & Border Prot.*, 2011 WL 4599592, at *5 (S.D.N.Y. Sept. 30, 2011) ("Context matters.").

4856-8496-4506.v1

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
debraw@rgrdlaw.com
cstewart@rgrdlaw.com
lbrowne@rgrdlaw.com
mrossi@rgrdlaw.com
ngilliland@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
CHAD JOHNSON (admitted *pro hac vice*)
420 Lexington Avenue, Suite 1832
New York, NY  10170
Telephone:  212/432-5100
chadj@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SNEHEE KHANDESHI (admitted *pro hac vice*)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
skhandeshi@rgrdlaw.com

Lead Counsel for Lead Plaintiffs

HUTCHINGS BARSAMIAN MANDELCORN, LLP
THEODORE M. HESS-MAHAN, BBO #557109
110 Cedar Street, Suite 250
Wellesley Hills, MA  02481
Telephone:  781/431-2231
781/431-8726 (fax)
thess-mahan@hutchingsbarsamian.com

Liaison Counsel for Lead Plaintiffs

- 21 -

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on January 12, 2024.

s/ Christopher D. Stewart
CHRISTOPHER D. STEWART

4856-8496-4506.v1