**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

In re PEGASYSTEMS INC. SECURITIES
LITIGATION

)
)
)
)

Case No.:  1:22-cv-11220-WGY

## DEFENDANTS' OPPOSITION TO LEAD PLAINTIFFS' MOTION TO COMPEL

**TABLE OF CONTENTS**

I.     INTRODUCTION ....................................................................................................1

II.    BACKGROUND ......................................................................................................2

III.    ARGUMENT...........................................................................................................3

      A.    Adding In-House Litigation Counsel As Custodians Is Not Proportional.............. 3

      B.    Indiscriminately Applying All Search Terms to All Custodians Is Inconsistent With Rule 26 ........................................................................................ 6

      C.    Production Without a Manual Relevance Review Is an Extreme Remedy That Would Not Expedite Discovery .......................................................... 10

      D.    Collection of Hyperlinked Attachments Imposes a Disproportionate Burden ..... 12

           1.    Background on Hyperlinked Attachments.................................................12

           2.    Background on Collection Efforts and Impact on Hit Reports..................13

           3.    Defendants Complied with the ESI Stipulation .......................................16

           4.    Collection of Hyperlinked Attachments Would Require Unnecessarily Recollecting All Documents From All Custodians In a New Format .......17

IV.    CONCLUSION.....................................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3D Sys. v. Wynne*,
2023 WL 7003271 (S.D. Cal. Oct. 24, 2023) ................................................................9

*ADT LLC v. Vivint, Inc.*,
2017 WL 11632812 (S.D. Fla. Dec. 1, 2017) ................................................................4

*In re Allergan PLC Sec. Litig.*,
2020 WL 4034751 (S.D.N.Y. Mar. 30, 2020) ............................................................16

*BancPass, Inc. v. Highway Toll Admin., LLC*,
2016 WL 4031417 (W.D. Tex. 2016) ..........................................................................10

*Certain Underwriters at Lloyd's, London v. Nat'l Railroad Passenger Corp.*,
218 F. Supp. 3d 197 (E.D.N.Y. 2016) ...........................................................................5

*Controlled Kinematics, Inc. v. Novanta Corp.*,
2019 WL 3082354 (D. Mass. July 15, 2019) ..............................................................17

*Covad Commc'ns Co. v. Revonet, Inc.*,
258 F.R.D. 5 (D.D.C. 2009) ..........................................................................................9

*EEOC v. George Washington Univ.*,
2020 WL 3489478 (D.D.C. June 26, 2020) ...................................................................5

*FlowRider Surf, Ltd. v. Pac. Surf Designs, Inc.*,
2016 WL 6522807 (S.D. Cal. Nov. 3, 2016) ..............................................................10

*Gilmore v. Ford Motor Co.*,
2012 WL 12895056 (W.D. Pa. Dec. 4, 2012) ...............................................................9

*Hall v. Life Care Ctrs. Of Am., Inc.*,
2018 WL 5295892 (D. Kan. Oct. 25, 2018) ..................................................................4

*Intuniv Antitrust Litig.*,
2021 WL 10362709 (D. Mass. Mar. 3, 2021) ...............................................................6

*Johansen v. Liberty Mut. Grp., Inc.*,
2017 WL 6045419 (D. Mass. Dec. 6, 2017) ...............................................................17

*Lawson v. Spirit Aerosystems, Inc.*,
2020 WL 6939752 (D. Kan. Nov. 24, 2020) .................................................................8

*Netherlands Ins. Co. v. HP, Inc.*,
   648 F. Supp. 3d 271 (D. Mass. 2022) .................................................................6

*Nichols v. Noom Inc.*,
   2021 WL 948646 (S.D.N.Y. Mar. 11, 2021) ............................................13, 18, 19

*Novedea Sys., Inc. v. Colaberry, Inc.*,
   2021 WL 1418983 (E.D. Tex. Feb. 3, 2021) .........................................................9

*O'Donnell/Salvatori Inc. v. Microsoft Corp.*,
   339 F.R.D. 275 (W.D. Wash. 2021) ...............................................................10, 11

*Palmer v. Cognizant Tech. Sols. Corp.*,
   2021 WL 3145982 (C.D. Cal. 2021)....................................................................10

*Pegasystems Inc. v. Appian Corp.*,
   No. 2020-7216 (Va. Ct. App.) .............................................................................2

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
   2009 WL 3443563 (D.D.C. Oct. 23, 2009) ...........................................................5

*SinglePoint Direct Solar LLC v. Solar Integrated Roofing Corp.*,
   2023 WL 2585296 (D. Ariz. Mar. 21, 2023) ......................................................10

*Sprint Communications Co. L.P. v. Charter Communications, Inc.*,
   2019 WL 3369659 (D. Del. July 15, 2019) ...........................................................5

*United States v. 400 Acres of Land*,
   2017 WL 955187 (D. Nev. Mar. 10, 2017) ...........................................................5

*Winchester Cap. Mgmt. Co. v. Manufacturers Hanover Tr. Co.*,
   144 F.R.D. 170 (D. Mass. 1992).........................................................................6

**Other Authorities**

Federal Rule of Civil Procedure 26 ..................................................................... *passim*

Federal Rule of Evidence 502(d) .......................................................................5, 12

Letter, *In re Allergan*,
   No. 1:19-cv-12089-CM-GWG (Mar. 24, 2020) ...................................................16

Order, *Bio-Rad Laboratories, Inc. et al. v. 10X Genomics, Inc.*,
   No. 1:19-cv-12533-WGY (D. Mass. Feb. 18, 2020), Dkt. 67 ................................8

Order, *Bio-Rad Laboratories, Inc. et al. v. 10X Genomics, Inc.*,
   No. 1:19-cv-12533-WGY (D. Mass. Oct. 19, 2020), Dkt. 186 ..............................8

John Roberts, Report on the Federal Judiciary (Dec. 31, 2015), available at
    http://www.supremecourt.gov/publicinfo/year-end/2015year-endreport.pdf............................9

I.        **<u>INTRODUCTION</u>**

Plaintiffs' Motion to Compel presents four discovery demands that highlight the extreme burdens Plaintiffs seek to impose on Defendants.  Each of these demands reflects Plaintiffs' perceived entitlement to discovery on their terms, at any cost, despite considerable concessions by Defendants that go far beyond what courts, including this one, have required litigants to provide in discovery.  Plaintiffs' demands should be denied because they are incompatible with the proportionality considerations of Federal Rule of Civil Procedure 26, impractical, and more likely to delay than expedite discovery.

