# Exhibit E

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

In re PEGASYSTEMS INC. SECURITIES          )          Case No.:  1:22-cv-11220-WGY
LITIGATION                                                    )
                                                                         )

**DECLARATION OF GEOFFREY SHERMAN IN SUPPORT OF DEFENDANTS'**
**OPPOSITION TO LEAD PLAINTIFFS' MOTION TO COMPEL**

I, Geoffrey Sherman, declare as follows:

1.       I am over the age of eighteen years, and I am competent to testify about the matters set forth in this declaration based upon personal knowledge and my experience in the eDiscovery industry.  If called as a witness I could and would testify as stated herein.  I submit this declaration in support of Defendants Pegasystems Inc.'s ("Pegasystems") and Alan Trefler's Opposition to Lead Plaintiff's Motion to Compel.

2.       I am currently employed at Consilio, LLC ("Consilio"), a global leader in eDiscovery and legal technology consulting services that was engaged by Defendants Pegasystems and Alan Trefler ("Defendants") through the law firm WilmerHale in connection with the above-captioned.  My title is Vice President of eDiscovery Solutions.

3.       Consilio supports multinational law firms and corporations using innovative software, cost-effective managed services, and deep legal and regulatory industry expertise. Consilio has extensive experience in eDiscovery and document review. Consilio employs leading professionals in the industry, applying defensible workflows with patented and industry-proven technology across all phases of the eDiscovery lifecycle.

4.       I have 18 years of experience working in eDiscovery and have been employed at Consilio since 2021.  As relevant here, during my 18 years of experience, I have gained expertise in collecting electronically stored information ("ESI") though the Microsoft eDiscovery platform and in processing electronic discovery once collected.

1

5.      Historically, in order to send a document to a recipient via email, an email user needed to attach a static copy of the document to the email.  The recipient of the email received a static copy of the document along with the email.  To access the static copy of the document, the email recipient could "double-click" on the document itself or save the document to their files.

6.      In recent years, Microsoft 365 adopted "modern attachments" (also referred to as "cloud attachments") which consist of hyperlinks embedded in emails that point to a shared file location like Microsoft SharePoint.  Microsoft SharePoint is an example of a platform that helps users share and manage content, such as documents.  To access the "modern attachment," the email recipient needs to click on the hyperlink to open the document.  Unlike traditional attachments that are shared as static files, the recipient of a hyperlinked document must have access to the shared file location the hyperlink points to in order to access the attachment.  There is no static attachment to the email that can be opened.

7.      Collecting email from a custodian using the Microsoft Email platform is commonly accomplished using a Personal Storage Table ("PST") delivery format.  PST delivery format has been the industry standard for Outlook based email collections for over 25 years.  Collecting email from a custodian in PST delivery format has many benefits, including providing the files in compressed container files that allows for industry standard extraction and deduplication prior to loading the contents into a Review Workspace.  Hyperlinked attachments are not collected when using a PST only delivery format.  Consilio is not presently aware of an automated way to collect hyperlinked attachments and the metadata connecting them to related documents using a PST only format.

8.      Within the Microsoft 365 ecosystem, emails may be collected from custodians using a condensed directory structure ("CDS") format.  CDS delivery format is commonly used

when it is necessary to collect hyperlinked attachments and related metadata. The CDS delivery format is designed to be used to collect both hyperlinked attachments and the metadata connecting them to related documents without any custom, manual post-processing work needed to link them together. One potential drawback of the CDS delivery format is that the data is not compressed or deduplicated as provided on export and as such can result in larger, more difficult to manage data volumes. The exported load files are considered "load ready" and may not be subject to deduplication prior to export. The MD5 Hash value presented is not family complete and the values presented are not fully documented by Microsoft as it relates to the email metadata fields utilized. In Consilio's testing the Hash value asserted for Email records may be considered unique in circumstances when messages are in fact identical in metadata elements.

9. Emails may also be collected from custodians using a "PST and Loose Files" delivery format. Using this delivery format, files are collected in a PST and hyperlinked attachments are collected as loose files. Consilio is not aware of an industry accepted metadata value available that automatically connects the hyperlinked attachments to related documents when this export format is utilized and therefore does not offer this service to clients.

10. I have reviewed the language asserted by Jerry Bui of FTI (Dkt. 116-23), which proposed a scripting method aimed at associating hyperlinked attachments to related documents. The script is flawed in several respects and would require manual intervention to execute and may be subject to changes in exports performed with the Microsoft 365 ecosystem due to software updates. Consilio does not have such a script nor do we have an established and vetted methodology for successfully linking hyperlinked attachments to collections completed in the "PST and Loose Files" delivery format. Additionally, emails embedded within a PST and email subjects are not guaranteed to be unique, meaning there is only one document with a specific email

3

subject. Finally, a hyperlinked attachment could be referenced by multiple emails.  However, when the data is processed, there will be only one native document provided for the hyperlinked attachment.  It is not possible to link the hyperlinked attachment to more than one document family in the group identifier field.

11.     Consilio understood that collecting hyperlinked attachments and the metadata identifying the relationship between the hyperlinked attachment and relevant email was a priority for the collections from Pegasystems.  As a result, Consilio provided instructions for Pegasystems IT to export email data using a CDS delivery format.  To the best of my knowledge and belief, Pegasystems IT followed the instructions provided by Consilio when exporting email data using a CDS delivery format.

12.     Pegasystems provided Consilio with an initial collection of email exported in CDS delivery format.  Of approximately 2,000,000 documents that were collected using a CDS delivery format, 9,892 of the documents were hyperlinked attachments, and of those 3,390 were duplicates. As a result, just 6,502 or 0.3% of the documents collected were unique hyperlinked attachments.

13.     Pegasystems later provided Consilio with a supplemental collection of email exported in CDS delivery format.  Consilio informed counsel that deduplication of this supplemental collection, either against itself or of documents presently in the database, was not possible because the files were provided in the CDS delivery format.

14.     Consilio thereafter worked with counsel to develop a custom solution to deduplicate the documents collected in CDS format.  Developing this custom solution required a weeks-long investigation and extensive consultations among many in-house experts at Consilio.  The challenges associated with deduplicating the documents stemmed from the fact that the documents were collected in CDS delivery format, not due to any error in the collection process.  The

conclusion of Consilio's investigation was that only a manual—not automatic—process of deduplication was available for documents collected in CDS format.

15.     The custom, manual process developed by Consilio for deduplicating data provided in CDS delivery format involved processing all natives delivered in the CDS delivery format in the Nuix processing platform to generate MD5 Hash values utilizing known and consistent metadata fields for email records that would enable the documents to be treated in the same manner as other documents that were ingested in Nuix.  The Family complete, generated MD5 Hash can be used to identify potential duplicates that could be tagged as such.   Further consultation with counsel would be needed to determine whether those tagged duplicates should be left in the review population, moved to a near-line database, or removed.

16.     Consilio determined that it was necessary to generate  a standardized MD5 Hash value in order to deduplicate the data provided in CDS delivery format because this will allow for deduplication on a family level and consistency across ESI collection sources.  This also preserves the relationship between emails and file attachments.

17.     Using this custom, manual process, Consilio undertook to deduplicate the documents presently in the database.  Consilio estimated that it would take approximately 230 to 270 hours of manual work to attempt to deduplicate the supplemental collection of data.   Consilio could not guarantee that the deduplication process would be as successful as a traditional PST based processing method.  Consilio also cautioned that there was added risk of error in proceeding this way in part due to the manual process involved.

18.     I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 26th day of January, 2024, in Merrick, NY, 11566.

*Geoffrey Sherman*

Geoffrey Sherman

6