**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

In re PEGASYSTEMS INC. SECURITIES            )          Case No.:  1:22-cv-11220-WGY
LITIGATION                                                     )
————————————————————————)

OPPOSITION TO LEAD PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ................................................................................................1

II.    BACKGROUND ..................................................................................................3

    A.    Plaintiffs' Variegated Theories of Liability ...............................................4

    B.    Plaintiffs' Proposed Means of Proving Classwide Damages...................5

    C.    Report of Prof. Amy Hutton ......................................................................7

III.    LEGAL STANDARD...........................................................................................7

IV.    ARGUMENT .......................................................................................................9

    A.    Plaintiffs Have Not Met Their Burden of Proving That Damages Can Be Proven on a Classwide Basis ...........................................................9

    B.    Plaintiffs Have Not Proven that Their Damages Model Will Identify Only Those Damages Caused by Their Theories of Liability .....................13

        1.    Plaintiffs Have Not Proven That Their Damages Model Can Disaggregate Harm Caused By Materialization of an Undisclosed Risk From Materialization of a Disclosed Risk .......................................14

        2.    Plaintiffs Have Not Proven that Their Damages Model Can Disaggregate Out-of-Pocket Damages for Each Theory of Misrepresentation or Omission ...............................................................17

V.    CONCLUSION..................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*In re Acuity Brands, Inc. Sec. Litig.*,
    2020 WL 5088092 (N.D. Ga. Aug. 25, 2020) ........................................................20

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)..............................................................................................5, 14

*In re Cabletron Sys., Inc.*,
    311 F.3d 11 (1st Cir. 2002)........................................................................................18

*Cheng v. Activision Blizzard, Inc.*,
    2022 WL 2101919 (C.D. Cal. Apr. 18, 2022) ..........................................................18

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013).......................................................................................... *passim*

*In re Dial Complete Mktg. & Sales Pracs. Litig.*,
    312 F.R.D. 36 (D.N.H. 2015) ...................................................................................13

*Dougherty v. Esperion Therapeutics, Inc.*,
    2020 WL 2832252 (E.D. Mich. May 31, 2020)........................................................20

*Fort Worth Emp'rs Ret. Fund v. Biovail Corp.*,
    615 F. Supp. 2d 218 (S.D.N.Y. 2009).......................................................................16

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014)................................................................................................7, 14

*In re Hydrogen Peroxide Antitrust Litig.*,
    552 F.3d 305 (3d Cir. 2008)......................................................................................13

*Indiana Pub. Ret. Sys. v. AAC Holdings, Inc.*,
    2023 WL 2592134 (M.D. Tenn. Feb. 24, 2023) .......................................................15

*Loritz v. Exide Techs.*,
    2015 WL 6790247 (C.D. Cal. July 21, 2015)............................................................9, 19

*Ludlow v. BP, PLC*,
    800 F.3d 674 (5th Cir. 2015) ....................................................................................15

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
    522 F.3d 6 (1st Cir. 2008)...............................................................2, 8, 10, 13, 19

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  259 F.3d 154 (3d Cir. 2001).............................................................................13

*In re Nexium Antitrust Litig.*,
  777 F.3d 9 (1st Cir. 2015)..................................................................7, 19, 20

*In re Nexium (Esomeprazole) Antitrust Litig.*,
  297 F.R.D. 168 (D. Mass. 2013).........................................................................8

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
  2018 WL 3861840 (N.D. Ohio, Aug. 14, 2018) ............................................ *passim*

*In re Polymedica Corp. Sec. Litig.*,
  453 F. Supp. 2d 260 (D. Mass. 2006) ...............................................................1, 7

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  725 F.3d 244 (D.C. Cir. 2013)...........................................................................9

*Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*,
  301 F.R.D. 116 (S.D.N.Y. 2014) ..................................................................8, 9, 10

*City of Sunrise Gen. Emps.' Ret. Plan v. FleetCor Techs., Inc.*,
  2019 WL 3449671 (N.D. Ga. July 17, 2019)...........................................................20

*City of Miami Gen. Emps.' Ret. Tr. v. RH, Inc.*,
  2018 WL 4931543 (N.D. Cal. Oct. 11, 2018).........................................................20

*Sicav v. James Jun Wang*,
  2015 WL 268855 (S.D.N.Y. Jan. 21, 2015) ......................................................2, 8, 10

*Weiner v. Tivity Health, Inc.*,
  334 F.R.D. 123 (M.D. Tenn. 2020) ...................................................................20

**State Cases**

*Pegasystems Inc. v. Appian Corp.*,
  No. 2020-7216 (Va. Ct. App.) ..........................................................................3

*Powell v. Sears, Roebuck & Co.*,
  231 Va. 464 (1986) ....................................................................................3

*Solentus, Inc. v. Lam*,
  2017 WL 9833483 (Va. Cir. Ct. May 4, 2017)........................................................3

**Other Authorities**

Va. Sup. Ct. R. 3:2(c)(ii)................................................................................3

## I.    **INTRODUCTION**

Plaintiffs[1] have offered only a barebones description of an as-yet unconstructed damages model by Prof. Steven Feinstein that they assert is capable of calculating damages on a classwide basis in support of their Motion for Class Certification ("Motion").  The described model is insufficiently specific, does not account for the complexities of this case, does not satisfy the requirements mandated by the Supreme Court in *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), and has been previously rejected by Courts for these very reasons.  *See, e.g., Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840, at *19 (N.D. Ohio, Aug. 14, 2018), *rev'd and remanded on appellate jurisdictional grounds*, 64 F.4th 731 (6th Cir. 2023) ("*OPERS*"). As a result, Plaintiffs have not met their burden to prove by a preponderance of the evidence that the putative class warrants certification pursuant to Rule 23(b)(3).

