# Exhibit 1

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

In re PEGASYSTEMS INC. SECURITIES
LITIGATION

No. 1:22-cv-11220-WGY

**Rebuttal Report of Amy Hutton, Ph.D.**

February 28, 2024

# Table of Contents

I.      Qualifications ................................................................................................................. 1

II.     Assignment .................................................................................................................... 2

III.    Summary of Opinions .................................................................................................... 3

IV.     Background and Summary of Allegations ...................................................................... 5

      A.      Plaintiffs' Allegations ........................................................................................5

      B.      The Virginia Litigation .......................................................................................7

V.      Prof. Feinstein Fails to Provide a Reliable Class-Wide Methodology Capable of Estimating Damages in a Manner Consistent with Plaintiffs' Theory of Liability .......... 10

      A.      Prof. Feinstein Fails to Provide a Methodology That Can Reliably Measure the Dissipation of Inflation Due to an Allegedly Misrepresented Risk Separately from the Stock Price Impact of the Materialization of the True Risk of a Negative Outcome in the Virginia Litigation ...........................................................................................12

      B.      Prof. Feinstein Fails to Provide a Methodology That Can Reliably Measure Potential Changes in Inflation During the Proposed Class Period ....................................19

## I.      Qualifications

1.      I am a Professor of Business Administration at the Carroll School of Management at Boston College.  I joined the Carroll School's faculty in 2006 and was promoted to Full Professor in 2010.  Previously, I served as an Associate Professor at the Tuck School of Business at Dartmouth College, an Assistant and Associate Professor at Harvard Business School, and a visiting scholar at Stanford University's Graduate School of Business.

2.      I have a Ph.D. in Business Administration from the Simon Business School at the University of Rochester, where I completed written qualifying exams in Accounting, Finance, and Organizations & Markets.  My research areas include empirical assessments of valuation methods, methods for detecting "earnings management" (a term connoting exploitation of opportunities to make accounting decisions that change reported income), effective corporate disclosure strategies, policy changes in response to Regulation Fair Disclosure and the Sarbanes-Oxley Act of 2002, and the roles of capital market intermediaries and regulators in determining market values of company stocks.  In my academic research, I have used statistical techniques to examine how information is incorporated into securities prices, including event studies.

3.      Based on my research, I was named to the 2001 Congressional Review Board, opining on the Securities Industry Association's best practices for equity research.  My research was used in the development of the Global Analyst Research Settlement between the U.S. Securities and Exchange Commission ("SEC") and numerous Wall Street firms.[1]

4.      My work has appeared in publications such as the *Journal of Financial Economics*, the *Journal of Accounting and Economics*, the *Accounting Review*, *Contemporary Accounting Research*, the *Journal of Accounting Research*, the *Review of Accounting Studies*, the *Harvard Business Review*, and the *Journal of Applied Corporate Finance*.  I served as an Editor for the *Accounting Review* from 2011 to 2014.  I also serve as a referee for a number of academic journals, including the *Journal of Financial Economics*, the *Journal of Accounting and Economics*, the *Journal of Accounting Research*, the *Review of Financial Studies*, and *Contemporary Accounting Research*.

---

[1] "SEC Fact Sheet on Global Analyst Research Settlements," U.S. Securities and Exchange Commission, available at https://www.sec.gov/news/speech/factsheet.htm, accessed on February 20, 2024.

5.      While I have taught various courses over the years, my specialty is Financial Statement Analysis and Valuation, a capstone case-method course that draws on my real-world experiences, as well as my research and study in the areas of Strategy, Financial Economics, and Accounting.  In my courses, I teach students and executives how to value companies and investments.

6.      A copy of my curriculum vitae is attached as **Appendix A**.  A list of my testimony over the last four years is attached as **Appendix B**.

## II.      Assignment

7.      I have been retained by counsel for Pegasystems Inc. ("Pega") and Alan Trefler (the CEO of Pega) to review and respond to the Report on Market Efficiency and Damages Methodology put forth by Prof. Steven Feinstein ("Feinstein Report").[2]  Specifically, I have been asked to assess whether Prof. Feinstein has provided a methodology that is capable of reliably measuring class-wide damages in a manner consistent with Plaintiffs' theory of liability in this matter.

8.      In forming my opinions in this matter, I have relied on my knowledge of economics and finance, prior experience, and academic research.  In performing my analyses in this matter, I have examined a variety of materials, including, but not limited to, legal pleadings, the Feinstein Report and production, SEC filings, analyst reports, and public press articles.  A list of the materials I have considered in forming my opinions is attached hereto as **Appendix C**.

9.      I am being compensated at my standard billing rate of $1,275 per hour.  I have been assisted in this matter by staff of Cornerstone Research, who worked under my direction.  I receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter.  Neither my compensation in this matter nor my compensation from Cornerstone Research is in any way contingent or based on the content of my opinion or the outcome of this or any other matter.  My work on this matter is ongoing, and I reserve the right to modify or supplement my opinions if I become aware of additional information regarding this matter.

---

[2] Report on Market Efficiency and Damages Methodology, Professor Steven P. Feinstein, Ph.D., CFA, December 12, 2023.

III.    **Summary of Opinions**

10.    Prof. Feinstein fails to provide a methodology that can reliably measure class-wide damages in a manner consistent with Plaintiffs' theory of liability in this matter.  In particular, as discussed in **Section V**, Prof. Feinstein fails to provide a methodology that can reliably address the following economic complexities arising in this matter:

11.    *Materialization of risk*:  Plaintiffs claim, in part, that Defendants "conceal[ed] the true risk posed by" a lawsuit filed against Pega by Appian Corporation ("Appian") in Virginia state court (the "Virginia Litigation" or "Virginia Action") alleging the misappropriation of trade secrets, and that the materialization of this risk caused Plaintiffs' losses in May 2022.[3]  Plaintiffs claim that the "true extent and likelihood of Pega's liability"[4] in the Virginia Litigation was revealed to the market on May 9, 2022 as a result of the disclosure of the jury verdict awarding damages of approximately $2 billion to Appian, causing Pega's stock price to decline.  However, as discussed in **Section V.A**, under this claim, the stock price decline following the announcement of the verdict does not accurately measure, and may overestimate, inflation, if any, that was dissipated by the announcement.  This is because the stock price reaction following the jury verdict would reflect both the valuation impact of the correction of the allegedly previously misrepresented risk (which allegedly could and should have been disclosed earlier) and the valuation impact of the materialization of the true risk (which could not have been disclosed earlier given that the outcome was uncertain).

12.    Thus, in order to reliably measure inflation and damages in this matter in a manner consistent with Plaintiffs' theory of liability, Prof. Feinstein's proposed damages methodology would need to be capable of estimating the market's assessment of the "extent and likelihood of Pega's liability"[5] in the Virginia Litigation prior to the May 9, 2022 verdict.  The methodology would need to be capable of doing so both in the actual world and in the but-for world where Pega would not have made any alleged misrepresentations regarding the "extent and likelihood of Pega's liability"[6] in the Virginia Litigation and Pega's alleged business practices.  Prof.

---

[3] *City of Fort Lauderdale Police and Firefighters' Retirement System v. Pegasystems Inc., et al.*, Lead Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Consolidated Amended Complaint, February 17, 2023, ("Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss"), footnote 46.
[4] Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss, footnote 46.
[5] Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss, footnote 46.
[6] Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss, footnote 46.

Feinstein lists a number of examples of generic valuation tools that he claims could be used in quantifying inflation. However, he fails to explain, even in general terms, how he would use any valuation tools to determine the market's assessment of the "extent and likelihood of Pega's liability"[7] in the Virginia Litigation in the actual and but-for worlds. He also fails to explain how he would use any valuation tools to otherwise measure *only* the portion of Pega's stock price decline that is causally linked to the allegedly concealed portion of the risk of the outcome that materialized in the Virginia Litigation on May 9, 2022. Thus, Prof. Feinstein fails to provide a methodology that can reliably measure the dissipation of inflation due to an allegedly misrepresented risk separately from the stock price impact of the materialization of the true risk of a negative outcome in the Virginia Litigation.

13.    ***Changes in inflation during the Proposed Class Period***:[8] Further complicating the analysis of inflation in this case, as discussed in **Section V.B**, the evolving information available to Pega and the market regarding the Virginia Litigation could have resulted in changes in alleged inflation during the Proposed Class Period. Indeed, Plaintiffs allege that, "[d]uring the course of the Virginia Action Pega suffered one setback after another," such as "multiple motions Appian filed to amend their complaint (which were opposed by Pega) [being] granted,"[9] and that given developments in the Virginia Litigation, "'the degree of probability of an unfavorable outcome' … was only increasing throughout the Class Period."[10] For example, Appian updated its damages claim during the Proposed Class Period from "an amount that will exceed $90 million in damages"[11] to approximately $3 billion. To the extent the updated damages claimed by Appian changed the but-for disclosure Pega allegedly could and should have made, the market's assessment of the "extent and likelihood of Pega's liability"[12] in the Virginia Litigation in the but-for world may also have changed during the Proposed Class Period. In addition, in its Q1 2022 SEC Form 10-Q filed on April 28, 2022, Pega disclosed that the court in the Virginia Litigation had adopted a legal standard that shifted to Pega the burden of

---

[7] Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss, footnote 46.

[8] The Proposed Class Period is the period between June 16, 2020 and May 9, 2022, inclusive. See *In re Pegasystems Inc. Securities Litigation*, Memorandum of Law in Support of Motion to Certify this Action as a Class Action and Related Relief, December 12, 2023, p. 1.

[9] *City of Fort Lauderdale Police and Firefighters' Retirement System v. Pegasystems Inc., et al.*, Consolidated Amended Complaint, October 18, 2022 ("Complaint"), ¶ 196(e).

[10] Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss, p. 16.

[11] *Appian Corporation v. Pegasystems Inc. and Youyong Zou*, Circuit Court of Fairfax County, Complaint, May 29, 2020 ("First Virginia Litigation Complaint"), ¶¶ 54, 68, 75, 88, 94.

[12] Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss, footnote 46.

proving that the damages sought by Appian were not the result of Pega's alleged misappropriation and use of the alleged trade secrets. This disclosure could have led to a change in the market's assessment of the potential outcomes of the Virginia Litigation.

