# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| In re PEGASYSTEMS INC. SECURITIES LITIGATION | No. 1:22-cv-11220-WGY |

REBUTTAL REPORT OF

PROFESSOR STEVEN P. FEINSTEIN, PH.D., CFA

March 3, 2024

**TABLE OF CONTENTS**

I.    SCOPE OF PROJECT AND REPORT ...................................................................................1

II.   SUMMARY OF CONCLUSIONS AND OPINIONS .......................................................2

III.  CRITIQUE OF PROFESSOR HUTTON'S DAMAGES METHODOLOGY
OPINION .........................................................................................................................6

     A.    Professor Hutton's Interpretation of Plaintiffs' Allegations is Too Narrow............7

     B.    The Out-of-Pocket Damages Methodology in the Feinstein Report Is Fully
Articulated.................................................................................................................9

     C.    The Out-of-Pocket Damages Methodology in the Feinstein Report is
Consistent with Plaintiffs' Theory of Liability.......................................................12

     D.    Professor Hutton's Criticism of the Out-of-Pocket Damages Methodology
Amounts to Baseless Speculation That the Methodology Will Be Executed
Incorrectly ...............................................................................................................13

          1.    Analysts Used the Standard Valuation Tools Referenced in the
Feinstein Report to Value Pega Stock and Other Securities
Routinely...................................................................................................14

          2.    The Measurement of Artificial Inflation and Treatment of
Potentially Confounding Information on Disclosure Dates Is Not
Unusual .....................................................................................................17

          3.    Professor Hutton's Argument About Materialization of a Known
Risk is Off Base and Inconsistent with Plaintiffs' Factual
Allegations ................................................................................................18

          4.    Time-Varying Inflation.........................................................................22

IV.  LIMITING FACTORS AND OTHER ASSUMPTIONS.................................................26

## I.    SCOPE OF PROJECT AND REPORT

1.    On 12 December 2023, I submitted a report addressing market efficiency and the methodology for computing damages in this matter (the "Feinstein Report"). Based on the analyses presented in the Feinstein Report, I concluded that the common stock of Pegasystems Inc. ("Pega" or the "Company")[1] traded in an efficient market over the Class Period, 16 June 2020 through 9 May 2022, inclusive.[2]

2.    In the Feinstein Report, I showed that each of the *Cammer* and *Krogman* factors supports a finding that Pega stock traded in an efficient market.[3] The analyses included an event study and a statistical test that compared the price behavior of Pega stock on high information flow dates with the stock price movements on ordinary non- or lesser-news dates. This test proved that Pega responded to new, Company-specific information and thereby demonstrated market efficiency during the Class Period.[4]

3.    In the Feinstein Report, I further concluded that Section 10(b) damages consistent with the Plaintiffs' theory of liability can be computed in this matter using a methodology that is common for all Class members.[5] In the Feinstein Report, I described that methodology – the out-of-pocket damages methodology – which is commonly applied in virtually all class action securities cases.[6] I explained how available valuation tools routinely address the various case specific-complexities that arise in the application of the out-of-pocket damages methodology.[7]

---

[1] Unless otherwise indicated, capitalized terms used herein have the same definition and meaning ascribed to them in the Feinstein Report.

[2] Feinstein Report, ¶20. I also concluded that the common stock of Pega traded in an efficient market over the Examination Period, 16 June 2020 through 15 September 2022, inclusive. Feinstein Report, FN 5. My conclusions as to the Class Period apply to the Examination Period.

[3] Feinstein Report, ¶18.

[4] Feinstein Report, ¶19.

[5] Feinstein Report, ¶21.

[6] Feinstein Report, ¶¶148-159.

[7] Feinstein Report, ¶¶154-156.

4. I am now asked by Robbins Geller Rudman & Dowd LLP, Lead Counsel for Lead Plaintiffs, to consider, evaluate, and respond to the arguments and conclusions in the Rebuttal Report of Amy Hutton, Ph.D., dated 28 February 2024 (the "Hutton Report"), which was submitted by Defendants in this matter. To that end, I analyzed the Hutton Report.

5. According to Professor Hutton, she was asked to "assess whether Prof. Feinstein has provided a methodology that is capable of reliably measuring class-wide damages in a manner consistent with Plaintiffs' theory of liability in this matter."[8]

6. This report presents my analysis and conclusions relating to the Hutton Report.

7. I have not been asked to opine on or conduct analyses of loss causation, or to compute damages, at this juncture. Should I be asked to do so, I will comprehensively address loss causation and damages at the appropriate stage in this litigation.

8. My conclusions are based on the information presently available to me. I reviewed and relied upon all the data and documents cited and listed in the Feinstein Report. Additional data and documents considered are listed in Exhibit-1. My credentials and compensation are presented in the Feinstein Report, as is a list of testimony I provided during the four years preceding that report.

9. My work in this matter is ongoing. I reserve the right to amend, refine, or supplement my analyses and opinions in the event that I become aware of additional information, evidence, arguments, or analyses that bear on my work in this matter.

## II. SUMMARY OF CONCLUSIONS AND OPINIONS

10. Professor Hutton does not contest my conclusion that Pega stock traded in an efficient market throughout the Class Period. Thus, the efficiency of the market for Pega stock is undisputed.

11. Professor Hutton does not dispute the existence of the out-of-pocket damages methodology. She does not dispute that it is widely used to compute damages in virtually all class action securities cases. She does not dispute that the out-of-pocket damages methodology can be applied commonly for all Class members. She does not dispute that

---

[8] Hutton Report, ¶7.

2

the out-of-pocket damages methodology measures damages using the difference between per-share inflation at purchase and per-share inflation at sale. Professor Hutton does not dispute that measuring artificial inflation on a daily basis produces an inflation ribbon, which the out-of-pocket damages methodology uses to compute damages commonly for all Class members. Professor Hutton does not dispute that an event study, in concert with valuation tools, can be applied to establish whether disclosures correcting certain alleged misrepresentations and omissions caused the price of Pega stock to fall. Neither does Professor Hutton dispute that an event study in concert with valuation tools can measure how much the Pega stock price declined due to the corrective disclosures. Professor Hutton does not dispute that an event study in concert with valuation tools can be applied to estimate artificial inflation on each day of the Class Period, producing the artificial inflation ribbon, which can then be used to estimate damages for all Class members according to the out-of-pocket damages methodology. In sum, Professor Hutton does not dispute a substantial portion of my analysis and the opinions I expressed.

12.    Professor Hutton's objection is not around the existence and appropriateness of the out-of-pocket damages methodology. Rather, her criticisms are that in her opinion, certain details of the implementation of the methodology were not sufficiently articulated, and that the damages methodology may be executed incorrectly.[9] She overlooks that my description of the methodology addresses how the methodology accommodates and overcomes potential complexities of precisely the sort she suggests may be encountered.

