UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re PEGASYSTEMS INC. SECURITIES LITIGATION | ) ) ) | No. 1:22-cv-11220-WGY<br><br>DECLARATION OF CHAD JOHNSON IN SUPPORT OF: (1) LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND APPROVAL OF PLAN OF ALLOCATION; AND (2) LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES AND AWARDS TO LEAD PLAINTIFFS PURSUANT TO 15 U.S.C. §78u-4(a)(4) |

## TABLE OF CONTENTS

Page

I.     PRELIMINARY STATEMENT ............................................................................2

II.    HISTORY OF THE ACTION ..............................................................................6

       A.    The Funds Are Appointed Lead Plaintiffs ...........................................7

       B.    The Complaint, the Court's MTD Order, and Defendants' Answer to the
             Complaint................................................................................................7

       C.    Lead Counsel Pursues Evidence of the Alleged Fraud Through Fact
             Discovery ................................................................................................9

             1.     Requests for Documents ..............................................................9

             2.     Interrogatories ...........................................................................11

             3.     Discovery Disputes with Defendants.........................................12

                    a.     Disputes over the Scope of Discovery ...........................12

                    b.     Disputes over Documents Concerning the SEC's
                           Investigation of Pega......................................................13

                    c.     Disputes over Other Discovery-Related Issues..............14

       D.    Discovery from Non-Parties ................................................................15

       E.    Lead Plaintiffs Move to Certify the Class...........................................16

III.   THE SETTLEMENT .........................................................................................17

       A.    Reaching the Settlement ......................................................................17

       B.    Reasons for the Settlement...................................................................18

       C.    The Plan of Allocation ........................................................................22

IV.    LEAD COUNSEL'S APPLICATION FOR ATTORNEYS' FEES AND
       EXPENSES IS REASONABLE ........................................................................24

       A.    Application for Attorneys' Fees...........................................................25

             1.     The Requested Fee of 30% of the Settlement Fund Is Fair and
                    Reasonable ..................................................................................25

             2.     The Complexity and Risks Inherent in the Litigation................25

**Page**

3.    The Contingent Nature of the Fee and the Financial Burden Shouldered by Lead Counsel ....................................................................26

4.    The Standing and Expertise of Lead Counsel.............................................27

5.    The Settlement Class' Reaction to Date to the Settlement .......................28

B.    Application for Litigation Expenses, Charges, and Costs ....................................29

V.    CONCLUSION.................................................................................................................30

4858-1853-1282.v1

1.      I am an attorney duly licensed to practice in the States of New York and Illinois and in the District of Columbia; and I have been admitted *pro hac vice* in this action.  I am a partner with the law firm of Robbins Geller Rudman & Dowd LLP ("Robbins Geller" or "Lead Counsel"), and counsel for Lead Plaintiffs Central Pennsylvania Teamsters Pension Fund - Defined Benefit Plan, Central Pennsylvania Teamsters Pension Fund - Retirement Income Plan 1987, and Construction Industry Laborers Pension Fund (the "Funds" or "Lead Plaintiffs").  I have been actively involved in the prosecution of this action since 2022 and am closely familiar with its proceedings (the "Litigation").[1]  I have personal knowledge of the matters set forth herein based upon my active participation in and supervision of all material aspects of this Litigation.  I also have reviewed our litigation files and consulted with other attorneys and support staff who worked on this case.  I could and would testify completely to the matters set forth herein if called upon to do so.

2.      I submit this declaration in support of Lead Plaintiffs' motion for approval of: (i) the $35,000,000 cash recovery on behalf of the Settlement Class (the "Settlement"); (ii) the proposed Plan of Allocation (the "Plan"); (iii) Lead Counsel's application for an award of attorneys' fees and expenses; and (iv) an award to Lead Plaintiffs in accordance with 15 U.S.C. §78u-4(a)(4).

3.      The Class, preliminarily certified by the Court in its Order Preliminarily Approving Settlement and Providing for Notice (ECF 147), is defined as:

> [A]ll Persons and entities who purchased or otherwise acquired the common stock of Pegasystems Inc. ("Pega" or the "Company") between June 16, 2020 and May 9, 2022, inclusive, and experienced loss (the "Settlement Class").  Excluded from the Settlement Class are Defendants and the Dismissed Defendant and their immediate families, the Company's officers and directors at all relevant times, as well as their immediate families, Defendants' and the Dismissed Defendant's legal representatives, heirs, successors or assigns, and any entity in which Defendants or the Dismissed Defendant have or had a controlling interest.  Also excluded is any

---

[1]    Unless otherwise defined herein, capitalized terms have the meaning ascribed to them in the Stipulation of Settlement, filed on April 23, 2024 (ECF 143) (the "Stipulation").

4858-1853-1282.v1

Person who properly excludes himself, herself, itself, or themselves by submitting a valid and timely request for exclusion.  [ECF 147 at 1-2.]

## I.   PRELIMINARY STATEMENT

4.      This action was initiated in 2022 against Pegasystems Inc. ("Pega"), Pega's CEO, Alan Trefler ("Trefler"), and Pega's CFO, Kenneth Stillwell ("Stillwell") on behalf of the Class for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").  This declaration does not seek to detail each and every event that occurred since the Litigation commenced in 2022.  Rather, it provides the Court with key highlights of the Litigation, the extensive fact discovery, the events leading up to the Settlement reached on March 4, 2024, Lead Counsel's advancement of this case toward summary judgment and trial, and the bases upon which Lead Counsel and Lead Plaintiffs recommend the Settlement's approval.

5.      The $35,000,000 proposed Settlement is the culmination of a lengthy, hard-fought litigation.  As detailed below, Lead Plaintiffs zealously prosecuted their claims throughout the Litigation, successfully defending their claims against Defendants' dismissal attempt before this Court.  The Settlement is an excellent result for the Settlement Class.

6.      As further detailed herein, proceeding with litigating this matter to summary judgment and a jury trial presented the Settlement Class with substantial risks.  In agreeing to resolve the action, Lead Plaintiffs and Lead Counsel were well-informed of the strengths of their case, as well as the substantial risks they faced from further litigating this case.  In opting to resolve this matter, Lead Plaintiffs and Lead Counsel concluded that resolution on the terms they obtained was in the Settlement Class' best interest.  Representatives of Lead Plaintiffs – who supervised Lead Counsel and remained well-informed throughout the litigation and settlement negotiations – approved of and support the Settlement.  *See* Lead Plaintiffs' Declarations in Support of Motion for Final Approval of Settlement, Plan of Allocation, Award of Attorneys' Fees and Expenses, and

Award to Lead Plaintiffs Pursuant to 15 U.S.C. §78u-4(a)(4) ("Lead Plaintiffs' Decls."), submitted herewith.