*First*, Plaintiffs contend Pegasystems must search documents from its in-house litigation counsel, even though they were involved in defense of the underlying Virginia Litigation and a search of their files will require reviewing thousands of privileged trial preparation materials and other litigation strategy documents from that litigation, and is highly unlikely to yield any non-duplicative, non-privileged documents.  Plaintiffs will have access to the documents of 24 other custodians, and their demand violates Rule 26's directive that discovery must be proportional.

*Second*, Plaintiffs argue it is neither reasonable nor proportional for Pegasystems to tailor search terms applicable to each custodian based on the custodian's role or scope of relevance to this litigation.  But adopting Plaintiffs' shotgun approach of applying all 149 search terms to each of the 24 custodians would result in more than 51,000 additional documents to review, many of which will not be responsive given the irrelevance of certain search terms to certain custodians.  Defendants' plan to apply between 10 and 149 search terms per individual custodian based on counsel's good faith judgment informed by their ongoing work on this matter is reasonable, proportional, and consistent with principles this Court and others have applied to similar disputes over search terms and custodians.

1

*Third*, Plaintiffs argue that Defendants should forego a responsiveness review and simply produce any and all non-privileged documents that hit on their 149 search terms—irrespective of relevance. To Defendants' knowledge, the District of Massachusetts has never ordered a party to take this extraordinary step which amounts to a fishing expedition in Defendants' documents. Further, such an order here would considerably slow down, rather than speed up, document productions because it would significantly increase the volume of documents to be reviewed for privilege by requiring Defendants to review *non-responsive* documents for privilege.

*Finally*, Plaintiffs argue that Defendants' collection of documents fails to comply with the terms of the Stipulated Electronic Discovery Protocol and Order (Dkt. 97) ("ESI Stip.") concerning hyperlinked attachments. They are wrong. *See* ESI Stip. at 7. Moreover, Plaintiffs' request that the Court order Defendants to recollect documents anew from each of the 24 custodians would unduly burden Defendants, considerably delay the completion of fact discovery, and is not necessary in light of the limited use at Pegasystems of linked attachments as a means to convey information.

For these and the reasons set forth below, Plaintiffs' Motion should be denied.

## II.    BACKGROUND

This case arises out of a lawsuit brought by Appian Corporation against Pegasystems Inc. ("Pegasystems" or the "Company") in Virginia state court in May 2020 for alleged misappropriation of trade secrets (the "Virginia Litigation"). The Virginia Litigation currently is on appeal. The Court of Appeals of Virginia heard oral argument on November 15, 2023. *See Pegasystems Inc. v. Appian Corp.*, No. 2020-7216 (Va. Ct. App.).[1]

---

[1] The audio recording of oral argument is available at the following location: "Court of Appeals of Virginia Recordings of Oral Arguments," Region 4 – Northern (11/15/2023), 1399-22-4 *Pegasystems, Inc. v. Appian Corp.* (Nov. 15, 2023), https://www.courts.state.va.us/courts/cav/oral_arguments/2023/11_home.html (Accessed 1/26/2024). During oral argument, the Court of Appeals twice expressed concerns about the exclusion of evidence concerning Appian's protection of its alleged trade secrets. *Id.* at 11:24-11:50 ("Relevance is kind of a low bar"),

A Consolidated Amended Complaint (Dkt. 61) ("Amended Complaint") in this case was filed on October 18, 2022. Plaintiffs allege that Pegasystems and certain executives made false and misleading misstatements and omissions between June 16, 2020 and May 9, 2022 regarding the Virginia Litigation among other topics. *See* CAC ¶ 120. Defendants moved to dismiss. Dkt. 64. The Court denied in part and granted in part the motion to dismiss. Dkt. 92.[2]

Each of the discovery disputes discussed herein concern Plaintiffs' First Set of Requests for the Production of Documents (the "Requests"), which requested 31 categories of documents from January 2020 to the date of production.[3] Defendants produced documents in July and August 2023, despite there being no protective order in place, and have made nine additional productions thereafter for a total of 803,136 pages and 330 video, audio, or sound files produced to date.[4]

On November 9, 2023, the parties filed a Stipulation and [Proposed] Order Amending the July 24, 2023 Case Management Order. Dkt. 101. On January 23, 2024, the Court entered the Stipulation, with modifications, and extended the fact discovery deadline from March 15, 2024 to August 2, 2024. Dkt. 122.

## III.    ARGUMENT

### A.    Adding In-House Litigation Counsel As Custodians Is Not Proportional

---

35:06-35:35 ("[A]gain, relevance is a low bar"). The Court also was "troubled" by the trial court's decision to prevent Pegasystems from showing its purportedly infringing software to the jury. *Id.* at 58:58-59:16. The Court of Appeals further expressed concerns regarding the jury instruction given with respect to damages, noting that it imposed a "very low burden" on Appian and Appian appeared to have "exploited the instruction." *Id.* at 44:58-46:30. The court commented that the jury instruction at issue was given in only one other case, which was found to be an error on appeal, and noted that Appian was advocating "burden-shifting," which the Virginia Supreme Court had previously refused to read into a similar Virginia Uniform Trade Secrets Act provision. *See id.* at 50:07-50:45.

[2] While Defendants dispute Plaintiffs' characterizations of the Amended Complaint and Court's motion to dismiss Order, they will not sidetrack the Court with argument here. Mot. at 1-2.

[3] Consistent with the "leave no stone unturned" approach Plaintiffs have taken to discovery, their Second Set of Requests for the Production of Documents sought, among other things, all of Mr. Trefler's personal email from a twelve-year period and production of documents over a twelve year period concerning matters at issue in the Virginia Litigation *beyond* that which was already produced in the Virginia Litigation.

[4] Subsequent productions occurred on August 28, 2023, August 30, 2023, September 12, 2023, September 27, 2023, October 9, 2023, October 25, 2023, November 14, 2023, December 8, 2023, and January 12, 2024.