*Comcast* requires plaintiffs seeking to certify a class to demonstrate that "damages are capable of measurement on a classwide basis."  569 U.S. at 34.  And "a model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to th[e] theory" of liability pursued.  *Id.* at 35.  In evaluating whether Plaintiffs satisfy this requirement and meet their burden under Rule 23(b)(3), "there must be a 'rigorous analysis'" of the evidence offered.  *In re Polymedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260, 265 (D. Mass. 2006) (Young, J.) (citing *In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 6 (1st Cir. 2005)); *see also Comcast*, 569 U.S. at 33.

To try meet their burden, Plaintiffs rely on the report of Prof. Steven Feinstein.  But the defects of Prof. Feinstein's report are fatal to Plaintiffs' Motion:

---

[1]      Lead Plaintiffs are Central Pennsylvania Teamsters Pension Fund – Defined Benefit Plan, Central Pennsylvania Teamsters Pension Fund – Retirement Income Plan 1987, and Construction Industry Laborers Pension Fund.

*First*, Prof. Feinstein's report gives no more than a generic description of a hypothetical damages model, replete with references to unspecified "valuation tools" and "empirical analysis," but devoid of any details about how the model applies to the facts and circumstances of *this* litigation.  Prof. Feinstein's description is virtually indistinguishable from his reports previously rejected as impermissibly "vague, indefinite, and unspecific."  *See, e.g*, *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840, at *19 (N.D. Ohio, Aug. 14, 2018), *rev'd and remanded on appellate jurisdictional grounds*, 64 F.4th 731 (6th Cir. 2023) ("*OPERS*"); *Sicav v. James Jun Wang*, 2015 WL 268855, at *6 (S.D.N.Y. Jan. 21, 2015) (faulting Prof. Feinstein's "[l]ack of explanation as to how damages would be proven").

*Second*, Prof. Feinstein's description of a generic model provides no assurance that, as required by *Comcast*, it will identify only the damages attributable to Plaintiffs' theories of liability on which they prevail.  569 U.S. at 35.  Plaintiffs have failed to prove that Prof. Feinstein's described model offered to prove damages that flow from a theory of liability in which class members relied on the integrity of the market price (entitling the class to out-of-pocket damages) can disaggregate the damages that flow instead from a theory of liability in which class members rely specifically on statements misrepresenting the prospect of a substantial judgment against Pegasystems which was disclosed on February 16, 2022 (entitling the class to consequential damages).  Plaintiffs have also failed to prove that Prof. Feinstein's described model can disaggregate stock price inflation associated with each of Plaintiffs' varying theories of misrepresentation or omission, which range from statements about sales performance and intellectual property rights to publicly reported financials, all of which cannot result in the same amount of price inflation as Prof. Feinstein assumes.  Because Plaintiffs have not shown that they can "separate[] out" these damages, *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522

F.3d 6, 27 (1st Cir. 2008), or disaggregate damages "according to the type of misrepresentation corrected," *In re BP plc Sec. Litig.*, 2013 WL 6388408, at \*16–17 (S.D. Tex. Dec. 6, 2013), they have not met their burden under Rule 23(b)(3).

For these and the additional reasons set forth below, Plaintiffs' Motion should be denied.

## II.    <u>BACKGROUND</u>

This putative securities class action follows a lawsuit brought by Appian Corporation ("Appian") against Pegasystems Inc. ("Pegasystems" or the "Company") in Virginia state court for alleged misappropriation of trade secrets ("Virginia Litigation").  The plaintiff in the Virginia Litigation originally sought damages in the amount of $90 million, *see* Consolidated Amended Compl. (ECF No. 61) ("CAC") ¶ 175, which under Virginia law acted as a cap on their total recovery in the lawsuit, *see* Va. Sup. Ct. R. 3:2(c)(ii); *Powell v. Sears, Roebuck & Co.*, 231 Va. 464, 469 (1986) ("In Virginia, a plaintiff cannot recover more than he sues for though he can recover less."); *Solentus, Inc. v. Lam*, 2017 WL 9833483, at \*4 (Va. Cir. Ct. May 4, 2017) ("[T]he *ad damnum* sets a cap on the amount recoverable by the plaintiff.").

Appian later amended its complaint, this time seeking $3 billion in damages, and Pegasystems shortly thereafter, on February 16, 2022, disclosed the litigation, cautioning that there was "uncertainty as to how a jury may rule."  CAC ¶ 145.  The Company also disclosed that it "believe[d] the claims brought by Appian against the Company [we]re without merit, that the Company ha[d] strong defenses to these claims and that, among other things, even were the jury to find that the Company misappropriated Appian's alleged trade secrets, any alleged damages claimed by Appian [we]re not supported by the necessary legal standard of proximate cause."  *Id.* On May 9, 2022, the jury unexpectedly awarded Appian roughly $2 billion in damages.  Defs.' Mem. in Support of Mot. to Dismiss (ECF No. 65) at 5.  The Virginia Litigation is presently on

appeal; oral argument was heard by the Virginia Court of Appeals on November 15, 2023. *See Pegasystems Inc. v. Appian Corp.*, No. 2020-7216 (Va. Ct. App.).

Plaintiffs filed the Consolidated Amended Complaint in this action on October 18, 2022, alleging that Pegasystems and certain executives had made false and misleading misstatements and omissions between June 16, 2020 and May 9, 2022 that allegedly inflated the value of Pegasystems's common stock, causing them damage. *See* CAC ¶ 120.