14. Having a reliable methodology to estimate the market's assessment of these pieces of information and their impact, if any, on the "extent and likelihood of Pega's liability"[13] in the Virginia Litigation in the actual and but-for worlds is critical to measuring inflation and damages in a manner consistent with Plaintiffs' theory of liability. However, Prof. Feinstein does not explain how he would use any valuation tools to estimate whether and to what extent disclosure of such information about the Virginia Litigation changed the market's assessment of the "extent and likelihood of Pega's liability"[14] in the Virginia Litigation in the actual world or the but-for world.

15. Additionally, the existence of the Virginia Litigation and Appian's initial and first amended complaint were discussed prior to February 16, 2022 in Pega and Appian's filings in another lawsuit between the two companies in Massachusetts federal court. Prof. Feinstein does not explain how he would use any valuation tools to address whether and to what extent the filings in the Massachusetts lawsuit had an impact on the market's assessment of the "extent and likelihood of Pega's liability"[15] in the Virginia Litigation, which would be required to reliably measure inflation in Pega's stock price, if any, during the Proposed Class Period. Thus, Prof. Feinstein fails to provide a methodology that can reliably measure potential changes in inflation during the Proposed Class Period.

## IV.     Background and Summary of Allegations

### A.     Plaintiffs' Allegations

16. Pega develops enterprise software for workflow automation and decision-making.[16] Plaintiffs allege that Pega made misrepresentations during the Proposed Class Period about Pega's business practices and the Virginia Litigation.[17] Specifically, Plaintiffs allege that during

---

[13] Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss, footnote 46.
[14] Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss, footnote 46.
[15] Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss, footnote 46.
[16] Pegasystems Inc. 2022 Form 10-K filed February 15, 2023 ("Pega 2022 Form 10-K"), p. 4.
[17] Complaint, ¶¶ 1, 3, 11.

the Proposed Class Period, Pega made misrepresentations in (i) statements about "Pega's competition and sales and marketing practices;" (ii) statements about "Pega's competitors' intellectual property rights" and the risk that Pega would be subject to intellectual property infringement claims; (iii) statements that Appian's claims in the Virginia Litigation "lacked merit and any damages were not supported;" (iv) statements about Pega's code of conduct and ethical practices; and (v) statements concerning compliance with federal securities laws in Pega's Sarbanes-Oxley certifications in SEC Forms 10-Q and 10-K.[18]  In addition, Plaintiffs allege that Pega's financial statements in its SEC Forms 10-Q and 10-K filed during the Proposed Class Period were "materially misstated" because "Pega failed to disclose the Virginia Action as a material legal proceeding" or "as a loss contingency."[19]

17.    Plaintiffs claim that the alleged misrepresentations inflated Pega's stock price during the Proposed Class Period, and that said inflation was allegedly removed when "defendants' prior misrepresentations and fraudulent conduct became apparent to the market" in a series of alleged corrective disclosures on the following dates:[20]

> a.  On February 16, 2022, the Pega SEC Form 10-K for 2021 discussed the Virginia Litigation, including that "Appian was seeking approximately $3 billion in damages."[21]
>
> b.  On May 9, 2022 (the last day of the Proposed Class Period), the jury in the Virginia Litigation entered a verdict against Pega and awarded damages of approximately $2 billion to Appian.[22]
>
> c.  On September 16, 2022 (after the Proposed Class Period), the court in the Virginia Litigation entered a judgment in favor of Appian, including damages, post-judgment interest, and attorneys' fees.[23]

18.    I understand from counsel that Plaintiffs' theory of liability is that investors relied upon the integrity of Pega's stock price, and that this theory entitles members of the proposed class to damages based on the difference in the inflation in the stock price between the time the stock

---

[18] Complaint, ¶¶ 120–161.  I understand from counsel that statements made by Kenneth Stillwell are not actionable. See *City of Fort Lauderdale Police and Firefighters' Retirement System v. Pegasystems Inc., et al.*, Memorandum and Order, July 24, 2023, p. 3.

[19] Complaint, ¶ 162.

[20] Complaint, ¶ 242.

[21] Complaint, ¶ 243.

[22] Complaint, ¶ 244.

[23] Complaint, ¶ 247.

was bought and the time it was sold, subject to certain limitations on per-share damages. Inflation, in turn, is measured as the difference between the actual stock price at a given point in time and what the stock price would have been at that time absent the alleged misrepresentations. I also understand from counsel that Plaintiffs are not claiming that proposed class members would not have purchased shares at all if Defendants had disclosed the full truth regarding the Virginia Litigation and Pega's alleged business practices.

### B.    The Virginia Litigation

19.    Appian filed a complaint against Pega in Virginia state court on May 29, 2020 (the "First Virginia Litigation Complaint"), alleging that Pega had "engaged in an unlawful campaign of corporate espionage against Appian," which involved "stealing Appian's trade secrets and confidential information."[24]  The First Virginia Litigation Complaint also stated that "as a direct and proximate result of defendants' misappropriation of Appian's trade secrets, Appian has suffered and will suffer substantial monetary damages in an amount that will exceed $90 million."[25]  The cover sheet of the First Virginia Litigation Complaint filing stated that "Damages in the amount of $90,000,000.00 are claimed."[26]  I understand from counsel that under Virginia law, civil complaints must state the amount of damages sought, which operates as a cap on any damages.[27]

20.    On November 24, 2020, in a separate litigation between Pega and Appian in Massachusetts federal court that had been ongoing since July 2019 (the "Massachusetts Litigation"),[28] Pega filed a motion that was publicly available on the Massachusetts Litigation docket in which Pega referenced the Virginia Litigation.[29]

---

[24] First Virginia Litigation Complaint, ¶ 1.

[25] First Virginia Litigation Complaint, ¶¶ 54, 68, 75, 88, 94.

[26] First Virginia Litigation Complaint, cover sheet.

[27] Va. Sup. Ct. R. 3:2(c)(ii).

[28] Pegasystems Inc. 2021 Form 10-K filed February 16, 2022 ("Pega 2021 10-K"), p. 23.

[29] *Pegasystems Inc. v. Appian Corporation and Business Process Management, Inc.* docket; *Pegasystems Inc. v. Appian Corporation and Business Process Management, Inc.*, Motion to Continue Mediation, November 24, 2020 ("Separately, and more importantly, there is another case between Pegasystems and Defendant Appian Corporation ('Appian') that is pending in state court in Virginia.").

21.     On November 4, 2021, Appian filed an amended complaint in the Virginia Litigation (the "Second Virginia Litigation Complaint"), which maintained Appian's claim that it suffered "monetary damages in an amount that will exceed $90 million."[30]

22.     On December 30, 2021, Pega filed a motion in the Massachusetts Litigation to compel Appian to disclose the extent of the overlap between the Virginia Litigation and the Massachusetts Litigation.[31]  Pega provided additional information about the Virginia Litigation in its memorandum in support of this motion and included the First Virginia Litigation Complaint as an exhibit.[32]  On January 13, 2022, Appian filed its opposition to Pega's motion and attached the Second Virginia Litigation Complaint as an exhibit.[33]  These documents, including the First and Second Virginia Litigation Complaints, were publicly available on the Massachusetts Litigation docket.[34]

23.     On February 11, 2022, Appian filed a second amended complaint (the "Third Virginia Litigation Complaint").[35]  The Third Virginia Litigation Complaint claimed damages "in an amount not to exceed $3,032,847,000," an amount over 33 times the previously claimed $90 million.[36]  On February 16, 2022, Pega provided information about the Virginia Litigation and Appian's updated claim of $3 billion in damages in its 2021 SEC Form 10-K.[37]

---

[30] *Appian Corporation v. Pegasystems Inc. and Youyong Zou*, Circuit Court of Fairfax County, First Amended Complaint, November 4, 2021 ("Second Virginia Litigation Complaint"), ¶¶ 54, 67, 79, 85; Pega 2021 10-K, p. 23.

[31] *Pegasystems Inc. v. Appian Corporation and Business Process Management, Inc.*, Motion to Amend Protective Order and to Compel Appian to Disclose Extent of Overlap between Massachusetts and Virginia Actions, December 30, 2021.

[32] *Pegasystems Inc. v. Appian Corporation and Business Process Management, Inc.*, Memorandum in Support of Motion to Amend Protective Order and to Compel Appian to Disclose Extent of Overlap between Massachusetts and Virginia Actions, p. 2 ("On or about May 29, 2020, Appian filed a complaint against Pegasystems in Virginia state court. *See* Affidavit of A. Horvath at Ex. 1. Appian alleged that Pegasystems enlisted an Appian developer, Youyong Zou, a resident of Virginia and also named as a defendant in the Virginia case, to 'to [*sic*] conduct detailed technical analyses of Appian's product to determine precisely how it was constructed and how it worked' and that Pegasystems employees then 'created marketing materials and training materials for Pegasystems' sales force.' *Id.* According to Appian, Pegasystems 'could not have created these materials without access to the trade secrets and confidential information they took from Appian.'"); *Pegasystems Inc. v. Appian Corporation and Business Process Management, Inc.*, Declaration of August Horvath in Support of Pegasystems Inc.'s Motion to Amend Protective Order and to Compel Appian to Disclose Extent of Overlap between Massachusetts and Virginia Actions, December 30, 2021, Exhibit 1.

[33] *Pegasystems Inc. v. Appian Corporation and Business Process Management, Inc.* docket; *Pegasystems Inc. v. Appian Corporation and Business Process Management, Inc.*, Declaration of Adeel A. Mangi in Support of Appian Corporation's Opposition to Pegasystems' Motion to Compel and to Modify Protective Order, January 13, 2022, Exhibit 1.

[34] See *Pegasystems Inc. v. Appian Corporation and Business Process Management, Inc.* docket.

[35] *Appian Corporation v. Pegasystems Inc. and Youyong Zou*, Circuit Court of Fairfax County, Second Amended Complaint, February 11, 2022 ("Third Virginia Litigation Complaint"); Pega 2021 10-K, p. 23.

[36] Third Virginia Litigation Complaint, ¶ 89.

[37] Pega 2021 10-K, p. 23.