13.    Professor Hutton's primary criticism is that my methodology does not address certain case-specific valuation issues, which she contends must be addressed at the current stage of the litigation.[10] This is the same generic criticism raised by defendants' experts in many Section 10(b) cases. In fact, Professor Hutton has raised these same generic criticisms in at least one past case where she was asked to evaluate the damages methodology at the class certification stage.[11]

---

[9] Hutton Report, ¶10.

[10] Hutton Report, ¶¶12, 14-15.

[11] Expert Report of Amy Hutton, Ph.D., dated 16 December 2022, *State of Alaska et al. v. Ryder System Inc., Robert E. Sanchez, Art A. Garcia, and Scott T. Parker*, U.S. District Court, Southern District of Florida, Civil Action No. 1:20-cv-22109-AMC.

14.    In the instant matter, Professor Hutton does not identify a single factor that valuation analysis cannot address when constructing an inflation ribbon. Indeed, Professor Hutton's concerns overlook the fact that market participants arrive at valuations for virtually all publicly traded securities, all the time, in real-time, no different from those analyses undertaken in many securities class actions. I found no complexities in this case, and Professor Hutton identified none, that would cause me to reach a different opinion.

15.    Similarly, though she does not challenge the damages methodology, Professor Hutton criticizes my articulation of it. She contends that in order to be a complete description I must provide more granular detail about how I would address potentially confounding information. Professor Hutton also seeks more detail about how I would estimate what the security prices would have been prior to the disclosures related to the Virginia Action had there been full disclosure rather than alleged misrepresentations and omissions.

16.    Disaggregating confounding information and estimating a "but-for" price, are not unusual issues and certainly not unique to this case. Not only can the out-of-pocket damages methodology accommodate confounding information, but it would do so in a common manner for all Class members. Similarly, not only do valuation and analytic tools exist to compute hypothetical full disclosure but-for security prices, but those tools too would be executed commonly for all Class members. While it is premature at this stage to undertake the damage computation exercise, and thus is premature to address every potential complexity that may be encountered, it is the case that the standard tools of valuation and statistical analysis can be applied (if necessary) to perform the measurements and disaggregation that concerns Professor Hutton.

17.    Moreover, whether there is actually any confounding information will be determined in the course of the loss causation analysis, which has not yet been conducted in this case. If there is any confounding information, the standard tools of valuation analysis can separate out the effects. Financial analysts routinely perform attribution analyses, determining how much of a particular security price reaction was caused by one piece of news as opposed to another. As detailed in the Feinstein Report, the computation of the but-for price is a straightforward application of generally accepted and widely used valuation tools. Financial analysts routinely produce valuation forecasts contingent on alternative scenarios, concluding for example, that the price of a security will be X if one course of

events takes place, or alternatively Y if different events occur. The widely used and generally accepted valuation and statistical tools usually applied for these purposes include valuation multiples, discounted cash flow, application of the expansive literature on the studied effects of various valuation factors, probability weighted scenario estimates, the principle of rational expectations (recognizing that investors rarely make systematic valuation errors), and statistical maximum likelihood analysis (wherein an observed outcome informs about the most likely *ex ante* probability distribution of certain potential events).

18. The actual execution of the but-for valuation requires full development of the record, so that the forensic financial analyst can assess what information could have been disclosed to the public that was instead concealed or misrepresented. Professor Hutton is wrong to assume that the valuation impact of the allegedly concealed information about the "true risk of the Virginia Action" was necessarily less than the security price declines that did occur when the jury verdict and the court judgement were made public. With all information in hand, it may be determined that investors would have lowered their valuations of the Company by an even greater amount. The assumptions underlying Professor Hutton's criticisms are speculative and unfounded. It may be the case that the price declines actually sustained, which the event study accurately measures, represents a conservative estimate of how much the stock price would have fallen if prior full disclosure had informed the market: (i) that the Company was "relying on corporate espionage to gain a competitive advantage;" (ii) of the "existence of the Virginia Action;" (iii) of "Pega's egregious scheme to misappropriate Appian's trade secrets;" and (iv) of the inextricable ramifications associated therewith.[12] Common valuation analysis, detailed in the Feinstein Report, will tell once executed.

19. Contrary to Plaintiffs' allegations, Professor Hutton appears to assume that full disclosure would only reveal the existence of the Virginia Action rather than the corporate behavior that brought about the lawsuit.

20. I have not yet conducted a loss causation or damages analysis, but will do so at the appropriate stage, if requested, and the inflation ribbon will appropriately reflect the

---

[12] Feinstein Report, ¶29; and Complaint, ¶120.

difference between the stock price that prevailed in the marketplace and the price of Pega stock absent any misrepresentations and omissions. In sum, the Hutton Report provides no reason to revise my conclusion that a common methodology exists to calculate damages for Class members – that methodology being the out-of-pocket damages methodology.

### III.    CRITIQUE OF PROFESSOR HUTTON'S DAMAGES METHODOLOGY OPINION

21.    Professor Hutton does not dispute the existence of the out-of-pocket damages methodology and does not dispute that it is widely used to compute damages in virtually all class action security cases, and that it is approved in published legal scholarship.[13] She does not dispute that it can be applied commonly for all Class members. Professor Hutton acknowledges that my description of the methodology addresses how it accommodates and can overcome potential complexities of precisely the sort she suggests may be encountered.[14]

22.    Professor Hutton's criticism is that my description of the out-of-pocket damages methodology does not provide sufficient details as to how the valuation analysis that may be used in the methodologies implementation would be carried out.[15] However, Professor Hutton does not identify a single factor that cannot be addressed using one or more of the generally accepted valuation tools, including those referenced in the Feinstein Report. As stated in the Feinstein Report (and summarized again below), such valuation tools are commonly employed to construct an inflation ribbon in the course of implementing the out-of-pocket damages methodology. Indeed, Professor Hutton's criticism disregards that market participants routinely arrive at valuations for virtually any type of publicly traded security in real time using the same valuation tools that would be readily applicable to estimate but-for prices in a securities class action such as this. I have found no particularly unusual complexities in this case that would cause me to reach a different opinion, and Professor Hutton identified none.

---

[13] Feinstein Report, ¶151.

[14] Hutton Report, ¶¶31-33.

[15] Hutton Report, ¶33.

23. In sum, Professor Hutton offers that it may be difficult to construct an inflation ribbon that accurately reflects the difference between the stock price that actually prevailed in the marketplace and the but-for price. But by identifying what a correct analysis should consider, Professor Hutton provides what she believes are instructions for correct construction of the inflation ribbon, and thusly concedes that such construction is possible in this matter.