7.     Lead Plaintiffs and Lead Counsel achieved the proposed Settlement after nearly two years of litigation, during which time Lead Plaintiffs and Lead Counsel, *inter alia*:

(a)     successfully moved for appointment as Lead Plaintiffs and appointment of Robbins Geller as Lead Counsel in August 2022;

(b)     conducted an extensive pre-filing investigation of information regarding Pega, culminating in the filing of the comprehensive Consolidated Amended Complaint for Violations of the Federal Securities Laws (ECF 61) ("Complaint") in October 2022;

(c)     fully briefed and substantially defeated Defendants' motion to dismiss the Complaint in May 2023;

(d)     fully briefed class certification;

(e)     conducted extensive party and non-party discovery, involving the exchange of multiple sets of document requests and interrogatories, and the production to Lead Plaintiffs of over 263,000 documents (over 1.8 million pages);

(f)     prepared to take various fact witness depositions, including of the Defendants, current and former Pega employees, and the lead audit partner from Pega's external auditor, Deloitte;

(g)     responded to Defendants' various document requests and interrogatories;

(h)     engaged in numerous lengthy and contentious disputes over fact discovery, including with respect to the substantive and temporal scope of document discovery, Defendants' assertions of attorney work product over documents and information withheld from their productions; and

- 3 -

4858-1853-1282.v1

(i)      fully briefed two motions to compel Defendants' production of discovery.

8.      The substantial fact discovery, motion practice, and other efforts outlined herein informed Lead Plaintiffs and Lead Counsel of their case's strengths and its potential weaknesses. Lead Plaintiffs and Lead Counsel considered this and other relevant information in determining the best course of action for the Settlement Class.

9.      The Settlement is also the product of the Settling Parties' extensive arm's-length negotiations, which were facilitated by mediator John Van Winkle and conducted by experienced counsel on both sides with a deep understanding of the factual and legal issues in this case.

10.      Lead Plaintiffs also seek approval of the proposed Plan, which Lead Counsel submits is fair and reasonable.  Lead Counsel developed the Plan with the assistance of Lead Plaintiffs' damages and loss causation expert, Professor Steven P. Feinstein, Ph.D., CFA.  As further described below and in the Notice of Pendency and Proposed Settlement of Class Action (the "Notice"), the Plan provides formulas for calculating the recognized claim of each Settlement Class Member, based on such information as when the Settlement Class Member purchased and sold Pega common stock on the open market.  Each Authorized Claimant, including the Lead Plaintiffs, will receive a *pro rata* distribution pursuant to the Plan, and Lead Plaintiffs will be subject to the same formula for distribution of the Net Settlement Fund.  Importantly, the Plan does not treat the Lead Plaintiffs or any other Settlement Class Member preferentially.

11.      Lead Counsel prosecuted the Litigation on a wholly contingent basis, advancing and incurring substantial litigation expenses and costs since 2022.  Lead Counsel shouldered substantial risk in doing so, and, to this date, has not received any compensation for its efforts.  Accordingly, in recognition of Lead Counsel's extensive efforts and the result achieved on behalf of the Settlement

Class, Lead Counsel is applying for an award of attorneys' fees in the amount of 30% of the Settlement Amount, plus interest accrued thereon.

12.     As set forth in the accompanying Memorandum of Law in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Expenses and Awards to Lead Plaintiffs Pursuant to 15 U.S.C. §78u-4(a)(4) (the "Fee Memorandum"), the requested fee is within the range of fees awarded in PSLRA securities class action settlements, and is fully justified in light of the substantial benefits conferred on the Settlement Class, the substantial risks undertaken, the quality of representation, and the nature and extent of the legal services Lead Counsel performed in this complex litigation.  While the time to object to the fee and expense application has not expired, it is my understanding that to date, no objections have been received.  Lead Counsel submits that the fee application is fair to the Settlement Class, under all applicable standards, and warrants the Court's approval.

13.     Lead Counsel also seeks an award in the amount of $420,336.79[2] (plus interest accrued thereon) for expenses and costs reasonably and necessarily committed to the prosecution of the Litigation.  These expenses include: (i) the fees and expenses of experts whose services were required for the successful prosecution and resolution of this case; (ii) photocopying, imaging, shipping, and managing a database of over 263,000 documents; (iii) online factual and legal research; and (iv) mediation expenses.  As described in detail below, these expenses were reasonably and necessarily incurred to, *inter alia*, develop and plead Lead Plaintiffs' claims with particularity, brief the motion to dismiss, to pursue and compel discovery, and to pursue certification of the Settlement Class, and obtain a settlement on the terms proposed.

14.     Finally, in connection with their representation of the Class, Lead Plaintiffs seek an award of $2,000 for each of the Lead Plaintiffs and an additional $9,947.30 for the out-of-pocket

---

[2]     This includes $718.40 in expenses of Liaison Counsel.

4858-1853-1282.v1

legal expenses incurred by one of the Lead Plaintiffs, for a total $13,947.30, pursuant to 15 U.S.C. §78u-4(a)(4).  Lead Plaintiffs actively monitored Lead Counsel's progress and the events in this case.  Lead Plaintiffs also dedicated time and resources to participating in discovery, which included gathering documents and information responsive to Defendants' discovery requests, monitoring Lead Counsel's prosecution of Lead Plaintiffs' and the Settlement Class' claims, and approving the ultimate settlement.

## II.    HISTORY OF THE ACTION

15.    This Litigation was highly contentious.  Defendants mounted vigorous challenges at the pleading and class certification stages, and the parties clashed numerous times over the scope of fact discovery.  Due to the extent of the disputes and communications, thousands of hours of attorney and staff time were required to obtain and review the documents responsive to discovery requests, compel the production of sufficient information in response to discovery requests, and prepare for depositions.

16.    Voluminous communications were exchanged between Lead Counsel and Defendants' Counsel regarding the disputes that arose during the pendency of the case, including numerous disputes over discovery.  The parties engaged in extensive meet and confers regarding Defendants' productions of documents responsive to Lead Plaintiffs' discovery requests, as well as regarding disputes concerning the search methods and parameters Defendants used to identify and produce responsive documents, Defendants' responses to interrogatories, and Defendants' assertions of attorney work product over information sought in discovery.

17.    These efforts, described in more detail below, contributed to the thousands of hours of attorney and staff time that were needed to pursue relevant discovery, prepare this case for summary

judgment and trial, and develop Lead Plaintiffs' claims in the manner that led the mediator to propose, and the Settling Parties to agree to, the proposed Settlement.

### A.    The Funds Are Appointed Lead Plaintiffs

18.    On May 19, 2022, City of Fort Lauderdale Police and Firefighters' Retirement System filed the initial complaint in this action in the United States District Court for the Eastern District of Virginia.  ECF 1 (22-CV-578).  Shortly thereafter, putative class members filed four competing motions seeking appointment as lead plaintiff pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA").  ECFs 15, 18, 19, 25 (22-CV-578).  Following the transfer of this litigation to this District, on August 9, 2022, Magistrate Judge Levenson appointed the Funds as Lead Plaintiffs and approved the Funds' selection of Robbins Geller as Lead Counsel.  ECF 40.