3

Pegasystems' in-house litigation counsel Chris Roche and Kevin O'Keefe are not proper custodians. The significant burden that reviewing and logging their documents would impose on Defendants far outweighs the low probability that such review would yield non-duplicative, non-privileged, relevant material; such discovery is not "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1) (proportionality depends on, among other things, "whether the burden or expense of the proposed discovery outweighs its likely benefit").[5]

During all or part of the period between May 2020 and October 2022, Mr. Roche and Mr. O'Keefe were in-house litigation counsel responsible for Pegasystems' management of the Virginia Litigation. Both attorneys were in near-constant communication with internal stakeholders and outside counsel as the case went through discovery—which included over 40 depositions—a plea in bar trial, and a merits trial. They attended at least 35 depositions and were named on the record by 16 Pegasystems witnesses as having prepared them to testify. They attended most hearings and were involved with witness preparation, trial strategy, and more. All of these activities generated a large volume of documents, most of which will be privileged communications and/or work product. One does not need a search term hit report to conclude that searching Mr. Roche's and Mr. O'Keefe's files using terms such as "discovery," "depos*," "hearing," or "exhibit*" in close proximity to "Appian" is likely to return a high volume of responsive, but privileged documents.

Reviewing and logging nearly entire mailboxes for two people, for a period of two years, is an exercise that would take hundreds of hours and needlessly run up legal fees. Ex. A (Smith

---

[5] Plaintiffs broadly state that "in-house lawyers are proper custodians," Mot. at 13, but none of the one-off decisions they cite involved in-house attorneys who played an active role in defending ongoing litigation. *See Hall v. Life Care Ctrs. Of Am., Inc*., 2018 WL 5295892, at *4 (D. Kan. Oct. 25, 2018) (ordering discovery of in-house counsel documents where counsel was one of only six total custodians and defendants did not raise a burden objection); *ADT LLC v. Vivint, Inc*., 2017 WL 11632812, at *2 (S.D. Fla. Dec. 1, 2017) (ordering discovery of in-house counsel documents where counsel were two of only five total custodians, counsel functioned "in a nonlegal capacity," and defendant had agreed to include counsel in all searches).

Nov. 17, 2023 Ltr.) at 3.[6]  This would clearly be disproportionate to the needs of the case, especially where Plaintiffs will already have access to the documents of 24 other custodians, including individuals who corresponded with Mr. Roche and Mr. O'Keefe.  *See, e.g.*, Pls.' Exs. 29, 33, 34, 35.  And, contrary to Plaintiffs' unfounded claims, there does not appear to be a reasonable way for Pegasystems to avoid this burden if forced to review the documents in question.[7]

*Sprint Communications Co. L.P. v. Charter Communications, Inc.*, a patent infringement case, is instructive.  There, the court denied discovery of in-house patent counsel's communications because their relevance, which, as here, the plaintiffs claimed was "undisputed," was outweighed by the "$100,000 or more [defendant] would have to spend on creating a privilege log."  2019 WL 3369659, at *1 (D. Del. July 15, 2019).[8]

---

[6] Exhibits cited herein are to the Declaration of Daniel W. Halston in Support of Defendants' Opposition to Lead Plaintiffs' Motion to Compel, which is filed contemporaneously.

[7] Plaintiffs first claim that the ESI Stipulation allows Defendants to "avoid logging certain documents altogether," thus alleviating any burden.  Mot. at 13.  However, the ESI Stipulation states that a party "shall provide a log, treating *each document withheld or redacted for Privilege from that production separately*, and shall provide information sufficient to allow the receiving party to assess the claimed Privilege and/or to allow the Court to rule on the applicability of the claimed protection."  ESI Stip. at 8 (emphasis added).  Plaintiffs also claim that Defendants could mitigate their burden by producing documents from Mr. Roche and Mr. O'Keefe pursuant to a broad Federal Rule of Evidence 502(d) agreement.  Defendants have declined this offer as to these obviously privileged documents, and with good reason: FRE 502(d) orders are meant to address a narrow group of documents that may include some privileged documents and may not be honored by other courts in subsequent matters.  *See, e.g.*, *Certain Underwriters at Lloyd's, London v. Nat'l R.R. Passenger Corp.*, 218 F. Supp. 3d 197, 201, 203 (E.D.N.Y. 2016) (finding waiver despite existence of prior FRE 502(d) order and citing cases doing the same).  As a result, producing a complete set of documents from Mr. Roche and Mr. O'Keefe pursuant to a FRE 502(d) order would risk broadly waiving the attorney-client privilege for all issues related to in-house counsel's activities in an ongoing matter in which there may be a retrial of the Virginia Litigation if the appeal is resolved favorably for Pegasystems.  Defendants are not willing to take that risk.  Moreover, Courts do not employ FRE 502(d) to force production of privileged documents.  *See, e.g.*, *EEOC v. George Washington Univ.*, 2020 WL 3489478, at *8-12 (D.D.C. June 26, 2020) (order requiring production under FRE 502(d) would be an abuse of discretion).

[8] *In re Rail Freight Fuel Surcharge Antitrust Litig.*, which Plaintiffs also cite, supports Defendants' position.  There, the court limited the scope of review of in-house counsel's hard copy documents based on the same burden concerns articulated by Defendants here.  2009 WL 3443563, at *9–10 (D.D.C. Oct. 23, 2009).  Unlike here, the parties in *Rail Freight* had agreed to include in-house counsel as ESI custodians and to the scope of ESI review because the plaintiffs had agreed to a broad privilege filter that would remove all documents with phrases like "privileged communication" from the review population at the front end and mark them as privileged.  *Id*.  Because no such filter could be applied to hard copy review, a dispute remained concerning the scope of hard copy review.  *Id*.  In allowing some discovery, the court noted that "it is far from certain that all communication by these custodians will be privileged, as their roles may include non-legal duties. Notably, [one] served in an executive business function and may have relevant, non-privileged documents based on his business capacity."  *Id*. at *9.  Applying a similar filter approach here using terms like "Privileged Communication" would not be practical because of the expected volume of informal but privileged communications that would lack such key words.

Defendants' agreement to include corporate in-house counsel Matt Cushing and Don Lancaster as custodians does not undermine their position as to Mr. Roche and Mr. O'Keefe.  Mot. at 13.  Mr. Cushing (the Company's GC and Chief Commercial Officer) and Mr. Lancaster (Senior Corporate Counsel who served on the Disclosure Committee) were not litigation counsel and had other business-facing aspects to their roles.[9]  Plaintiffs proposed blanket rule that in-house lawyers are always proper custodians is not supported by the case law, whereas Defendants' approach considers "whether the burden or expense of the proposed discovery outweighs its likely benefit," as required by Rule 26(b)(1).[10]

## B. Indiscriminately Applying All Search Terms to All Custodians Is Inconsistent With Rule 26

Plaintiffs' proposed approach of applying all search terms to all custodians is not consistent with how this Court and others have managed the use of search terms and custodians, violates Rule 26's proportionality requirements, and should be rejected.  Fed. R. Civ. P. 26(b)(1); *Netherlands Ins. Co. v. HP, Inc.*, 648 F. Supp. 3d 271, 274 (D. Mass. 2022) (reiterating "proper scope of discovery" pursuant to Rule 26(b) and denying motion to compel where any relevance of documents sought "would be outweighed by the burden production would impose" on defendant).