### A.    Plaintiffs' Variegated Theories of Liability

As Plaintiffs acknowledge, the Consolidated Amended Complaint asserts theories of liability that are grounded in "numerous" and disparate alleged misstatements and omissions. Pls.' Mem. in Support of Mot. for Class Certification (ECF No. 109) at 3 ("Mot."). These include: statements about sales practices, competitive position, intellectual property rights, SOX certifications, the Company's Code of Conduct, CAC ¶ 120; allegations that Pegasystems's SEC filings included financial statements that were materially misstated, *id.* ¶¶ 162–96; and allegations that statements in several of these filings regarding the risk of material litigation were materially misleading because they did not disclose the existence of the Virginia Litigation, and, when that litigation was disclosed, did not accurately disclose the risk of liability, *id.* ¶¶ 120, 136.

As for damages, Plaintiffs claim that they—and the putative class—sustained economic losses when the market reacted to three events that, in various ways, supposedly corrected each of the different and variegated statements Plaintiffs challenge:

*First*, Plaintiffs allege that the Company's disclosure of the Virginia Litigation in its Form 10-K filed on February 16, 2022—which disclosed the risk of $3 billion in damages and "uncertainty as to how a jury may rule"—corrected certain of the challenged statements, causing Pegasystems's stock price to fall. *See* Mot. at 3; CAC ¶¶ 145, 243.

*Second*, Plaintiffs allege that the Company's disclosure on May 9, 2022 that a jury had found Pegasystems liable in the Virginia Litigation for over $2 billion corrected certain of the challenged statements, including the February statement disclosing the risk of a $3 billion verdict, causing Pegasystems's stock price to fall.  *See* Mot. at 3–4; CAC ¶ 244.

*Third*, Plaintiffs allege that the Company's disclosure on September 16, 2022 that the trial court in the Virginia Litigation had rejected post-trial challenges to the verdict and entered judgment in favor of Appian, caused Pegasystems's stock price to fall, *see* Mot. at 4; CAC ¶ 247, removing any remaining inflation from the stock price.

### B.      Plaintiffs' Proposed Means of Proving Classwide Damages

In an attempt to meet their burden of proving that the putative class can be certified pursuant to Rule 23(b)(3), Plaintiffs have offered a 47-page report prepared by Prof. Steven P. Feinstein.  Dkt. 110-1 at Ex. 1 ("Feinstein Report").

The overwhelming majority of the Feinstein Report is devoted to a recitation of evidence and analysis that Prof. Feinstein conducted to support his opinion that Pegasystems's stock traded in an efficient market during the alleged class period, *see* Feinstein Report ¶¶ 34–147, the factual predicate to Plaintiffs' invocation of the "presumption of reliance" afforded by *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), *see* Mot. at 11–17.[2]  To prove market efficiency, the Feinstein Report marshals facts regarding, for example, Pegasystems's trading volume (¶¶ 56–58), Company coverage by securities analysts (¶¶ 62–63) and news media (¶ 70), and its market capitalization during the alleged class period (¶ 90), all specific to the circumstances of this case.  The Feinstein Report also applies an event study methodology to evidence Pegasystems stock price movement (¶¶ 109, 139–44), which Prof. Feinstein claims is evidence of market efficiency.

---

[2]      Defendants do not contest Prof. Feinstein's analysis of whether the market for Pegasystems stock was efficient during the alleged class period.

In stark contrast to these specific, marshalled facts and applied analysis to prove market efficiency, the Feinstein Report spends just a handful of paragraphs describing a *hypothetical and vague* damages model that Prof. Feinstein summarily asserts will be capable of proving damages on a classwide basis. *See id.* ¶¶ 148–59. Far from conducting any analysis, Prof. Feinstein simply asserts that he will use an event study and unspecified "valuation tools" and "empirical analyses" to establish that the Company's stock was artificially inflated, to construct an "inflation ribbon" indicating the extent of such inflation during the alleged class period, and to calculate, based on the stock price drops, the reduction in the inflation over the period in which each putative class member held their stock. *Id.* ¶ 157(i)-(ii).[3]

Prof. Feinstein also does not explain how the hypothetical model that he describes will be constructed given the facts and circumstances of *this* case. No facts specific to this case are identified or recited, and no evidence or analysis is conducted. Indeed, Prof. Feinstein readily admits that he has not constructed or applied his described model; he has not "computed damages as of this time"—"nor ha[s] [he] been asked to do so." Feinstein Report ¶ 150.

Lastly, and contrary to *Comcast*, Prof. Feinstein does not explain how his model will ensure that it will not calculate damages for a theory not pursued (putative class members would not have bought Pegasystems stock at all but for the allege misrepresentations) instead of the one pursued (putative class members bought at an inflated price), or how it will calculate damages classwide when different challenged statements at different times caused different amounts of supposed inflation. Indeed, Prof. Feinstein makes no effort at such an explanation. *See id.* ¶ 153 (asserting that unspecified "[e]conomic analyses, including valuation and empirical event study analysis, can

---

[3]        This method is commonly known as "backcasting," *see* Decl. of Robert Kingsley Smith, Ex. 1, Report of Amy Hutton, Ph.D. ¶ 31 ("Hutton Report"), and assumes the drop or drops in stock price at the end of the class period are a fair measure of the original price inflation.

be used to estimate the relationship between specific statements or sets of statements and the subsequent effect on stock prices").