24.     On March 21, 2022, the jury trial in the Virginia Litigation began.[38]  Pega reported trial updates in its SEC Form 10-Q filed on April 28, 2022, including that Appian had withdrawn a claim for tortious interference and that the court had altered the burden of proof with respect to damages.[39]

25.     On May 9, 2022, Pega disclosed that the jury had "rendered a verdict against the Company with respect to the trade secrets claim for $2.04 billion in damages and entitling Appian to recover attorney's fees."[40]

26.     On September 16, 2022, Pega disclosed that the court in the Virginia Litigation "took its final step in the trial portion of the case with formal entry of judgment in the amount of $2,060,479,287 for damages for the previously jury determined amount plus attorney's fees and costs."[41]  Pega also stated that the "entry of judgment enabled us to file a notice of appeal, which we filed on September 15, 2022.  As a reminder, the appeals process could potentially take years to complete, and no judgment would be payable until this process has ended."[42]

27.      On February 6, 2023, Pega filed an appeal of the verdict in the Court of Appeals of Virginia.[43]

28.     On September 7, 2023, Appian disclosed that it had obtained a "$500 million judgment preservation insurance policy … in connection with its $2.1 billion judgment against Pegasystems Inc."[44]  The insurance policy "provides that if the final judgment against Pegasystems after all appeals are exhausted (the 'Enforceable Judgment') is reduced below $500.0 million, Appian will receive a payment for the difference between such Enforceable Judgment and $500.0 million."[45]

[38] Pegasystems Inc. Form 10-Q filed April 28, 2022, p. 18.

[39] Pegasystems Inc. Form 10-Q filed April 28, 2022, p. 18 ("On April 13, 2022, Appian withdrew its claim against the Company for tortious interference with business expectancy. On that same day, in the course of making determinations on various motions, the Court stated that if the jury finds that the Company misappropriated information that constituted Appian trade secrets and finds that the Company incorporated those trade secrets into the Company's products or the Company's marketing materials, the burden will then shift to the Company to prove that the sales Appian seeks as damages were not the result of the alleged misappropriation and use of the alleged trade secrets. This legal standard has not previously been adopted by the Virginia courts.").

[40] Pegasystems Inc. Form 8-K filed May 9, 2022.

[41] Pegasystems Inc. Form 8-K filed September 16, 2022.

[42] Pegasystems Inc. Form 8-K filed September 16, 2022.

[43] "Pega response to Appian lawsuit," available at https://www.pega.com/appian-lawsuit-statement, accessed on December 5, 2023; *Pegasystems Inc. v. Appian Corporation*, Court of Appeals of Virginia, Opening Brief of Appellant, February 6, 2023.

[44] Appian Corporation Form 8-K filed September 7, 2023.

[45] Appian Corporation Form 8-K filed September 7, 2023.

29.     On November 15, 2023, the Virginia Court of Appeals heard oral argument on Pega's appeal of the verdict.[46]  I understand from counsel that during the oral argument, the Court of Appeals commented that the lower court's instruction on the burden of proof for damages was inconsistent with case law from the Supreme Court of Virginia.[47]  Following the oral argument, Pega stated that the Court of Appeals "hasn't given a timeframe for its opinion to be issued, and, as a reminder, after that, there could be a request to the Court of Appeals to rehear the case, or a further appeal to the Supreme Court of Virginia."[48]  I understand from counsel that as of the date of this report, the ultimate outcome of the Virginia Litigation remains uncertain.

## V.      Prof. Feinstein Fails to Provide a Reliable Class-Wide Methodology Capable of Estimating Damages in a Manner Consistent with Plaintiffs' Theory of Liability

30.     Prof. Feinstein proposes calculating damages using an "out-of-pocket methodology," in which "damages are measured as the difference between the amount of stock price inflation at purchase and the amount of inflation in the stock price at sale."[49]  Prof. Feinstein defines inflation as "the difference between the observed market price of the stock and what that stock price would have been but for the misrepresentations and omissions," *i.e.*, the difference between the stock price in the actual and "but-for" worlds.[50]

31.     Prof. Feinstein states that "[c]onstruction of the inflation ribbon generally employs event study analysis, combined with widely used and generally accepted valuation tools.  The inflation

---

[46] "Pega response to Appian lawsuit," available at https://www.pega.com/appian-lawsuit-statement, accessed on December 5, 2023.

[47] "Court of Appeals of Virginia Recordings of Oral Arguments," Region 4 – Northern (11/15/2023), 1399-22-4 Pegasystems, Inc. v. Appian Corp. (November 15, 2023), available at https://www.courts.state.va.us/courts/cav/oral_arguments/2023/11_home.html, accessed on February 20, 2024 ("Appeals Court Oral Arguments Recording, November 15, 2023"), 45:05–45:48 (The court stated:  "[I]n looking at jury instruction 14, it seems, as you just noted, that clearly … Appian has to show there were misappropriated trade secrets. But then just show what Pegasystems profit was or sales. That is—that second prong of the test seemed—in that jury instruction seemed to be a very low burden. Why doesn't Appian have to show more than just what their profit was for the second prong?"), 50:30–50:43 (The court stated:  "[Y]ou're advocating burden shifting and I would like to know what you think about MicroStrategy vs. Lee because the Virginia Supreme Court has said we don't burden shift, and we don't reverse the Virginia Supreme Court.").  In addition, I understand from counsel that the court questioned the decision to prevent Pega from showing its software at trial via a Pega laptop, with one of the judges stating that she was "troubled by the fact that both [Appian] and Judge Gardner seemed to place emphasis on the laptop, when … what Pega was trying to introduce was actually the software."  See Appeals Court Oral Arguments Recording, November 15, 2023, 59:01–59:12.

[48] "Pega response to Appian lawsuit," available at https://www.pega.com/appian-lawsuit-statement, accessed on December 5, 2023.

[49] Feinstein Report, ¶ 152.

[50] Feinstein Report, ¶ 152.  I understand from counsel that Prof. Feinstein does not need to quantify inflation or damages at this stage of the litigation, but he does need to provide a methodology capable of reliably doing so in a manner consistent with Plaintiffs' theory of liability.

ribbon is often constructed by working chronologically backwards from the final corrective disclosure back to the start of the Class Period, accounting for alleged fraud-related residual price declines as they occurred. Inflation prior to a corrective disclosure that dissipated inflation is greater than the inflation afterward by the amount of inflation that dissipated."[51] In other words, Prof. Feinstein appears to be proposing, as a starting point, a methodology to measure inflation throughout the Proposed Class Period by (i) measuring inflation dissipated by alleged corrective disclosures using an event study, potentially along with unspecified "valuation tools," and (ii) "backcasting" the resulting inflation to dates earlier in the Proposed Class Period.

32.     While an event study is a commonly used tool to disaggregate the security price movements due to company-specific information from market and/or industry factors, it has certain limitations. In particular, an event study as described by Prof. Feinstein[52] can only be used to assess the total impact of all new company-specific information revealed on a given alleged corrective disclosure day. Even if an event study is performed appropriately, it cannot, on its own, separately measure the effects of corrective and other company-specific confounding information that is released at the same time—additional analysis would need to be performed in any attempt to identify only the impact of the corrective information. Therefore, an event study that merely measures company-specific stock price changes on the alleged corrective disclosure dates may not by itself reliably measure inflation dissipated on those dates, or inflation on any other day during the Proposed Class Period.

33.     Prof. Feinstein acknowledges that he may need to account for the effect on Pega's stock price of "potentially non-fraud-related information" when calculating inflation using price reactions following alleged corrective disclosures.[53] Prof. Feinstein states that "[t]o the extent that there may be specific issues complicating the quantification of artificial inflation … due to any potentially unique facts and circumstances of this case, the standard tools of valuation analysis can be applied as needed … to measure what the price of Pega stock would have been but-for the alleged misrepresentations and omissions, and that but-for valuation would determine

---

[51] Feinstein Report, ¶ 157.ii.
[52] Feinstein Report, ¶ 105 ("An event study measures how much a security price rises or falls in response to new, company-specific information. One component of an event study is the statistical regression analysis that determines how much of a security price change is explained by market-wide and industry sector factors, rather than company-specific information, so that those influences can be statistically factored out.").
[53] Feinstein Report, ¶ 157.i.

how much artificial inflation was in the observed market price."[54]  Prof. Feinstein lists a number of examples of generic valuation tools (including valuation multiple models, discounted cash flow models, and scenario analysis) that *could* be used in quantifying inflation,[55] but he does not explain, even in general terms, how any of these valuation tools might be applied in this matter to assess inflation dissipated by the alleged corrective disclosures (*i.e.*, to measure only the portion of the stock price declines causally linked to the alleged fraud given the particulars of the matter), as well as to determine whether and to what extent inflation may have changed over the course of the Proposed Class Period prior to the alleged corrective disclosures.

34.     As discussed below, it is my opinion that Prof. Feinstein fails to provide a reliable class-wide methodology capable of estimating damages in a manner consistent with Plaintiffs' theory of liability in light of the economic complexities specific to this matter.  In particular, Prof. Feinstein fails to provide a methodology that can reliably measure (a) the dissipation of inflation due to an allegedly misrepresented risk separately from the stock price impact of the materialization of the true risk of a negative outcome in the Virginia Litigation, as discussed in **Section V.A**; and (b) potential changes in inflation during the Proposed Class Period, as discussed in **Section V.B**.

> **A.     Prof. Feinstein Fails to Provide a Methodology That Can Reliably Measure the Dissipation of Inflation Due to an Allegedly Misrepresented Risk Separately from the Stock Price Impact of the Materialization of the True Risk of a Negative Outcome in the Virginia Litigation**

35.     Plaintiffs claim, in part, that Defendants "conceal[ed] the true risk posed by the Virginia Action even after they disclosed the existence of the litigation in February 2022," and that "[i]t was the materialization of this concealed risk – the true extent and likelihood of Pega's liability" that caused Plaintiffs' losses in May 2022.[56]  In addition, as explained in **Section IV.A** above, I understand from counsel that under Plaintiffs' theory of liability, members of the proposed class are entitled to damages based on the difference in the inflation in the stock price between the

---

[54] Feinstein Report, ¶ 154.

[55] Feinstein Report, ¶ 156 ("Among the commonly used valuation tools that are available to investors, analysts in real time, and forensic analysts when computing damages, are, for example: valuation multiple models, such as those based on earnings, earnings before interest, tax, depreciation and amortization (EBITDA), revenue, book value, and cash flow; discounted cash flow (DCF) models; scenario analysis, and the literature regarding valuation effects of factors such as reputation, transparency, governance, and the quality of internal controls.").

[56] Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss, footnote 46.

time the stock was bought and the time it was sold, subject to certain limitations on per-share damages.[57]  Inflation, in turn, is measured as the difference between the actual stock price at a given point in time and what the stock price would have been at that time absent the alleged misrepresentations pertaining to the Virginia Litigation and Pega's alleged business practices.