### A. Professor Hutton's Interpretation of Plaintiffs' Allegations is Too Narrow

24. Professor Hutton adopts a too narrow interpretation of what Plaintiffs allege, incorrectly characterizing the allegations to amount to: "Defendants 'conceal[ed] the *true risk* posed by the Virginia Action.'"[16] She uses this, or related phrasing, over 25 different times in her report.[17] Professor Hutton's selective interpretation of Plaintiffs' allegations appears to be based on an excerpt from a footnote on the last page of the Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss, which she cites 24 times in her report:[18]

> "Leung v. bluebird bio, Inc., 599 F. Supp. 3d 49, 70 (D. Mass. 2022), is inapposite as Defendants here continued to conceal the true risk posed by the Virginia Action even after they disclosed the existence of the litigation in February 2022. It was the materialization of this concealed risk – the true extent and likelihood of Pega's liability – which only occurred in May and September 2022, that caused Plaintiffs' losses. Defendants' other cited cases are out-of-Circuit and likewise distinguishable."
> ***City of Fort Lauderdale Police and Firefighters' Retirement System v. Pegasystems Inc., et al.*, Lead Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Consolidated Amended Complaint, 17 February 2023, ("Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss"), FN 46.**

25. Professor Hutton's erroneous characterization of Plaintiffs allegations omits that the Company allegedly concealed its improper behavior. Contrary to Professor Hutton's mischaracterization of Plaintiffs' allegations, full timely disclosure would have revealed

---

[16] Hutton Report, ¶36 (emphasis added) (internal citations omitted).

[17] See, e.g., Hutton Report, ¶¶11, 35, 36, 37, 38, 39, 41, and 43.

[18] Hutton Report, FNs 3, 4, 5, 6, 7, 12, 13, 14, 15, 56, 58, 60, 61, 72, 73, 74, 81, 84, 86, 89, 90, 92, 93, and 94.

the improper behavior and reasonably anticipated, inextricable consequences. Professor Hutton is wrong to opine that all that was concealed was the "risk of a negative outcome in the Virginia Litigation."[19] Professor Hutton is wrong to opine at this stage that the risk of a negative verdict necessarily changed over time. Therefore, Professor Hutton's criticism that I must specify how the but-for price necessarily changed as the risk of a negative verdict changed is off base, given that according to Plaintiffs' allegations the truth underlying the negative verdict did not change.

26.    I understand that Plaintiffs' allegations are not that Defendants merely "conceal[ed] the true risk posed by the Virginia Action," as Professor Hutton contends. Rather, as detailed in the Feinstein Report, Plaintiffs allege that "Defendants, fully aware of their involvement in the actions leading to the Virginia lawsuit, intentionally withheld information about the litigation, provided false assurances to investors that Appian's claims lacked merit, and deceptively pledged to never engage in the unauthorized use of trade secrets."[20] Defendants materially false and misleading statements and omissions included:

> i.    "statements touting Pega's competition and sales and marketing practices, while failing to disclose, *inter alia*, it was relying on corporate espionage to gain a competitive advantage."[21]
>
> ii.    "statements concerning Pega's competitors' intellectual property rights and that infringement claims by unnamed competitors could arise at some indeterminate point, while concealing, *inter alia*, the existence of the Virginia Action and evidence of Pega's egregious scheme to misappropriate Appian's trade secrets."[22]
>
> iii.    "statements that Appian's claims lacked merit and any damages were not supported, while failing to disclose, *inter alia*, Appian's liability and damages claims were well-supported."[23]

---

[19] Hutton Report, ¶12; and Section V. A.

[20] Feinstein Report, ¶29; and Complaint, V. A, B, C.

[21] Feinstein Report, ¶29; and Complaint, ¶120.

[22] Feinstein Report, ¶29; and Complaint, ¶120.

[23] Feinstein Report, ¶29; and Complaint, ¶120.

iv.  "statements regarding Pega's Code and ethical practices, which failed to disclose, *inter alia*, Pega's egregious corporate espionage and flagrant violations of Pega's own guidelines."[24]

v.  "statements concerning defendants' compliance with the federal securities laws, which failed to disclose that, *inter alia*, Pega's Forms 10-K and 10-Q were materially misleading and contained false financial statements."[25]

27.  Professor Hutton's mischaracterization or misunderstanding of Plaintiffs' allegations renders her criticisms erroneous and her conclusions incorrect. Plaintiffs' allegations are not that there was a risk of the Company engaging in fraudulent conduct, rather, Plaintiffs' allegations are that the misrepresentations and omissions concealed from investors that the Company did engage in fraudulent conduct, including corporate espionage, and as a result, the Company faced financial and legal ramifications stemming from Defendants' concealed conduct and scheme.

### B.  The Out-of-Pocket Damages Methodology in the Feinstein Report Is Fully Articulated

28.  Contrary to Professor Hutton's contention that the Feinstein Report's description of the out-of-pocket damages methodology is generic and lacks details specific to the instant case, the Feinstein Report fully articulates the out-of-pocket damages methodology in a clear, concise, and detailed manner.[26] I explained that "out-of-pocket damages are measured as the difference between the amount of stock price inflation at purchase and the amount of inflation in the stock price at sale or, if held, at the end of the Class Period. The out-of-pocket method of calculating damages also takes into account formulaic prescriptions in relevant case law and statutes."[27] The out-of-pocket damages methodology is the same in virtually all class action securities cases alleging misrepresentations and omissions, and

---

[24] Feinstein Report, ¶29; and Complaint, ¶120.

[25] Feinstein Report, ¶29; and Complaint, ¶120.

[26] Hutton Report, ¶¶12-13, 14-15.

[27] Feinstein Report, ¶152.

fits the facts, circumstances, and liability theory of the instant case. I explained that the calculation of each Class member's damages would be a mechanical arithmetical exercise, conducted the same way for all Class members, applying the results of the Class-wide analyses described in the Feinstein Report (and again below) to each Class member's trading data.[28]

29.   The Feinstein Report detailed the steps of the out-of-pocket damages methodology as follows:

> "First, valuation tools, which would include event study analysis, and potentially other empirical analyses, if necessary, would be used to establish if the disclosure(s) correcting the alleged misrepresentations and omissions caused the price of Pega stock to fall. This analysis, after controlling for potentially non-fraud-related information, would establish whether the alleged misrepresentations and omissions had caused the stock price to be artificially inflated, and if a corrective disclosure caused that artificial inflation to dissipate, in turn causing investor losses. This analysis would apply on a Class-wide basis."

> "Second, an inflation ribbon would be constructed, using generally accepted empirical analysis and valuation tools, indicating how much artificial inflation caused by the alleged misrepresentations and omissions was in the price of Pega stock on each day during the Class Period, if any. An inflation ribbon is a time series of the difference between a stock's actual price observed in the marketplace, and the estimated price that the stock would have traded at each day had there been full disclosure. Construction of the inflation ribbon generally employs event study analysis, combined with widely used and generally accepted valuation tools. The inflation ribbon is often constructed by working chronologically backwards from the final corrective disclosure back to the start of the Class Period, accounting for alleged fraud-related residual price declines as they occurred. Inflation prior to a corrective disclosure that dissipated inflation is greater than the inflation afterward by the amount of inflation that dissipated. The corrective disclosure that finally eliminates all remaining artificial inflation may occur at or after the end of the Class Period."