### B.    The Complaint, the Court's MTD Order, and Defendants' Answer to the Complaint

19.    In preparation for filing a consolidated complaint, Lead Counsel analyzed years of Pega's public filings with the U.S. Securities and Exchange Commission (the "SEC"), media reports, analyst reports, earnings and industry call transcripts, and trading data.  Lead Counsel's pre-filing investigation also included identifying, collecting, and reviewing significant volumes of court records from the trade secret misappropriation action between Appian Corporation ("Appian") and Pega, *Appian Corporation v. Pegasystems Inc., et al.*, Civil Action No. 2020-07216 (Circuit Court of Fairfax County, Virginia) (the "Virginia Action").  These materials included assorted pleadings, hearing transcripts, deposition and trial testimony, deposition and trial exhibits, pre-trial and trial records, and other filings from the Virginia Action.

20.    On October 18, 2022, following Lead Counsel's extensive investigation and synthesis of the facts collected and analyzed, Lead Plaintiffs filed the 97-page Complaint, alleging violations of §§10(b) and 20(a) of the Exchange Act.  In summary, the Complaint alleges that the Defendants

- 7 -

violated the securities laws by making materially false and misleading misstatements and omissions pertaining to the Virginia Action and the alleged trade secret misappropriation, including statements: (i) regarding Pega's competition and sales and marketing practices; (ii) concerning Pega's and its competitors' intellectual property, and Pega's exposure to intellectual property infringement claims; (iii) that the Virginia Action was "without merit," that Pega had "strong defenses," and that Appian's alleged damages were not supported; (iv) in Pega's Code of Conduct, and regarding Pega's compliance with legal and ethical guidelines; and (v) in Defendants' Sarbanes-Oxley certifications.

21.     The Complaint alleges Defendants' actions caused Pega's stock to trade at inflated prices, causing economic harm to Settlement Class Members when the true facts regarding the alleged misstatements and omissions were revealed through a series of partial corrective disclosures on: (i) February 16, 2022, when Pega publicly disclosed the existence of the Virginia Action, while also stating that Appian's claims were "without merit," that Pega had "strong defenses to these claims," and that Appian's claimed damages were "not supported"; (ii) May 9, 2022, when Pega announced that a Virginia jury had found Pega liable to Appian for over $2 billion for willfully and maliciously violating the Virginia Uniform Trade Secrets Act, and that Pega had violated the Virginia Computer Crimes Act; and (iii) September 16, 2022, when the Virginia court entered judgment against Pega affirming the $2 billion verdict and awarding Appian approximately $24 million in attorneys' fees and costs, as well as post-judgment interest of approximately $122 million annually.

22.     Defendants moved to dismiss the Complaint on December 19, 2022, raising various challenges under Federal Rule of Civil Procedure 9(a) and the PSLRA.  ECF 64.  Among other things, Defendants challenged whether the Complaint adequately alleged materiality, falsity, scienter, and loss causation.  ECF 65.  Lead Plaintiffs prepared and filed an opposition to

4858-1853-1282.v1

Defendants' motion on February 17, 2023 (ECF 71), and Defendants replied on April 3, 2023 (ECF 72).  Following oral argument, the Court denied, in large part, Defendants' motion from the bench on May 17, 2023, and further explained its ruling in a July 24, 2023 written opinion.  ECF 92.  The Court only granted the motion to dismiss for defendant Stillwell.

23.     Shortly after the Court upheld Lead Plaintiffs' claims against Pega and CEO Trefler, the parties filed a proposed case management order on May 31, 2023.  ECF 78.  Defendants answered the Complaint on June 30, 2023, substantially denying Lead Plaintiffs' allegations and asserting approximately twenty-five affirmative and other defenses.  ECF 87.  On July 24, 2023, the Court issued a case management order which included a schedule for fact and expert discovery, briefing on class certification and summary judgment, and other pre-trial and trial deadlines.  ECF 93.

### C.     Lead Counsel Pursues Evidence of the Alleged Fraud Through Fact Discovery

24.     Fact discovery began shortly after the Court upheld the Complaint.  Fact discovery in this case was complex, voluminous, and replete with technical, legal, and accounting-related subject matters.  Fact discovery included: (i) various sets of document requests and interrogatories; (ii) over 40 third-party document subpoenas; (iii) the production to Lead Plaintiffs of over 263,000 documents (over 1.8 million pages), including large volumes of discovery, deposition, expert, and trial materials from the Virginia Action; and (iv) noticing and preparing for the fact depositions of defendants Pega and Trefler, and other Pega employees and various non-parties.

#### 1.     Requests for Documents

25.     Lead Counsel crafted and propounded two sets of document requests (totaling 44 requests) on Defendants, seeking various categories of documents necessary for proving the alleged fraud and its impact on Pega's share price.  On June 2, 2023, Lead Plaintiffs served their First

- 9 -

Request for Production of Documents to Defendants, containing 31 requests regarding various aspects of Lead Plaintiffs' claims.  Defendants served responses and objections to Lead Plaintiffs' document requests on July 14, 2023.  Lead Plaintiffs propounded a second set of document requests on July 25, 2023, to which Defendants responded and objected on August 24, 2023.

26.     Over the course of several months, the Settling Parties conferred extensively over the requests and Defendants' objections, engaging in significant telephonic conferrals and written exchanges regarding Lead Plaintiffs' requests and the scope of Defendants' productions.  The matters on which the Settling Parties conferred included, without limitation, the temporal and substantive scope of Defendants' document production in response to the requests, the identities of the custodians and sources whose documents would be searched, the search terms and other parameters Defendants would employ in identifying responsive materials, Defendants' assertions of privilege or work product over information withheld from discovery, and the timing of Defendants' productions of documents and privilege logs in this case.

27.     On August 10, 2023, Defendants served discovery requests on Lead Plaintiffs regarding, *inter alia*, Lead Plaintiffs' transactions in Pega common stock, and the various allegations in the Complaint.  Lead Plaintiffs drafted and provided responses and objections to these discovery requests on September 22, 2023.  On August 18, 2023, Defendants propounded sets of document requests on third-party investment advisors and consultants who managed Lead Plaintiffs' investments.

28.     In all, Defendants and non-parties (*see infra* ¶43) produced over 263,000 documents (totaling more than 1.8 million pages) to Lead Plaintiffs in this Litigation.  To effectively prosecute this complex case, Lead Counsel organized and executed a careful review of these documents by a team of skilled attorneys.  The fact that these documents featured technological, legal, and

- 10 -

accounting-based subject matters increased the challenges Lead Counsel faced in efficiently and intelligently analyzing and synthesizing their contents.