---

[9] For example, Defendants did not object to Mr. Cushing's inclusion as a custodian—despite his involvement with the Company's handling of the Virginia Litigation—because he also served as Secretary of the Board and Chief Commercial Officer.  Mr. Lancaster served on the Disclosure Committee and review of his material is limited to his time on the committee.

[10] Plaintiffs' assertions that Pegasystems has disclosed privileged information or taken a "lackadaisical" approach to preserving privilege are baseless.  Mot. at 18.  At trial, Mr. Trefler testified that Pegasystems had investigated Appian's allegations and taken remedial measures.  However, the mere fact that an investigation occurred or led to certain outcomes is not itself privileged.  *See Intuniv Antitrust Litig.*, 2021 WL 10362709, at *18 (D. Mass. Mar. 3, 2021) (fact of legal consultation is not privileged).  Moreover, the outside counsel letter that Plaintiffs point to was obtained for the purpose of publicly assuring Pegasystems' clients that they would not be barred from using Pegasystems software as a result of the verdict; it was posted on Pegasystems' website upon receipt.  Because the letter was intended to be used for business purposes and was not intended to be confidential, it is not privileged and there was no waiver.  *See Winchester Cap. Mgmt. Co. v. Manufacturers Hanover Tr. Co.*, 144 F.R.D. 170, 174 (D. Mass. 1992) ("[I]nformation which is to be communicated to the public or others is not privileged.").  And Defendants have taken steps to ensure that Pegasystems' privilege is adequately preserved in third-party productions and have produced privilege logs to Plaintiffs covering this material.  Defendants' review of their own documents for responsiveness and privilege is ongoing.

Defendants have agreed to 24 custodians and between 10 and 149 terms per individual custodian.[11] As Plaintiffs acknowledge, Defendants have already agreed to run 131 or more of the 149 search terms across eleven of the custodians.  Mot. at 14.  Although Defendants believed Plaintiffs' demands were excessive, they agreed to them in an effort to conclude the costly and time intensive negotiations.[12]  Defendants' compromise to accept this large number of custodians and search terms was specifically premised on their understanding that search terms would be tailored by custodian to address burden and proportionality and give effect to the parties' negotiated scope of discovery—a position Defendants have consistently and clearly taken since the parties' earliest discussions concerning search terms and custodians.  Ex. A (Smith Nov. 17, 2023 Ltr.) at 4.[13]

Tailoring search terms to a custodian's areas of relevance is also a commonsense approach to discovery.  The current draft of the discovery plan reflects counsel's good faith judgment about which search terms best apply to which custodians, as informed by counsel's ongoing work on this matter.  For example, Ben Baril, who was Director, Office of the Chief Technology Officer, and

---

[11] An email alias called PegaCompliance@Pega.com is also identified as a custodian.  This is a generic compliance mailbox.  The terms proposed for the PegaCompliance@Pega.com email alias are those that are focused on a "complaint" or "report" related to allegations in the Amended Complaint.

[12] In contrast, Plaintiffs' attempt to identify their concessions during the meet and confer process rings hollow. Mot. at 3.  Plaintiffs note that they "withdrew several proposed custodians," yet they had proposed custodians who had no connection to the litigation and in one case admitted that their theory of relevance was based on conjecture. Dkt. 116-10 (Smith Oct. 16, 2023 Ltr.) at 5-6.  Plaintiffs say they "withdrew or narrowed proposed search terms."  By Defendants count, Plaintiffs have withdrawn one search term ("(script* OR prep* OR remark*) w/10 (conference* OR earning* OR call*)"), which was egregiously overbroad and would have pulled in any document discussing "prep" for a conference or call on any topic.  Ex. B (Stewart Oct. 26, 2023 Ltr.) at 9.  Plaintiffs characterize themselves as "relent[ing]" to Defendants by agreeing to a discovery cutoff date of October 26, 2022.  But Plaintiffs are also pressing for discovery past that date in the other motion to compel presently before the Court.  *See* Dkt. 103 at 9.  Finally, Plaintiffs state that they have "significantly limited the search time period" for Disclosure Committee members; yet Plaintiffs unnecessarily sought years of records from custodians who only served on the Committee for a few quarters during the relevant time period.  Dkt. 116-10 (Smith Oct. 16, 2023 Ltr.) at 1-2.

[13] Defendants have also rejected Plaintiffs' demands concerning Term 146 ("Zou" and not "Zhou") on burden grounds.  Mot. at 12.  Several of the terms in the discovery plan are limited by time.  Defendants have agreed to run *two* terms for Mr. Zou's first name across the time period May 29, 2020 through October 26, 2022 but declined to take the same approach for Mr. Zou's last name because Mr. Zou was a party to the Virginia Litigation and his last name would therefore appear in any reference to the case caption.  Dkt 116-14 (Smith Jan. 5, 2024 Ltr.) at 4.  These case documents would be duplicative of filings and other documents submitted to the Court in the Virginia Litigation that Defendants have already produced.  *Id.*  Defendants agreed to provide search hit reports showing the differential between the parties' positions; those reports show a differential of over 15,000 documents and substantiate that Plaintiffs' approach is unduly burdensome.  Ex. C, ¶ 8.

who was deposed in the Virginia Litigation does not have the same areas of knowledge as Marissa Arsenault, a Revenue Manager, who sat on the Disclosure Committee for five months in 2020. While terms related to competitive intelligence gathering will be applied to Mr. Baril's documents, they are not applicable to Ms. Arsenault's. Similarly, Peter Welburn, VP, Investor Relations and Corporate Development, is differently situated from Steve Bixby, VP, Product Management. Terms related to analyst reports or public statements are properly directed at Mr. Welburn's documents but would return irrelevant documents in Mr. Bixby's files. Throughout the meet and confer process, Defendants have also been receptive to requests to add search terms to custodians where Plaintiffs have articulated a reasonable rationale for doing so. Dkt. 116-14 (Smith Jan. 5, 2024 Ltr. at 5) (recounting changes made to discovery plan at Plaintiffs' request). Despite the numerous changes made by Defendants in response to Plaintiffs' requests, Plaintiffs continue to push for the indiscriminate application of all search terms to all custodians.