On this slender reed of Prof. Feinstein's say-so, Plaintiffs assert—in less than one page— that common questions of damages predominate such that a damages methodology consistent only with Plaintiffs' theory of liability can be applied to all class members, and the putative class can be certified pursuant to Rule 23(b)(3).  *See* Mot. at 19; Feinstein Report ¶¶ 151, 158.

### C.        Report of Prof. Amy Hutton

The report by Prof. Amy Hutton, filed with Defendants' opposition, responds to the Feinstein Report.  As Prof. Hutton explains, the Feinstein Report offers little more than a "definition" of damages, as opposed to a methodology that is capable of reliably measuring classwide damages in the circumstances of this case.  Hutton Report ¶ 46.  Prof. Hutton further explains that the Feinstein Report does not show how its proposed methodology is capable of disaggregating harms associated with theories of liability Plaintiffs do not pursue.  *Id.* ¶¶ 30–56.

## III.   LEGAL STANDARD

The Court may certify a class under Rule 23(b)(3) only if Plaintiffs "actually *prove*"— rather than "simply plead"—that questions common to the class predominate over individual ones. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014).  And they must do so "by a preponderance of evidence."  *In re Nexium Antitrust Litig.*, 777 F.3d 9, 27 (1st Cir. 2015) (quoting *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012)).  In evaluating whether plaintiffs meet their burden under Rule 23, a court must conduct a "rigorous analysis" of the evidence specific to the case before it.  *Comcast*, 569 U.S. at 33; *see In re Polymedica Corp. Sec. Litig.*, 453 F. Supp. 2d at 265 (citing *In re PolyMedica Corp. Sec. Litig.*, 432 F.3d at 6) (same).

When certifying a damages class, Plaintiffs must prove that "damages are capable of measurement on a classwide basis." *Comcast*, 569 U.S. at 34. Plaintiffs' say-so—or an expert's bare assertion regarding what he says he might be able to do but has not done yet—does not suffice. *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d at 29 (vacating class certification for want of "a more thorough explanation of how the pivotal evidence behind plaintiffs' theory can be established" by the expert's proposed methodology); *see also Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 141–42 (S.D.N.Y. 2014) ("Without assurance beyond [an expert's] say-so," courts "cannot conclude that there is a damages model that will permit the calculation of damages on a classwide basis.").

Instead, Plaintiffs must prove "concretely" how damages would be proven given the specific theories of liability alleged and the specific facts presented in the case. *Sicav*, 2015 WL 268855, at *6; *cf. In re Nexium (Esomeprazole) Antitrust Litig.*, 297 F.R.D. 168, 181 (D. Mass. 2013) (Young, J.) (conducting a "careful review" of competing expert reports to identify "conclusions that appear based on the *application of reliable principles and methods to the presented facts*" (emphasis added)), *aff'd sub nom. In re Nexium Antitrust Litig.*, 777 F.3d 9 (1st Cir. 2015) ("*Nexium (D. Mass.)*").

Proposing a means of proving classwide damages that calculates damages for theories of liability that Plaintiffs do not (or cannot) pursue is insufficient. *Comcast*, 569 U.S. at 34; *cf. Nexium (D. Mass.)*, 297 F.R.D. at 181 ("Dr. Rosenthal's aggregate damages calculation reflects these theories of antitrust impact (generic foreclosure) and, therefore, has laid out a damages case 'consistent with its liability case'") (quoting *Comcast*, 569 U.S. at 35). Rather, Plaintiffs must prove that damages that are "the result of the wrong" alleged can be proven on a classwide basis. *Comcast*, 529 U.S. at 37. If a proposed damages model "cannot withstand this scrutiny" at class

certification, the class cannot be certified: "No damages model, no predominance, no class certification." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 253 (D.C. Cir. 2013); *see OPERS*, 2018 WL 3861840, at *19 (in addressing Prof. Feinstein's report, holding that a "vague, indefinite, and unspecific" damages model and descriptions of "unspecified 'tools' available to measure damages" amounts to "no damages model at all") (quoting *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 552 (C.D. Cal. 2014)).

## IV.   <u>ARGUMENT</u>

Plaintiffs' Motion for Class Certification fails for two related reasons. *First*, Plaintiffs have not met their burden of proving that damages can be proven on a classwide basis because the Feinstein Report gives no more than a generic description of a hypothetical damages model untethered to the facts of this case. *Second*, Plaintiffs have not proven that Prof. Feinstein's described damages model will identify only damages attributable to their theory of liability, or can disaggregate theories that are based on qualitatively different statements that necessarily produce different levels of alleged price inflation.

### A.   **Plaintiffs Have Not Met Their Burden of Proving That Damages Can Be Proven on a Classwide Basis**

As numerous courts have held, a barebones description of a hypothetical damages model is insufficient to prove that damages in a putative securities class action can be proven on a classwide basis. *See, e.g.*, *OPERS*, 2018 WL 3861840, at *19–20 (denying class certification); *J.P. Morgan Chase & Co.*, 301 F.R.D. at 141–42 (denying class certification); *In re BP plc Sec. Litig.*, 2013 WL 6388408, at *16–17 ("Without a more complete explication of how Plaintiffs propose to use an event study to calculate class members' damages, and how that event study will incorporate—and, if necessary, respond to—the various theories of liability, the Court cannot certify this litigation for class action treatment."; denying class certification); *Loritz v. Exide*

*Techs.*, 2015 WL 6790247, at *22 (C.D. Cal. July 21, 2015) (rejecting model because it "fail[ed] to tie" techniques described to "the facts of this case"; denying class certification); *Sicav*, 2015 WL 268855, at *4, 6 (explaining that courts "must understand, concretely, how plaintiffs propose to reliably establish damages" and that a report by Prof. Feinstein fell short of the "concrete presentation" that would support such a finding; denying class certification). That is because "[w]ithout more specificity" a court cannot "be certain" that damages can be calculated on a classwide basis. *J.P. Morgan Chase & Co.*, 301 F.R.D. at 141. Moreover, as the First Circuit has explained, "[i]f there is no realistic means of [classwide] proof, many resources will be wasted setting up a trial that plaintiffs cannot win." *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d at 29.