36.    If, as alleged by Plaintiffs, Defendants "conceal[ed] the true risk posed by the Virginia Action," and the "true extent and likelihood of Pega's liability"[58] in the Virginia Litigation was revealed to the market on May 9, 2022, then Pega's stock price decline following the announcement of the verdict does not accurately measure, and may overestimate, inflation, if any, that was dissipated by the announcement.  This is because the outcome in the Virginia Litigation was uncertain prior to the materialization of the risk that occurred when the jury awarded approximately $2 billion in damages against Pega on May 9, 2022.[59]  Consequently, given that uncertainty, if a disclosure of the alleged true risk had been made prior to May 9, 2022, the market would not have incorporated the valuation impact of the May 9 verdict into Pega's stock price at that time.  Thus, even if Pega had disclosed the alleged "true extent and likelihood of Pega's liability"[60] in the Virginia Litigation prior to May 9, 2022, Pega's stock price would still have declined following the verdict on May 9, 2022, when the true risk of a negative outcome materialized and the market incorporated the valuation impact of that outcome.

37.    As discussed through the illustrative examples below, because Pega's stock price would have declined following the verdict even if Pega had disclosed the alleged "true extent and likelihood of Pega's liability"[61] prior to May 9, 2022, a reliable methodology that can measure inflation and damages in a manner consistent with Plaintiffs' theory of liability must be capable of disaggregating the portion of the stock price decline attributed to the allegedly concealed risk

---

[57] According to Prof. Feinstein, "per-share damages would be calculated as the difference between the inflation on the date the shares were purchased and the inflation on the date those same shares were subsequently sold.  Per-share damages are limited, however, to be no greater than the decline in the share price over the investor's holding period, which is the investment loss actually sustained.  Pursuant to the Private Securities Litigation Reform Act of 1995 (15 U.S.C. § 78u-4(e)), for purposes of computing the investment loss limitation on damages, for any shares sold during the 90-day period after the final corrective disclosure, the investment loss is computed as if the selling price was the greater of the actual selling price or the average closing price following the final corrective disclosure up to the sale date.  For any shares held 90 days or more beyond the final corrective disclosure, the investment loss is computed as if the shares were sold for the average closing price over the 90 days following the final corrective disclosure."  See Feinstein Report, ¶ 157.

[58] Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss, footnote 46.

[59] As discussed above in **Section IV.B**, I understand from counsel that as of the date of this report, the ultimate outcome of the Virginia Litigation remains uncertain.

[60] Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss, footnote 46.

[61] Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss, footnote 46.

from the portion attributed to the materialization of the true risk. That requires separating the portion, if any, of the stock price reaction following the alleged corrective disclosure on May 9, 2022 that reflects the valuation impact of the correction of the allegedly previously misrepresented risk (which allegedly could and should have been disclosed earlier) from the valuation impact of the materialization of the true risk (which could not have been disclosed earlier given that the outcome was uncertain).

38.    Consider a company that is under investigation by its regulator and faces the risk of a fine. Assume the company expects to pay a fine of $100 million if the outcome of the regulatory investigation is unfavorable and no fine otherwise. Assume further that the company has 10 million shares outstanding, such that a fine of $100 million would correspond to a loss of $10 per share. As shown in **Exhibit 1**, if the company publicly represents that it believes the probability of an unfavorable outcome, which would result in a $100 million fine, is 60% (and this is the true risk that the company faces) and the market consensus reflects this, then the expected loss would be $60 million (adjusted for the probability of an unfavorable outcome), and the stock price would decline by $6 to incorporate this expectation of a $60 million loss.[62] If the regulatory investigation ultimately results in an unfavorable outcome and the company pays a fine of $100 million, then the company's stock price would *decrease* by an additional $4, as the previous *risk* of paying a $100 million fine (60% probability) has now materialized in a *certain* and *negative* outcome, and the market now expects a $10 per share loss compared to the $6 per share *expected* loss that was previously incorporated into the stock price.[63]

39.    The $4 decline in the stock price would be due to the materialization of a known, true risk that the regulatory investigation would conclude unfavorably, resulting in a $100 million fine compared to the risk-adjusted expectation of a $60 million fine. In this example, the company accurately represented its expectation of both the probability of paying a fine (60%) and the magnitude of the loss associated with a fine ($100 million). The stock price decline of $4 upon the disclosure of the outcome was caused by the materialization of the true risk that was not

---

[62] There is a 60% chance the company will incur a loss of $100 million due to a regulatory fine and a 40% chance that the company will have no loss due to a regulatory fine. Thus, the market expects a loss of (60% × $100 million) + (40% × $0) = $60 million. Note that this example assumes that all the losses are in cash and there is no discounting when determining the stock price.

[63] Likewise, had the regulatory investigation concluded favorably with no fine imposed on the company, then one would expect the company's stock price to *increase* as the previously *uncertain* outcome of a fine (60% probability) has now become a *certain* and *positive* outcome of no fine (0% probability) and the market now expects no loss attributed to a regulatory fine compared to the $60 million loss that was previously incorporated into the stock price.

misrepresented or concealed.  Therefore, investors would not be damaged (due to fraud) by that decline.[64]

40.    In contrast, as shown in **Exhibit 2**, consider a situation where the company *misrepresents* the probability of paying a fine by publicly stating that it believes the probability is 30% when its true expectation is that the probability is 60%.  The market would then assume an expected loss of $30 million (30% x $100 million), and the stock price would decline by $3 to incorporate the expected loss.[65]  In the but-for world, the company would have disclosed the true probability of 60% and the stock price would have declined by $6.  Because the stock price in the actual world declined by only $3, it would be *inflated* by $3 due to the company's misrepresentation.[66]  If the regulatory investigation eventually concludes unfavorably and the company pays a fine of $100 million, the market would now expect a $100 million ($10 per share) loss compared to the $30 million ($3 per share) that was previously incorporated into the stock price.  Thus, the company's stock price would *decrease* by an additional $7.

41.    In contrast to the previous example, the $7 decline in stock price upon disclosure of the fine would include both (a) the valuation impact of the concealed portion of the risk that the company could pay a fine of $100 million upon conclusion of the regulatory investigation (*i.e.*, the dissipation of the inflation of $3), and (b) the materialization of the true risk (*i.e.*, the $4 decline that would have occurred in the but-for world as well).  Because $4 of the full stock price decline of $7 would have occurred even if the company had not misrepresented the risk of paying a fine, it would be inappropriate to assume that the stock price was inflated by the full decline of $7 due to the misrepresentation of the risk.  Investors would be damaged (by fraud) by only $3 per share.[67]

---

[64] Consider a modification to this example where the company fully discloses its expectation of a $100 million fine and the true probability of 60%, but where the regulator unexpectedly fines the company $200 million ($20 per share) at the end of the investigation.  In this situation, the company's stock price would still decline by $6 per share when the company discloses the possibility of the fine, reflecting the expected loss due to the fine, but the stock price would decrease by a further $14 per share when the $200 million fine is announced, reflecting the materialization of the true risk *and* the unexpected increase in the size of the fine.  Because the company did not misrepresent its knowledge of the probability or size of the fine, investors still would not be damaged due to fraud when the true risk materializes.
[65] The market would assume that there is a 30% chance the company will pay a $100 million fine and 70% chance the company will not pay a fine.  Thus, the market expects a loss of (30% × $100 million) + (70% × $0) = $30 million.
[66] For simplicity, this illustrative example assumes that all the losses are in cash and there is no discounting when determining the stock price.
[67] As another example, consider a situation where the company learns of the regulatory investigation and discloses the true probability of the fine (60%) but misrepresents the expected *size* of the fine by disclosing that the fine is expected to be $100 million, when it knows that the fine will actually be $200 million if the regulatory investigation concludes unfavorably.  When the company discloses the 60% probability of a $100 million fine, the stock price will

42.     As the above example demonstrates, to measure the amount of inflation due to the misrepresentation of the risk of an unfavorable outcome, one would need to determine to what extent the alleged misrepresentation affected the market's assessment of the probability of an unfavorable outcome and only measure the valuation impact of the portion of the risk that is concealed.  Thus, the stock price decline that occurs following the materialization of an allegedly misrepresented risk, on its own, does *not* provide a reliable measure of the price decline that would have occurred had a but-for disclosure been made earlier.

43.     Analyst commentary indicates that at least a portion of the stock price decline following the May 9, 2022 disclosure of the verdict in the Virginia Litigation may reflect the materialization of the true risk of such an outcome.  For example:

(*Goldman Sachs, May 10, 2022*) While the litigation was initiated in May 2020, the magnitude of the verdict caught many investors by surprise.[68]

(*RBC, May 10, 2022*) $2B in damages seems exorbitant in our view and does not reflect economic value. We would highlight some precedent cases in tech which involved larger organizations with materially smaller awards: the patent infringement cases of BMC/HP v. ServiceNow ($270M awarded in total), the trade secret case of Motorola v. Hytera ($418M awarded), and the trade secret case of Waymo v. Uber ($245M awarded). Further, we note Pega and Appian combined market caps and revenue run rates are $8B and $1.9B, respectively. As such, we view the award relative to real economic value as unprecedented.[69]

(*Truist Securities, May 11, 2022*) While we were aware that the company was in litigation with Appian, we were surprised by the size of the damages charged to PEGA.[70]

(*SMBC Nikko Securities America, Inc., May 12, 2022*) Along with most investors with whom we've talked, we're stupefied by the size of the award (if not the verdict itself).  In our 18 years covering software stocks, legal disputes have

---

decline by $6 per share.  However, in the but-for world, the company would have disclosed the true expected size of the fine ($200 million), and the stock price would have declined by $12 per share.  Because the stock price in the actual world declined by only $6, it would be inflated by $6 due to the company's misrepresentation.  If the risk materializes into a fine of $200 million, the stock price would decline by an additional $14 per share, reflecting both the valuation impact of the concealed portion of the risk that the company could pay a fine of $200 million upon conclusion of the regulatory investigation (*i.e.*, the dissipation of the inflation of $6), and the materialization of the true risk (*i.e.*, the $8 decline that would have occurred when the true risk materialized in the but-for world as well).

[68] "APPN receives favorable jury verdict in litigation against PEGA for trade secret misappropriation," Goldman Sachs, May 10, 2022.

[69] "Our Thoughts on the $2B Appian Verdict," RBC, May 10, 2022.

[70] "Downgrading PEGA to Hold on Litigation Overhang & Uncertainty," Truist Securities, May 11, 2022.

rarely moved the needle on a company's market value, and then only marginally.[71]

See **Exhibit 3** for additional examples of analyst commentary.