> "Supplementing event study results, the full array of generally accepted and widely used valuation tools can be applied, if necessary, to calculate the but-for stock prices under the assumption of prior full disclosure. This analysis enables computation of the artificial inflation ribbon even in cases where there is confounding information, changes in the concealed information, and changes in the value of the concealed information, among other

---

[28] Feinstein Report, ¶157.

potential complexities. This analysis would also apply on a Class-wide basis. My reading of Plaintiffs' allegations and my review of the experience of the Company over the course of the Class Period uncovered no facts or circumstances that are extraordinarily unusual or might make application of this methodology exceptionally difficult."

"Third, the measure of per-share damages generally applied in Section 10(b) cases is the reduction in the inflation ribbon over an investor's holding period (the economic/inflation loss). That is, for each Class member, per-share damages would be calculated as the difference between the inflation on the date the shares were purchased and the inflation on the date those same shares were subsequently sold."

"Per-share damages are limited, however, to be no greater than the decline in the share price over the investor's holding period, which is the investment loss actually sustained."

"Pursuant to the Private Securities Litigation Reform Act of 1995 (15 U.S.C. § 78u-4(e)), for purposes of computing the investment loss limitation on damages, for any shares sold during the 90-day period after the final corrective disclosure, the investment loss is computed as if the selling price was the greater of the actual selling price or the average closing price following the final corrective disclosure up to the sale date. For any shares held 90 days or more beyond the final corrective disclosure, the investment loss is computed as if the shares were sold for the average closing price over the 90 days following the final corrective disclosure."

"The calculation of each Class member's per-share damages would be a mechanical arithmetic exercise for all Class members who bought Pega stock during the Class Period, conducted the same way for all Class members, applying the results of the Class-wide analyses described above to each Class member's stock trading data."
**Feinstein Report, ¶¶157(i)-(vii).**

30. The Feinstein Report specifically identifies many of the practical and routinely used valuation tools, in addition to event study analysis, that are available to a financial economist constructing an inflation ribbon under the out-of-pocket damages methodology:

"Valuation analysis is undertaken continuously, every day, for virtually every publicly traded security, and these tools address the very complexities that could potentially be encountered in the course of computing inflation and damages in this case. Valuations assuming alternative scenarios are commonly conducted by analysts and investors."
**Feinstein Report, ¶155.**

11

> "Among the commonly used valuation tools that are available to investors, analysts in real time, and forensic analysts when computing damages, are, for example: valuation multiple models, such as those based on earnings, earnings before interest, tax, depreciation and amortization (EBITDA), revenue, book value, and cash flow; discounted cash flow (DCF) models; scenario analysis, and the literature regarding valuation effects of factors such as reputation, transparency, governance, and the quality of internal controls. In addition, forensic analysts have the added advantage of being able to use event study analysis, which quantifies the price effects that occurred when information did reach the market."
> **Feinstein Report, ¶156.**

31.    Professor Hutton acknowledges that these valuation tools exist.[29] Such valuation analysis is precisely what is called for to construct a correct inflation ribbon in this case.

## C.    The Out-of-Pocket Damages Methodology in the Feinstein Report is Consistent with Plaintiffs' Theory of Liability

32.    The out-of-pocket damages methodology, specified in the Feinstein Report, is consistent with Plaintiffs' theory of liability in the instant matter. Plaintiffs' theory of liability is that Defendants violated Section 10(b) by making misleading statements and omissions of material fact, which were widely disseminated to analysts and the investing public.[30] The Complaint alleges that Plaintiffs and other members of the Class purchased or otherwise acquired Pega stock relying upon the integrity of the market price for Pega's stock and public information relating to Pega.[31] The alleged misrepresentations and omissions artificially inflated the price of Pega stock according to Plaintiffs, such that investors overpaid for the security. [32]

---

[29]Hutton Report, ¶33.

[30] Complaint, ¶¶260-263.

[31] Complaint, ¶264.

[32] Complaint, ¶265.

33. As Plaintiffs further allege, when the truth was revealed, the price of Pega stock declined promptly as the artificial inflation dissipated from the market price of the stock, causing investors to sustain losses, and causing substantial damage to Plaintiffs and Class members.[33]

34. The out-of-pocket damages methodology measures the loss caused by the introduction and subsequent dissipation of artificial inflation. Therefore, this damages methodology measure is consistent with Plaintiffs' theory of liability, and the methodology is applied commonly for all Class members.

**D.      Professor Hutton's Criticism of the Out-of-Pocket Damages Methodology Amounts to Baseless Speculation That the Methodology Will Be Executed Incorrectly**

35. Professor Hutton does not actually criticize the out-of-pocket damages methodology. She does not dispute that the out-of-pocket damages methodology is appropriate in the instant case. Nor does she disagree that an inflation ribbon can be used to compute damages commonly for all Class members. In fact, Professor Hutton implicitly concedes that a common damages methodology exists by noting what she contends should be considered when constructing an inflation ribbon under her misinterpretation of Plaintiffs' theory of liability.[34] Rather, Professor Hutton's criticism amounts to misdirected, erroneous, and unsupported speculation that this generally accepted and appropriate methodology would not be executed correctly.

36. Nonetheless, Professor Hutton asserts that I fail "to provide a reliable class-wide methodology capable of estimating damages in a manner consistent with Plaintiffs' theory of liability in light of the economic complexities specific to this matter."[35] Specifically, Professor Hutton claims that I do "not explain, even in general terms, how any of these valuation tools might be applied in this matter to assess inflation dissipated by the alleged corrective disclosures (*i.e.*, to measure only the portion of the stock price declines causally linked to the alleged fraud given the particulars of the matter), as well as to determine

---

[33] Complaint, ¶242.

[34] Hutton Report, ¶¶11-15.

[35] Hutton Report, ¶34.

whether and to what extent inflation may have changed over the course of the Proposed Class Period prior to the alleged corrective disclosures."[36] As explained below, this criticism is erroneous.

### 1. Analysts Used the Standard Valuation Tools Referenced in the Feinstein Report to Value Pega Stock and Other Securities Routinely

37. Professor Hutton contends that my articulation of the damages methodology is insufficient, in part, because I did not identify which specific valuation tools would be necessary to construct the artificial inflation ribbon given the facts and circumstances of the instant case and the potential valuation complexities that therefore could arise.[37]

38. Artificial inflation on any particular day is the difference between what the prevailing price of Pega stock was that day and what the price would have been but-for the alleged misrepresentations and omissions. The actual prevailing prices are publicly available and thus indisputable. The alternative but-for prices can be estimated by a valuation of the common stock under the but-for scenario of prior full disclosure, taking into account the quantity of inflation observably dissipated by the ultimate corrective disclosures. If the valuation impact of the concealed but later revealed information is determined to be relatively constant over the course of the Class Period, the inflation level indicated by the event study is sufficient to construct the inflation ribbon. Only if the value of the information changes over time is additional valuation analysis necessary. Nonetheless, conducting this but-for valuation is straightforward and routinely undertaken, and is also common for all Class members.