29.     In addition, Lead Plaintiffs prepared to take dozens of depositions, including of defendant Trefler and other Pega employees.  Lead Counsel expended substantial efforts identifying relevant deponents, and searching for, identifying, and analyzing documents that could be used during depositions or otherwise utilized in preparing for them.

30.     Lead Counsel faced additional challenges due to delays in Defendants' document productions, caused in part by technological issues Pega experienced in the course of its document production.  Notwithstanding such delays, Lead Counsel capably and efficiently reviewed large volumes of documents in compressed time-frames.

31.     Lead Counsel's pursuit of discovery from numerous third parties is discussed in detail further below.

32.     Lead Counsel achieved the $35,000,000 Settlement in large part because Lead Counsel was capable of amassing voluminous evidence of the alleged fraud and was preparing to use that evidence during depositions and to present that evidence at summary judgment and trial.

### 2.     Interrogatories

33.     Fact discovery also included several sets of interrogatories between the parties.  On July 11, 2023, Lead Plaintiffs served their First Set of Interrogatories to Defendants, which sought specific information regarding certain defenses asserted in Defendants' Answer.  Defendants provided objections and responses to the interrogatories on August 10, 2023, and, following the parties' conferral over those responses, provided supplemental responses to the interrogatories on August 25, 2023.  On August 2, 2023, Lead Plaintiffs served their Second Set of Interrogatories to Defendants, seeking information regarding the members of Pega's Disclosure Committee.

4858-1853-1282.v1

Defendants provided objections and responses to this second set of interrogatories on September 1, 2023. Lead Plaintiffs served their Third Set of Interrogatories to Defendants on January 26, 2024, seeking information relevant to Lead Plaintiffs' accounting-based allegations and other facets of the alleged fraud. Defendants provided objections and responses to this third set of interrogatories on February 26, 2024.

34. On January 10, 2024, Defendants served interrogatories on Lead Plaintiffs, principally regarding their transactions in Pega common stock. Lead Counsel prepared and served detailed responses and objections to the interrogatories on February 9, 2024.

### 3. Discovery Disputes with Defendants

35. Numerous disputes arose during the fact discovery phase of this Litigation, requiring extensive written correspondence, telephonic conferrals, and hours upon hours of negotiations between the parties. While the parties resolved many of these disputes through conferral, others could not be resolved and were brought before the Court via motion practice. Set forth below are examples of some of the significant disputes that arose during fact discovery.

### a. Disputes over the Scope of Discovery

36. The parties engaged in extensive conferral over the scope of the documents and electronically stored information ("ESI") Defendants searched in response to Lead Plaintiffs' document requests, including the document custodians, search terms, time periods, and other parameters Defendants employed in searching for responsive information. To provide some context, in the course of negotiations over the scope of Lead Plaintiffs' document requests, the parties exchanged proposed lists of search terms and custodians that Defendants would utilize in searching for responsive documents. Notwithstanding months of negotiations over the parties' respective proposals and counter-proposals, the parties were unable to reach an agreement with respect to the

4858-1853-1282.v1

search parameters. The parties were also unable to agree on whether two of Pega's in-house lawyers would be included as document custodians, and whether Defendants would employ certain steps to search for and produce so-called "point-in-time" attachments from the relevant period.

37.     Unable to resolve their disagreements regarding these issues, on January 12, 2024, Lead Plaintiffs moved to compel Defendants to search the files of various custodians using a defined list of search terms, including the files of two of Pega's in-house lawyers, and collect and produce point-in-time attachments from the relevant period. ECF 115. On February 27, 2024, the Court granted in part and denied in part Lead Plaintiffs' motion. ECF 132.

**b.      Disputes over Documents Concerning the SEC's Investigation of Pega**

38.     The parties also clashed over Lead Plaintiffs' request for documents regarding the SEC investigation into Pega's accounting for its litigation with Appian Corporation.

39.     By way of background, Pega publicly announced on April 26, 2023 that the SEC was investigating Pega's accounting treatment of its litigation with Appian Corporation. One of Lead Plaintiffs' initial document requests (Request No. 5) specifically sought documents regarding the SEC's investigation of Pega. Defendants initially refused to produce materials in response to Request No. 5, but in the course of the parties' conferral, offered to produce certain responsive documents that were dated prior to the date on which the Complaint was filed (*i.e.*, October 18, 2022). The parties continued to disagree on whether Defendants should also produce documents responsive to Request No. 5 that were dated after October 18, 2022.

40.     Despite significant written and telephonic conferral over the issue, the parties were unable to reach an agreement, prompting Lead Plaintiffs to file a motion to compel on November 27, 2023. ECF 103. The parties reached an agreement in principle to resolve this Litigation before the Court issued a ruling on Lead Plaintiffs' motion.

- 13 -

### c.    Disputes over Other Discovery-Related Issues

41.    The parties met and conferred extensively over various other discovery-related disputes.  As one example, a dispute arose concerning Defendants' assertions of attorney work product over information that was produced in discovery by Pega's external auditor, Deloitte.  Pega had asserted work product protection over various documents that Deloitte had produced to Lead Counsel in response to a document subpoena.  Lead Counsel disputed Pega's assertions of work product over the Deloitte documents, and the parties engaged in substantial written and telephonic conferral over the matter, including regarding the bases for Pega's assertions of work product over the withheld information, whether the work product protection applied and had been waived, and whether the parties could agree on a framework for the production of the withheld information.  In the course of their conferral, the parties negotiated the terms of a Joint Stipulation and Proposed Rule 502(d) Order, pursuant to which the withheld information would be produced to Lead Plaintiffs.  The parties filed the Joint Stipulation and Proposed Rule 502(d) Order on February 20, 2024, which the Court entered as an order on February 22, 2024.  ECFs 130, 131.

42.    The parties also conferred extensively over a dispute regarding the factual bases of Defendants' defenses, including whether (and when) Defendants were obligated to disclose to Lead Plaintiffs whether Defendants were relying on the advice or involvement of counsel as part of their defenses in this case.  In addition, the parties also engaged in disputes over the timing of Defendants' production of privilege logs, the sufficiency of Defendants' responses to Lead Plaintiffs' interrogatories, the parameters of the parties' negotiated Electronic Discovery Protocol (ECF 97), and the specific language that would be included in the parties' Proposed Stipulated Protective Order (ECF 95).  In connection with each of these disputes, as well as several others that arose, Lead Counsel zealously prosecuted the Settlement Class' interests by drafting, reviewing, and responding

- 14 -

to voluminous communications between the parties, as well as preparing for and engaging in scores of lengthy meet and confer sessions.