Adopting Plaintiffs' "one size fits all" approach not only would burden Defendants with an additional 51,000 documents to review (Ex. C (Decl. of Deborah Tongren), ¶ 7), but is also not in line with how this Court and others have managed discovery. In its supervision of another complex litigation, the Court limited the parties to "no more than five custodians" and "a total of no more than five ESI search terms/phrases *per* custodian" with an exception for consideration of "up to five additional search terms/phrases *per* custodian." *See, e.g.*, Order at 7, *Bio-Rad Laboratories, Inc. et al. v. 10X Genomics, Inc.*, No. 1:19-cv-12533-WGY (D. Mass. Feb. 18, 2020), Dkt. 67; *see also* Order, *Bio-Rad Laboratories*, No. 1:19-cv-12533-WGY (D. Mass. Oct. 19, 2020), Dkt. 186 (rejecting request for ten ESI custodians and limiting parties to five). Other courts have required litigants to tailor search terms to custodians in the same way. *See, e.g.*, *Lawson v. Spirit Aerosystems, Inc.*, 2020 WL 6939752, at *3 (D. Kan. Nov. 24, 2020) ("[T]he

8

Court limited [plaintiff] to 25 search terms and instructed him to tailor them according to custodian rather than running the same search terms across all custodians."); *Novedea Sys., Inc. v. Colaberry, Inc.*, 2021 WL 1418983, at *1 (E.D. Tex. Feb. 3, 2021) ("The Court has already ordered that Plaintiff could 'select up to twelve search terms per custodian' so long as, among other things, the search terms were 'narrowly tailored to particular issues'").

In six pages of briefing concerning this topic, Plaintiffs identify no legal authority supporting their proposed approach. Mot. at 6-12. Their sole authority, cited in a footnote, is one First Circuit case from 1985 that quotes from the 1983 amendment to Rule 26 but that nowhere supports the arguments they advance. Mot. at 12. Rule 26 has been amended seven times since, in 1987, 1993, 2000, 2006, 2007, 2010, and 2015. Substantive edits over the years reflected the changing landscape of discovery due to the advent of personal computing and other new sources of electronic data. Most relevant here, the 2015 amendments to Rule 26(b) "restore[d] the proportionality factors to their original place in defining the scope of discovery." *Id.* Chief Justice John Roberts observed: "Rule 26(b)(1) crystalizes the concept of reasonable limits on discovery through increased reliance on the common-sense concept of proportionality. … The key here is careful and realistic assessment of actual need."[14] Courts have reaffirmed the importance of proportionality in the years since the 2015 amendments.[15] There is no reason for the Court to

---

[14] John Roberts, 2015 Year-End Report on the Federal Judiciary (Dec. 31, 2015), at 6–7, available at http://www.supremecourt.gov/publicinfo/year-end/2015year-endreport.pdf.

[15] *See, e.g.*, *3D Sys. v. Wynne*, 2023 WL 7003271, at *5 (S.D. Cal. Oct. 24, 2023) ("The recent amendments to the discovery rules are meant to curb the culture of scorched earth litigation tactics by emphasizing the importance of ensuring that the discovery process 'provide[s] parties with efficient access to what is needed to prove a claim or defense, but eliminate unnecessary and wasteful discovery.'" (citing *United States v. 400 Acres of Land*, 2017 WL 955187, at *1 (D. Nev. Mar. 10, 2017)); *Gilmore v. Ford Motor Co.*, 2012 WL 12895056, at *3 n.11 (W.D. Pa. Dec. 4, 2012) ("[C]ourts are required to strike a balance between allowing the requesting party to take full advantage of the technologies available to it and protecting the producing party from having to pay to leave no stone unturned. Resting all of the costs of electronic discovery on the producing party may create a perverse incentive on the part of the requesting party to dispense with reason and restraint and unleash every new technology under the sun to try and find information that supports the requesting party's claims." (quoting *Covad Commc'ns Co. v. Revonet, Inc.*, 258 F.R.D. 5, 16 (D.D.C. 2009)).

deviate from the proportionality touchstone of Rule 26.

### C.     Production Without a Manual Relevance Review Is an Extreme Remedy That Would Not Expedite Discovery

Plaintiffs' demand that Defendants produce all non-privileged documents hitting on particular search terms, without a relevance review, contradicts both prevailing case law and Plaintiffs' own purported goal of "expedit[ing]" production. *See* Mot. at 16.[16]

Plaintiffs' proposal is contrary to prevailing case law, which holds that parties are generally permitted to conduct a responsiveness review prior to production.     For example, in *O'Donnell/Salvatori Inc. v. Microsoft Corp.*, 339 F.R.D. 275, 276 (W.D. Wash. 2021), the court held that the producing party was entitled to withhold documents based on a lack of relevance even where those documents hit on agreed-upon search terms. 339 F.R.D. at 276–77 (collecting cases and denying plaintiffs' motion to compel production without a relevance review). As the court noted, "courts that have addressed [this issue] have almost uniformly found that a relevance review, and the withholding of irrelevant documents, is appropriate." *Id*. (collecting authorities). Numerous other cases have similarly rejected attempts to deny parties the opportunity to conduct a relevance review and withhold irrelevant documents.[17]

Plaintiffs' claims as to why such an intrusive remedy is justified are insufficient and inaccurate.    While agreed-upon custodians and search terms represent an initial effort to cull relevant documents from often massive volumes of a company's documents, they nonetheless

---

[16] In addition, Plaintiffs' request was premised on the prior case schedule, which has since been adjusted. *See* Mot. at 15-16; Dkt. 122.