*OPERS* is particularly instructive. In that case, the plaintiffs claimed that the defendants did not accurately disclose certain risks to the market. 2018 WL 3861840, at *18. To satisfy their burden of showing that they could prove damages on a classwide basis and therefore certify the putative class, the plaintiffs offered an expert declaration of Prof. Feinstein that "describe[d] . . . various techniques he believe[d] he could use to calculate out-of-pocket damages based on inflation that can be applied on a classwide basis to determine damages[.]" *Id.* at *19. Specifically, as he does here, in that case Prof. Feinstein asserted that he had not been asked to "calculate damages for any of the claims alleged on behalf of the class"—and therefore had not. Decl. of Steven P. Feinstein ¶ 154, *OPERS*, Dkt. No. 4:08-cv-00160 (N.D. Ohio, June 12, 2017), ECF No. 372-3.[4] As in this case, there Prof. Feinstein stated that he would use an event study and unspecified "valuation tools" and "empirical analyses" to establish that the misstatements caused the stock to be artificially inflated and that the corrective disclosures caused the inflation to

---

[4]     Prof. Feinstein's report in *OPERS* is attached as Exhibit 2 to the Declaration of Robert Kingsley Smith.

dissipate; use unspecified "valuation tools" and "empirical analysis" to construct an "inflation ribbon" indicating how much "artificial inflation" caused by the challenged statements and omissions was in the stock on each day of the class period; and calculate the reduction in the inflation over the period in which each putative class members held their stock.  *Id.* ¶ 152(i)-(ii). Prof. Feinstein asserted that he would "take into account all relevant valuation factors" and "do so correctly"—without explanation of what that would entail.  *Id.* ¶ 155.

Faced with this "vague, indefinite, and unspecific" description of a damages model, the court held that it was not sufficient to support class certification.  *OPERS*, 2018 WL 3861840, at *19.  The court explained that, when a plaintiff presents such a vague model "or simply asserts (as did Prof. Feinstein) that there are unspecified 'tools' available to measure damages, the model amounts to 'no damages model at all,' and the class cannot be certified."  *Id.* (quoting *In re ConAgra Foods, Inc.*, 302 F.R.D. at 552).

The same defects characterize the Feinstein Report in this case.  Here, too, Prof. Feinstein admits that he "ha[s] not yet been asked to calculate damages."  Feinstein Report ¶ 159.  He summarily asserts that he will use unspecified "valuation tools" and "empirical analyses" to establish that the alleged misstatements caused Pegasystems's stock to be artificially inflated and that the corrective disclosures caused the inflation to dissipate.  *Id.* ¶ 157.  He asserts that he will again use unspecified "valuation tools" and "empirical analysis"—whether Prof. Feinstein means the same "tools" or "analysis" or different ones is impossible to tell—to construct an "inflation ribbon" indicating how much "artificial inflation" was in the stock on each day of the class period. *Id.*  And Prof. Feinstein asserts that he will then calculate the reduction in the inflation over the period in which each putative class members held their stock—but has not done so.  *Id.*

Prof. Feinstein's vague descriptions do not end there. He also summarily asserts that his review of "Plaintiffs' allegations" and of the unspecified "experience of the Company over the course of the Class Period uncovered no facts or circumstances that are extraordinarily unusual or might make application of [his purported] methodology exceptionally difficult." *Id.* ¶ 157(iii). What Pegasystems's "experience" is over two-plus years, and what might qualify as "extraordinarily unusual" or "exceptionally difficult" is anyone's guess. And Prof. Feinstein then provides an abstract assurance that "[t]o the extent that there may be specific issues complicating the quantification of artificial inflation encountered in the execution of the out-of-pocket damages methodology due to any potentially unique facts and circumstances of this case, the standard tools of valuation analysis can be applied as needed." *Id.* ¶ 154. In essence, Prof. Feinstein says little more than, "I'm an expert, trust me."

But Prof. Feinstein cannot simply be taken at his word without scrutiny and "rigorous analysis." *Comcast*, 569 U.S. at 33. As Prof. Hutton demonstrates, Prof. Feinstein's perfunctory and speculative description of what he *may* do does not prove that he *can in fact* calculate damages on a classwide basis. As Prof. Hutton explains, what Prof. Feinstein proposes is to calculate "out-of-pocket" damages, or "the difference between the amount of stock price inflation at purchase and the amount of inflation in the stock price at sale." Hutton Report ¶ 30 (citing Feinstein Report ¶ 152). But this reflects only a "*definition* of damages, rather than a meaningful description of a reliable methodology" for calculating classwide damages. *Id.* ¶ 46. Prof. Feinstein does not explain, "even in general terms," how "standard tools of valuation analysis" would be employed. *E.g.*, *id.* ¶¶ 12, 33. In short, the approach proposed by Prof. Feinstein is "akin to saying that one can use 'calculus' to solve a math problem without explaining how 'calculus' is even relevant to solving the particular math problem under consideration." *Id.* ¶ 46.