44.     Thus, in order to reliably measure inflation and damages in this matter in a manner consistent with Plaintiffs' theory of liability, Prof. Feinstein's proposed damages methodology would need to be capable of estimating the market's assessment of the "extent and likelihood of Pega's liability"[72] in the Virginia Litigation on each day of the Proposed Class Period. Furthermore, the methodology would need to be capable of estimating the market's assessment both in the actual world and in the but-for world where Pega would not have made any alleged misrepresentations or omissions regarding the Virginia Litigation and Pega's alleged business practices.

45.     Prof. Feinstein lists a number of examples of generic valuation tools that he claims could be used in quantifying inflation, but merely pointing to generic valuation tools is not the same as articulating whether and how such tools can be applied to the specific circumstances in this case to reliably measure inflation and damages in a manner consistent with Plaintiffs' theory of liability.  Prof. Feinstein fails to explain, even in general terms, how he would use unspecified valuation tools to determine the market's assessment of the "extent and likelihood of Pega's liability"[73] in the Virginia Litigation in the actual and but-for worlds.  He also fails to explain how he would use unspecified valuation tools to otherwise measure *only* the portion of the stock price decline on May 10, 2022 that is causally linked to the allegedly concealed portion of the risk of the outcome that materialized in the Virginia Litigation on May 9, 2022.

46.     Prof. Feinstein's proposed "out-of-pocket methodology" thus amounts to a *definition* of damages, rather than a meaningful description of a reliable methodology for calculating class-wide damages consistent with Plaintiffs' theory of liability in this case.  His approach is akin to saying that one can use "calculus" to solve a math problem without explaining how "calculus" is even relevant to solving the particular math problem under consideration.  Absent that assessment, which Prof. Feinstein fails to undertake here, there can be no assurance that

---

[71] "After a Big Shock, What Comes Next?" SMBC Nikko Securities America, Inc., May 12, 2022.
[72] Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss, footnote 46.
[73] Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss, footnote 46.

unspecified "valuation tools" will in fact provide a reliable methodology for measuring inflation in this matter.

47.    To the extent Prof. Feinstein claims that it is not necessary to analyze the market's assessment of the "extent and likelihood of Pega's liability"[74] in the Virginia Litigation in the but-for world because Pega could have anticipated (and disclosed) the eventual outcome that occurred on May 9, 2022, such a claim is inconsistent with what Plaintiffs assert are their "well-pled allegations detail[ing] how 'the degree of probability of an unfavorable outcome' in the [Virginia Litigation] was only increasing throughout the Class Period."[75]  Further, the uncertainty of the ultimate outcome of the Virginia Litigation expressed by analysts also contradicts such a claim.  In particular, analysts expressed uncertainty following the May 9, 2022 alleged corrective disclosure as to whether the approximately $2 billion jury verdict would survive the appeals process, and acknowledged the possibility that the verdict could be reversed or the damages award could be reduced.  For example, J.P. Morgan wrote on May 10, 2022 that "we are skeptical that something of this magnitude will be a final resolution."[76]  JMP Securities noted over five months later that "much uncertainty remains regarding this verdict and what the ultimate impact on Pega will be."[77]  Uncertainty as to the ultimate outcome continued in 2023. Following appellate oral arguments on November 15, 2023, RBC noted that "[o]verall, we continue to believe it is possible the end result is a much lower award for damages."[78]  On December 18, 2023, Loop identified four "likely scenarios [that] could result from the Virginia Court of Appeals," including the possibilities that the approximately $2 billion damages award is upheld or that the appeals court rules in Pega's favor and invalidates the prior verdict and damages award.[79]  Appian has even acknowledged the uncertainty of the ultimate outcome of the Virginia Litigation through its purchase of an insurance policy against the final judgment.[80]

---

[74] Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss, footnote 46.

[75] Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss, p. 16.  Plaintiffs also allege that "[d]uring the course of the Virginia Action Pega suffered one setback after another, continually losing discovery fights, multiple motions to send the lawsuit to arbitration were denied, and multiple motions Appian filed to amend their complaint (which were opposed by Pega) were granted," indicating that, as I explain in **Section V.B** below, the information about potential outcomes in the Virginia Litigation evolved during the Proposed Class Period.  See Complaint, ¶ 196(e).  This allegation is also inconsistent with a claim that the outcome that occurred on May 9, 2022 could have been anticipated earlier in the Proposed Class Period.

[76] "Pegasystems-Appian Litigation Resolution Could Likely Take Years," J.P. Morgan, May 10, 2022.

[77] "FX Headwinds Persist; ACV Grows 10% (16% in CC), Down from 14% (19% in CC) in 2Q," JMP Securities, October 27, 2022.

[78] "Takeaways from Oral Argument of Virginia Appeal," RBC, November 17, 2023.

[79] "Investor Meetings Shed Light on Appellate Court Process, PT to $50," Loop Capital, December 18, 2023.

[80] Appian Corporation Form 8-K filed September 7, 2023.

48.    Given the continued uncertainty with respect to the ultimate outcome of the Virginia Litigation (even as of the time of this report), a reliable damages methodology would need to be capable of estimating the market's assessment of the "extent and likelihood of Pega's liability"[81] in the Virginia Litigation throughout the Proposed Class Period in the but-for world.  However, Prof. Feinstein fails to articulate a damages methodology, even in general terms, that is capable of reliably performing this assessment throughout the Proposed Class Period.

**B.    Prof. Feinstein Fails to Provide a Methodology That Can Reliably Measure Potential Changes in Inflation During the Proposed Class Period**

49.    Further complicating the analysis of inflation in this case, the evolving information available to Pega and the market regarding the Virginia Litigation could have resulted in changes in alleged inflation during the Proposed Class Period.  Indeed, Plaintiffs allege that "[d]uring the course of the Virginia Action Pega suffered one setback after another, continually losing discovery fights, multiple motions to send the lawsuit to arbitration were denied, and multiple motions Appian filed to amend their complaint (which were opposed by Pega) were granted."[82] Plaintiffs claim that given these developments, their "well-pled allegations detail how 'the degree of probability of an unfavorable outcome' in the [Virginia Litigation] was only increasing throughout the Class Period."[83]

50.    Thus, even if Prof. Feinstein's damages methodology is capable of reliably estimating the inflation dissipated by any alleged corrective disclosure (which it is not), if there are changes in information that could have affected the market's assessment of the "extent and likelihood of Pega's liability"[84] in the Virginia Litigation during the Proposed Class Period in the actual world or the but-for world, a methodology that simply "backcasts" the amount of inflation dissipated on the alleged corrective disclosure dates would not be capable of reliably measuring inflation on each day of the Proposed Class Period.

51.    Continuing with the above hypothetical example of a company facing the risk of a regulatory fine, assume again that the company faces the possibility of paying a $100 million fine, and that it misrepresents to the market that there is a 30% probability of paying the fine

---

[81] Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss, footnote 46.
[82] Complaint, ¶ 196(e).
[83] Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss, p. 16.
[84] Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss, footnote 46.

(which the market believes), but the true probability is 60%. As shown in **Exhibit 4**, inflation at this time would be $3 per share, calculated as the difference between the actual expected loss ($6 per share, based on a 60% true probability of a $100 million fine) and the market's expected loss based on the misrepresented probability ($3 per share, based on a 30% probability of a $100 million fine). Now consider how inflation changes as new information becomes available:

a. First, suppose that the company learns new information that leads it to believe that the fine, if paid, will be $200 million instead of $100 million. Assume that the company discloses its revised expectation regarding the size of the fine but continues to misrepresent the probability. Thus, inflation at this time would increase to $6 per share, calculated as the difference between the actual expected loss ($12 per share, based on a 60% true probability of a $200 million fine) and the market's expected loss based on the misrepresented probability ($6 per share, based on a 30% probability of a $200 million fine).

b. Suppose that subsequently, due to other information available in the market (e.g., fines issued to other similarly situated companies or statements made by the regulator), the market revises its expectation of the probability that the company will pay a fine to 40%. Inflation would decrease when the market revises its probability assessment. At the time the market believes that the probability of paying a fine is 40%, inflation would be $4 per share, calculated as the difference between the actual expected loss (still $12 per share, based on a 60% true probability of a $200 million fine) and the market's expected loss based on the misrepresented probability (now $8 per share, based on a 40% probability of a $200 million fine).

52.    This example demonstrates that when the market's assessment of probabilities or expected magnitudes of outcomes vary over time (in the actual world or the but-for world) as a result of changing information, there are further complications with using the stock price declines following alleged corrective disclosures to reliably measure inflation throughout the entire class period. Prof. Feinstein acknowledges the possibility that he would need to take into account "changes in the *value* of the concealed information" when providing a methodology that

can reliably measure inflation throughout the Proposed Class Period.[85] As explained in **Section V.A** above, Prof. Feinstein lists a number of examples of generic valuation tools that he claims could be used in quantifying inflation. However, merely pointing to generic valuation tools is not the same as articulating whether and how such tools can be applied—if at all—to the specific circumstances in this case to reliably measure inflation and damages in a manner consistent with Plaintiffs' theory of liability. Prof. Feinstein fails to explain, even in general terms, how he would use unspecified valuation tools to account for potential changes in the market's assessment of the "extent and likelihood of Pega's liability"[86] in the Virginia Litigation during the Proposed Class Period (both in the actual world and the but-for world where Pega would not have made any alleged misrepresentations regarding the Virginia Litigation and Pega's alleged business practices).

53.     The information about potential outcomes in the Virginia Litigation evolved during the Class Period. For example, as described above, Appian increased its damages claim during the Proposed Class Period. In the First Virginia Litigation Complaint, which was operative at the start of the Proposed Class Period, Appian claimed damages "in an amount that will exceed $90 million in damages."[87] This $90 million figure was far below the $3 billion in damages Appian claimed in the Third Virginia Litigation Complaint filed on February 11, 2022.[88] To the extent the updated damages claimed by Appian changed the but-for disclosure Pega allegedly could and should have made, the market's assessment of the "extent and likelihood of Pega's liability"[89] in the Virginia Litigation in the but-for world may also have changed during the Proposed Class Period. Prof. Feinstein does not explain, even in general terms, how he would use unspecified valuation tools to account for changes in information that Pega allegedly could and should have

---

[85] Feinstein Report, ¶ 157.iii, emphasis added.

[86] Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss, footnote 46.

[87] First Virginia Litigation Complaint, ¶¶ 54, 68, 75, 88, 94.