39. Indeed, the types of but-for valuation analysis that may be necessary or appropriate to construct the inflation ribbon if complexities are encountered are essentially the same as those that are conducted by innumerable finance professionals who value all kinds of publicly traded securities every day. Finance professionals value all financial assets given the current set of facts, but also frequently assess what valuations might be under a broad range of alternative scenarios. The field of valuation analysis is exactly this endeavor:

---

[36] Hutton Report, ¶33.

[37] Hutton Report, ¶¶12, 14-15.

determining the appropriate valuation of an asset under a specific set of facts, and also the valuation under alternative or changing facts. The valuation work that may be necessary to implement the out-of-pocket damages methodology if complexities are encountered has at its disposal the full set of tools and techniques comprised by the rich field of valuation analysis, and has the added benefit of the information provided by the event study analysis.

40.     Numerous analysts following Pega employed the valuation tools and techniques I identified in the Feinstein Report to value the Company's stock, e.g., discounted cash flow (DCF) models, Enterprise Value/Free Cash Flow multiple (EV/FCF), and Enterprise Value/Sales multiple (EV/Sales).[38]

> "We're reiterating our Outperform rating and raising our 12-month target price to $160 from $142. Our target price is based on averaging our EV/ revenue (9.5x CY22E), EV/FCF (100x CY22E), and DCF methods. PEGA's valuation looks reasonable given the optics of its cloud transition: PEGA's EV/ revenue multiple (9.8x CY21E) is above peers (8.7x) and below the industry (15.4x)."
> **"A Hit Down the Middle, and Encouraging Guide," by Steve Koenig, SMBC Nikko Securities America, analyst report, 18 February 2021, p. 2.**

> "We are raising our price target to $165 (from $150), assuming a 9x multiple on our CY22E EV/ revenue estimate (vs. 8x prior), inline with the peer group and reflecting our greater confidence in the transition and growth prospects for the company. Our target continues to be supported by our DCF analysis."
> **"On the (Virtual) Road with Pega; GTM, Competition," by Rishi Jaluria et al., RBC Capital Markets, analyst report, 15 June 2021, p. 3.**

> "Valuation Our 12-month price target of $155 is based on a 8x EV/revenue multiple on our FY22 revenue estimate."
> **"Cloud Transition Remains the Key to Success; Another Solid Print," by Daniel Ives, Wedbush, analyst report, 29 July 2021, p. 6.**

> "Valuation Methodology Our $160 price target is a reasonable 9x EV/Revenues and 9.5x EV/ACV on our respective 2022 estimates, which is below the cloud infrastructure software comp group."
> **"21%-plus ACV Growth Gets Pushed Out Until Next Year," by Mark Schappel, Benchmark, analyst report, 29 July 2021, p. 5.**

---

[38] Feinstein Report, ¶156.

"Our Dec 2021 price target of $145 is based on ~10x EV/CY22E sales (was 9x). The higher multiple is merited based on improving total ACV growth this quarter, which is a critical forward looking-metric for PEGA. The PT remains the same with a higher multiple given a higher EV stemming from a higher share count this quarter."

**"Upside Driven by Term License as Other Metrics Remain in Growth Territory," by Mark Murphy et al., JPMorgan, analyst report, 28 July 2021, p. 3.**

"Pegasystems currently trades at an EV/2022E revenue multiple of 7.6x, while our $172 price target implies a EV/2022E revenue multiple of 9.6x, versus the peer group median multiple of 8.9x."

**"A Good Quarter to Begin With and a $30M Term License Deal on Top," by Patrick Walravens and Joe Goodwin, JMP, analyst report, 29 July 2021, p. 1.**

41. These stock valuation tools and techniques, properly applied, would accurately measure and accommodate any potential adjustments to inflation that are necessary. As explained in the Feinstein Report, the forensic analyst conducting a loss causation analysis would have all of the valuation tools available to analysts and investors in real time, plus the added benefit of event study analysis.[39] The selection of specific tools that could be brought to bear on such issues would be directly informed by the evidence. Disaggregation of simultaneous effects could be handled with the same valuation tools.

42. Professor Hutton's requirement that any proposed damages methodology must identify now, at this pre-close-of-discovery class certification stage, which specific valuation tools would (or would not) be used to accommodate potential valuation complexities when refining the inflation ribbon, would be unworkable, imprudent, and unnecessary. First, relevant complexities will often not be adequately identifiable until after discovery is complete. Second, and more important, to commit to a specific valuation tool prior to the close of discovery is unnecessary as the field of valuation analysis is rich enough, and the array of valuation tools is broad enough, to conclude confidently that any particular valuation complexity that actually does arise can be handled. Professor Hutton also ignores that one can adequately identify the out-of-pocket damages methodology, as I have described it, without having to identify how each of a wide array of valuation tools would specifically be marshalled to address potential complexities that might arise.

---

[39] Feinstein Report, ¶156.

### 2. The Measurement of Artificial Inflation and Treatment of Potentially Confounding Information on Disclosure Dates Is Not Unusual

43. Professor Hutton contends that my explanation of the out-of-pocket damages methodology is insufficient because I purportedly did not explain how the methodology would measure only losses caused by the fraudulent misrepresentations and omissions and exclude losses caused by confounding information.[40] Professor Hutton is wrong because I did explain exactly that.[41] First, only losses sustained following corrective disclosures would be included in damages, so losses sustained when there was no corrective disclosure would be excluded. Second, event study analysis is a reliable tool for measuring the loss caused by an announcement of company-specific information. Third, if there is confounding information accompanying a corrective disclosure, the price impact of that non-allegation-related information can be evaluated with standard valuation tools, so that that price impact can be excluded from the measure of damages. Thus, as explained in the Feinstein Report, event study analysis supplemented with valuation tools (such as valuation multiples and discounted cash flow computation, if needed and appropriate) can detect and accurately measure the losses caused only by the corrective disclosures on corrective disclosure event dates. This is the standard implementation of the out-of-pocket damages methodology, routinely used in virtually all Section 10(b) security cases.