###    D.    Discovery from Non-Parties

43.    In addition to seeking party discovery, Lead Counsel also identified various non-parties they believed were most likely to possess relevant information regarding the allegations in the Complaint, the alleged fraud's impact on the market for Pega's shares, and the factual bases for Defendants' defenses.   In total, Lead Counsel pursued documents from over 40 non-parties, including: (i) Appian Corporation; (ii) Youyong Zou, Pega's co-defendant in the Virginia Action; (iii) Deloitte; (iv) former employees of Pega that testified in deposition(s) or at trial in the Virginia Action regarding their personal knowledge of the alleged trade secret misappropriation; (v) a member of Pega's Board of Directors, and the chairperson of Pega's Audit Committee, during the Settlement Class Period; (vi) investor and public relations firms Pega retained during the relevant period; and (vii) securities and market analysts who reported on Pega during the relevant time period, including J.P. Morgan, JMP, Morgan Stanley, RBC Capital Markets, William Blair, and Wedbush.

44.    With regard to each of these non-parties, Lead Counsel prepared and propounded document requests seeking information which could be used to support Lead Plaintiffs' claims and/or address Defendants' defenses.   Once the non-party document requests had been crafted and served on the non-party, Lead Counsel would thereafter assess any written responses and objections of the non-party to the document requests, meet and confer with the non-party's counsel regarding the objections and responses as needed, negotiate the substantive and temporal scope of the non-party's document production, and receive and review the voluminous document productions from the non-parties.

4858-1853-1282.v1

**E.**     **Lead Plaintiffs Move to Certify the Class**

45.     On December 12, 2023, Lead Plaintiffs moved to certify this action as a class action, appoint Lead Plaintiffs as Class Representatives, and appoint Robbins Geller as Lead Counsel pursuant to Rule 23 of the Federal Rules of Civil Procedure.  ECF 108.  Among other things, Lead Plaintiffs' motion detailed how all five of the *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) factors – which courts routinely consider in addressing class certification – were met, and how damages could be measured on a class-wide basis consistent with Lead Plaintiffs' theory of liability. ECF 109.  In connection with the motion, Lead Counsel retained the services of Crowninshield Financial Research, Inc. and its founder, Steven P. Feinstein, Ph.D., CFA, to provide economic analysis in support of the motion, opine as an expert on market efficiency, and explain that damages could be measured on a class-wide basis consistent with Lead Plaintiffs' theory of liability.

46.     On February 28, 2024, Defendants filed their opposition to Lead Plaintiffs' motion for class certification, arguing, *inter alia*, that the motion should be denied because damages could not be measured on a class-wide basis.  In opposing the motion, Defendants submitted the expert report of Amy Hutton, Ph.D. ("Hutton").  ECF 134.  In her 23-page report, Dr. Hutton sought to rebut Dr. Feinstein's conclusion that damages could be measured on a class wide basis consistent with Lead Plaintiffs' theory of liability.  ECF 135-1.

47.     On March 3, 2024, Lead Plaintiffs filed their reply brief in support of their motion for class certification, addressing and disputing Defendants' various arguments against class certification.  ECF 137.  Lead Plaintiffs included with their reply the rebuttal report of Dr. Feinstein, in which he evaluated and responded to the analyses in Dr. Hutton's February 28, 2024 report.  Lead Plaintiffs also continued preparing for oral argument on their motion, which was set for March 7, 2024.  ECF 124.  The Parties reached an agreement in principle to resolve this action on March 4,

- 16 -

2024, and advised the Court of this agreement the next day.  ECF 139.  As a result, the Court took the oral argument off calendar.  *Id.*

III.    **THE SETTLEMENT**

48.    The Settlement recovery of $35,000,000 for the benefit of the Settlement Class was the result of extensive arm's-length negotiations between the Settling Parties, provides the Settlement Class with an immediate substantial benefit, and eliminates the significant risks Lead Plaintiffs faced in further litigating this case toward summary judgment, trial, and post-trial appeals. Lead Counsel believes the Settlement is fair, reasonable, and an excellent result for Settlement Class Members, considering the risks Lead Plaintiffs faced in obtaining, and subsequently protecting, a jury verdict in their favor.

A.    **Reaching the Settlement**

49.    In early 2024, the Settling Parties engaged mediator John Van Winkle to facilitate settlement discussions between the parties.  As part of their settlement discussions, the Settling Parties attended an in-person meditation session with Mr. Van Winkle in Boston, Massachusetts on February 27, 2024.  In advance of that session, Lead Counsel drafted and provided to Defendants and Mr. Van Winkle a comprehensive mediation statement outlining the alleged fraud.  In preparing their mediation statement, Lead Counsel meticulously surveyed the voluminous documents that Defendants and non-parties had produced in discovery, many of which Lead Counsel highlighted in the mediation statement as support for Lead Plaintiffs' claims.  Defendants, meanwhile, submitted their own mediation statement, emphasizing what they perceived to be the strengths of their defenses and the weaknesses in Lead Plaintiffs' case.  These mediation statements presented the Settling Parties and the mediator with a thorough set of arguments regarding the strengths and the weaknesses of the case.

4858-1853-1282.v1

50.     Although the Settling Parties made good progress during the in-person mediation, they were unable to reach a resolution of the Litigation on February 27, 2024.  Following the in-person mediation, Mr. Van Winkle facilitated further negotiations between the Settling Parties, and on March 1, 2024, Mr. Van Winkle submitted a mediator's proposal to settle the action for $35,000,000.  The Settling Parties accepted the mediator's proposal late in the day on March 4, 2024, and promptly informed the Court of the agreement in principle to settle the action on March 5, 2024.

51.     Thereafter, the Settling Parties negotiated the specific terms of the Settling Parties' Stipulation of Settlement.  On April 23, 2024, Lead Plaintiffs filed their unopposed motion for preliminary approval of the Settlement, a copy of the Stipulation of Settlement, and other materials which Lead Plaintiffs proposed for providing notice of the Settlement to the Settlement Class.  ECFs 141-143.  On May 15, 2024, this Court granted preliminary approval of the Settling Parties' Settlement, approved the form and manner of notice to the Settlement Class, preliminarily certified the Settlement Class for settlement purposes, and scheduled the final approval hearing for September 19, 2024.  ECF 147.

### B.     Reasons for the Settlement

52.     Lead Plaintiffs and Lead Counsel both strongly endorse the Settlement.  Lead Plaintiffs are sophisticated institutional investors who have actively overseen the prosecution of this Litigation since 2022.  Lead Counsel, meanwhile, specializes in complex securities litigation, and is highly experienced in such litigation.  *See* Declaration of Debra J. Wyman Filed on Behalf of Robbins Geller Rudman & Dowd LLP in Support of Application for Award of Attorneys' Fees and Expenses ("Wyman Declaration"), Ex. E.  Based upon the evidence obtained in discovery, as well as the investigation, research, analyses, and motion practice conducted, Lead Counsel and Lead

Plaintiffs believed in the strength of their claims.  Lead Counsel and Lead Plaintiffs also recognized there were significant risks and uncertainties that had to be carefully evaluated in determining what course (*i.e.*, whether to settle and on what terms or whether to continue to litigate through trial and beyond) was in the best interest of the Settlement Class.  Based on their considerable experience in complex securities litigation, and knowledge of the case from having litigated the matter since 2022, Lead Counsel and Lead Plaintiffs determined that the Settlement for $35,000,000 was in the best interest of the Settlement Class.