[17] *See SinglePoint Direct Solar LLC v. Solar Integrated Roofing Corp.*, 2023 WL 2585296, at *3 (D. Ariz. Mar. 21, 2023) (holding that even where documents hit on relevant search terms, party may "nonetheless review all documents that are 'hits' on a search term for relevance and withhold irrelevant documents"); *see also Palmer v. Cognizant Tech. Sols. Corp.*, 2021 WL 3145982, at *9 (C.D. Cal. 2021) ("The Court will not compel defendants to produce any document simply because it contains a search term whether or not it is responsive to the discovery request"); *FlowRider Surf, Ltd. v. Pac. Surf Designs, Inc.*, 2016 WL 6522807, at *7-8 (S.D. Cal. Nov. 3, 2016) (overruled on other grounds) (finding that a party did not waive its right to conduct a relevance review by agreeing to run search terms); *BancPass, Inc. v. Highway Toll Admin., LLC*, 2016 WL 4031417, at *3 (W.D. Tex. 2016) (same).

often capture large quantities of documents that have no relevance.  Indeed, like the defendants in *O'Donnell*, Defendants have reviewed numerous categories of clearly irrelevant documents that were collected pursuant to the agreed-upon custodians and search terms.  *See* 339 F.R.D. 275 at 276.  These include, for example:  generic news alerts that mention Appian products or unrelated legal matters; resumés of job applicants; Glassdoor reviews of Appian; Postmaster notifications of "messages on hold" for Pegasystems employees; purchase order receipt notification reports; and privileged documents concerning unrelated litigation.   Such examples are merely illustrative of the broad universe of irrelevant documents that Plaintiffs' search terms hit upon.   Under Defendants' current approach to the document review, which includes an initial relevance review, these irrelevant documents are set to the side once determined to be irrelevant.  Under Plaintiffs' proposed approach, these irrelevant documents would instead be required to be produced; and while they would not be subject to a relevance review, they would still be subjected to a privilege review, which would greatly slow down, not speed up, any production, and not advance any legitimate purpose.

Plaintiffs' assertions that production of irrelevant documents is necessary because Defendants are "starting [document collection] from scratch" and "nowhere near substantial completion" are also inaccurate.  *See* Mot. at 16, 17.  As detailed *infra*, Defendants conducted a supplemental collection to address technical issues caused by Plaintiffs' insistence that hyperlinked attachments be collected with metadata explaining document relationships.  *See infra* § D.  Defendants have been reviewing and producing documents since the outset of discovery.[18]

---

[18] As Plaintiffs are aware, the timing of production of certain Virginia Litigation documents was impacted by the need to seek permission from Appian and third parties to produce documents designated as Confidential under the protective order in the Virginia Litigation.  Although they were not required to do so, Defendants undertook the task of obtaining consent from Appian and other third parties in order to produce those documents to Plaintiffs.  *See, e.g.*, Ex. D (August 29, 2020 Letter from R. Smith to A. Mangi (Appian Counsel)) at 1.

To-date, Defendants have produced more than 800,000 pages of discovery material.[19]  While Plaintiffs complain that not enough of the documents produced are the product of the review conducted with search terms, the reason for that is two-fold.  First, the broad search terms hit on a large number of irrelevant documents and second, the documents that are relevant have been overwhelmingly identified by the review team as potentially privileged, which necessitates a secondary privilege review.  *See* Ex. C, ¶ 5.  This should come as no surprise given that the search terms proposed by Plaintiffs—and indeed the subject matter of the case—focuses on the Virginia Litigation.  Plaintiffs' supposed solution to force thousands more documents into a privilege review queue is impractical, would unnecessarily prolong discovery rather than speeding it up, and should be denied.[20]

> **D.    Collection of Hyperlinked Attachments Imposes a Disproportionate Burden**

Plaintiffs' request for a Court order requiring Defendants to recollect *again* all documents from all custodians in order to capture a small number of hyperlinked attachments would create an undue burden on Defendants, would needlessly delay fact discovery, and is premised on the incorrect conclusion that Defendants have not complied with the ESI Stipulation.

> **1.    Background on Hyperlinked Attachments**

Historically, in order to send a document to a recipient via email, a Microsoft 365 email user needed to attach the document to the email.  The result was that the recipient received a static copy of the document, and, at collection, both the email and the document could be obtained

---

[19] Defendants' review remains ongoing.  Much what remains to be reviewed is documents that hit on Term 150, which is a broad, generic search term: "(Appian OR APPN OR litigation OR "legal proceeding*" OR lawsuit OR "loss contingen*" OR verdict OR "jury trial" or Virginia OR Fairfax OR VA OR VCCA or VUTSA or compet*) AND [(quarter* OR annual* OR investor* OR earning* OR Q1* OR Q2* OR Q3* OR Q4* OR FY19 OR FY20 OR FY21 OR FY22 OR "FY 1*" OR "FY2*" OR "full year" OR "fiscal year") AND (conference* OR call* OR update* OR announc*)]".  A mere 7% of documents that hit on this search term are responsive.  Ex. C, ¶ 9.

[20] *See supra* n. 8 (explaining why a blanket FRE 502(d) order is not appropriate here given the risk of a broad waiver of the attorney-client privilege in a future matter, such as any retrial of the Virginia Litigation).

together.  In recent years, Microsoft 365 has developed "modern attachments" which consist of hyperlinks embedded in emails that point to a shared file location like Microsoft SharePoint.  To access the "modern attachment," the email recipient needs to click on the hyperlink to open the document; there is no static attachment to the email that can be opened.  Litigants have faced challenges with collecting hyperlinked attachments, and there has been disagreement about whether these hyperlinks are attachments at all.  *See Nichols v. Noom Inc.*, 2021 WL 948646, at *4 (S.D.N.Y. Mar. 11, 2021) ("[T]he Court does not agree that a hyperlinked document is an attachment.").

There is not widespread use of hyperlinked attachments at Pegasystems. *See* Ex. E (Decl. of Geoffrey Sherman) ¶ 12.[21]  Notably, Plaintiffs have not identified a single document relevant to their claims that has a hyperlinked attachment, let alone any for which they cannot identify or locate the relevant document elsewhere in the production.  Of approximately 2,000,000 documents initially collected in a format that includes hyperlinked attachments, only about 6,000 or *0.3%* of the documents had hyperlinked attachments.  Ex. E, ¶ 12.  Moreover, because hyperlinked attachments point to a file repository at Pegasystems which is separately being searched, any relevant attachments are likely to be duplicative of what is produced from the file repository.

### 2.    Background on Collection Efforts and Impact on Hit Reports

The ESI Stipulation requires that parties "use their best efforts to collect and produce documents that are links in communications such as emails and chats, including … cloud attachments [i.e., hyperlinked attachments] in Microsoft 365, to the extent those collections can be done in an automated manner."  ESI Stip. at 6.  The producing party has an obligation to notify

---

[21] Plaintiffs misleadingly state that "Pega uses a system which routinely uses 'hyperlinks' to 'attach' documents to emails and communications."  Mot. at 17.  This statement is about the capabilities of Microsoft 365, not about the frequency of use of hyperlinked attachments at Pegasystems. *Id.* at 17 n.31.