For these reasons, as in *OPERS*, Prof. Feinstein's vague description of what he may do does not suffice. 2018 WL 3861840, at *19. Prof. Feinstein "simply has not provided the court with sufficient details to permit a full assessment of whether damages can be feasibly calculated on a classwide basis." *In re Dial Complete Mktg. & Sales Pracs. Litig.*, 312 F.R.D. 36, 79 (D.N.H. 2015). And he has offered the type of untested, speculative "assurance" that courts deem insufficient for purposes of class certification. *See In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 318 (3d Cir. 2008), *as amended* (Jan. 16, 2009) ("A party's assurance to the court that it intends or plans to meet the requirements is insufficient."). Indeed, "there can be no assurance" that the "valuation tools" referenced will provide a reliable methodology in this case. Hutton Report ¶ 46. Rather than have experts "assert[] in a purely conclusory manner" that proof can be provided, courts require "a more thorough explanation of *how* the pivotal evidence behind plaintiff's theory can be established." *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d at 29; *see also Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 191 (3d Cir. 2001), *as amended* (Oct. 16, 2001) (expressing "hesita[tion] to rely on a formulaic nostrum given the consequences if it fails to meet expectations"). Plaintiffs and Prof. Feinstein have not provided this "more thorough" explanation, and the Motion for Class Certification thus fails.

**B.     Plaintiffs Have Not Proven that Their Damages Model Will Identify Only Those Damages Caused by Their Theories of Liability**

In the alternative, even if Prof. Feinstein's abbreviated description of a hypothetical model would be sufficient to satisfy a plaintiff's burden in *some* cases, it does not suffice given the specific facts and complexities of *this case*. This is for two reasons. *First*, Plaintiffs have not proven that the damages model that Prof. Feinstein describes can disaggregate damages caused by the materialization of an undisclosed risk from the materialization of a disclosed risk, which must necessarily be excluded from any inflation associated with the disclosures that post-dated the

February 16, 2022 disclosure of the Virginia Litigation. *Second*, Plaintiffs also have not proven that the described model can disaggregate out-of-pocket damages for each theory of misrepresentation or omission liability that Plaintiffs allege, all of which involve varying degrees of price inflation.

### 1. Plaintiffs Have Not Proven That Their Damages Model Can Disaggregate Harm Caused By Materialization of an Undisclosed Risk From Materialization of a Disclosed Risk

Certain statements that Plaintiffs challenge—in particular, statements that the Virginia Litigation was "without merit," *see, e.g.*, CAC ¶¶ 114, 145—lend themselves to at least two possible theories of liability:

The first theory is that Plaintiffs and the putative class relied upon the "integrity" of the market price. *Halliburton*, 573 U.S. at 268 (citing *Basic*, 485 U.S. at 247). This theory, if proven, would entitle Plaintiffs to the difference between the price at which Pegasystems's stock was bought and sold and the price at which the putative class *would* have bought and sold Pegasystems's stock had Defendants accurately disclosed the risk of liability in the Virginia Litigation—*i.e.*, the amount they are "out-of-pocket" as a result of the Defendants' alleged fraud. Hutton Report ¶ 30. As Prof. Hutton explains, calculating those damages correctly means differentiating between the portions of the drop in Pegasystems's stock price following the May 9, 2022 verdict in the Virginia Litigation that are associated with (i) the materialization of the disclosed risk of an adverse outcome to Pegasystems in the Virginia Litigation; and (ii) the correction of the allegedly misrepresented portion of that risk. *Id.* ¶¶ 36–37, 43–45. Plaintiffs are entitled only to the latter portion.

The second theory is that Plaintiffs and the putative class relied upon Pegasystems's concealment of the true risk of liability in the Virginia Litigation and would not have purchased Pegasystems's stock *at all* had Pegasystems's disclosure been accurate. Under this theory,

members of the putative class would be entitled to the full amount of the stock drop following the jury verdict—*i.e.,* the harm they incurred as a consequence of purchasing stock they otherwise would not have purchased. *See Ludlow v. BP, PLC*, 800 F.3d 674, 689 (5th Cir. 2015) (explaining that materialization of the risk damages constitute the full drop in share price upon materialization of the undisclosed risk, rather than the portion of the drop caused by the fraud that can be backcast to estimate the purported inflation in the share price); *see also Indiana Pub. Ret. Sys. v. AAC Holdings, Inc.*, 2023 WL 2592134, at *23 (M.D. Tenn. Feb. 24, 2023) (citing *Ludlow* and *Mulderrig v. Amyris, Inc.*, 340 F.R.D. 575 (N.D. Cal. 2021)).

Plaintiffs here proceed only on the first theory, *see* Mot. at 11–17, likely because the second involves "individualized inquiry" into questions of reliance that would defeat predominance. *Ludlow*, 800 F.3d at 690. But the problem is that the damages model that Prof. Feinstein states he will develop, in fact, measures damages for the theory Plaintiffs do *not* plead. This is because Prof. Feinstein assumes Plaintiffs should recover based on the entire May 9, 2022 stock price drop, which would reflect damages for the materialization of both the disclosed and undisclosed risk rather than the more limited "out-of-pocket" damages that would be consistent with Plaintiffs' theory of liability. Consequently, Prof. Feinstein's proposed model does not measure damages for the theory Plaintiffs do plead because it fails to disaggregate damages for *understating* the risk of an adverse jury verdict from damages that simply reflect materialization of the risk that Pegasystems disclosed of such an outcome. As Prof. Hutton explains, the Virginia Litigation and the risk of an Appian win were clearly disclosed, and therefore part of the drop was simply from the materialization of this already known risk. Hutton Report ¶¶ 43–44; *see also Fort Worth Emp'rs Ret. Fund v. Biovail Corp.*, 615 F. Supp. 2d 218, 229 (S.D.N.Y. 2009) (where underlying trial data had been disclosed, "decline in the price of [company's] stock price following the . . .

announcement that the FDA had not approved the [drug] application . . . was caused by the agency's failure to approve the drug—not by any 'corrective' disclosure of some prior untruth").