[88] Pega 2021 10-K, p. 23. Pega discussed the Virginia Litigation and the $3 billion damages figure in its 2021 10-K, which was filed after market hours on February 16, 2022. I note that Pega disclosed additional company-specific information on February 16, 2022. Specifically, after market close on February 16, 2022, around the same time as its 10-K filing, Pega issued a press release in which it disclosed Q4 and full-year 2021 results and guidance for 2022. See Pegasystems Inc. Form 8-K filed February 16, 2022. Thus, to the extent Prof. Feinstein would use Pega's stock price decline on February 17, 2022 to measure the inflation dissipated by the February 16, 2022 alleged corrective disclosure, he would need to disaggregate any portion of the stock price decline attributable to confounding news not causally linked to the Virginia Litigation. Further, even if Prof. Feinstein were able to disaggregate the stock price impact of confounding news, simply "backcasting" any remaining price decline would not constitute a reliable damages methodology, as he would still need to address potential changes in inflation due to changing information during the Proposed Class Period.

[89] Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss, footnote 46.

disclosed regarding Appian's claimed damages in the Virginia Litigation and measure the impact of those changes on alleged inflation during the Proposed Class Period.

54.    In addition, other events during the Proposed Class Period may have caused the market to change its assessment of the "extent and likelihood of Pega's liability"[90] in the Virginia Litigation.  For example, in its Q1 2022 SEC Form 10-Q filed on April 28, 2022, Pega disclosed that:

> On April 13, 2022 … the Court stated that if the jury finds that the Company misappropriated information that constituted Appian trade secrets and finds that the Company incorporated those trade secrets into the Company's products or the Company's marketing materials, the burden will then shift to the Company to prove that the sales Appian seeks as damages were not the result of the alleged misappropriation and use of the alleged trade secrets.  This legal standard has not previously been adopted by the Virginia courts.[91]

This disclosure could have led to a change in the market's assessment of the potential outcomes of the Virginia Litigation.  Thus, having a reliable methodology to estimate the market's assessment of this disclosure and its impact, if any, on the "extent and likelihood of Pega's liability"[92] in the Virginia Litigation is critical to calculating a reliable measure of inflation and damages in a manner consistent with Plaintiffs' theory of liability.  Yet Prof. Feinstein does not explain how he would use unspecified valuation tools to estimate whether and to what extent disclosure of such information about the Virginia Litigation changed the market's assessment of the "extent and likelihood of Pega's liability."[93]

55.    As another example, as discussed above in **Section IV.B**, the existence of the Virginia Litigation and Appian's First and Second Virginia Litigation Complaints were discussed in Pega and Appian's filings in the Massachusetts Litigation.  Prof. Feinstein does not explain how he would use unspecified valuation tools to address whether and to what extent the filings in the Massachusetts Litigation had an impact on the market's assessment of the "extent and likelihood of Pega's liability"[94] in the Virginia Litigation, which would be required to reliably measure inflation in Pega's stock price, if any, during the Proposed Class Period.  Thus, Prof. Feinstein

---

[90] Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss, footnote 46.
[91] Pega Form 10-Q filed April 28, 2022, p. 18.
[92] Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss, footnote 46.
[93] Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss, footnote 46.
[94] Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss, footnote 46.

fails to provide a methodology that can reliably measure potential changes in inflation during the Proposed Class Period.

56.    In sum, I conclude that Prof. Feinstein has not provided a methodology that is capable of reliably measuring class-wide damages in a manner consistent with Plaintiffs' theory of liability in this matter.

Executed this 28th of February, 2024

Amy Hutton, Ph.D.

**Appendix A**

# AMY HUTTON

550A Fulton Hall
Carroll School of Management
Boston College
140 Commonwealth Ave.
Chestnut Hill, MA 02467
(617) 552 1951
amy.hutton@bc.edu

## EDUCATION

| | |
|---|---|
| 1992 | Ph.D., Business Administration, The Simon Business School, University of Rochester. |
| 1986 | M.B.A., *beta gamma sigma*, Accounting, Finance, and Organizations & Markets, The Simon Business School, University of Rochester. |
| 1985 | B.A., *magna cum laude*, Political Science, University of Rochester. |

## FACULTY APPOINTMENTS

| | |
|---|---|
| 7/1/92-6/30/97 | Assistant Professor of Business Administration, Harvard Business School |
| 7/1/97-6/30/03 | Associate Professor of Business Administration, Harvard Business School |
| 7/1/02-12/31/02 | Visiting Associate Professor of Business Administration, Tuck School of Business at Dartmouth |
| 1/1/03-6/30/03 | Visiting Scholar, Graduate School of Business, Stanford University |
| 7/1/03-6/30/06 | Associate Professor of Business Administration, Tuck School of Business at Dartmouth |
| 7/1/06-6/30/10 | Associate Professor of Business Administration, Carroll School of Management, Boston College |
| 7/1/10-present | Professor of Business Administration, Carroll School of Management, Boston College |
| 7/1/20-present | Ph.D. Program Director, Accounting |

### Teaching Assignments

#### Harvard Business School

| | |
|---|---|
| 1991-1994 | Financial Reporting, Management Accounting and Control |
| 1995-2000 | Business Analysis and Valuation |
| 1998-2001 | Driving Corporate Performance, Executive Education |
| 2000-2001 | Financial Reporting and Control |

#### Tuck School of Business at Dartmouth

| | |
|---|---|
| 2002-2004 | Financial Measurement, Analysis and Reporting |
| Spring 2005 | Financial Reporting and Statement Analysis |
| 2002-2006 | Various Executive Education Programs |

#### Carroll School of Management at Boston College

| | |
|---|---|
| 2006-present | Financial Statement Analysis and Valuation |
| 2009-2011 | Intermediate Accounting II |
| 2018-present | Ph.D. research seminars – Empirical, financial accounting research |



**PUBLICATIONS**

**Academic Articles[1]**

1.  \*\* "Debt-Covenant Violations and Managers' Accounting Responses," *Journal of Accounting and Economics,* May 1994.

2.  \*\* "Detecting Earnings Management" (with Patricia M. Dechow and Richard G. Sloan), *Accounting Review*, April 1995.

3.  \*\* "Causes and Consequences of Earnings Management: An Analysis of Firms Subject to Enforcement Actions by the SEC" (Patricia M. Dechow and Richard G. Sloan), *Contemporary Accounting Research*, Spring 1996.

4.  "Economic Consequences of Accounting for Stock-based Compensation" (with Patricia M. Dechow and Richard G. Sloan), *Journal of Accounting Research*, Supplement 1996.

5.  "An Empirical Assessment of the Residual Income Valuation Model" (with Patricia M. Dechow and Richard G. Sloan), *Journal of Accounting and Economics*, January 1999.

6.  "Stock Performance and Intermediation Changes Surrounding Sustained Increases in Disclosure" (with Paul Healy and Krishna Palepu), *Contemporary Accounting Research,* Fall 1999.

7.  "The Relation Between Analysts' Long-Term Earnings Forecasts and Stock Price Performance Following Equity Offerings" (with Patricia M. Dechow and Richard G. Sloan), *Contemporary Accounting Research,* Spring 2000.

8.  "Short Sellers, Fundamental Analysis, and Stock Returns" (with Patricia M. Dechow, Lisa Meulbroek, and Richard G. Sloan), *Journal of Financial Economics*, July 2001.

9.  "The Role of Supplementary Statements with Management Earnings Forecasts" (with Greg Miller and Douglas Skinner), *Journal of Accounting Research,* December 2003.

10. "Analyst Earnings Forecast Revisions and the Pricing of Accruals" (with Mary Barth), *Review of Accounting Studies*, Spring 2004.

11. "Determinants of Managerial Earnings Guidance Prior to Regulation Fair Disclosure and Bias in Analysts' Earnings Forecasts," *Contemporary Accounting Research*, Winter 2005.

12. "A discussion of 'Corporate Disclosure by Family Firms' " *Journal of Accounting and Economics*, September 2007.

13. "Opaque Financial Reports, R-square, and Crash Risk" (with Alan Marcus and Hassan Tehranian), *Journal of Financial Economics*, October 2009.

14. "Detecting Earnings Management – A New Approach" (with Patricia Dechow, Jung Hoon Kim and Richard Sloan), *Journal of Accounting Research*, May 2012.

15. "Do Managers Always Know Better?  An Examination of the Relative Accuracy of Management and Analyst Forecasts" (with Lian Fen Lee and Susan Shu), *Journal of Accounting Research*, December 2012.

---

[1] \*\* published under the name *Amy Sweeney*.

**Appendix A**

16. "The Role of Social Media in the Capital Market: Evidence from Consumer Product Recalls" (with Lian Fen Lee and Susan Shu), *Journal of Accounting Research*, May 2015.

17. A Discussion of "Aggregate Noise Trader Risk, Mispricing, and Accounting Fundamentals" *Contemporary Accounting Research*, May 2017.

18. "Prior Forecasting Accuracy and Investor Reaction to Management Earnings Forecasts" (with Phillip C. Stocken), *Journal of Financial Reporting*, April 2021.

19. "Regulatory Transparency and the Alignment of Private and Public Enforcement" (with Susan Shu and Xin Zheng), *Journal of Financial Economics*, July 2022.

20. The Learning Hypothesis Revisited: A Discussion of Sani, Shroff and White" (with Eric Gelsomin), *Journal of Accounting and Economics*, Forthcoming.

## Working Papers

"The Costs and Benefits of Regulatory Transparency for Public Banks: Evidence from Disclosure of SEC Comment Letters" (with Y. Lin, S. Shu, I Yeung, X. Zheng).

## Practitioner Publications

"Solving the New Equity Puzzle" (with Patricia M. Dechow and Richard G. Sloan), *The Financial Times: Mastering Finance Series,* Summer 1997.

"Best Practice: Four Rules for Taking Your Message to Wall Street," *Harvard Business Review*, May 2001.

"Review of the Securities Industry Association's Best Practices for Research" completed for the House Financial Service Committee, Capital Markets Subcommittee, *Congressional Record*, August 2001.

"Beyond Financial Reporting—An Integrated Approach to Disclosure," *Journal of Applied Corporate Finance*, Fall 2004.

"Roundtable on Corporate Disclosure, National Corporate Finance Forum" (with Donald Chew), *Journal of Applied Corporate Finance*, Fall 2004.

"Bad News Rings True: Supplemental Information Can Enhance Earnings Forecast Credibility" (with Greg Miller and Douglas Skinner), *Investor Relations Quarterly* vol. 6 no. 2, 2004.