44. The valuation analysis that would be necessary if there is confounding information accompanying the corrective disclosures is the same valuation analysis that is routinely employed by financial analysts who regularly assess the price impacts of various pieces of information and alternative hypothetical or realized scenarios. Financial analysts routinely produce valuation forecasts contingent on alternative scenarios and performance metrics, concluding, for example that the price of a stock will be X if the company achieves a particular level of earnings, or alternatively Y if the company fails to hit that earnings target. Financial analysts also routinely perform attribution analyses, determining how much of a particular stock price movement was caused by one news item as opposed to another. The widely used and generally accepted valuation tools typically applied for this

---

[40] Hutton Report, ¶33.

[41] Feinstein Report, ¶¶148-159.

purpose include valuation multiples, discounted cash flow, and the expansive literature on the studied effects of various relevant factors.

45.    Professor Hutton speculates that the residual stock price decline on 10 May 2022 following the 9 May 2022 alleged corrective disclosures in this case may have been caused in part by confounding information.[42] Her concern is not a valid challenge to the existence, applicability, and commonality of the damages methodology. Rather, it is a premature challenge to what might be offered as a particular quantification of damages, even though damages have not yet been quantified. Disagreeing with a particular quantification, which neither she nor I, or any damages expert has proffered at the current stage of this case, is not a legitimate criticism of the methodology. For all Professor Hutton knows at this juncture, the output from the damages methodology for that particular day may ultimately be acceptable to her.

46.    Moreover, with this criticism Professor Hutton is challenging the facts and merits of the case, not the damages methodology.

47.    Whether there was indeed any confounding information accompanying corrective disclosures in this case will be determined in the course of loss causation analysis, which has not yet been conducted in this case. There is no reason to suspect that the generally accepted and widely used valuation tools could not be applied to disaggregate the effect of confounding information in this case. Professor Hutton's concern is premature and unfounded.

### 3.    Professor Hutton's Argument About Materialization of a Known Risk is Off Base and Inconsistent with Plaintiffs' Factual Allegations

48.    Professor Hutton contends that the decline in stock price following the announcement of the jury verdict in the Virginia Action on 9 May 2022 (after the close of trading) "does not accurately measure, and may overestimate, inflation," because the stock price reaction on 10 May 2022 "would reflect both the valuation impact of the correction of the allegedly previously misrepresented risk (which allegedly could and should have been disclosed earlier) and the valuation impact of the materialization of the true risk (which could not

---

[42] Hutton Report, ¶37.

have been disclosed earlier given that the outcome was uncertain)."[43] Professor Hutton continues that a reliable damages methodology "must be capable of disaggregating the portion of the stock price decline attributed to the allegedly concealed risk from the portion attributed to the materialization of the true risk."[44]

49. The premises of Professor Hutton's argument is wrong. In Professor Hutton's argument, all that Defendants concealed from the public was the probability of adverse consequences stemming from the Company's behavior, and she disregards that the improper behavior itself, which led to adverse consequences, is what Plaintiffs allege was concealed. In Professor Hutton's conceptualization of the instant case, there is no direct connection between the Company's improper behavior and the adverse jury verdict in the Virginia Action, which is preposterous. In Professor Hutton's conceptualization of the case, the jury verdict was a random occurrence, and investors were well aware that random adverse occurrences such as that jury verdict could happen from time to time by chance alone. This is the conceptualization that would recast some amount of the loss caused by the jury verdict to be a materialization of a known risk, about which Defendants could not have previously provided any relevant information. This conceptualization of the case is at odds with Plaintiffs' allegations.

50. Moreover, even if the case facts and allegations were as Professor Hutton mischaracterizes them, and if a non-allegation-related materialization of known risk caused some of the stock price decline alongside a corrective disclosure, the out-of-pocket damages methodology can handle the necessary disaggregation by treating the materialization of known risk as confounding information. That is, whatever evidence would indicate that investors and analysts would have still been surprised by an adverse jury verdict even if they were told beforehand the truth about the Company's behavior (which is a highly unlikely scenario), that evidence would indicate how much of the ultimate price decline was caused by that surprise.

51. Of note, Professor Hutton's contention that the alleged corrective disclosures necessarily constitute materializations of risk is inconsistent with Plaintiffs' allegations, because

---

[43] Hutton Report, ¶11.

[44] Hutton Report, ¶¶37-41.

Plaintiffs plead those events as corrective disclosures that informed investors of previously concealed or misrepresented facts about the Company, not as materializations of risks. Nevertheless, corrective disclosures that take the form of materializations of risks are not unusual and do not pose particularly complex issues when damages are calculated. The out-of-pocket damages methodology presented in the Feinstein Report handily and commonly computes damages even when loss is caused by a materialization of risk.

52. Additionally, Professor Hutton is wrong to imply that any component of a corrective disclosure is a non-allegation-related materialization of risk, either disclosed or undisclosed, when the risk at issue had already materialized and that materialization could have been earlier disclosed. If the market is misled to believe that there is a potential risk of an adverse development, when in fact conditions were such that the adverse development would occur, that misinformation would artificially inflate the security price, and that artificial inflation would have been caused by the misrepresentations and omissions. No part of the materialization would be confounding information unrelated to the alleged fraud, because in that scenario the company could have earlier disclosed that the risk materialized or was materializing.

53. Professor Hutton overlooks the fact that the out-of-pocket damages methodology accommodates materialization of both known and unknown risks, for all Class members commonly, given the liability theory and facts of the case. Professor Hutton's opinion on this point mischaracterizes the damages methodology as relying exclusively on the event study to measure artificial inflation.[45] Professor Hutton overlooks that the Feinstein Report explains that the event study coupled with standard tools of valuation could be used, in concert, to construct the inflation ribbon and account for potential valuation complexities, including any difference between the disclosed and concealed likelihoods of a risk realization, if the evidence indicates a measurable difference.[46]

54. When executing the out-of-pocket damages methodology, one can assess whether a risk at issue was previously disclosed, and if so to what extent. Valuation principles and tools also indicate what impact truthful and timely disclosure would have had on investors'

---

[45] Hutton Report, ¶32.

[46] Feinstein Report, ¶157.

assessments of risk and their valuation of the company stock. This analysis estimates the but-for stock price. The comparison of this but-for stock price with the actual prevailing stock price measures artificial inflation and, in turn, damages.

55.     Professor Hutton does not opine that this analysis is impossible, nor that the damages methodology cannot incorporate it. Whether this valuation analysis will be necessary, however, depends on what the evidence ultimately indicates about the nature of the concealed or misrepresented information, what could have been disclosed, when the information could have been disclosed, how much of the ultimate disclosures were corrective of prior misrepresentations and omissions, what confounding information there may have been if any, and the measured impact of the eventual disclosures on the stock price. Professor Hutton has not conducted this analysis, so her criticism is just conjecture.