53.    Lead Plaintiffs faced an assortment of risks and uncertainties if this case had proceeded to summary judgment, trial, a judgment, and appeal.  One such risk concerned the amount of damages, if any, that Lead Plaintiffs would recover following a jury verdict.  Under prevailing case law, damages under §10(b) may be reduced or eliminated if a portion or all of the alleged damages are attributable to causes other than the misstatements or omissions.   In this case, Defendants contended that factors other than the alleged misstatements and omissions caused Lead Plaintiffs' alleged losses.  For instance, Defendants argued: (i) Pega's contemporaneous disclosure of low earnings and revenue reports on February 16, 2022 – not the alleged fraud – caused Pega's stock price decline on February 17, 2022; and (ii) Pega's stock price declines following Pega's disclosures on May 9 and September 16, 2022, were simply the result of bad news about a matter that had already been disclosed (*i.e.*, the Virginia Action).  Lead Plaintiffs expected Defendants to emphasize this defense at trial, and presented with such a defense, a jury may have concluded that Lead Plaintiffs were entitled to far less than their estimated damages – or no damages at all.

54.    In addition to challenging loss causation and damages, Defendants were also expected to contend at trial that their alleged misstatements and omissions were neither materially misleading, nor made with scienter.  To support their position, Defendants likely would have argued at trial that

Pega never corrected, retracted, or restated its publicly-issued statements or financial results issued during the Settlement Class Period, and that Deloitte neither resigned as Pega's auditor nor withdrew its unqualified audit opinions issued during the Settlement Class Period.

55.     Meanwhile, based on the Defendants' Answer and prior briefing, and on deposition and trial testimony from the Virginia Action, Defendants were expected to testify at trial that Pega had acted appropriately, that the conduct by Pega as alleged by Appian did not violate Pega's Code of Conduct, and that Pega was not obligated to publicly disclose the existence of the Virginia Action prior to February 2022.  Additionally, Defendants' Answer specifically disputed that the "features and functionality of Appian's platform" constitute "trade secrets."  ECF 87 at 103.  Therefore, Lead Plaintiffs expected Defendants and witnesses that had been implicated in the alleged conduct against Appian, to testify at trial that none of the information Pega obtained from Appian or Zou constituted "trade secrets."

56.     Lead Plaintiffs also expected Defendants to present evidence that Pega's outside and in-house counsel, as well as Deloitte, had reviewed and/or approved Defendants' public statements regarding the Virginia Action, including Defendants' statements on February 16, 2022 disclosing the Virginia Action.  Moreover, based on Defendants' Answer and other materials reviewed in discovery, Lead Plaintiffs expected Defendants to argue at trial that they had relied in good faith on Pega's professional advisers throughout the Settlement Class Period, and therefore did not act with the requisite state of mind.

57.     Based on the history of the case, Lead Plaintiffs expected Defendants to lean heavily on these and other themes at trial, posing a real risk that one or more of the themes would gain traction with a jury and result in a verdict in Defendants' favor.

- 20 -

58.     The multi-billion dollar judgment pending against Pega from the Virginia Action presented another substantial risk to the Settlement Class' recovery of damages following a jury trial in this case.   In September 2022, Appian obtained a judgment against Pega for $2.036 billion in damages, nearly $24 million in attorneys' fees and costs, and post-judgment interest accruing at 6% annually (approximately $122 million per year).   This jury verdict equates to approximately 59% of Pega's then market capitalization of approximately $3.4 billion, and approximately 300% of Pega's then current assets of approximately $660 million.   The sheer size of this judgment put Pega's viability at some risk.   Pega appealed this judgment to the Virginia Court of Appeals, which heard oral argument in November 2023.   On July 30, 2024, the Virginia Court of Appeals set aside the verdict and ordered a new trial, overturning the prior judgment.   Appian has announced its intent to appeal the ruling to the Supreme Court of Virginia and seek to reinstate the verdict.   Pega, therefore, remains exposed to a potential multi-billion dollar judgment.   Should Pega ultimately fail to significantly reduce or nullify this potential liability, Pega's ability to fund that judgment in addition to a judgment following a trial in this case would be uncertain.

59.     The fact that Pega employs or employed many of the key witnesses in this case posed another considerable risk to bringing this case to trial.   For example, many of the Pega officers and executives identified in the Complaint (including Kerim Akgonul, Leon Trefler, Don Schuerman, Ken Stillwell, and Benjamin Baril), as well as other witnesses Lead Plaintiffs expected to testify in this matter, remain employed by – and receive substantial compensation from – Pega.   Given that many of the key witnesses had testified in the Virginia Action, Lead Counsel can anticipate how those same witnesses would likely testify in this case.   Based on these and other factors, Lead Counsel expected these witnesses to testify in Pega's favor at trial.

60.     At the time the Settlement was reached, risks to recovery for the Settlement Class also included the following: (i) the risk the Settlement Class would not be certified in whole or in part. Certification of a litigation class is never guaranteed; even if the Court were to certify a litigation class, Defendants may later have moved to decertify the class or sought to shorten the class period; (ii) the risk at summary judgment that the Court would dismiss certain of the alleged misstatements on the grounds that they were inactionable forward-looking statements, puffery, or statements of opinion; (iii) the risk that expert testimony or important factual evidence would be limited or excluded at trial; and (iv) the risk, in what was certain to be a heated "battle of the experts," that the jury would find Defendants' experts more credible than Lead Plaintiffs', potentially undermining Lead Plaintiffs' ability to prove the elements of their claims or resulting in a damages award of minimal or no value.

61.     In summary, while Lead Plaintiffs had developed strong evidence and expected to continue developing such evidence through the completion of discovery and at trial, they faced both factual and legal challenges in presenting this matter to a jury and potentially on appeal.  The Settlement eliminates these and other risks, enabling the Settlement Class to recover substantial monetary compensation, while avoiding continued litigation and the unpredictability of summary judgment or a jury trial.

## C.     The Plan of Allocation

62.     The proposed Plan was developed by Dr. Feinstein under the oversight of Lead Counsel based on his event study and analysis of the movement of Pega common stock during the

4858-1853-1282.v1

Settlement Class Period.[3]  The Plan is intended to fairly apportion the net proceeds of the Settlement based on the alleged inflation and subsequent declines in Pega's common stock price.