13

and meet and confer with the receiving party if it "finds that this process is unduly burdensome." *Id.* Further, "if certain linked documents cannot be collected in an automated manner without imposing an undue burden on the producing party, the parties agree[d] to promptly meet and confer to discuss alternative methods of collection and production." *Id.* Defendants negotiated for burden provisions in the ESI Stipulation because collection of hyperlinked attachments is not the industry standard and was expected to be challenging. *See* Ex. F (Schutzman Dec. 15, 2023 Email) at 1.

With the assistance of Consilio LLC, one of the top eDiscovery vendors, and Pegasystems' IT department, Defendants initially collected email using a condensed directory structure ("CDS") delivery format that allowed for collection of the current version of hyperlinked attachments and extraction of metadata identifying the relationship between the hyperlinked attachment and relevant email, consistent with Plaintiffs' demands. Ex. E, ¶¶ 2-3, 8, 12.[22] Search terms were necessary to use at the point of collection for email in part due to the significant file sizes associated with collecting documents using a CDS delivery format as compared to the more common Personal Storage Table ("PST") format. Ex. E, ¶ 8. However, because the list of search terms was not yet final, the initial collection necessarily was not comprehensive. Ex. F (Schutzman Dec. 15, 2023 Email) at 1. Defendants began reviewing this population (the "CDS1 data") for production and have produced documents to Plaintiffs from this set. *Id.*

After substantial negotiations on the discovery plan, including the addition of many more search terms, had taken place, Defendants conducted a supplemental collection of documents, again using a CDS format (the "CDS2 data"). This collection was still not comprehensive because the parties were still negotiating search terms. The collection also contained duplicate copies of

---

[22] The CDS delivery format is designed to be used to collect hyperlinked attachments and the metadata connecting them to related documents without any custom, manual post-processing work necessary to link them together. Ex. E, ¶ 8.

14

documents previously collected.  When counsel requested that the CDS2 data be deduplicated prior to ingestion into the database, it learned that deduplication of the CDS2 data against itself or the CDS1 data was not possible because the documents had been collected using a CDS delivery format.  Ex. F (Schutzman Dec. 15, 2023 Email) at 1–2.

Defendants then embarked on a weeks-long investigation with Consilio to develop a solution.  Ex. E, ¶ 14.  The conclusion of this intensive period of work was that only a manual— not automatic—process of deduplication is available for documents collected in CDS format and that it would take approximately 230 to 270 hours of manual work to *attempt* to deduplicate the CDS2 data.[23]  Ex. E, ¶¶ 14, 17.  Consilio could not guarantee that the deduplication process would be as successful as a traditional PST based processing method and cautioned that there was an added risk of error in proceeding this way in part due to the manual process involved.   Ex. E, ¶ 17.    Defendants concluded that a manual deduplication of the CDS2 data would be unduly burdensome and impractical, notified Plaintiffs pursuant to the ESI Stipulation, and began exploring alternative methods to obtain the material.

In consultation with Consilio, Defendants proceeded to recollect data from all of the custodians using traditional PST format, which has been the industry standard for collection for over 25 years.  Ex. E, ¶ 7.  Unlike CDS format, deduplication occurs automatically; however, a collection in PST-only format does not include hyperlinked attachments.  Ex. E, ¶ 7.  Consilio is not presently aware of an automated way in which to collect hyperlinked attachments and the metadata connecting them to related documents using a PST-only format.  Ex. E, ¶ 7.[24]

---

[23] Plaintiffs state that deduplication of CDS collection "should have been easily accomplished if exported correctly." Mot. at 18.  That is not correct.  Deduplication of data exported in CDS delivery format requires a custom, manual process.  Ex. E, ¶¶ 13–17.

[24] Plaintiffs ask that Defendants recollect documents using an alternative "PST and Loose Files" format.  Consilio does not offer connecting hyperlinked attachments to related documents as a service to its clients.  Ex. E, ¶ 9.  The proposed "script" method suggested by Plaintiffs is flawed in several respects and would require manual intervention.  Ex. E, ¶ 10.  Consilio does not have an established and vetted methodology for successfully linking hyperlinked

Finally, applying search terms at the point of collection to comply with Plaintiffs' requested collection format hindered Defendants' ability to provide hit reports. Search term hit reports could not be reliably provided using the CDS1 data. Search term hit reports would have been *underinclusive* because search terms had to be used at the point of collection.[25] Search term hit reports also would have been *overinclusive* because duplicates were not removed when documents were input into the database due to the format in which documents were collected. Contrary to Plaintiffs' narrative, Defendants never stated that they "***would not*** provide hit reports" (Mot. at 8); rather Defendants explained to Plaintiffs that it made no sense to provide information they knew to be inaccurate. As Plaintiffs concede, Defendants have repeatedly said that they would provide hit reports and have done so. *Id.* Those hit reports reflect the operative discovery plan and are not "missing" any terms. *Id.*[26]

### 3.   Defendants Complied with the ESI Stipulation

Defendants have complied with the ESI Stipulation. Mot. at 17. By undertaking a collection in CDS format, Defendants used "best efforts" to respond to Plaintiffs' demands that they collect and produce hyperlinked attachments "to the extent [that] collection[] [could] be done in an automated manner." ESI Stip. at 7; *see supra* at § III.D.2. When the collection of documents

---

attachments to collections completed in the 'PST and Loose Files" delivery format. Ex. E, ¶ 10.

[25] Using search terms at the point of collection limits the ability to reliably provide hit reports for terms that do not align with the collection terms. For example, if the search term "Appian" were used at collection, then that would generate a set of documents that hit on the term "Appian." If one attempted to use documents collected using the search term "Appian" to prepare a search term hit report for another term, such as "(Emily* w/3 Gold*)," the result would be inaccurate. That is because the search term hit report would show the number of hits *within the documents collected* using the term "Appian" that *also* hit on the term "(Emily* w/3 Gold*)," rather than the number of hits *within the review universe* that hit on the term "(Emily* w/3 Gold*)."