Prof. Feinstein does not even mention this complication.  *See* Feinstein Report ¶ 157.  As noted above, he only states vaguely that "standard tools of valuation analysis can be applied as needed" to any "issues" complicating the quantification of damages based on the "unique facts and circumstances of this case."  *Id.* ¶ 154.  Thus, the damages that Prof. Feinstein is purporting to model are those to which the putative class would be entitled if the theory of liability was that they would not have purchased Pegasystems stock at all, not the price inflation theory.  *Compare id.* ¶¶ 154–57, *with* Pls.' Mem. in Opp'n to Defs.' Mot. to Dismiss (ECF No. 71) at 30 n.46 (arguing that "Defendants here continued to conceal the true risk posed by the Virginia [Litigation] even after they disclosed the existence of the litigation in February 2022," and that "[i]t was the *materializing of this concealed risk*—the true extent and likelihood of Pega's liability—which only occurred in May and September 2022, that caused Plaintiffs' losses") (emphasis added).

Plaintiffs' failure here is contrary to the requirements established by the Supreme Court in *Comcast*.  In that case, the Supreme Court made clear that "a model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to th[e] theory" of liability pursued.  569 U.S. at 35.  "If the model does not even attempt to do that," however, "it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)."  *Id.*  The plaintiffs in *Comcast* had not met their burden because their proposed model calculated aggregate damages for four different theories of liability; three were dismissed; and the damages model could not disaggregate damages associated with the one that was sustained from the three that were dismissed.  *Id.* at 36–37.  Consequently, there was a mismatch between the model and the theory of damages being pursued.  *Id.*

As just described, that is exactly the problem here: a mismatch exists between the damages captured by the described model and the theory of liability pursued.  Thus, Prof. Feinstein's model "cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)."  *Id.* at 35.

> **2.**  **Plaintiffs Have Not Proven that Their Damages Model Can Disaggregate Out-of-Pocket Damages for Each Theory of Misrepresentation or Omission**

Plaintiffs' attempt to certify the alleged class fails for the independent reason that Prof. Feinstein's described damages model does not disaggregate out-of-pocket damages for each of the various theories of misrepresentation or omission that Plaintiffs advance, which may result in different amounts of price inflation.

As explained above, *see supra* Part II.A, Plaintiffs admit that they have theories of liability grounded in "numerous" and disparate alleged misstatements and omissions.  Mot. at 3.  These include:

- "statements touting Pega's competition and sales and marketing practices" (CAC ¶ 120);

- "statements concerning Pega's competitors' intellectual property rights" (*id.*);

- "statements regarding Pega's Code and ethical practices" (*id.*);

- "statements concerning defendants' compliance with the federal securities laws" (*id.*);

- allegations that Pegasystems's financial statements, as reported to the Securities and Exchange Commission on Forms 10-Q and 10-K, were materially misstated (*id.* ¶ 120); and

- allegations that statements in several of these SEC filings regarding the risk of material litigation were materially misleading because they did not disclose the existence of the Virginia Litigation, and, when that litigation was disclosed, did not accurately disclose the risk of liability.  *Id.* ¶¶ 120, 136.

Plaintiffs allege that "[e]ach of these types" of statements or omissions, *id.* ¶ 120, were materially false and misleading when made, *e.g.*, *id.* ¶ 143.

But each of these theories relies on *different* statements made at *different* times during the alleged class period when different and varying information was available to both the market and the Company. Moreover, each of the challenged statements, if material at all, are of *varying* materiality and therefore importance to investors. For example, there is no basis for assuming that a misstatement in the Company's Code of Conduct is equally material to investors (and therefore results in the same amount of price inflation), especially when most courts have concluded such statements are merely aspirational, *see, e.g.*, *Cheng v. Activision Blizzard, Inc.*, 2022 WL 2101919, at *9–10 (C.D. Cal. Apr. 18, 2022), as a statement in a SOX certification, statements about competitive position, a technical violation of a reporting requirement or, most obviously, the alleged concealment of a substantial claim by a competitor and then allegedly mischaracterizing that claim when it was disclosed, *see, e.g.*, *In re Cabletron Sys., Inc.*, 311 F.3d 11, 34–37 (1st Cir. 2002) (evaluating distinct potential materiality of SEC filings, direct statements by defendant company or its executives, and statements by third-party analysts). Given the different qualitative nature of each of these challenged statements and omissions, there is no reason to assume (as Prof. Feinstein implicitly does, without explanation) that each alleged misstatement would have injected the same amount of inflation into Pegasystems's common stock. *See* Feinstein Report ¶ 153.