**Citations**    Google Scholar over 36,500   (over 14,300 since 2018)

## Awards & Fellowships

AAA's **Distinguished Contribution to Accounting Literature Award**, 2010.

Carroll School **Coughlin Distinguished Teaching Award**, 2020.

**Ernst & Young Faculty Fellow**, 2022.

**Appendix A**

## PROFESSIONAL ACTIVITIES

Editor of the *Accounting Review*, June 2011 – June 2014

Referee    *Contemporary Accounting Research, Journal of Accounting and Economics, Journal of Accounting Research, Review of Accounting Studies, Journal of Financial Economics, Journal of Finance, Review of Financial Studies*, American Accounting Association Annual Conferences

Member of    American Accounting Association (AAA), 1991 – present.
Editorial Review Board of the *Accounting Review*, 1994-99, 2014 – 2017
Research Advisory Committee AAA, 1997 – 2000.
Faculty Development Committee, AAA, 1997 – 2000.
Corporate Accounting Policy Committee, AAA 1999-2001, Chair 2001.
Review Board for the House Financial Service Committee, Capital Markets Subcommittee examining Securities Industry Association's proposals governing the standards and practices of research analysts, June 2001.

Board of    National Industries for the Blind (NIB), 2002 – 2006
Advisors    Audit and Finance Committee, NIB, 2004 – 2006

Directorship    Bandag, Inc., member of audit and corporate governance and nominating committees, June 2003-June 2007; chair of the audit committee May 2005-June 2007.  Bandag acquired by Bridgestone June 2007.

Service    University Research Committee, January 2007 – January 2010
at Boston    Accounting Department's Recruiting Committee, January 2007 – present
College    Faculty Guide for Freshmen, Class 2012
Parent Action Committee for the Boston College Children's Center, September 2007 – 2010, 2014 – 2016.
Provost's Advisory Council, September 2009 – July 2011
Promotion & Tenure Committee, July 2010 – July 2012
Student Advisor

Cornerstone Research – Expert

**Appendix A**

**Invited presentations of working papers:**

Boston College, Columbia University, HBS – Harvard University,
MIT Sloan School of Business, New York University, Northwestern University,
University of Pennsylvania – Wharton School of Business, Winter/Spring 1991

University of Michigan, January 1993 and March 2011

AAA Northeast Regional Conference, March 1993

Harvard Business School, September 1993, February 1996, May 2002,
  September 2007, and March 2012

University of Rochester, October 1993, May 2002 and May 2015

Southern Methodist University, April 1994

Financial Decision and Control Conference,
  Harvard University, July 1993, 1994, and 1998

AAA National Meetings, August 1994, 1995, 1997 – 2001 and 2003

Cornell University, September 1994 and November 1997

Mitsui Life Symposium, University of Michigan, October 1994

Columbia University, January 1995 and December 2010

*Contemporary Accounting Research* Conference, April 1995 and 1998

University of Iowa, September 1995

Ohio State University, September 1995, June 2010

*Journal of Accounting Research* Conference, 1996, 2011, and 2014

Stanford University July 1996, May 2013 and December 2019

University of North Carolina, October 1996 and February 1999

Washington University, Fall 1996

University of Georgia, Fall 1996

University of Oregon, Winter 1997

University of Waterloo, April 1997

Michigan State University, September 1997

*Journal of Accounting and Economics* Conference, May 1998

Northwestern University, October 1998

Western AAA Conference, April 1999

University of Texas, Austin, October 1999

Prudential Securities Quantitative Research Conference, December 1999

*The Center for Investment Research,* Corporate Earnings Analysis
  Seminar, NYC, May 2001.

Tuck School of Business - Dartmouth, September 2001 and May 2005

National Investor Relations Institute (NIRI) Senior Roundtable Nov. 2001

M.I.T., Sloan School of Management, May 2002 and May 2006

London Business School, July 2002

University of Washington, November 2002



**Appendix A**

**Invited presentations of working papers (continued):**

Emory University, November 2002

Boston College, April 2005

FEA Conference, University of North Carolina, Chapel Hill, Nov. 2005

George Washington University, March 2006

Carnegie Mellon University, January 2007

University of Pennsylvania, Wharton School of Business, April 2007 and November 2020

Boston University, May 2007 and May 2013

University of Wisconsin, Madison, November 2007 and November 2009

INSEAD, May 2009

Yale University, November 2014

University of Southern California, October 2020

Baruch College, October 2020

Community Banking Research Conference, St. Louis Fed., Sept. 2022

London School of Economics, October 2023

**Invited presentations and discussions:**

AAA National Meetings, various years as a discussant and moderator

AAA New Faculty Consortium as a panelist, February 1996

The Conference Board, May 2001

SEC / NIRI (National Investor Relations Institute) Symposium on the Effects of Regulation Fair Disclosure, as a panelist May 2001

Securities Industry Association (SIA), Research and Regulation: Analyst Objectivity and Related Issues, as a panelist April 2002

NIRI 2002 Annual Conference: "Disclosure Tactics", June 2002

National Association of Corporate Directors, Corporate Financial Reporting and Disclosure: "The Expanding Role of the Audit Committee", November 2002

Forum on Corporate Finance Annual Meeting, "Earnings Guidance: Taking Back Control of the Disclosure Agenda", Stern School of Business New York University, May 2004

2005 Financial Services CEO Gathering, Panel Discussion: The Role of the CEO in Dealing with the External Environment, Morgan Stanley, May 2005.

*Journal of Accounting and Economics* Conferences, Discussant 2005

*Contemporary Accounting Research* Conference, Discussant 2014

IMO Conference, Harvard Business School, Discussant 2016

Stanford Summer Camp, Discussant 2021

*Journal of Accounting and Economics* Conferences, Discussant 2022

**Appendix A**

**Invited conferences (that I was able to attend):**

AAA Financial Reporting Conferences, 1991, 1992, 1994 & 1995

Trueblood Seminar Series, Deloitte & Touché 1993

AAA New Faculty Consortium 1993

Arthur Andersen Accounting Research Symposium 1993

Stanford Summer Camp 1996, 2021, 2023

AAA Corporate Accounting Polices (CAPs) 1994, 1999 & 2000
Selected Chairman for the AAA CAPs Conference in 2001

AAA Financial Reporting Conference, The FASB, 1996 & 1997

*Journal of Accounting and Economics* Conferences, 1993, 2000 through
2003; 2005 through 2011, 2013 through 2022
Discussant at the October 2022 JAE conference.

*Journal of Accounting Research* Conference, 1994, 2003, 2006, 2008
through 2011

Financial Decision and Control Conference, Harvard Business School,
1993 through 1998 and 2001

IMO Conference, Harvard Business School
2006, 2007, 2009 – 2011, 2015 – 2019, 2022

**Appendix B**

# AMY HUTTON
## Depositions and Testimony for Prior Four Years

Deposition Testimony of Amy Hutton in *In Re Perrigo Company plc Securities Litigation*, U.S. District Court, Southern District of New York, Civil Case No. 19-CV-70 (DLC) (February 24, 2021).

Deposition Testimony of Amy Hutton in *Huntsman International LLC v. Albemarle Corporation, Rockwood Specialties Group, Inc., and Rockwood Holdings, Inc.*, American Arbitration Association, Case No. 01-17-001-4588 (March 5, 2021).

Arbitration Testimony of Amy Hutton in *Huntsman International LLC v. Albemarle Corporation, Rockwood Specialties Group, Inc., and Rockwood Holdings, Inc.*, American Arbitration Association, Case No. 01-17-001-4588 (May 13, 2021).

Deposition Testimony of Amy Hutton in *In Re Millennium Lab Holdings II, LLC, et al.*, U.S. Bankruptcy Court, District of Delaware, Case No. 15-12284 (LSS) (April 5, 2022).

Deposition Testimony of Amy Hutton in *In Re Valeant Pharmaceuticals International, Inc. Securities Litigation,* U.S. District Court, District of New Jersey, Civil Action No. 3:18-cv-00343-MAS-LHG (June 20, 2022).

Deposition Testimony of Amy Hutton in *State of Alaska et al. v. Ryder System Inc., Robert E. Sanchez, Art A. Garcia, and Scott T. Parker*, U.S. District Court, Southern District of Florida, Civil Action No. 1:20-cv-22109-AMC (February 2, 2023).

**Appendix C**

# Materials Considered by Amy Hutton, Ph.D.

### Analyst Reports

Pegasystems Inc. analyst reports for the periods February 11, 2022 to February 23, 2022, May 3, 2022 to May 16, 2022, and May 17, 2022 to December 31, 2023, obtained from counsel, Feinstein Report production materials, Capital IQ, and Refinitiv Eikon, including:

- "After a Big Shock, What Comes Next?" SMBC Nikko Securities America, Inc., May 12, 2022.

- "APPN Receives Favorable Jury Verdict in Litigation Against PEGA for Trade Secret Misappropriation," Goldman Sachs, May 10, 2022.

- "Downgrading PEGA to Hold on Litigation Overhang & Uncertainty," Truist Securities, May 11, 2022.

- "Further Thoughts on the Appian/Pega Verdict," Barclays, May 12, 2022.

- "FX Headwinds Persist; ACV Grows 10% (16% in CC), Down from 14% (19% in CC) in 2Q," JMP Securities, October 27, 2022.

- "Investor Meetings Shed Light on Appellate Court Process, PT to $50," Loop Capital, December 18, 2023.

- "Jury Renders Verdict Against Pega for ~$2.04B in Damages to Appian; Downgrading to MP," JMP Securities, May 12, 2022.

- "Our Thoughts on the $2B Appian Verdict," RBC, May 10, 2022.

- "Pegasystems-Appian Litigation Resolution Could Likely Take Years," J.P. Morgan, May 10, 2022.

- "Takeaways from Oral Argument of Virginia Appeal," RBC, November 17, 2023.

- "Thoughts on Appian Verdict; Long Road Ahead on Lawsuit," Wedbush Securities, May 10, 2022.

### Expert Reports

- Report on Market Efficiency and Damages Methodology, Professor Steven P. Feinstein, Ph.D., CFA, December 12, 2023 and production.

### Legal Pleadings

- *Appian Corporation v. Pegasystems Inc. and Youyong Zou*, Circuit Court of Fairfax County, Complaint, May 29, 2020.

- *Appian Corporation v. Pegasystems Inc. and Youyong Zou*, Circuit Court of Fairfax County, First Amended Complaint, November 4, 2021.

- *Appian Corporation v. Pegasystems Inc. and Youyong Zou*, Circuit Court of Fairfax County, Second Amended Complaint, February 11, 2022.