56.     Development of the record and examination of the evidence regarding what the Company knew about event probability and potential severity will not only reveal if there is any merit to Professor Hutton's concerns, but will also facilitate the computations to address that concern if they do have merit. That is, the very evidence that may hypothetically suggest that some of the surprise and price decline engendered by the corrective disclosures would also have occurred in a but-for scenario with full and timely disclosure, could be evaluated to measure that level of surprise and price decline and factor it out of the damage computation. Among the available tools for this purpose, if necessary, are the body of generally accepted economic principles regarding how securities are valued under uncertainty and information asymmetry – that is, the effect on a security price when information is withheld from the public.[47] Other tools that may be brought to bear on this issue are the valuation tools aimed at uncovering information and probability estimates implied by security prices. Two published articles that review and extend this branch of the literature include the following: "Recovering Probability Distributions from Option

---

[47] The Nobel Prize in Economics was twice awarded for developing the principles about behavior and pricing under conditions of asymmetric information. "The Market for 'Lemons': Quality Uncertainty and the Market Mechanism," by George Akerlof, *The Quarterly Journal of Economics*, Vol. 84, No. 3, 1970; "Markets with Asymmetric Information: The Contributions of George Akerlof, Michael Spence and Joseph Stiglitz," by Karl-Gustaf Lofgren et al., *The Scandinavian Journal of Economics*, Vol. 104, No. 2, June 2002; and "Improvements to Auction Theory and Inventions of New Auction Formats," The Committee for the Prize in Economic Sciences in Memory of Alfred Nobel, 12 October 2020, describing the award to Paul Milgrom in 2020 for his work addressing asymmetric information, which cited, among others, "Rational Expectations, Information Acquisition, and Competitive Bidding," by Paul Milgrom, *Econometrica*, Vol. 49, No. 4, 1981.

Prices," by Jens Jackwerth and Mark Rubinstein [1996] and "Measuring Stock Market Performance," by Richard Dobbs and Tim Koller [2005].[48]

57. Consequently, the described damages methodology would accommodate the potential complexities Professor Hutton surmises may be encountered. The methodology handles these potential complexities, and does so in a common manner for all Class members.

### 4. Time-Varying Inflation

58. Without completion of discovery and without a complete evidentiary record, Professor Hutton surmises that inflation may have varied over time and that this time-varying inflation may complicate the computation of damages in this case.[49] Time-varying inflation means that the valuation effect of the alleged misrepresentations and omissions may have changed over the course of the Class Period. Time-varying inflation, however, is a common issue in class action securities cases, and I am confident that here it will not pose insurmountable difficulties.

59. Professor Hutton theorizes that due to the "evolving" nature of the Virginia Action, the "market's assessment of the 'extent and likelihood of Pega's liability'" in that action could have changed over the course of the Class Period, thereby causing the artificial inflation in Pega stock to change.[50] Professor Hutton's argument falters, however, because the Company's history of behavior that led to the adverse consequences allegedly did not change over the course of the Class Period.

60. Notwithstanding the absence of a complete evidentiary record, Professor Hutton asserts that time-varying inflation, a frequently encountered phenomenon, could make the computation of damages in the instant case difficult.[51] Specifically, according to Professor Hutton, the "market's assessment of the 'extent and likelihood of Pega's liability' in the Virginia Litigation" potentially changed over the course of the Class Period, such that the

---

[48] "Recovering Probability Distributions from Option Prices," by Jens Jackwerth and Mark Rubinstein, *The Journal of Finance*, Vol. 51, No. 5, 1996; and "Measuring Stock Market Performance," by Richard Dobbs and Tim Koller, *McKinsey on Finance*, No. 16, 2005.

[49] Hutton Report, ¶49.

[50] Hutton Report, ¶49 and ¶50.

[51] Hutton Report, ¶¶49-50.

but-for corrective disclosure would have revealed different risk levels and thus different valuation effects depending on when full disclosure would have been made.[52]

61. Professor Hutton's conjectures are unsupported, and they disregard that had there been full prior disclosure about the Company's behavior, the market's assessment of the likelihood of adverse consequences would not have changed over time during the Class Period.

62. Professor Hutton suggests that time-varying inflation may exist in the instant matter, but she did not conduct any quantitative analysis to determine if inflation did vary. Professor Hutton's criticism is more of an admonition about the importance of further discovery to identify whether this "complexity" may exist here, rather than evidence of any deficiency in the proposed damages methodology. For the same reasons as I have already discussed, detailing precisely what the evidence will show and what valuation tools will be used to evaluate it (e.g., discounted cash flow, price/earnings multiples, varying inputs in analysts' valuation tools, etc.) is premature until the evidentiary record is complete. I conclude with confidence that whatever complexities may ultimately be determined to exist can be dealt with by my previously detailed list of available valuation tools (including event study analysis). The criticism that the description of the methodology is incomplete because it does not detail how currently unavailable documents and information will be evaluated is therefore senseless.

63. In class action securities cases, time-varying inflation is a common issue that in my experience does not pose insurmountable difficulty. Nor does Professor Hutton contend that the potential presence of time-varying inflation in the instant case would raise insurmountable problems. If it is determined by the factual record that inflation actually varied during the Class Period in this case, that very same evidence would indicate how and why the inflation varied, and in turn, which valuation tools best measure it. In matters where I have served as the damages expert at the merits stage, when the facts indicate artificial inflation varied over time, the same facts that indicated the presence of the issue

---

[52] Hutton Report, ¶50.

also facilitated the appropriate measurement and accounting for it in the computation of damages.[53]

64. Presently, however, it is premature to agree or disagree with the conjecture that the "market's assessment of the 'extent and likelihood of Pega's liability'" in the Virginia Action would have change substantially over the course of the Class Period under the but-for scenario of full disclosure, and how that but-for assessment compared to the market's actual assessment given the alleged misrepresentations and omissions. If and to what extent the true probability and the market's induced misperception of the "extent and likelihood of Pega's liability" in the Virginia Action changed over the Class Period is the kind of information that discovery will likely illuminate.

65. Professor Hutton overlooks that computational issues such as time-varying inflation are common and are routinely encountered and addressed in class action securities cases. She certainly identifies no "time-varying" inflation complexities that are so unusual (let alone unique) here as to suggest that the out-of-pocket damages methodology will not work here. The computational issues are more about the execution of the common damages methodology at the loss causation stage rather than the existence of a common damages methodology, which needs to be addressed at the class certification stage. In matters where I have served as the damages expert at the merits stage, such complexities were identified, accounted for, and appropriately addressed. One such case that is a matter of public record was *Pearlstein v. Blackberry Limited et al.* ("*Blackberry*").