63.     In summary, Dr. Feinstein employed generally accepted and widely used methodologies in order to determine how much artificial inflation resided in Pega's stock price on each day of the Settlement Class Period.  Dr. Feinstein reached this determination by measuring how much the stock price: (i) was inflated as a result of alleged misrepresentations and omissions; and (ii) declined as a result of disclosures that corrected the alleged misrepresentations and omissions.

64.     The Plan estimates the amount of alleged artificial inflation in the price of Pega common stock that was proximately caused by Defendants' materially false and misleading statements and omissions.  In calculating the estimated artificial inflation allegedly caused by the misrepresentations and omissions, Dr. Feinstein considered price changes in Pega common stock related to the alleged misrepresentations and omissions and adjusted the price change for factors that were attributable to market or industry forces and for non-fraud-related, Pega-specific information, if any.

65.     Under the Plan, for each Settlement Class Period purchase or acquisition of Pega common stock that is properly documented, a "Recognized Loss Amount" will be calculated according to the formulas described in the Notice.  As set forth in greater detail in the Notice, the calculation of a claimant's Recognized Loss Amount is based upon a formula that takes into account such information as: (i) when a claimant's share was purchased, acquired, and sold; (ii) the amount of the alleged artificial inflation per share; (iii) the purchase price of the share; and (iv) the purchase

---

[3]     The summary of the Plan provided herein is intended only to explain the basis on which the Plan was developed in order to assist the Court in evaluating the fairness, reasonableness, and adequacy of the proposed Settlement.  Nothing set forth herein is intended to, or does, modify or affect the interpretation of the Plan, which is set forth in full in the Notice and will be applied by the Claims Administrator according to its express terms.

4858-1853-1282.v1

price minus the average closing price for Pega common stock during the 90-day look-back period described in the PSLRA (15 U.S.C. §78u-4(e)). Because the alleged corrective disclosures reduced the artificial inflation in stages over the course of the Settlement Class Period, the damages suffered by any particular claimant may vary.

66.     Based on Lead Counsel's experience in this and other securities actions, its understanding of the factual circumstances giving rise to this action, and the risks at trial, including the risks as to both liability and damages, Lead Counsel believes the Plan provides a fair, reasonable, and adequate method of compensating Settlement Class Members for the economic harm they suffered as a result of the alleged fraud.

## IV.     LEAD COUNSEL'S APPLICATION FOR ATTORNEYS' FEES AND EXPENSES IS REASONABLE

67.     The successful prosecution of this Litigation required Lead Plaintiffs' Counsel and their staff to perform more than 13,500 hours of work, valued at over $8.2 million and incur $420,336.79 in expenses, as detailed in the accompanying declarations in support of the application for an award of fees and expenses.

68.     Based on its extensive efforts on behalf of the Settlement Class, including those described herein, Lead Counsel is applying for compensation from the Settlement Fund on a percentage basis in the amount of 30% of the Settlement Fund, and for $420,336.79 in litigation expenses, plus interest at the same rate and for the same time as that earned on the Settlement Fund. In addition, Lead Plaintiffs seek an award of $13,947.30 in total, pursuant to 15 U.S.C. §78u-4(a)(4), in connection with Lead Plaintiffs' representation of the Settlement Class. In consideration of the points and authorities set forth in the Fee Memorandum, Lead Counsel and Lead Plaintiffs respectfully submit that the fees and expenses described above should be granted.

4858-1853-1282.v1

A.     **Application for Attorneys' Fees**

1.     **The Requested Fee of 30% of the Settlement Fund Is Fair and Reasonable**

69.     For their extensive efforts on behalf of the Settlement Class, Lead Counsel is applying for compensation from the Settlement Fund on a percentage basis.  As set forth in the accompanying Fee Memorandum, the percentage method is the appropriate method of fee recovery because, among other things, it aligns the lawyers' interest in being paid a fair fee with the interest of the Settlement Class in achieving the maximum recovery in the shortest amount of time required under the circumstances.  Courts throughout the First Circuit have applied the percentage-of-recovery method in awarding fees, and the percentage sought is merited in this case in light of the effort required and the results obtained.

70.     The fact that Lead Counsel was able to obtain an exceptional result for the Settlement Class supports the requested fee.  As explained in the Fee Memorandum, the $35,000,000 cash Settlement equates to nearly four times the median settlement value for securities fraud cases settled in the first half of 2024.[4]  *See* Fee Memorandum at 7.  A 30% fee is fair and reasonable for attorneys' fees in common fund cases such as this, and is well within the range of the percentages typically awarded in securities class actions in the First Circuit.  *See* Fee Memorandum at 5-6.

2.     **The Complexity and Risks Inherent in the Litigation**

71.     The requested fee is also reasonable in light of the various risks Lead Plaintiffs faced litigating the case, as well as the complexity of the Litigation and the factual issues it entailed.  As set forth above, Lead Counsel vigorously prosecuted the Settlement Class' claims for nearly two years and against a top-tier law firm.  In doing so, Lead Counsel engaged in substantial briefing of

---

[4]     *See* Edward Flores and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2024 H1 Update* at 16, fig. 14 (NERA Aug. 6, 2024), attached hereto as Exhibit A.

- 25 -

complex legal and factual issues on motions to dismiss, to compel fact discovery, and to certify the Settlement Class.  Moreover, given the nature of Lead Plaintiffs' allegations and the Virginia Action's subject matter (an intellectual property dispute involving the highly-technical software platforms of two large corporations), Lead Counsel was tasked with analyzing and digesting substantial volumes of documents covering myriad technological, legal, and accounting-based topics and concepts.

72.     The requested fee is also reasonable in light of the substantial risks identified above at ¶¶53-60.  Had the parties not reached a settlement, Lead Plaintiffs risked an adverse ruling on their pending motion for class certification, and even if the Court had certified the class, Defendants might have tried to unwind the Court's decision by seeking an appeal pursuant to Federal Rule of Civil Procedure 23(f).

73.     In light of the complexity of the factual and legal issues presented in the Litigation, the substantial risks that Lead Plaintiffs faced, and the other factors described in the accompanying Fee Memorandum, Lead Counsel submits that the requested 30% fee is fair, reasonable, and should be approved.

**3.     The Contingent Nature of the Fee and the Financial Burden Shouldered by Lead Counsel**

74.     Lead Counsel prosecuted this Litigation on an "at-risk" contingent-fee basis.  At the outset in 2022, Lead Counsel knew it was embarking on complex and expensive litigation with no guarantee of compensation for the time, money, and effort it intended to pour into this case over its lifespan.  Accordingly, Lead Counsel fully assumed the risk of an unsuccessful result, and has received no compensation for services rendered or the significant expenses incurred in litigating this action.