[26] Plaintiffs' reliance on *In re Allergan PLC Sec. Litig.*, 2020 WL 4034751, at *1 (S.D.N.Y. Mar. 30, 2020) is misplaced because Defendants have provided hit reports. Mot. at 8 n.7. In contrast, in *Allergan*, the defendants took the position that requests for hit reports were improper "discovery on discovery" and refused to provide them. Ltr. at 3-4, *In re Allergan*, No. 1:19-cv-12089-CM-GWG (Mar. 24, 2020), Dkt. 104. It would be manifestly unfair for the Court to find that Defendants have "waived" the ability to oppose this Motion using search term hit reports derived from the newly collected data where those same hit reports have been provided to Plaintiffs and any delay in providing them arises out of Plaintiffs' original demands that Defendants collect hyperlinked attachments.

in CDS format became unworkable because of the quantity of data and need to serially collect documents using search terms as the discovery plan evolved, Defendants spent weeks investigating the workaround issues with Consilio. *See supra* at § III.D.2. Having concluded that hyperlinked documents in email could not "be collected in an automated manner without imposing an undue burden on the producing party," Defendants promptly notified Plaintiffs and arranged a meet and confer during which the parties discussed alternative approaches for collecting hyperlinked attachments and metadata in an automated manner. ESI Stip. at 7; *see supra* at § III.D.2. To date, Plaintiffs have proposed no workable solutions to collect hyperlinked attachments and the related metadata in an automated manner, and Defendants are aware of none.

4.      Collection of Hyperlinked Attachments Would Require Unnecessarily Recollecting All Documents From All Custodians In a New Format

As an initial matter, Plaintiffs have not met their burden of showing the relevance of the hyperlinked attachments or the metadata connecting the hyperlinked attachments to related documents, which should end the Court's inquiry. *Controlled Kinematics, Inc. v. Novanta Corp.*, 2019 WL 3082354 at *2 (D. Mass. July 15, 2019) ("On a motion to compel, '[t]he party seeking information in discovery over an adversary's objection has the burden of showing its relevance.'" (quoting *Johansen v. Liberty Mut. Grp., Inc.*, 2017 WL 6045419, at *1 (D. Mass. Dec. 6, 2017))). Even if Plaintiffs could establish relevance, however, the burden of obtaining the requested discovery is disproportionate where it would involve hundreds of hours of work to recollect and reprocess data for all custodians simply to collect documents that can be obtained directly from the file repository instead.

Plaintiffs' suggested approach is impractical and would delay fact discovery needlessly. In order to gather hyperlinked attachments from emails (rather than the file repository) and the metadata connecting those documents to emails, Defendants would need to recollect emails from

17

all custodians again, from scratch, but in a different format.  The collection process alone could take weeks for 24 custodians.  Collecting with the CDS format would require hundreds of man-hours to deduplicate the data and prepare it for review, if it could be done successfully (which Consilio believes it could not).  *See* Ex. E, ¶ 17.  Forgoing deduplication would likely result in Defendants having to review *tens of thousands* of duplicate documents, some of which would be exact duplicates of documents already in Plaintiffs' possession.[27]  It is also likely to significantly increase the costs of hosting the data because of the volume of data that would be generated.[28]  The most efficient and practical approach, which is the one Defendants' adopted after notice to Plaintiffs, is to collect documents from custodians in the more typical PST format and proceed with the review.

Defendants recognize that there may be some limited circumstances in which a hyperlinked attachment appears to be relevant and Plaintiffs cannot locate it in the production (even though the attachment should be produced from the file repository).  That is why Defendants have offered to investigate a reasonable number of requests to locate hyperlinked attachments on a case-by-case basis.  Ex. F (Schutzman Dec. 15, 2023 Email) at 2; *see Noom*, 2021 WL 948646, at *1, *4 (denying motion for reconsideration of discovery order that required defendants to produce non-privileged hyperlinked documents if plaintiffs identified "documents containing hyperlinks to internal … documents that appeared to be material to the claims or defenses in this action and [for which plaintiffs] could not locate the corresponding hyperlinked document").  Plaintiffs have

---

[27] By way of example, a single email sent to all of the custodians would be collected as 24 documents.  If that email had already been collected as part of the CDS1 data, the result from the two collections without any deduplication would be higher.  Defendants' review burden for a single document without employing deduplication could therefore easily increase by 24x.

[28] Collecting with "PST and Loose Files" format would require Consilio to develop a methodology to link together the hyperlinked attachments and related documents.  This would take time and trial-and-error as Consilio does not have an established and vetted methodology for successfully linking hyperlinked attachments to collections completed in the "PST and Loose Files" delivery format. Ex. E, ¶ 10.

18

rejected this reasonable offer because, among other things: they are not willing to limit their requests to a reasonable number, are unwilling to make requests that are not specifically required by the ESI Stipulation, believe they will be prejudiced by the production of documents "hand-picked" by them, and, in circular logic, claim that they are unequipped to make any such requests without first seeing the hyperlinked attachments they would be requesting. Mot. at 20. None of these arguments is persuasive. "It is entirely speculative how many underlying hyperlinked documents are relevant and material to this case" and "not at all clear that Plaintiffs cannot identify the underlying hyperlinked documents or the quantity that are even material to this action." *Noom*, 2021 WL 948646, at *1, *4. Defendants' proposal that the parties address this on a case-by-case basis is reasonable, proportional, and reflects the realities of the case.

## IV.    **CONCLUSION**

Defendants have agreed to far more search terms and custodians here than ordered by courts, including this one, in other complex litigation and have produced a significant volume of material. Yet, Plaintiffs now request that Defendants indiscriminately apply all search terms to all custodians (including to litigation counsel), thereby increasing the number of irrelevant documents, and then produce without a relevance review all of those irrelevant documents, at significant burden and cost. While Plaintiffs profess an interest in expedient discovery, this relief and their request for additional custodians will needlessly slow down the discovery process when Defendants have already made substantial concessions. The Court should enforce Rule 26 and deny Plaintiffs' Motion to Compel.

Dated: January 26, 2024

Respectfully submitted,

*/s/ Daniel W. Halston*
Daniel W. Halston (BBO # 548692)
Michael G. Bongiorno (BBO # 558748)
Robert Kingsley Smith (BBO # 681914)
Erika M. Schutzman (BBO # 696241)
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
Daniel.Halston@wilmerhale.com
Michael.Bongiorno@wilmerhale.com
Robert.Smith@wilmerhale.com
Erika.Schutzman@wilmerhale.com

*Counsel for Defendants*