Because they are entitled to different out-of-pocket damages depending on the alleged misstatements and omissions for which Defendants may ultimately be liable, Plaintiffs need to demonstrate that they can prove, on a classwide basis, the damages associated with each of these theories of liability. *See Comcast*, 569 U.S. at 35 (explaining that an aggregate damages model for multiple theories of liability is inadequate where only one theory was ultimately pursued); *In*

*re Nexium Antitrust Litig.*, 777 F.3d at 18 (same); *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d at 27–29 (vacating class certification where expert "asserted in a purely conclusory manner" that damages consistent with liability theory "could be separated out using the concept of Nash equilibriums"); *In re BP plc Sec. Litig.*, 2013 WL 6388408, at *16–17 (denying class certification for failing *Comcast* where the damages model "does not disaggregate 'inflation' according to the type of misrepresentation corrected"); *Loritz*, 2015 WL 6790247, at *22 (denying class certification for failing *Comcast* where, as here, expert failed to explain how it would construct a model of damages for multiple alleged misrepresentations, corrective information was disclosed at multiple times, and corrective information regarding different alleged misrepresentations was allegedly disclosed on the same day).

All that Plaintiffs offer is Prof. Feinstein's summary assertion that the damage computation methodology he articulates "allows the calculation of individual and Classwide damages stemming from various alleged misrepresentations and omissions," supposedly because unspecified "economic analyses, including valuation and empirical event study analyses, can be used to estimate the relationship between specific statements or sets of statements and the subsequent effect on stock prices." Feinstein Report ¶ 153. But Prof. Feinstein does not explain how that can be done given the facts of *this* case or even that he has assessed *whether* that can be done given the facts of *this* case. *Comcast* "signals a significant shift in the scrutiny required for class certification," and "[s]imply invoking the event study methodology" is not enough for Plaintiffs to meet "*their burden*" to prove "that the class-wide damages methodology proposed will track Plaintiffs' theories of liability." *In re BP plc Sec. Litig.*, 2013 WL 6388408, at *17.

Accordingly, Prof. Feinstein's damages model cannot meet the basic requirements under *Comcast* and its progeny. [5]

## V.   <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' Motion for Class Certification should be denied.

---

[5]     None of the cases on which Plaintiffs rely suggest otherwise.  At most, these decisions address disaggregation of multiple different pieces of confounding information, whereas Defendants' argument is that the damages model proposed by Prof. Feinstein must be capable of disaggregating the portion of any drop in Pegasystems's stock price caused by the very corrective information on which Plaintiffs would be entitled to damages.

In *In re Nexium Antitrust Litigation*, for example, the First Circuit did not address a classwide damages methodology for claims of securities fraud, and only addressed whether the existence of uninjured class members defeats predominance.  *See* 777 F.3d at 15–32.  Defendants advance no such argument here.  And Defendants are not arguing that a "free-ranging merits inquiry" is necessary; only that Plaintiffs must prove that their damages offer is capable of calculating damages limited to their theory of liability.

In *Luna v. Carbonite, Inc.*, the defendants argued that the plaintiffs' damages model did not adequately disaggregate stock drops associated with confounding events—again, an argument that the court rightly explained was better addressed at the merits.  2023 WL 4539855, at *10 (D. Mass. July 14, 2023).  But that holding is inapposite here because the flaw in Prof. Feinstein's proposed methodology is not about disaggregating the stock price impact of *confounding* information, but that he has not explained how he would disaggregate the portion of a drop in Pegasystems's stock price associated with a theory of liability plaintiffs pursue and one they do not.  *See id.*

Similarly, in *Levy v. Gutierrez*, the defendants argued that the plaintiffs' damages model did not prove loss causation—again, an argument the court rightly explained was better address on the merits, 448 F. Supp. 3d 46, 65 (D.N.H. 2019), and that is inapplicable here for the same reason as *Carbonite*.  Again, the court did not address whether the damages methodology was capable of excluding damages for theories of *liability* not pressed by the plaintiffs or for which the plaintiffs may not prove liability.  *See id.* at 65–67.

Finally, the cases cited by Dr. Feinstein in which event studies were approved under *Comcast* are all inapposite for the same additional reason: they involved only a single theory of misstatement liability, with alleged misstatements concerning only one specific topic.  *Cf. Weiner v. Tivity Health, Inc*., 334 F.R.D. 123, 137 (M.D. Tenn. 2020) (accepting event study methodology where all alleged misstatements concerned end of joint venture); *In re Acuity Brands, Inc. Sec. Litig.*, 2020 WL 5088092, at *7 (N.D. Ga. Aug. 25, 2020) (same, where all alleged misstatements concerned impact of increased competition); *Dougherty v. Esperion Therapeutics, Inc*., 2020 WL 2832252, at *7 (E.D. Mich. May 31, 2020) (same, where all alleged misstatements concerned results of End of Phase 2 meeting with the FDA); *City of Sunrise Gen. Emps.' Ret. Plan v. FleetCor Techs., Inc*., 2019 WL 3449671, at *6–7 (N.D. Ga. July 17, 2019) (same, where all alleged misstatements concerned revenue attribution); *City of Miami Gen. Emps.' Ret. Tr. v. RH, Inc.*, 2018 WL 4931543, at *3 (N.D. Cal. Oct. 11, 2018) (same, where all alleged misstatements concerned company's insufficient inventory ahead of product launch).  Here, by contrast, Plaintiffs have asserted several different theories of misstatement liability, the damages for which they have not disaggregated.

Dated: February 28, 2024

Respectfully submitted,

_/s/ Daniel W. Halston_
Daniel W. Halston (BBO # 548692)
Michael G. Bongiorno (BBO # 558748)
Robert Kingsley Smith (BBO # 681914)
Erika M. Schutzman (BBO # 696241)
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
Daniel.Halston@wilmerhale.com
Michael.Bongiorno@wilmerhale.com
Robert.Smith@wilmerhale.com
Erika.Schutzman@wilmerhale.com

_Counsel for Defendants_