**Appendix C**

- *City of Fort Lauderdale Police and Firefighters' Retirement System v. Pegasystems Inc., et al.*, Consolidated Amended Complaint, October 18, 2022.

- *City of Fort Lauderdale Police and Firefighters' Retirement System v. Pegasystems Inc., et al.*, Defendants' Memorandum in Support of Their Motion to Dismiss the Consolidated Amended Complaint, December 19, 2022.

- *City of Fort Lauderdale Police and Firefighters' Retirement System v. Pegasystems Inc., et al.*, Lead Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Consolidated Amended Complaint, February 17, 2023.

- *City of Fort Lauderdale Police and Firefighters' Retirement System v. Pegasystems Inc., et al.*, Defendants' Reply Memorandum in Support of Their Motion to Dismiss the Consolidated Amended Complaint, April 3, 2023.

- *City of Fort Lauderdale Police and Firefighters' Retirement System v. Pegasystems Inc., et al.*, Memorandum and Order, July 24, 2023.

- *In re Pegasystems Inc. Securities Litigation,* Memorandum of Law in Support of Motion to Certify this Action as a Class Action and Related Relief, December 12, 2023.

- *Pegasystems Inc. v. Appian Corporation and Business Process Management, Inc.*, Docket.

- *Pegasystems Inc. v. Appian Corporation and Business Process Management, Inc.*, Pegasystems' Motion to Continue Mediation, November 24, 2020.

- *Pegasystems Inc. v. Appian Corporation and Business Process Management, Inc.*, Motion to Amend Protective Order and to Compel Appian to Disclose Extent of Overlap between Massachusetts and Virginia Actions, December 30, 2021.

- *Pegasystems Inc. v. Appian Corporation and Business Process Management, Inc.*, Memorandum in Support of Motion to Amend Protective Order and to Compel Appian to Disclose Extent of Overlap between Massachusetts and Virginia Actions, December 30, 2021.

- *Pegasystems Inc. v. Appian Corporation and Business Process Management, Inc.*, Declaration of August Horvath in Support of Pegasystems Inc.'s Motion to Amend Protective Order and to Compel Appian to Disclose Extent of Overlap between Massachusetts and Virginia Actions, December 30, 2021.

- *Pegasystems Inc. v. Appian Corporation and Business Process Management, Inc.*, Declaration of Adeel A. Mangi in Support of Appian Corporation's Opposition to Pegasystems' Motion to Compel and to Modify Protective Order, January 13, 2022.

- *Pegasystems Inc. v. Appian Corporation*, Court of Appeals of Virginia, Opening Brief of Appellant, February 6, 2023.

**Appendix C**

**Public Press**

Public press articles and conference call transcripts from Factiva for the period May 28, 2020 (one day prior to the filing of the First Virginia Litigation Complaint) to May 12, 2022 based on searching for "Pegasystems" or "Pega" in the title or first paragraph in Barron's, Financial Times – Print and Online, Forbes, Investor's Business Daily, The Economist United Kingdom, The New York Times, The Wall Street Journal, PR Newswire, Reuters, Dow Jones, and Business Wire.

**SEC Filings**

- Pegasystems Inc. 2020 Form 10-K filed February 17, 2021.

- Pegasystems Inc. 2021 Form 10-K filed February 16, 2022.

- Pegasystems Inc. Form 8-K filed February 16, 2022.

- Pegasystems Inc. Form 10-Q filed April 28, 2022.

- Pegasystems Inc. Form 8-K filed May 9, 2022.

- Pegasystems Inc. Form 8-K filed September 16, 2022.

- Pegasystems Inc. 2022 Form 10-K filed February 15, 2023.

- Appian Corporation Form 8-K filed September 7, 2023.

**Websites and Other Public Sources**

- "Court of Appeals of Virginia Recordings of Oral Arguments," Region 4 – Northern (11/15/2023), 1399-22-4 Pegasystems, Inc. v. Appian Corp. (November 15, 2023), available at https://www.vacourts.gov/courts/cav/oral_arguments/2023/11_home.html, accessed on February 20, 2024.

- "Pega Response to Appian Lawsuit," Pega, available at https://www.pega.com/appian-lawsuit-statement, accessed on December 5, 2023.

- "SEC Fact Sheet on Global Analyst Research Settlements," U.S. Securities and Exchange Commission, available at https://www.sec.gov/news/speech/factsheet.htm, accessed on February 20, 2024.

- Va. Sup. Ct. R. 3:2(c)(ii).

**Note: In addition to the materials on this list, I considered all materials cited in my report and my exhibits to form my opinions.**

**Exhibit 1**



## Hypothetical Stock Price Reaction to Materialization of Fully Disclosed Risk

Stock Price

**Risk is fully disclosed:**
Company with 10 million shares outstanding learns of and discloses 60% probability of $100 million fine ($10 per share).

**Risk materializes:**
Company receives $100 million fine.

Stock price declines $6 per share. Risk fully incorporated into stock price.

**Actual stock price**

Stock price declines additional $4 per share when risk materializes.

**Exhibit 2**



# Hypothetical Stock Price Reaction to Materialization of Partially Disclosed Risk

**Exhibit 3**

# Pegasystems Inc.
## Analyst Commentary on 5/9/22 Disclosure of the Virginia Action Verdict

| | Date | Source | Quote |
|---|---|---|---|
| 1. | 5/10/22 | J.P. Morgan | [O]ur understanding is that Pegasystems strongly disagrees with the findings of the court and is expected to pursue an appeal, which could take years to come to a resolution. Although we are not expert in any legal matter, in our view, it is rare to see realization of damages of such a large magnitude, relative to the size of the company making the claim ($2B in damages is 5x Appian's LTM revenue). As such, we are skeptical that something of this magnitude will be a final resolution and view the headlines as somewhat hyperbolic during a very fragile equity market environment, driving PEGA shares to an unduly low valuation level (<3x EV/CY23). |
| 2. | 5/10/22 | Goldman Sachs | While the litigation was initiated in May 2020, the magnitude of the verdict caught many investors by surprise, with Appian up +39% and Pega down 21% (vs S&P500 +0.25%). This corresponded to approximately $1.2bn increase / decrease in market capitalization for APPN / PEGA, respectively. While no additional details were presented in court documents on how the damages claim was constructed, the verdict is subject to appeal by PEGA. |
| 3. | 5/10/22 | RBC | It's possible that the verdict will be appealed with a lower $ amount, and we highlight high-profile precedents….$2B in damages seems exorbitant in our view and does not reflect economic value. We would highlight some precedent cases in tech which involved larger organizations with materially smaller awards: the patent infringement cases of BMC/HP v. ServiceNow ($270M awarded in total), the trade secret case of Motorola v. Hytera ($418M awarded), and the trade secret case of Waymo v. Uber ($245M awarded). Further, we note Pega and Appian combined market caps and revenue run rates are $8B and $1.9B, respectively. As such, we view the award relative to real economic value as unprecedented. The size of the award from a state court is odd.  In our experience, a multi-billion dollar verdict from a state court is unusual, and it's possible that Pega could appeal the decision in federal court...we don't expect case resolution or damages paid anytime soon. |
| 4. | 5/10/22 | Wedbush Securities | The next step in this case will be hearing from the Judge from Fairfax courts about this lawsuit and ultimately allowing or revising this massive number from the jury.  Depending on the ultimate ruling PEGA will then have the opportunity to appeal in a case that will likely last a few years.  The initial reaction to the stock has been a ~35% cut to shares as the Street is reading this ruling as cemented rather than a very long process that could have a much different outcome possibly through appeal.<br><br>Dealing with these software trade secret trials over the decades many times the bark was worse than the bite at the end of the day although clearly this news adds risk and uncertainty to the stock in the near term. |
| 5. | 5/11/22 | Truist Securities | While we were aware that the company was in litigation with Appian, we were surprised by the size of the damages charged to PEGA. |

**Exhibit 3**

# Pegasystems Inc.
## Analyst Commentary on 5/9/22 Disclosure of the Virginia Action Verdict

| | Date | Source | Quote |
|---|---|---|---|
| 6. | 5/12/22 | Barclays | The >$2bn verdict grabs headlines[,] but as typical with litigation[,] there will likely be a lengthy appeal process and often the magnitude of damages can change.<br><br>Unsurprisingly, we saw a significant market move from both stocks over the next few days - Appian's market cap increased by ~$0.7bn and Pega's market cap decreased by ~1.3bn as of intraday prices on 5/12/22. What this could mean is the market is pricing in a final payout of anywhere between these two amounts at the conclusion of the appeals process. |
| 7. | 5/12/22 | SMBC Nikko Securities America, Inc. | Along with most investors with whom we've talked, we're stupefied by the size of the award (if not the verdict itself). In our 18 years covering software stocks, legal disputes have rarely moved the needle on a company's market value, and then only marginally. Also, we're somewhat puzzled by the magnitude of the impact on PEGA shares, but not terribly surprised given market de-risking and volatility in tech shares.<br><br>While PEGA may have erred in how it obtained access to Appian products, it's unclear whether Appian actually lost any deals as a result of PEGA's actions, and the size of the award (the majority of PEGA's gross profits from 2014 through 2021) defies logic. However, unless the judge vacates the award or reduces damages significantly in his decision following the jury verdict, we would expect an appeals process that takes years to reach a conclusion.<br><br>[T]here's still considerable uncertainty about the nature of the judge's decision and the outcome of any appeals process…. Most likely, the award will ultimately be reduced substantially (or the verdict reversed), and PEGA would likely have plenty of financial options available to fund any damages. |
| 8. | 5/12/22 | JMP Securities | [W]e expect Pegasystems to pursue appeal of the trial court's findings, a process that could potentially 'take years to complete' and would require the company to post a bond…. We point out that no judgement would be payable until this process has ended. There are a few scenarios that can occur. First, the verdict against Pegasystems could potentially be overturned. Second, while the verdict may be upheld, there is the possibility that the amount the company has to pay to Appian is less than the ~$2.04B that was decided by the jury in the Circuit Court for Fairfax County, Virginia. This is an ongoing situation that we intend to watch closely.<br><br>All things considered, we believe Pegasystems is currently fairly valued, as it trades at an EV/2023E revenue multiple of 2.5x, versus the peer group median multiple of 5.7x, which we believe is justified given the uncertainty surrounding the lawsuit and its potential impact. |

Source: Pega Analyst Reports

**Exhibit 4**

# Hypothetical Changes in Inflation Due to Changes in Information Available