> "While the misrepresentations and omissions caused and maintained inflation since the start of the Class Period, they also caused an increase in artificial inflation on 12 August 2013. As described in ¶¶96-97 and ¶¶210-211 above, on that date the Company announced that it would explore strategic alternatives. The stock price rose significantly on this news, as an acquisition target typically commands an acquisition premium. However, when the final corrective disclosures on 20 September 2013 revealed the true state and prospects for BlackBerry 10, analysts commented that BlackBerry's attractiveness and value as an acquisition target had waned considerably. … Some of the price decline that occurred on September 20th, therefore, was the reduction in the value accretion that entered the stock

---

[53] See *e.g.*, Report On Loss Causation And Damages Professor Steven P. Feinstein, Ph.D., CFA, *Marvin Pearlstein, vs. Blackberry Limited (formerly known as Research In Motion Limited)*, No. 1:13-CV-7060-CM-KHP, 29 May 2020, ¶¶341-343; and Report of Professor Steven P. Feinstein, Ph.D., CFA, *Plumbers & Pipefitters National Pension Fund vs. Michael J. Burns and Robert C. Richter*, No. 3:05-cv-07393-JGC, 4 August 2014, ¶¶121-124.

price on August 12th. Just as the full truth caused that value reduction on September 20th, the full truth, had it been known, would have prevented the value accretion on August 12th. Therefore, of the $1.75 per share artificial inflation that dissipated on September 20th, $0.94 per share had newly entered the stock price on August 12th. The rest, $0.81 per share, was in the stock price since the beginning of the Class Period."

**Report On Loss Causation and Damages by Professor Steven P. Feinstein, Ph.D., CFA, *Pearlstein v. Blackberry Limited et al.*, No. 1:13-cv-07060 (S.D.N.Y.), 29 May 2020, ¶¶341-343.**

66.     Another example of a case that is publicly available where I constructed a time-varying inflation ribbon is *Plumbers & Pipefitters National Pension Fund et al. v. Burns et al.* case (*Dana Corporation* securities litigation, or "*Dana*"). In that case, I constructed an artificial inflation ribbon that increased in connection with successive earnings overstatements. Specifically, in *Dana*, I determined based on principles espoused in the published peer-reviewed literature that "artificial inflation caused by concealment of the internal control deficiencies and unreliability of the Company's accounting and reporting grew as the cumulative earnings overstatements accrued. That is, just as the alleged accounting fraud grew in magnitude, so too did the artificial inflation attributable to the reputation effect."[54]

67.     It is noteworthy that the appropriate valuation tool needed to address time-varying inflation in each of those two cases, *Blackberry* and *Dana*, depended on what was the cause of the inflation variation in each case. Different causes dictated the application of different valuation tools. In the *Blackberry* case, it was the changing likelihood that *Blackberry* would be acquired that caused inflation to vary. In the *Dana* case, it was the change in reputation effect stemming from an accumulating earnings overstatement that caused inflation to vary. In the *Blackberry* case, the artificial inflation ribbon was constructed to reflect appropriately the increase and then decrease in the acquisition premium. In the *Dana* case, the artificial inflation ribbon was scaled up over time to reflect the increasing earnings overstatement, consistent with the published peer-reviewed literature linking reputation effect to the magnitude of an earnings overstatement.

---

[54] Report of Professor Steven P. Feinstein, Ph.D., CFA, *Plumbers & Pipefitters National Pension Fund et al. v. Burns et al.,* No. 3:05-cv-07393 (N.D. Ohio), 4 August 2014, ¶141.

68.    Importantly, if the evidence reveals that the "market's assessment of the 'the extent and likelihood of Pega's liability,'" in the Virginia Action changed substantially over the Class Period, that same evidence will measure and time that change so that it can be incorporated into the artificial inflation ribbon. Specifically, should the evidentiary record ultimately indicate that artificial inflation did change over the course of the Class Period on account of the change in "market's assessment of the 'the extent and likelihood of Pega's liability,'" in the Virginia Action, or if that the probability is even relevant, that very same evidence considered with valuation tools and the event study can be used to assess changing artificial inflation accordingly.

69.    Presently, however, Professor Hutton did not claim in her report that she proved artificial inflation in Pega's stock price varied during the Class Period. Ultimately, the issue she raises is only a hypothetical concern. Professor Hutton's discussion of time-varying inflation does not refute the existence or feasibility of implementing the out-of-pocket damages methodology. If anything, it acknowledges the existence of the damages methodology and that that the methodology can be applied commonly for all Class members.

## IV.    LIMITING FACTORS AND OTHER ASSUMPTIONS

70.    This report is furnished solely for the purpose of court proceedings in the above-referenced matter and may not be used or referred to for any other purpose. The analysis and opinions contained in this report are based on information available as of the date of the report. I reserve the right to amend, refine, or supplement this report in the event that I become aware of additional information, evidence, arguments, or analyses which bear on my work in this matter.

Steven P. Feinstein, Ph.D., CFA

**Exhibit-1**
**Documents and Other Information Considered**
**In Addition to Those Cited in the Feinstein Report**


**CASE DOCUMENTS**

- Lead Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Consolidated Amended Complaint, dated 17 February 2023.
- Rebuttal Report of Amy Hutton, Ph.D., dated 28 February 2024.


**ACADEMIC AND PROFESSIONAL LITERATURE**

- Akerlof, George, "The Market for 'Lemons': Quality Uncertainty and the Market Mechanism," *The Quarterly Journal of Economics*, Vol. 84, No. 3, 1970.
- Dobbs, Richard, and Timothy Koller, "Measuring Stock Market Performance," *McKinsey on Finance*, No. 16, 2005.
- Jackwerth, Jens and Mark Rubenstein, "Recovering Probability Distributions from Option Prices," *The Journal of Finance*, Vol. 51, No. 5, 1996.
- Lofgren, Karl-Gustaf, Torsten Persson, and Jorgen Weibull, "Markets with Asymmetric Information: The Contributions of George Akerlof, Michael Spence and Joseph Stiglitz," *The Scandinavian Journal of Economics*, Vol. 104, No. 2, June 2002.
- Milgrom, Paul, "Rational Expectations, Information Acquisition, and Competitive Bidding," *Econometrica*, Vol. 49, No. 4, 1981.


**OTHER LEGAL CASE DOCUMENTS**

- Report of Professor Steven P. Feinstein, Ph.D., CFA, *Plumbers & Pipefitters National Pension Fund et al. v. Burns et al.*, No. 3:05-cv-07393 (N.D. Ohio), 4 August 2014.
- Report On Loss Causation and Damages Professor by Steven P. Feinstein, Ph.D., CFA, *Pearlstein v. Blackberry Limited et al.,* No. 1:13-cv-07060 (S.D.N.Y.), 29 May 2020.


**OTHER**

- "Improvements to Auction Theory and Inventions of New Auction Formats," The Committee for the Prize in Economic Sciences in Memory of Alfred Nobel, 12 October 2020.
- Expert Report of Amy Hutton, Ph.D., dated 16 December 2022, *State of Alaska et al. v. Ryder System Inc., Robert E. Sanchez, Art A. Garcia, and Scott T. Parker*, U.S. District Court, Southern District of Florida, Civil Action No. 1:20-cv-22109-AMC.
- Any other documents cited in the report.