- 26 -

75.     In undertaking the responsibility for prosecuting the Litigation, Lead Counsel assured that sufficient attorney resources were dedicated to advancing Lead Plaintiffs' and the Settlement Class' claims, and that sufficient funds were available to advance the expenses required to zealously pursue such complex litigation.  Lead Plaintiffs' Counsel have received no compensation to date and seek $420,336.79 in litigation expenses incurred in prosecuting this Litigation for the benefit of the Settlement Class.

76.     Lead Counsel also shouldered the risk that no recovery would be achieved.  Lead Counsel knows from experience that success in contingent-fee litigation is never assured, and that the commencement of a securities class action in no way guarantees a recovery.  Instead, it takes diligence, commitment, and years of tireless work by skilled counsel to develop the facts, theories, and evidence necessary to prevail on the merits.  Even after such efforts, a case can be dismissed or a jury trial lost.

77.     Courts have repeatedly held it is in the public interest to have experienced and able counsel enforce the securities laws.  Vigorous private enforcement of the federal securities laws can only occur if private plaintiffs – particularly institutional investors like Lead Plaintiffs here – can obtain some parity in representation with that available to large corporate defendants.  If this important public policy is to be carried out, courts should award fees that will adequately compensate private plaintiffs' counsel, taking into account the enormous risks inherent in prosecuting securities class actions on a contingent-fee basis.

### 4.     The Standing and Expertise of Lead Counsel

78.     Lead Counsel is among the most experienced and skilled securities litigation law firms in the field, as illustrated by Lead Counsel's firm biography attached as Exhibit E to the Wyman Declaration.  Indeed, Lead Counsel has consistently obtained significant recoveries for

4858-1853-1282.v1

defrauded investors, including in: *In re Enron Corp. Sec. Litig.*, No. H-01-3624 (S.D. Tex.) (recovering in excess of $7.2 billion for investors); *Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc., et al.*, No. 02-C-05893 (N.D. Ill.) (largest securities class action recovery following a trial: $1.575 billion); *In re Am. Realty Cap. Props., Inc.*, No. 1:15-mc-00040 (S.D.N.Y.) (recovering $1.025 billion for investors); *In re Dell Techs. Inc. Class V Stockholders Litig.*, No. 2018-0816 (Del. Ch.) (recovering $1 billion, the largest recovery in a securities case in any State court in the nation); *In re UnitedHealth Grp., Inc. PSLRA Litig.*, No. 06-CV-1691 (D. Minn.) (recovering over $925 million); and *In re HealthSouth Corp. Sec. Litig.*, No. CV-03-BE-1500-S (N.D. Ala.) (obtaining a combined recovery of $671 million).

79.     The quality of work Lead Counsel provided in attaining the Settlement should also be evaluated in light of the quality of opposing counsel in this Litigation.  Over the course of the Litigation, Defendants were well-represented by various attorneys from the law firm of WilmerHale.  Moreover, in defending against Lead Plaintiffs' claims, Pega possessed the capability of leveraging the institutional knowledge of its attorneys in the Virginia Action.  Faced with knowledgeable, experienced, and formidable opposing counsel, Lead Counsel were nonetheless able to develop a strong case and persuade Defendants to settle the action for $35,000,000.

### 5.     The Settlement Class' Reaction to Date to the Settlement

80.     The Notice advises the Settlement Class that Lead Counsel intends to request an award of attorneys' fees in an amount not to exceed 33% of the Settlement Amount and for payment of litigation expenses reasonably incurred not to exceed $450,000, plus interest on both amounts.  The Notice also advised of Lead Plaintiffs' intent to apply for an award (pursuant to 15 U.S.C. §78u-4(a)(4) in an amount not to exceed $20,000 in the aggregate.  The Notice provided Settlement Class Members until August 29, 2024 to submit objections to Lead Counsel's fee and expense application.

- 28 -

While the time to object to the fee and expense application has not expired, it is my understanding that to date, no objections have been received.  Furthermore, only one request for exclusion has been received to date, and that was from an individual who is not a member of the Class.

      **B.**     **Application for Litigation Expenses, Charges, and Costs**

     81.     Lead Plaintiffs' Counsel request $420,336.79 for expenses, charges, and costs reasonably and necessarily incurred in prosecuting Lead Plaintiffs' claims for the past two years. Lead Plaintiffs' Counsel respectfully submit that this amount is appropriate, fair, and reasonable and should be approved.

     82.     Since 2022, we knew we may never recover any of the expenses we incurred in prosecuting this case.  Lead Counsel also understood that, even assuming the case was ultimately successful, an award of expenses would not compensate it for the lost use of the funds they had dedicated to this Litigation.  Accordingly, Lead Counsel was motivated to, and did, take steps to minimize expenses where practicable without jeopardizing the vigorous and efficient prosecution of this Litigation.

     83.     As set forth in the Wyman Declaration, the expenses, charges, and costs incurred were necessary and appropriate in light of the complex nature of the action and were associated with, among other things, retaining and working with experts and consultants, service of process, online legal and factual research, and mediation.

     84.     Lead Plaintiffs Central Pennsylvania Teamsters Pension Fund - Defined Benefit Plan and Central Pennsylvania Teamsters Pension Fund - Retirement Income Plan 1987 seek an award of $2,000 for the Funds' time overseeing this Litigation, and Construction Industry Laborers Pension Fund seeks an award of $2,000 for the Fund's time overseeing this Litigation and $9,947.30 to reimburse the Fund for the amount it paid to its regular outside counsel for its work advising the

- 29 -

Fund about this Litigation (for a total of $11,947.30), pursuant to 15 U.S.C. §78u-4(a)(4), for their time and efforts relating to their representation of the Settlement Class.  In addition to monitoring the developments in the Litigation, Lead Plaintiffs dedicated time and resources to gathering documents and information responsive to Defendants' discovery requests, monitoring Lead Counsel's prosecution of Lead Plaintiffs' and the Settlement Class' claims, and approving the ultimate settlement. *See* Lead Plaintiffs' Decls., submitted herewith.

## V.   CONCLUSION

85.     In light of the $35,000,000 Settlement obtained, the substantial risks Lead Counsel faced, the exceptional quality of Lead Counsel's work, the contingent nature of the requested fee, and the substantial complexity of the case, as described above and in the accompanying memoranda in support of their motions, Lead Plaintiffs and their counsel respectfully submit that the Court should approve the Settlement and Plan as fair, reasonable, and adequate, and approve Lead Counsel's application for an award of attorneys' fees and expenses, and an award to Lead Plaintiffs in accordance with 15 U.S.C. §78u-4(a)(4).

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 15th day of August, 2024, at New York, New York.

*s/ Chad Johnson*
CHAD JOHNSON

4858-1853-1282.v1

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 15, 2024.

*/s/ Chad Johnson*
CHAD JOHNSON